# Exhibit A

DEPOSITION OF OFFICER PHILLIP WOOLEY

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--o0o--

AG.G. a minor, by and through )
his guardian ad litem, JESSICA )
AQUINO; AR.G., a minor, by and )
through his guardian ad litem, )
JESSICA AQUINO; KARLA GONSALEZ )
individually; and AUGUSTIN     )
GONSALEZ, JR., individually,   )
                               )
              Plaintiffs,      )
                               )
        vs.                    )CASE NO.: 4:19-cv-00697 DMR
                               )
CITY OF HAYWARD, a municipal   )
corporation; MARK KOLLER,      )
individually; PHILLIP WOOLEY,  )
individually; MICHAEL CLARK,   )
individually; TASHA DECOSTA,   )
individually; and DOES 1-100,  )
inclusive,                     )
                               )
              Defendants.      )
_____)          CERTIFIED COPY

DEPOSITION OF OFFICER PHILLIP WOOLEY

TUESDAY, MARCH 24, 2020

REPORTED BY:  LISA M. BOSCHETTI-MAURINO, CSR #9389

1

DEPOSITION OF OFFICER PHILLIP WOOLEY

1      A.    Yes, sir.

2      Q.    All right.  Now when you were in the police

3   academy back in 1989, did you receive training on

4   responding to mentally impaired subjects?

5      A.    I don't recall.

6      Q.    Okay.  Are you familiar with that term,

7   "mentally impaired subjects"?

8      A.    Yes, sir.

9      Q.    Okay.  What does that mean, based on your

10   understanding?

11      A.    My understanding of a mentally impaired

12   subject would be someone who has some sort of mental

13   illness which is causing them to act out.

14      Q.    Okay.  And -- well, part of your job being a

15   police officer is that you receive refresher training,

16   what, annually?

17      A.    We -- at the Hayward Police Department we get

18   90 hours a year in training, in-house, and then you can

19   also have other outside training that comes up.

20      Q.    Okay.  And the training that you get

21   in-house -- or strike that.

22          The training that you get through Hayward

23   Police Department includes refresher training on

24   subjects like respond -- responding to mentally impaired

25   subjects, correct?

12

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1      Q.    Okay.  Now -- and I assume that you went

2   through Taser training again when you were issued the

3   next Taser?

4      A.    We have ongoing Taser training.

5      Q.    Oh, so it's not just when you get the Taser,

6   but it's continued -- well, not continuous, but ongoing?

7      A.    Yes, sir.

8      Q.    Is that part of the perishable skills

9   training?

10     A.    No.  California posts their minimum standard

11  is 24 hours every two years.  Our department does 90

12  hours every year.

13     Q.    Okay.

14     A.    And our captain is very strict about it being

15  mandatory and you must go.

16     Q.    Which captain is that?

17     A.    Captain Deplitch.

18     Q.    Can you --

19           THE REPORTER:  Can you spell that.

20           MR. NISENBAUM:  Q.  -- the last name?

21     A.    D-e-p-l-i-t-c-h.

22           THE REPORTER:  Thank you.

23           MR. NISENBAUM:  Q.  Okay.  And within those 90

24  hours annually, that's -- does that include Taser

25  training?

                                                         29

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1     A.     Usually.   We -- it's always broken up, too,

2  and we have pursuit training, range training, and we --

3  at the end of every year we have what's called a force

4  options training; it's a 10-hour training block where we

5  do scenario-based training.   And you might have to use a

6  Taser in the scenario, you might have to use a baton,

7  you might have to use deadly force; it just depends upon

8  the scenario and how it unfolds.

9     Q.     Okay.   Now, you're familiar with the term

10  "edged weapon"?

11     A.     Yes, sir.

12          MR. VIGILIA:   Objection.   Lacks foundation.

13          MR. NISENBAUM:   Q.   What does that mean?

14     A.     An edged weapon can be a variety of things; it

15  can be a knife, obviously, it can be a machete, it can

16  be a meat cleaver.

17          I'm sorry, am I talking loud enough?

18          THE REPORTER:   Yeah.

19          THE WITNESS:   You want me to talk louder?

20          THE REPORTER:   Yeah.

21          THE WITNESS:   It could be a box cutter, it

22  could be a knitting needle, it can be an ice pick, it

23  can be a screwdriver.

24          MR. NISENBAUM:   Q.   You mentioned box cutter.

25  What is a "box cutter"?

30

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

 1   you think that Mr. Gonsalez was approaching you with a

 2   knife?

 3        A.    Yes, I did.

 4        Q.    Okay.  Did you see a knife?

 5        A.    I saw something, I wasn't quite sure what it

 6   was.

 7        Q.    Okay.  And your vision is fine, right?

 8        A.    That is correct.

 9        Q.    And what time of day did this happen?

10        A.    It was nighttime.

11        Q.    Okay.  Was there lighting on Mr. Gonsalez?

12        A.    There was from the headlights of my car, the

13   patrol car.

14        Q.    Okay.  And the knife that you thought you saw,

15   describe what you thought you saw.

16        A.    I saw a quick glint of some -- something that

17   was metallic.  But you also have to understand what was

18   going on at the time, there was a lot of fires up in

19   California, and the skies were -- or the skies.  I'm

20   sorry.  It was a very dark area, and it was very, I

21   don't know what words you want to use, but alot of the

22   dust and the fallout from the fires were also in the

23   air, so it made vision a little bit worse.

24        Q.    Well we have video camera footage of the

25   incident, so -- but we can see with our own eyes what it

                                                        44

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1    testimony.

2              THE WITNESS:  My eyesight vision was fine.

3              MR. NISENBAUM:  Q.  Okay.

4         A.    But the way the suspect came at me, I could

5    not completely identify what was in his hands --

6         Q.    Did he --

7         A.    -- because his hands were cupped together.

8         Q.    Did he run at you?

9         A.    He did not run.  He walked at a fast pace.

10        Q.    Okay.  Have you been trained that

11   redeployment, meaning changing your location is an

12   option to consider?

13             MR. VIGILIA:  Objection.  Lacks foundation.

14             Go ahead.

15             THE WITNESS:  It is an option to consider,

16   yes.  However, in this particular case, it was not an

17   option.

18             MR. NISENBAUM:  Q.  We'll get to that.  I'm

19   just asking you about your training.

20        A.    Okay.

21        Q.    So "redeployment," meaning changing your

22   location is an option to consider?

23        A.    Yes.

24             MR. VIGILIA:  Objection.  Lacks foundation.

25             MR. NISENBAUM:  Q.  And when you have multiple

                                                        46

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

```
 1  and you announced that you saw a knife at the scene,
 2  correct?
 3            MR. VIGILIA:  Objection.  Misstates the
 4  testimony.  Lacks foundation.
 5            MR. NISENBAUM:  Well, I'll strike that.
 6      Q.    Didn't you announce to other officers that
 7  he's got a knife --
 8            MR. VIGILIA:  Objection.
 9            MR. NISENBAUM:  Q.  -- meaning -- referring to
10  Mr. Gonsalez?
11            MR. VIGILIA:  Objection.  Leading.
12            THE WITNESS:  No, I did not.
13            MR. NISENBAUM:  Q.  What did you say?
14      A.    I told --
15            MR. VIGILIA:  Objection.  Lacks foundation.
16            MR. NISENBAUM:  Q.  Go ahead.
17      A.    I told Mr. Gonsalez to drop the knife.
18      Q.    Drop the knife.
19            Okay.  So describe to me, you said you saw
20  a -- a quick glint of something metallic.  What size was
21  the glint that you saw?
22      A.    I could not tell you.
23      Q.    Was it small; was it like an inch,
24  inch-and-a-half, or less than that?
25      A.    Again, I could not tell you.
```

48

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1      Q.    Okay.  Tell me to the best of your
2  recollection, was it a foot long?
3      A.    No.
4      Q.    Okay.  Was it six inches long?
5      A.    No.
6      Q.    Okay.  Was it three inches long?
7      A.    It could have been.
8      Q.    Okay.  And what did you do to get a better
9  view of that?
10      A.    I didn't do anything.
11      Q.    Okay.  You stood in place, correct?
12      A.    Correct.
13      Q.    Okay.  And when you saw it, where was it?
14      A.    In his hands.
15      Q.    Which hand?
16      A.    That, I couldn't tell you.
17      Q.    Okay.  And his hands were clasped over each
18  other, correct?
19      A.    That is correct, sir.
20      Q.    And were his hands up high, like in a stabbing
21  motion towards you?
22      A.    They were pointing directly at me, so not high
23  in a stabbing motion, no.
24      Q.    Weren't they waist height?
25            MR. VIGILIA:  Objection.  Lacks foundation.

                                                    49

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1    Assumes facts not in evidence.

2              THE WITNESS:  Could have been.

3              MR. NISENBAUM:  Q.  Okay.  You've watched the

4    video prior to this deposition, correct?

5              MR. VIGILIA:  Objection.  Leading.

6              THE WITNESS:  Probably not in a year.

7              MR. NISENBAUM:  Q.  Okay.  What did you do to

8    prepare for this deposition?

9         A.    I spoke --

10             MR. VIGILIA:  Objection.

11             MR. NISENBAUM:  Q.  I'm not entitled to the

12   contents of your discussion, but I am entitled to know

13   the materials you reviewed.

14        A.    I spoke with the City attorney.  I reviewed

15   the audio tape.  Since I retired, I could not get into

16   Evidence.com in order to review the videotape, so I

17   didn't get a chance to review that.  And I read Officer

18   Clark's deposition.

19        Q.    Okay.  So you actually know that a lot of

20   these questions are questions that I asked Officer

21   Clark, right?

22        A.    Yes, sir.

23        Q.    Okay.  So you haven't watched the video in

24   more than a year?

25        A.    I would say about a year, yes.

                                                    50

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1    your eyesight is fine, you've told us that, right?

2        A.    Yes.

3        Q.    Okay.  So your eyesight is fine.

4              So what steps did you take to ascertain what

5    the weapon was in his hand before you announced, drop

6    the knife, or after that?

7              MR. VIGILIA:  Objection.  Compound.

8              MR. NISENBAUM:  Q.  Anytime?

9        A.    Again, you're -- you're asking a question

10   that's being taken out of context of something that I

11   can't properly explain without explaining the entire

12   incident.  And every time I try to, you say to me, we'll

13   get to that.

14             MR. NISENBAUM:  Q.  We will get to the entire

15   incident, but this is my deposition, and I ask you the

16   questions that I want to ask you that I think are

17   appropriate.

18             Now you have the view.  I have the view, as

19   well.  And you know what my view is, you've read the

20   depositions, so you know it.

21             Now my question to you is, you get a call that

22   this involves a knife, correct?

23       A.    Yes.

24       Q.    Okay.  You arrive on scene, and you see a

25   person and he's apparently talking to someone,

                                                              63

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1    correct --

2              MR. VIGILIA:  Objection.  Lacks foundation.

3              MR. NISENBAUM:  Q.  -- when you arrive?

4        A.    He wasn't talking to someone.  He was

5    threatening them.

6        Q.    What was he -- was he saying words?

7        A.    I couldn't hear what he was saying, but it

8    looked to me like he was getting ready to stab a lady.

9        Q.    And was the lady saying anything?

10       A.    I couldn't hear what she was saying.

11       Q.    When you say he was getting ready to stab her,

12   was his hand up like this (indicating)?

13       A.    Yes.

14       Q.    Okay.  So his right hand was up?

15       A.    Yes.

16       Q.    Okay.  And did it look like he had a knife

17   protruding out of it?

18       A.    I couldn't see.

19       Q.    Did you see anything coming out of it at that

20   time?

21       A.    No.

22       Q.    Okay.  And so you arrive.  You don't see any

23   weapon at that time, correct?

24              MR. VIGILIA:  Objection.  Vague.

25              MR. NISENBAUM:  Q.  I'm referring to the time

                                                              64

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1   when you said that his right hand was up.

2        A.    You have to understand that when I got out of

3   the patrol car -- when I first arrived and I looked and

4   I saw him, and the other person pointed and said, he's

5   over there, you're talking a span of that quick

6   (indicating).  To me it looked like he was threatening

7   her with a knife.

8        Q.    My question is, did you see a knife?

9        A.    I don't recall.

10       Q.    Well, either you did or you didn't.  If you

11  don't recall, it sounds to me like what you're saying is

12  you have no recollection of seeing a knife?

13       A.    You could say that.

14       Q.    Well, I did say that.  The question is, would

15  you say that?

16       A.    Yes.

17       Q.    Thank you.

18             Not to go "My Cousin Vinny" on you.

19       A.    You can.  It doesn't bother me.

20       Q.    It's all right.  I don't have any mug anyway.

21  Law Offices of Vincent Gambini.

22             Now my question -- so you don't see a knife

23  then.  You know there wasn't a knife at that point,

24  right?  Afterwards, after the fact, we know, correct?

25       A.    Okay.  Say -- rephrase that.

                                                          65

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1      Q.    After the fact, we know that there was not a

2  knife in his hand, correct?

3      A.    After what point are we talking about?

4      Q.    After he was shot.

5      A.    Yes.

6      Q.    Okay.  So you obviously did not see a knife in

7  his hand when you -- when you saw it when you arrived,

8  correct?

9            MR. VIGILIA:  Objection.  Misstates the

10  testimony.

11            MR. NISENBAUM:  Q.  I'm not trying to go 20/20

12  hindsight here after the fact, but I want to deal with

13  reality --

14      A.    That's exactly what you're doing.

15      Q.    No, I want to deal with reality.

16            You're telling me that you don't recall

17  exactly what you saw.

18      A.    What I saw was a man holding up his arm as if

19  he had a knife to stab someone.

20      Q.    Okay.

21      A.    And the only information I had was that he had

22  a knife.

23      Q.    And that -- and you didn't shoot him at that

24  time, correct?

25      A.    No.

66

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1    Q.    So instead of shooting him, you got out of

2    your car, right?

3    A.    Yes.

4    Q.    Okay.   And what did you do?

5    A.    I got out of my car, took out my gun, pointed

6    it at him, and told him to drop the knife.

7    Q.    And who else was present, what other officers?

8    A.    No one.

9    Q.    Okay.   And then he turned away from the person

10   he was talking to?

11          MR. VIGILIA:   Objection.   Lacks foundation.

12          MR. NISENBAUM:   Q.   Well, strike that.   Let me

13   go back.

14          I know that you said that he sounded angry,

15   right?

16          MR. VIGILIA:   Objection.   I don't -- misstates

17   the testimony.

18          MR. NISENBAUM:   Q.   You heard -- you couldn't

19   tell the words that Mr. Gonzalez was saying, but it

20   sounded like he was, what?

21   A.    I didn't hear anything he said at all, so I

22   couldn't tell you if he was angry or not.

23   Q.    Was he yelling?

24   A.    I -- that, I don't recall.

25   Q.    Did you see his face at that time?

67

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1      A.    No.

2      Q.    Okay.  Did you see the other person's face?

3      A.    The girl?

4      Q.    Yeah.

5      A.    Yes.

6      Q.    Okay.  And what did her face look like?

7      A.    Scared.

8      Q.    Okay.  So she looked scared.  And did it look

9  like Mr. Gonsalez was holding on to her?

10     A.    He was -- he did not -- my recollection, he

11 was not touching her.

12     Q.    Okay.  So she looked scared.  But Mr. Gonsalez

13 was not touching her.  How close to her was she -- was

14 he?

15     A.    He was close enough to stab her.

16     Q.    How close was he to her, how many feet?

17     A.    A foot away.

18     Q.    One foot away.

19           Okay.  Because you would agree, I'm close

20 enough to stab you, right?

21     A.    Uh-huh.

22     Q.    Okay.  All right.  Now you're coming to this,

23 having been primed by the call that says there's a

24 knife, right?

25     A.    Yes.

                                                      68

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1      A.    I just testified, I did.  When I was there, I

2  did.

3      Q.    You testified that you saw him with his hand

4  up.

5      A.    And any reasonable person would think someone

6  was about ready to be stabbed at that point in time.

7      Q.    So you thought he was about to stab her, but

8  he didn't?

9      A.    Yes.

10     Q.    So instead of going after her, what happened?

11     A.    He turned and came after me.

12     Q.    Well, he didn't run after you, right?

13     A.    He walked directly toward me after I told him

14  three times to drop the knife and to stop.

15     Q.    Okay.  Did it appear to you that he was --

16  well, strike that.

17          Wasn't he saying things to you?

18          MR. VIGILIA:  Objection.  Lacks foundation.

19          THE WITNESS:  He said one thing to me that I

20  recall, and that was, you're going to have to shoot me.

21          MR. NISENBAUM:  Q.  You're going to have to

22  shoot me.

23          All right.  So you're going to have to shoot

24  me.  That means that is a person who you -- you would

25  reasonably believe to be suicidal, correct?

71

DEPOSITION OF OFFICER PHILLIP WOOLEY

1      A.    Yes.

2      Q.    Okay.  Did you hear that other officers were

3  saying that they were coming?

4      A.    Yes.

5      Q.    Okay.  So you knew that there were officers on

6  their way?

7      A.    I knew that they were on their way.  When you

8  asked me the original question, I thought you meant,

9  were officers arriving at that moment in time.

10     Q.    That's fine.  I get it.  I -- you know, I want

11  to have a clear record.

12            So -- so you knew that other officers were on

13  their way.  Did you communicate to dispatch further,

14  until you fired shots, up to the point that you fired

15  shots?

16     A.    I said I was on scene, and give me a 10-3, and

17  got out of the car.

18            THE REPORTER:  A 10, what?

19            THE WITNESS:  10-3.  It's a code, it means to

20  clear the radio traffic, so that no one can transmit on

21  that channel, and it's open just for that incident.

22            MR. NISENBAUM:  Q.  And was that before --

23  when you announced that, was that before or after you

24  saw what you thought was Mr. Gonsalez threatening the

25  woman?

75

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1      A.     Before.

2      Q.     Okay.  After you saw Mr. Gonsalez threatening

3   the woman, did you communicate to dispatch that you

4   observed that?

5      A.     No.

6      Q.     Okay.  Did you make any -- you didn't make any

7   further communication to dispatch until after shots were

8   fired, correct?

9            MR. VIGILIA:  Objection.  Leading.

10           THE WITNESS:  That is correct.

11           MR. NISENBAUM:  Q.  You said it was a 10-3?

12     A.     Yes.

13     Q.     Meaning, clear the air?

14     A.     Correct.  It means basically, stop

15   transmitting and -- you know, other agencies do it

16   different, they'll say a Code 33, it's the same thing.

17     Q.     Right.  I was going to ask you, is the

18   Code 33 --

19     A.     It's the same thing, we just use 10-3.

20     Q.     Does that mean, is there a term for "critical

21   incident"?

22     A.     Just critical incident.

23     Q.     Okay.  Did you announce that this was a

24   critical incident?

25     A.     After the shots were fired, yes.

                                                              76

**BARBARA J. BUTLER & ASSOCIATES - Certified Court Reporters**
**1659 Scott Blvd., Suite 15, Santa Clara, CA 95050  -  (510) 83-BUTLER (28853) or (408) 248-BUTLER (2885)**

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1    Q.    Okay.   And before shots were fired, did you

2    announce it was a critical incident?

3    A.    No.

4    Q.    What is the code for a critical incident?

5    A.    We don't have one.

6    Q.    Okay.   Is 10-3, when that's given, when that's

7    requested, 10-3 means clear the air, is that typically

8    considered that a critical incident is occurring?

9    A.    Yes, sir.

10   Q.    Okay.   And about how far was Mr. Gonsalez away

11   from you once you stepped out of your car?

12   A.    That's a really good question.   I'm going to

13   say anywhere from seven, eight yards.

14   Q.    Okay.   And did he notice you immediately?

15   A.    Immediately.

16   Q.    And was that before you gave commands?

17   A.    Yes.

18   Q.    Okay.   Did he -- could you tell that he had

19   noticed you before you even stopped your cr?

20   A.    No --

21   Q.    Okay.

22   A.    -- I couldn't tell.

23   Q.    Okay.   How did you come to believe that he had

24   noticed you?

25   A.    He looked at me, we made eye contact, and he

77

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1    gave me probably the most blackest, blankest stare that

2    I've ever seen in my life.   It almost -- it did, it

3    frightened me the way he looked at me.

4          Q.    You said "blackest" and "blankest"?

5          A.    Yes.   The way I try to describe it to people

6    is he had a plan in his mind.   He was purpose driven,

7    and there was nothing that I could do to get him to

8    change his mind.   That's how he had -- it was just a

9    blank stare on his face.   It was -- again, it was

10   frightening.

11         Q.    Right.   I'm sure you were scared, right?

12         A.    Yes.

13         Q.    Okay.   But you've been trained to respond to

14   these incidents, correct?

15         A.    Yes.

16         Q.    And you've been trained -- I assume, tell me

17   if I'm wrong.   You've been trained throughout your

18   career in how to control fear and panic responses,

19   correct?

20         A.    Yes.

21               MR. VIGILIA:   Objection.   Lacks foundation.

22               MR. NISENBAUM:   Q.   And what do you do in

23   order to control fear and panic responses?

24         A.    The best way to control it is through

25   training.   The more you do scenario-based training, and

78

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

```
 1    you're actually faced with it, the calmer you become.
 2              Not only that, you have to look at the fact
 3    that, you know, we've already talked about how long I've
 4    done this job.  I've been in that situation 200 times,
 5    same exact type of situation.
 6         Q.   Where you've had the blackest, blankest stare
 7    that you've ever seen?
 8         A.   Not that bad.  But someone standing there
 9    holding a knife, or a machete, or a meat cleaver.
10         Q.   Okay.
11         A.   That, I've confronted hundreds of times.
12         Q.   Okay.
13         A.   Guns, baseball bats, crowbars --
14         Q.   Right.
15         A.   -- all of it, you name it.
16         Q.   Right.  And so this was a time when the person
17    was not compliant with your orders?
18         A.   The only time in my career, that's correct.
19         Q.   Okay.  So the difference here -- so every
20    other time -- and I know you said that you've tased
21    people and they've laughed and pulled them out.  But --
22    but were those people who had weapons in their hands?
23         A.   Yes.
24         Q.   Okay.  So you've tased people who have had
25    weapons in their hands?
```

79

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1    A.    Okay.  Any reasonable officer would have done

2  the exact same thing that I did.

3    Q.    I don't think so.  I think no reasonable

4  officer would have.

5          (Reporter admontion.)

6          MR. NISENBAUM:  Q.  Well, my question -- my

7  question to you is, what steps did you take to verify

8  whether or not the weapon in his hand was a knife?

9    A.    Mr. Gonsalez didn't give me enough time to

10  verify anything.

11    Q.    So the answer is no other steps; is that

12  correct?

13    A.    That's correct.

14    Q.    You saw a glinty thing in his hand, and he

15  walked towards you, and you assumed it was a knife, and

16  you shot and killed him?

17    A.    I didn't shoot to kill him.  I shoot him to

18  stop the threat.

19    Q.    Where did you shoot him?  What did you aim

20  for?

21    A.    Center mass of the body.

22    Q.    Okay.  So you shot to kill, correct?

23    A.    No, I did not.

24    Q.    So when you shoot someone, center mass of the

25  body, what -- what do you think is going to happen to

                                                          84

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1  them?

2      A.     I've seen lots of people shot and live.  Lots

3  more people live than actually die.

4      Q.     So you're saying you did not have an intent to

5  kill here?

6      A.     No.

7      Q.     You simply were trying to stop a threat that

8  was moving at what pace towards you again?

9      A.     He was walking fairly quickly.

10      Q.     Quick walk, meaning, I assume that you -- if

11  you wanted to move, you could have moved a lot faster

12  than he was moving towards you, correct?

13          MR. VIGILIA:  Objection.  Incomplete

14  hypothetical.  Calls for speculation.

15          THE WITNESS:  I couldn't move.

16          MR. NISENBAUM:  Q.  Were your feet encased in

17  cement?

18          MR. VIGILIA:  Objection.  Argumentative.

19          THE WITNESS:  The problem that was still going

20  on at that moment in time was I had two other people I

21  had to worry about, the girl and the guy.  If I would

22  have left from where I was, Mr. Gonsalez could have

23  quickly turned and went back and stabbed them.

24          MR. NISENBAUM:  Q.  Well, he didn't quickly

25  turn, correct?

85

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1      Q.    Okay.  But you don't recall listening to see
2  if you could tell how close they were?
3      A.    No.
4      Q.    No, you do not?
5      A.    No, I don't.  I don't recall listen --
6  assessing that at all.
7      Q.    I take it you don't recall assessing the use
8  of other force options short of lethal force, correct?
9           MR. VIGILIA:  Objection.  Misstates testimony.
10  Leading.
11           THE WITNESS:  I didn't have time.
12           MR. NISENBAUM:  Q.  You didn't do it --
13      A.    No --
14      Q.    -- correct?
15      A.    -- because I didn't have time.
16      Q.    My question to you, did you assess whether or
17  not other less lethal options would be viable?
18      A.    Yeah.
19      Q.    You did?
20      A.    I did, yes.
21      Q.    When did you do that, was it before you saw
22  the glinty thing, or after?
23      A.    Driving all the way up from where I was
24  originally all the way up to the call.
25      Q.    Okay.  So in driving, did you think -- what

                                                        93

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1  did you think, how did you make your assessment?

2        A.    What do you mean by that?

3        Q.    Well, you said that you assessed other less

4  lethal force options.  How did you make that assessment?

5        A.    You always think about it.

6        Q.    What did you think about in this case?  Not

7  what you always think about.

8        A.    Taser, 40 millimeter launcher.

9        Q.    Okay.  And did you think Taser check, yes, I

10  have that on me, it's right on my belt here?

11        A.    Yeah, every day I go out.

12        Q.    I'm not asking every day.  I'm asking

13  specifically what you thought on this day, responding to

14  this scene?

15        A.    Yes, sir.

16        Q.    Okay.  So you thought taser.  So you knew you

17  had the taser available, correct?

18        A.    Yes.

19        Q.    And you thought OC spray, you had that

20  available?

21        A.    Yes.

22        Q.    What else did you think?  You said 40

23  millimeter launcher, you didn't have that in your car,

24  correct?

25        A.    I didn't, but I knew a sergeant was

94

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1        Q.     Right.  You're supposed to say -- are there
2    particular words you're supposed to say?
3        A.     No.
4        Q.     Okay.  Well, you could say something like,
5    stop or I'll shoot, right?
6        A.     Yes.
7        Q.     Give a command followed by, or I'll shoot?
8        A.     Yes.
9        Q.     Some people say, or you'll be shot?
10       A.     Yes.
11       Q.     Okay.  Did you think about giving a warning in
12   this situation?
13       A.     That I would shoot him?
14       Q.     Yeah.
15       A.     No.
16       Q.     Okay.  And the reason you didn't give a
17   warning is that because he was already saying, you're
18   going to have to shoot me?
19       A.     Well, no.  It was pretty obvious, I was
20   pointing a gun at him, and I told him to stop.  I told
21   him to drop the knife three times, and stop.  It's
22   pretty obvious what was going to happen next.
23       Q.     Maybe to you, but you're not in his shoes.
24       A.     No.
25       Q.     You don't know whether or not he is suffering

                                                          103

DEPOSITION OF OFFICER PHILLIP WOOLEY

1      A.    Yes.

2      Q.    Okay.  And you said you're stopping in the

3  middle of the street?

4      A.    Yes.

5      Q.    And there was a report over dispatch that the

6  person, what the call was about, still had the knife?

7      A.    Yes.

8      Q.    Okay.  Did that -- did you have an

9  understanding that dispatch was on the phone with the --

10  with the victim, the caller?

11      A.    No.  I was originally told that the phone was

12  put down, and was just left open.

13      Q.    Okay.  Did you have an understanding who

14  dispatch was getting that further information from?

15      A.    No.

16            MR. NISENBAUM:  Okay.  Continuing at 03:41.

17            (Playing video.)

18            MR. NISENBAUM:  Q.  Pausing at 03:44.

19      You stopped your car and you get out, correct?

20      A.    Yes.

21      Q.    Okay.  And the reason why you stopped where

22  you stopped was?

23      A.    Because I could see the person that had the

24  knife up ahead of me, and the girl, like I said, when I

25  got there you can't see it, because of the camera -- the

                                                        112

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1    dashboard's blocking the camera, so you can't see it,

2    but that's when I saw, it looked like he was getting

3    ready to stab her.

4         Q.    Okay.  So let me go right back here.

5               (Playing video.)

6               MR. NISENBAUM:  Q.  Going back about five

7    seconds or so to 03:40.

8               And so at 03:40 we're paused, and you can see

9    that the camera has a view of basically the steering

10   wheel, the dashboard, and the left -- and the front of

11   the driver's side door, correct?

12        A.    That's correct.

13        Q.    Okay.  Is this when you saw him, Mr. Gonsalez

14   holding his -- his arm up?

15        A.    Roughly in this time frame, yes.

16        Q.    Okay.  How long did you observe him in that

17   position?

18        A.    A second, maybe less.

19        Q.    Okay.  And did you see him bring his hand

20   down?

21        A.    No.

22        Q.    Okay.  Did you take your eye off him?

23        A.    As I got out of the car, yes.

24        Q.    You took your eye off him as you got out of

25   the car?

                                                    113

DEPOSITION OF OFFICER PHILLIP WOOLEY

```
 1  girl?
 2       A.    Yes.
 3       Q.    And it looks like she has blonde hair from
 4  here; is that right?
 5       A.    I couldn't tell you.
 6       Q.    Okay.  Your --
 7       A.    I don't recall.
 8       Q.    The resolution.
 9             And there is a distance there, it looks like
10  they are facing each other, correct?
11       A.    Yes.
12       Q.    And there is a distance there of about five
13  feet between them?
14             MR. VIGILIA:  Objection.  Calls for
15  speculation.
16             MR. NISENBAUM:  Q.  It's what it looks like to
17  me, but you tell me.  Does that look about right?
18       A.    That's about right.
19       Q.    Okay.  Continuing at 03:46.
20             (Playing video.)
21             MR. NISENBAUM:  Q.  Okay.  So at 03:47 we're
22  paused.  You yelled, "Put the knife down."
23       A.    Right.  When I got out of the car, he said,
24  "You're going to have to shoot me."
25       Q.    Okay?
```

                                                     115

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1      A.     And then I got out of the car and said, "Put

2   the knife down."

3      Q.    We'll go back and do that.  I'm going to play

4   again from 03:44.

5             (Playing video.)

6             MR. NISENBAUM:  Q.  03:46, there was a voice

7   that said something about, "You're going to have to

8   shoot me."  That was, "You're going to have to shoot

9   me."

10      A.     Uh-huh.

11      Q.    Do you know if he said, they are going to have

12   to shoot me, meaning he was talking to the woman?

13      A.    That --

14             MR. VIGILIA:  Objection.  Calls for

15   speculation.

16             THE WITNESS:  What I heard was, "You're going

17   to have to shoot me."

18             MR. NISENBAUM:  Q.  Okay.  So you thought he

19   was talking to you?

20      A.    Yes.

21      Q.    Okay.  Continuing at 03:46.

22             (Playing video.)

23             MR. NISENBAUM:  Q.  And that's your voice.

24   "Put the knife down."

25      A.    Yes.

116

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1    Q.    Is that the first time we heard you say that?

2    A.    Yes.

3    Q.    Okay.  03:47.

4          We're at 03:47, so he's turned towards you,

5    correct?

6    A.    That is correct.

7    Q.    All right.  And...

8          (Playing video.)

9          MR. NISENBAUM:  Q.  His hands are, where?

10         We're paused now at 03:49.

11         He's walking towards you, correct?

12   A.    Yes.

13   Q.    And where are his hands?

14   A.    Right about waist level.

15   Q.    Okay.  Waist level in front of him, correct?

16   A.    Yes.

17   Q.    All right.  I've told you we would get there.

18   A.    Okay.

19   Q.    And it looks like he's got his hands possibly

20   on top of each other, correct?

21   A.    Could be.

22   Q.    And it looks like he is illuminated here

23   pretty clearly, correct?

24   A.    Yes.

25   Q.    And that's by, is that your headlights?

117

DEPOSITION OF OFFICER PHILLIP WOOLEY

```
1   see the glint of metal, when you first saw it?
2        A.    I don't know if I'm able to see it on video.
3        Q.    Well, I understand.  But maybe the video will
4   refresh your recollection --
5        A.    Okay.
6        Q.    -- as to when you first saw it.
7              (Playing video.)
8              THE WITNESS:  Right about there (indicating).
9              MR. NISENBAUM:  Q.   Okay.  I'm pausing it at
10  03:48.
11             It's blurry right in the video, but right
12  before this is when you saw the glint?
13       A.    Roughly in that time frame, yes.
14       Q.    Okay.  So he had maybe taken a step towards
15  you at the most when you saw the glint?
16       A.    Yes.
17       Q.    Yes?
18       A.    Yes.
19       Q.    Thank you.
20             Continuing -- and now at this time, was your
21  gun in your left hand or your right hand?
22       A.    Right hand.
23       Q.    Okay.  And you had already -- you had already
24  withdrawn it, correct?
25       A.    Yes.
```

122

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1      Q.    All right.   So how many steps did he take

2  towards you?

3      A.    I don't recall.

4      Q.    Was it more than four?

5      A.    I -- I couldn't tell you.

6      Q.    All right.   Let's go back.   Starting again at

7  03:46.

8            And I know you can't tell me, but off the top

9  of your head, but using the video, if you can tell me if

10  it refreshes your recollection as to how many steps he

11  took before you shot him?

12     A.    Okay.

13           (Playing video.)

14           THE WITNESS:   I counted seven.

15           MR. NISENBAUM:  Q.   Me, too.

16           THE REPORTER:   Excuse me?

17           THE WITNESS:   I counted seven.   I'm sorry.

18           MR. NISENBAUM:  Q.   Me, too.

19           And so it's -- how much distance did he

20  cover?

21           MR. VIGILIA:   Objection.   Calls for

22  speculation.

23           MR. NISENBAUM:  Q.   From the time that he

24  turned towards you, to the time that he was shot --

25           MR. VIGILIA:   Objection.   Compound.   Calls for

124

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1    speculation.

2              MR. NISENBAUM:  Q.  -- 10 feet?

3         A.    Sounds about right.

4         Q.    Okay.  And that's your best estimate based on

5    looking at the video, correct?

6         A.    Correct.

7         Q.    And does that comport with your recollection?

8         A.    Yes.

9         Q.    Okay.  And now I want to go back again.

10             We paused at 03:53.  I want to go back to --

11   let's go to 03:46.

12             (Playing video.)

13             MR. NISENBAUM:  Q.  All right.  Pausing at

14   03:46.

15             And this is before Mr. Gonsalez has taken any

16   steps towards you, correct?

17        A.    Yes.

18        Q.    And how far away is he from you at that time?

19             MR. VIGILIA:  Objection.  Calls for

20   speculation.

21             MR. NISENBAUM:  Q.  Best estimate?

22        A.    I think earlier I said eight to ten yards,

23   somewhere right in that range.

24        Q.    Okay.  And does that -- looking at the video,

25   does that comport with your recollection that it was 24

125

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1    to 30 feet?

2        A.    Roughly, yes.

3        Q.    Okay.  I'm just going to say, that could be --

4    it could be 30 feet.

5              All right.  Continuing at 03:46.  So he

6    covered about half the distance before he was shot?

7        A.    (Nods head.)

8              MR. VIGILIA:  Objection.  Calls for

9    speculation.

10             MR. NISENBAUM:  Q.  Let's see.  So note where

11   he is there 03:46.

12             THE REPORTER:  Excuse me?

13             MR. NISENBAUM:  Q.  Note where Mr. Gonsalez is

14   at 03:46 before he's taken any steps.

15             (Playing video.)

16             MR. NISENBAUM:  Q.  All right.  And that's

17   03:51 I paused it at.

18             He had been shot.  He doesn't move forward

19   after he's been shot, correct?

20       A.    Correct.

21       Q.    So moves a little bit sideways to his left if

22   he were facing you, correct, after he had been shot?

23       A.    Yes, correct.  Yes.

24       Q.    Okay.  And that was about half the distance

25   that he covered --

                                                          126

DEPOSITION OF OFFICER PHILLIP WOOLEY

```
1
2
3           I certify (or declare) under penalty of
4      perjury under the laws of the State of California that
5      the foregoing is true and correct.
6
7      Executed at_____on_____.
8                    (Place)              (Date)
9
10
11     _____
12         Signature of Deponent OFFICER PHILLIP WOOLEY
13
14                        --o0o--
15
16
17
18
19
20
21
22
23
24
25
                                                         150
```

DEPOSITION OF OFFICER PHILLIP WOOLEY

```
1                    REPORTER CERTIFICATE
2         I, Lisa M. Boschetti-Maurino, hereby certify that
3    the witness in the foregoing deposition was by me placed
4    under oath to testify to the truth, the whole truth and
5    nothing but the truth in the within-entitled cause; that
6    said deposition was taken at the time and place therein
7    named; that the testimony of said witness was reported
8    by me, a certified shorthand reporter and a
9    disinterested person, and thereafter transcribed into
10   typewriting.
11        Pursuant to Federal Rule 30(e), transcript review
12   was requested.
13        I further certify that I have no interest in the
14   outcome of this action.  And I further certify that I am
15   not of counsel or attorney for either or any of the
16   parties to said deposition, nor in any way interested in
17   the outcome of the cause named in said caption.
18
19        In witness whereof, I have hereunto set my hand
20
21   this 3rd day of April 2020.
22
23
24   ___/s/Lisa M. Boschetti-Maurino_____
     Certified Shorthand Reporter
25   State of California, CSR#9389
```

                                                       151

DEPOSITION OF OFFICER PHILLIP WOOLEY

```
1                         WITNESS LETTER

2    TO:  Officer Phillip Wooley            Date: 04.03.20
          c/o Michael G. Vigilia, Sr. Asst. City Attorney
3         CITY OF HAYWARD                   Depo: 03.24.20
          777 B Street                      Ref. #20032413
4         Hayward, CA  94541

5    RE: AG.G...J.Aquino; K.Gonsalez v. City of Hayward, et al.

6    Dear Officer Wooley:

7         Please be advised that the transcript of your
     deposition taken in the above matter has been completed
8    and is now available at this office for your reading and
     signing.
9         Please contact our office between the hours of 9:30
     a.m. and 5:00 p.m. Monday-Friday, to schedule an
10   appointment.  Or, if you prefer, contact the attorney to
     review and sign the copy of your deposition under penalty
11   of perjury.
          Read the transcript making any changes necessary.
12   In making any changes, please use the following guide:
          1. DO NOT WRITE on the original transcript.
13        2. SIGN UNDER PENALTY OF PERJURY at the end of the
             Deposition on the Certificate of Witness Page.
14        3. List each change on the Deposition Errata Sheet
             following this page. Signature is required at
15           the bottom of the Errata Sheet.
          4. Forward the signed Certificate of Witness Page
16           and signed Errata Sheet in addition to a copy of
             this letter to:
17                   Barbara J. Butler & Associates
                     Certified Court Reporters
18                   P.O. Box 3508, Santa Clara, CA  95055
                     (510) 832-8853 or (408) 248-2885.
19        Upon receipt of items requested in this letter, I
     will forward copies of same to all Counsel.
20        In the event you have not reviewed you deposition
     within 35 days or by trial date, whichever is sooner, the
21   original transcript will be sealed pursuant to applicable
     laws and thereafter mailed to the deposing attorney.
22
                          Sincerely,
23
                          /s/Barbara J. Butler
24                        Barbara J. Butler, CSR

25   cc:  All Counsel
                                                         152
```