# Exhibit B

**DEPOSITION OF OFFICER MICHAEL CLARK**

```
                IN THE UNITED STATES DISTRICT COURT

           IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

                          --oOo--

AG.G. a minor, by and through )
his guardian ad litem, JESSICA)
AQUINO; AR.G., a minor, by and)
through his guardian ad litem,)
JESSICA AQUINO; KARLA GONZALEZ)
individually; and AUGUSTIN    )
GONSALEZ, JR., individually,  )
                              )
              Plaintiffs,     )
                              )
          vs.                 )CASE NO.: 4:19-cv-00697 DMR
                              )
CITY OF HAYWARD, a municipal  )
corporation; MARK KOLLER,     )
individually; PHILLIP WOOLEY, )
individually; MICHAEL CLARK,  )
individually; TASHA DECOSTA,  )
individually; and DOES 1-100, )
inclusive,                    )
                              )
              Defendants.     )
_____)       CERTIFIED COPY




                DEPOSITION OF OFFICER MICHAEL CLARK

                  TUESDAY, JANUARY 28, 2020







        REPORTED BY:  ANGELICA R. GUTIERREZ, CSR NO. 13292
```

1

**DEPOSITION OF OFFICER MICHAEL CLARK**

1    stopped and similar commands, in totality constituted

2    the warning, correct?

3        A.   Yes, exactly.

4        Q.   Now, you have been trained in how to respond

5    to mentally impaired subjects, correct?

6        A.   Yes, I have.

7        Q.   And subjects who exhibit signs of mental

8    problems, correct?

9        A.   Yes, I have.

10       Q.   Okay.  And you've also been trained in how to

11   respond to subjects who exhibit symptoms of suicide by

12   cop, correct?

13       A.   Correct.

14       Q.   Okay.  And you have no training that says that

15   if a person is exhibiting signs of suicide by cop that

16   it's okay to then shoot them, correct.

17       A.   I'm sorry.  Can you repeat the question?

18       Q.   You don't have any training that says if a

19   subject is exhibiting suicide by cop that it is okay to

20   then shoot them?

21            MR. VIGILIA:  Objection, incomplete

22   hypothetical.

23            THE WITNESS:  Scenarios change.  Situations

24   change.  Trainings -- it's all scenario-based and it's

25   subjective to that actual particular incident at the

77

DEPOSITION OF OFFICER MICHAEL CLARK

1    he supposes can be reduced or mitigated substantially

2    by stepping back that you should do that as opposed to

3    shooting the subject?

4        A.   Objection.  Lacks foundation, incomplete

5    hypothetical.

6        Q.   If it's safe to do so, and it doesn't put the

7    lives of someone else in danger, then if that's a

8    possibility use to advantage to deescalate the

9    situation, I think that's a good practice to get into.

10       Q.   Okay.  Not just that it's a good practice,

11   you've been trained that you should do that, correct?

12   If it's reasonable?

13       A.    If it's reasonable and, again, if no one's

14   life is in danger, there's no immediate threat to

15   somebody, and the situation allows for that, then yes,

16   it's a good thing to do.

17       Q.   Okay.  And you have been trained in

18   deescalation, correct?

19       A.   Yes.

20       Q.   You have been through the ACIT training?

21       A.   I believe so, yes.

22       Q.   Okay.  Did you review that in preparation for

23   your deposition?

24       A.   Just in talking with my attorney about things.

25   So.

87

**DEPOSITION OF OFFICER MICHAEL CLARK**

1    Q.   Okay.  And what was your first notification of

2  this incident?

3    A.   There was a notification via dispatch with a

4  three tone beat.   Three beat tone.

5    Q.   Which means?

6    A.   It's a sound that the radio makes when there's

7  a critical incident taking place.

8    Q.   So this was considered a critical that you

9  were going to respond to?

10   A.   It was by the -- it was broadcasted that way

11 by the tones, yes.

12   Q.   Okay.  And once you heard the tone, I take it

13 you paid closer attention?

14   A.   Correct.

15   Q.   And what was the substance of what you heard

16 next after you heard the tone?

17   A.   That there was a man armed with a knife

18 threatening people?

19   Q.   Okay.  Are you familiar with the term

20 "swatting".

21   A.   Swatting or squatting?

22   Q.   Swatting.

23   A.   Swatting?

24   Q.   Yes.

25   A.   Like, as in what reference?

132

**DEPOSITION OF OFFICER MICHAEL CLARK**

1     Q.   You attached yourself to the call, correct?

2     A.   Yes.  Let -- let me redirect.  I don't

3  remember if they gave a height or weight of the

4  suspect.  I know they gave a vague description that he

5  was Hispanic and what he was wearing.  I don't know if

6  they gave descriptors.

7     Q.   Okay.  So you put yourself on the call,

8  correct?

9     A.   Yes.

10     Q.   That means that dispatch didn't ask you to

11  respond.  You did it -- you initiated your response?

12     A.   That is correct.

13     Q.   Okay.  And did you receive further information

14  prior to when you arrived?

15     A.   I received information that the location the

16  subject with the knife had changed from Orchard and

17  O'Neil to an address specifically on O'Neil.

18     Q.   Okay.  And you were familiar with the area?

19     A.   I am.

20     Q.   And is it a high-crime area?

21     A.   It is.

22     Q.   And did that heighten your sense of danger?

23     A.   Yes.

24     Q.   Why?

25     A.   Because I -- because like you said, it's a

136

1    A.    Yes.

2    Q.    And was likely on-scene if she was getting

3  flagged down?

4    A.    That she was on-scene.  I don't know she was

5  responding, but it made sense that she was on-scene, so

6  she was there.

7    Q.    Okay.  And you understood that Wooley was

8  getting flagged down as well, correct?

9    A.    I believe someone was getting flagged down.  I

10  know that both of them -- I believe one was getting

11  flagged down.

12    Q.    Okay.  And once you got onto O'Neil and drove,

13  you saw a police car that was parked on the side of the

14  road, correct?

15    A.    In the middle of the road.

16    Q.    Oh, in the middle of the road.  Your interview

17  says -- after going northbound onto O'Neil, it says, "I

18  drove.  I saw a police car parked along the side of the

19  road and an unintelligible was in it, and I got to

20  another police car, I believe was Officer Wooly's, and

21  I that's when I got out of the car, and I see Officer

22  Wooley off to my left, and I didn't see Sergeant

23  DeCosta.  I don't know where she was at that particular

24  point.  I knew she was there, but I didn't -- like, I

25  don't remember where she was in proximity to us."  Is

139

**DEPOSITION OF OFFICER MICHAEL CLARK**

1    that an accurate reflection of your memory?

2         A.    The car was offset.   The car was off to the

3    side of the road for the most part, but still on the

4    road.   It wasn't onto, like, closest to the curb or

5    sidewalk.

6         Q.    Okay.   Fair enough, but you understood that

7    Sergeant DeCosta and Officer Wooley were there,

8    correct?

9         A.    I I knew that Officer Wooley was there.   I

10   knew that Sergeant DeCosta was in the area.   I don't

11   know where she was at.

12        A.    Did you have an understanding that someone was

13   getting information -- gathering information about what

14   happened?

15        A.    Someone as in who?

16        Q.    One of the officers present.

17        A.    We're all -- were all gathering information as

18   we got on-scene one way or the other.

19        Q.    Okay.   Did you review the -- the CAD on your

20   way over?

21        A.    Did I or can I?

22        Q.    Did you.

23        A.    On the way to the call?

24        Q.    Yes.

25        A.    No, I didn't.   I didn't -- I was striving.

                                                        140

**DEPOSITION OF OFFICER MICHAEL CLARK**

```
 1    to put them in and annotate them into your detail.
 2         Q.   Okay.  Up until point when shots were fired,
 3    can you tell me what you had heard over the radio ?
 4         A.   Sure.  I got dispatched to a man that was
 5    brandishing a knife and threatening people with a
 6    knife.  Hispanic male, blue jeans, and a red, possibly
 7    black colored shirt at O'Neill and Orchard.  I
 8    continued to here that there was still an ongoing
 9    situation, had not solved itself, meaning that there
10    was still a need for us to respond.  As I got closer to
11    the scene, there was people -- I heard that there was
12    people -- I heard that there was updates of people
13    being flagged down, that the address had actually
14    changed to a physical address, or at least in front of
15    one, and that -- but at that time, I got out, I
16    ascertained the situation and made the decision, based
17    on my training and experience, what I perceived to be
18    my partner in immediate, bodily harm.  And I feared for
19    his death and his safety, so therefore I made the
20    decision, which I'm trained to do, which I realized at
21    the time was a need for a lethal force situation.
22         Q.   You never saw anything in mister -- when you
23    say -- strike that.  When you say you got out and saw
24    your -- your fellow officer and you were in fear of his
25    safety, and you did what you were trained to do, what
```

146

**DEPOSITION OF OFFICER MICHAEL CLARK**

1    you mean is you started shooting, correct?

2        A.    Not without --

3              MR. VIGILIA:   Objection, argumentative.

4              MR. NISENBAUM:   Q.   Okay.   What did -- what do

5    you mean?   You said you did what you were trained to

6    do?

7        A.    Sure.   Based on the information that I had, I

8    saw a man who matched the description who was -- I

9    heard in the -- the seven seconds that this whole event

10   unraveled, unfolded, there were -- I heard commands

11   that my partner was giving, which I believe to be a

12   warning and a command at the same time because, as I

13   mentioned earlier, requesting someone and showing the

14   gun -- pointing a gun at someone and telling them to

15   stop is as much an equal warning as it is a command.

16   And he was directly making pre-threat indicators

17   towards my partner as he walked towards him, and I

18   believed he was armed with a knife, so therefore,

19   because my partner's life was in jeopardy, I discharged

20   my firearm to stop the threat.

21       Q.    And so you shot him?

22       A.    I did.

23       Q.    Okay.   How many times?

24       A.    Three?   Two or three.   Somewhere around there.

25       Q.    And at the time that you shot him, you saw

147

**DEPOSITION OF OFFICER MICHAEL CLARK**

1        A.   There's no such thing as "well-lit" in the

2    dark, whether you have lights or not.

3        Q.   So your --

4        A.   You're well-lit.  You are well-lit, but if we

5    take the light out of this room and it's dark outside

6    and I put a flashlight on you, a spotlight, or

7    headlights on you, you're -- I can see you.  Doesn't

8    mean you're well-lit.

9        Q.   Could you see his hands?

10       A.   I could see his hands.

11       Q.   Was there any objects in his hands?

12       A.   I didn't see any objects in his hands, but he

13   was presenting his hands in a way as if he had

14   something --

15       Q.   Show me how he was presenting them.

16       A.   Something along the lines of this.

17       Q.   Please stand and show me.  He wasn't sitting,

18   was he?

19       A.   He wasn't sitting.  So, he had his hands out,

20   for the court purposes.

21       Q.   You're holding your hands together, you're

22   collapsing -- and I take it you have the correct hands,

23   if you can recall?

24       A.   It wouldn't really matter to know which hands.

25   Either way --

149

**DEPOSITION OF OFFICER MICHAEL CLARK**

1     Q.    Okay.  I just want to know how accurate your
2     memory is.
3     A.    All I know is he had his hands where one hand
4     was over the other.  I don't think it really matters.
5     It was presented this way like he was holding
6     something.
7     Q.    And so, his hands were in front of him.
8     A.    Correct.
9     Q.    Keep standing.  Keep standing.  I need to
10    describe it for the record.  I didn't tell you that at
11    the beginning, but when we make gestures, we have to
12    describe them for the record.
13    A.    I understand.
14    Q.    Okay.  So, you're collapsing one hand
15    underneath the other.  You're about belly button in
16    height?
17    A.    That's correct.
18    Q.    Okay.  And your hands are together in front of
19    you, your elbows are bent, correct?
20    A.    Something of this nature, yes.
21    Q.    And you have one hand collapsing the other
22    hand that's on top of it, and the top hand is a thumb
23    out, correct?  As opposed to the inside?
24    A.    I'm telling you what I believe to have
25    observed.  I'm not saying that it was exactly like

150

**DEPOSITION OF OFFICER MICHAEL CLARK**

1    this.  I'm saying that he was -- had his hands one way

2    or the other, this, this, but in a threatening

3    manner --

4         Q.   To be clear --

5         A.   -- towards --

6         Q.   To be clear, what you are saying is that his

7    hands looked as if, like, his fingers were curled up --

8    in one of his hands, his fingers were curled up as if

9    he was grasping something, correct?

10        A.   Correct.  I'm saying it look like he was

11   holding something in his hands --

12        Q.   Okay.

13        A.   -- and pointing it towards somebody.

14        Q.   And so, if there were an object protruding

15   from his hand, it would be protruding on the outside

16   from the thumb, correct?  Away from the body from the

17   thumb, correct?  The thumb and forefinger?

18             MR. VIGILIA:   Objection.  Calls for

19   speculation.

20             MR. NISENBAUM:  Q.  Just the way that you're

21   holding it?

22        A.   Could have been held in any way.  If it's not

23   in front of him -- if the knife -- if the blade is

24   pointing towards him or towards -- it doesn't matter to

25   me.  It's all the same.  It's just equally as

                                                       151

**DEPOSITION OF OFFICER MICHAEL CLARK**

1    Q.   Later you found out?

2    A.   Later I found out I did.

3    Q.   Right.  And you found out -- well, strike

4    that.  You didn't hear her say anything along the lines

5    of, "wait, he's threatening"?

6    A.   I don't recall that, no.

7    Q.   Okay.  Did you know that she had been

8    gathering information at the scene?

9    A.   No, I did not.

10   Q.   Okay.

11   A.   Well, I knew that she, just like all of us,

12   had been gathering information, so I don't know if she

13   was gathering specific information.

14   Q.   Well, we knew she was gathering some specific

15   information, because she gave the address, correct?

16   A.   Correct.

17   Q.   Okay.  And what did you do to gather

18   information?

19   A.   I listened to the radio broadcast.  I looked

20   at where my partner's cars parked.  I monitored the

21   situation via -- like I said, via radio.  I factored

22   formulas and plans on how to deal with the situation,

23   whatever it may be.  Big ,little, or indifferent.  Then

24   formulated a game plan on how to deal with the

25   situation.

153

**DEPOSITION OF OFFICER MICHAEL CLARK**

1      A.    Did any of those game plans consider the use

2   of the taser?

3      A.    That's also a possibility.

4      Q.    So did you formulate a specific game plan that

5   included the use of the taser?

6      A.    It crossed my mind that there's a number of

7   options that I could have used, yes.

8      Q.    Okay.  And you knew that Officer Wooley had

9   him at gunpoint, correct?

10     A.    I was already out of my car by the time

11  Officer Wooley had him at gunpoint.

12     Q.    Okay.  And you know that Officer Wooley had a

13  taser, correct?

14     A.    Correct.

15     Q.    You had a taser.  Nobody mentioned taser ever,

16  correct?

17     A.    There was no time to.

18     Q.    Okay.  The question, nobody mentioned taser

19  ever, correct?

20     A.    No.  No, specifically because there was no

21  time to.

22     Q.    Okay.  Is this one of those rare situations

23  where there is almost never no time?  That this time is

24  one them?

25     A.    This is a very fast situation.  It happened in

154

**DEPOSITION OF OFFICER MICHAEL CLARK**

1    seven seconds, but I still believe that you can

2    formulate a game plan, and you can formulate tactics,

3    and you can think about all these things.  The

4    application of which was not there, because there was

5    no time to do so.  There was one specific way to handle

6    this, unfortunately, and it was the way had -- it was

7    handled.

8        Q.   Did you see anything that blocked Officer

9    Wooley from moving backwards?

10       A.   There -- I don't know -- I didn't know

11   anything at the time.  I didn't see anything at the

12   time, but that's not say there wasn't.  I wasn't really

13   focused on what was behind Officer Wooley at the time.

14       Q.   And was Mr. Gonzales -- we've already

15   discussed he wasn't charging at Officer Wooley,

16   correct?

17       A.   I would say he was.

18       Q.   So walking towards Officer Wooley is charging

19   at him?

20       A.   In this situation yes.

21       Q.   Okay.  What is your definition of charge?

22       A.   When given commands to stop and you continue

23   in a -- in a way that is threatening, that would be

24   charging.

25       Q.   So, walking at -- with a methodical -- at a

155

1   officers believe.  Lacks foundation.

2       A.    To answer your question, I -- I can't, you

3   know, say what other officers would do.  I can say that

4   it's -- you should not drink a gallon of whiskey, but

5   that doesn't mean can't do it if you really wanted to.

6   That's the metaphor.  Perhaps a poor one, but that's

7   the point I'm trying convey.

8       Q.    That's a pretty poor metaphor.

9       A.    But I think it's the point that I'm trying to

10  convey that should be taken out of that, not the

11  metaphor itself.

12      Q.    Got it.  I think I understand the metaphor.

13  Thank you.  Now, you heard Officer Wooley, before shots

14  were fired, saying, "Put down the knife.  Put down the

15  knife", correct?

16      A.    Correct.

17      Q.    Okay.  And you never saw Sergeant DeCosta at

18  the scene until after shots were fired, correct?

19      A.    That is correct.

20      Q.    And how far were you from Mr. Gonzales when

21  you shot him?

22      A.    Between 12 to 15 feet.

23      Q.    Okay.  And you were approaching him?

24      A.    I was.

25      Q.    Okay.  As you shot, were you walking?

160

1    A.    I was -- I was running.

2    Q.    Okay.  You were running and shooting?

3    A.    I was running to him, and when I saw him, I

4  stopped.

5    Q.    Okay.  Did you start shooting after you

6  stopped?

7    A.    Yes.

8    Q.    Okay.  And how long did it take you to fire

9  your shots?

10    A.    From the minute I exited my car, I -- I put my

11  first foot on the ground, and after the shots were --

12  after the shots were fired, I believe it was somewhere

13  around seven seconds.

14    Q.    Okay.  And you don't -- you have no idea

15  whether or not Officer Wooley shot before you did,

16  correct?

17    A.    I -- I don't know.

18    Q.    And you don't recall hearing any of Officer

19  Woolly's shots after you stopped firing, correct?

20    A.    I remember hearing Officer Wooley shoot.  I

21  don't remember chronologically in which order it came,

22  before or after.

23    Q.    And so, you would be shooting at

24  Mr. Gonzalez's right side, correct?

25    A.    I believe it would be his left side.

161

**DEPOSITION OF OFFICER MICHAEL CLARK**

1    Q.   His left side?   Okay.   And did you believe

2  that you were about the same distance from Officer

3  Wooley as you were from Mr. Gonzales when you shot him?

4    A.   In close proximity.   About the same distance.

5    Q.   Okay.   Were you closer -- you were in a

6  straight line.   Were you closer to Mr. Gonzales than to

7  Officer Wooley?

8    A.   I would say I was probably slightly closer to

9  Officer Wooley, maybe.   Not by much, though.   Maybe a

10  foot or two.

11    Q.   So how long after you heard Officer Wooley

12  say, "put the knife down", did you -- the last time you

13  heard him say it did you fire?

14    A.   I heard him saying it as I was approaching

15  Mr. Gonzalez.

16    Q.   I understand that.   How long after you last

17  heard him say, "put the knife down" did you fire?

18    A.   Split second.

19    Q.   Was he still saying that when you fired?

20    A.   I don't recall.

21    Q.   Okay.   And last thing I want to do is watch

22  the video.   I want to make sure that I don't have any

23  other questions here.   Did you hear Officer Wooley say,

24  "put the knife down" or "he's got the knife"?

25    A.   I believe I heard both.

162

**DEPOSITION OF OFFICER MICHAEL CLARK**

1    Q.   Okay.  And how far -- in your demonstration

2  how far, were Mr. Gonzalez's away from his body?  Like

3  from his abdomen, from what you could tell?

4    A.   Based on what I recall, they were extended in

5  front of his body.  I don't know if it was tucked up

6  under his body or out.  I couldn't give you a

7  definitive answer.  They were in front of his body.

8    Q.   So if they were out, they were out a few

9  inches?

10   A.   I don't -- I -- they were out in front of his

11  body.  I don't know how far they were approximately in

12  front of his stomach, for example.

13   Q.   In other words, his elbows weren't locked --

14  in a locked out position, correct?

15   A.   They could have been.  I don't recall.

16   Q.   Okay.  And your life was not threatened,

17  correct?

18   A.   I did not feel like mine was at the time,

19  doesn't mean it wasn't.  Within the proximity he was to

20  me, he was actually closer to me than he was Officer

21  Wooley.  I felt and perceived that the threat was on

22  Officer Wooley at the time.  Doesn't mean he couldn't

23  have turned it on me.

24   Q.   I'm sorry, how far was he from Officer Wooley?

25   A.   I'd say he was probably, maybe, 15 feet.

163

**DEPOSITION OF OFFICER MICHAEL CLARK**

1    Q.   When you fired?

2    A.   Yes.

3    Q.   Okay.   And how far from you was he when you

4    fired?

5    A.   10 to 12 feet.

6    Q.   Okay.

7    A.   12 to 14, 15, somewhere around there.   Not

8    very far.

9    Q.   Now, you told interviewers that you saw a box

10   cutter directly underneath Mr. Gonzalez; do you recall

11   that?

12   A.   I do.

13   Q.   By box cutter you're referring to the razor

14   blade?

15   A.   It was brought to my attention that it was

16   just a razor blade.

17   Q.   Okay.   Why did you say "box cutter"?

18   A.   'Cause it looked like a box cutter when it --

19   when it was all said and done.   Because of the

20   situation, adrenaline perhaps.   You never know.   It was

21   just something that -- it looked like to me like it was

22   a box cutter.

23   Q.   So a box cutter, you know the difference

24   between a box cutter and razor blade, right?

25   A.   I do.

164

```
 1    question?  Am I talking about what I'm observing in

 2    this video, or you asking what I recall from -- at the

 3    time and looking in hindsight as to this video --

 4         Q.   Good question.  I'll try to make the clear in

 5    my questions, but you recall that you were present at

 6    this point in time, correct?  Or were you present yet?

 7         A.   Actually on scene?

 8         Q.   Yes.

 9         A.   Yes, I was.

10         Q.   Did you see this at this very point in time?

11         A.    I saw him at this point coming towards Officer

12    Wooley, yes.

13         Q.   Okay.  What did he do?  What did he do?

14              MR. VIGILIA:  Objection.  Vague,

15    argumentative.

16              MR. NISENBAUM:  Q.  What did he do that caused

17    you to do that?

18         A.    It's what he could have done.

19         Q.   What he could have done?

20         A.   Yes.

21         Q.   He's not walking fast, right?  Is he walking

22    fast?

23         A.   He's walking -- he's not walking fast.  He's

24    walking deliberately.

25         Q.   Deliberately, okay.  He's walking slowly
```

181

**DEPOSITION OF OFFICER MICHAEL CLARK**

1          DECLARATION OF WITNESS

2

3          I hereby declare I am the deponent in the

4     within matter; that I have read the foregoing deposition

5     and know the contents thereof, and I declare that the

6     same is true of my knowledge except as to the matters

7     which are therein stated upon my information or belief,

8     and as to those matters, I believe them to be true.

9          I declare under the penalties of perjury of the

10    State of California that the foregoing is true and

11    correct.

12

13          Executed this _____ day of _____,

14    20___, at _____, _____.
                    (City)                        (State)

15

16

17    MICHAEL CLARK
      _____

18

19

20

21

22

23

24

25

                                                        192

**DEPOSITION OF OFFICER MICHAEL CLARK**

```
 1   STATE OF CALIFORNIA    )
                            ) ss.
 2   COUNTY OF CONTRA COSTA )

 3

 4        I, Angelica R. Gutierrez, a licensed Certified

 5   Shorthand Reporter, duly qualified and certified as such

 6   by the State of California;

 7        That prior to being examined, the witness named in

 8   the foregoing deposition was by me duly sworn to testify

 9   to the truth, the whole truth,and nothing but the truth;

10        That the deposition was by me recorded

11   stenographically at the time and place first herein

12   mentioned, and the foregoing pages constitute a full,

13   true, complete and correct record of the testimony given

14   by the said witness;

15        That I am a disinterested person, not being in any

16   way interested in the outcome of said action, nor

17   connected with,nor related to any of the parties in said

18   action, or to their respective counsel, in any manner

19   whatsoever.

20

21                  DATED:  January 28, 2020

22

23        ___/s/Angelica R. Gutierrez_____

24        ANGELICA R. GUTIERREZ, CSR No.  13292

25
                                              193
```

**DEPOSITION OF OFFICER MICHAEL CLARK**

1                          WITNESS LETTER

2    TO:  Officer Michael Clark              Date: 03.06.20
          c/o Michael G. Vigilia, Sr. Asst. City Attorney
3         CITY OF HAYWARD                    Depo: 01.28.20
          777 B Street                       Ref. #20012804A
4         Hayward, CA  94541

5    RE: AG.G...J.Aquino; K.Gonsalez v. City of Hayward, et al.

6    Dear Officer Clark:

7         Please be advised that the transcript of your
     deposition taken in the above matter has been completed
8    and is now available at this office for your reading and
     signing.
9         Please contact our office between the hours of 9:30
     a.m. and 5:00 p.m. Monday-Friday, to schedule an
10   appointment.  Or, if you prefer, contact the attorney to
     review and sign the copy of your deposition under penalty
11   of perjury.
          Read the transcript making any changes necessary.
12   In making any changes, please use the following guide:
          1. DO NOT WRITE on the original transcript.
13        2. SIGN UNDER PENALTY OF PERJURY at the end of the
             Deposition on the Certificate of Witness Page.
14        3. List each change on the Deposition Errata Sheet
             following this page. Signature is required at
15           the bottom of the Errata Sheet.
          4. Forward the signed Certificate of Witness Page
16           and signed Errata Sheet in addition to a copy of
             this letter to:
17                   Barbara J. Butler & Associates
                     Certified Court Reporters
18                   P.O. Box 3508, Santa Clara, CA  95055
                     (510) 832-8853 or (408) 248-2885.
19        Upon receipt of items requested in this letter, I
     will forward copies of same to all Counsel.
20        In the event you have not reviewed you deposition
     within 35 days or by trial date, whichever is sooner, the
21   original transcript will be sealed pursuant to applicable
     laws and thereafter mailed to the deposing attorney.
22
                          Sincerely,
23
                          /s/Barbara J. Butler
24                        Barbara J. Butler, CSR

25   cc:  All Counsel

                                                        194