# Exhibit C

DEPOSITION OF OFFICER TASHA DeCOSTA

```
              IN THE UNITED STATES DISTRICT COURT

         IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

                          --oOo--

AG.G. a minor, by and through )
his guardian ad litem, JESSICA)
AQUINO; AR.G., a minor, by and)
through his guardian ad litem,)
JESSICA AQUINO; KARLA GONSALEZ)
individually; and AUGUSTIN    )
GONSALEZ, JR., individually,  )
                              )
              Plaintiffs,     )
                              )
         vs.                  )CASE NO.: 4:19-cv-00697 DMR
                              )
CITY OF HAYWARD, a municipal  )
corporation; MARK KOLLER,     )
individually; PHILLIP WOOLEY, )
individually; MICHAEL CLARK,  )
individually; TASHA DECOSTA,  )
individually; and DOES 1-100, )
inclusive,                    )
                              )
              Defendants.     )
_____)          CERTIFIED COPY




                DEPOSITION OF OFFICER TASHA DeCOSTA

                  TUESDAY, JANUARY 28, 2020
```

REPORTED BY:  ANGELICA R. GUTIERREZ, CSR NO. 13292

1

**DEPOSITION OF OFFICER TASHA DeCOSTA**

1    what actually occurred that evening.

2         Q.   Okay.  Did you review the summary of your

3    statement?

4         A.   No.

5         Q.   Did you review your interview?

6         A.   No.

7         Q.   Did you review any documents?

8         A.   I have -- I have reviewed my body camera

9    footage.

10        Q.   Okay.  And we'll get to that probably towards

11   the end.

12        A.   Okay.

13        Q.   Now, I assume that you have received the same

14   training that other officers have with respect to --

15   essentially your department has a training with respect

16   to responding to people who appeared to be emotionally

17   disturbed, correct?  Or mentally impaired.

18        A.   We have a training we just had on deescalation

19   training.

20        Q.   Deescalation, and is that put on by ICAT?

21        A.   It was put on in-house by in-house people.  I

22   don't know where they were trained.

23        Q.   Okay.  Are you familiar with the -- with the

24   training that talks about crisis recognition, tactical

25   communications, operational tactics, and scenario based

                                                          9

**DEPOSITION OF OFFICER TASHA DeCOSTA**

1    training, and a critical decision making model?

2        A.    At some different points in my career, yes, we

3    have had training on all of those things, yes.

4        Q.    Okay.  And so, what is your understanding of

5    what deescalation training is?

6        A.    Well, my understanding would be just as the

7    words are.  So, to deescalate a situation, if possible,

8    to bring the motion of a situation down in order to

9    return to rational thought.  So to kind of get people

10   back to center, so that their sessions are made.

11       Q.    And that includes good decisions by the both

12   the subject you're dealing with and the officers,

13   correct?

14       A.    It could apply at both, sure.

15       Q.    And you understand that officers can get

16   emotionally captured by events, correct?

17       A.    I do.

18       Q.    And officers are trained on how to avoid that

19   happening, correct?

20       A.    Yes.

21       Q.    And that's -- includes by keeping a calm head,

22   correct?

23       A.    Yes.

24       Q.    Among a lot of other ways, being well-trained

25   is one of them, correct?

10

**DEPOSITION OF OFFICER TASHA DeCOSTA**

1    A.   Yes.

2    Q.   Okay.  And do you recall, in responding to

3    this incident involving Mr Gonzales, whether there

4    were -- what was it -- communication that was preceded

5    by three beeps?

6    A.   I don't recall.

7    Q.   Okay.  And we'll preview the tape later.

8    A.   Okay.

9    Q.   But, in any event, at some point, you did

10   responded to this incident, correct?

11   A.   Yes.  Sure.

12   Q.   Okay.  Why did you respond?

13   A.   I was on duty.  I was somewhat close to the

14   area.  It's not uncommon I wouldn't -- that I would

15   respond.  I respond to calls all day, whether they're

16   critical or not, whether they're my people or not.  But

17   I think the biggest reason why I went this was a man

18   with a knife call, and -- or at least that's how it

19   came out, and I was probably a mile or so away.

20   Q.   Okay.  And, by the way, do you recall what

21   officers you were supervising on your shift this day?

22   A.   I don't recall.  I was working an overtime

23   shift.

24   Q.   Okay.  So one of the reasons you responded was

25   you were close?

16

**DEPOSITION OF OFFICER TASHA DeCOSTA**

```
 1   from that that Officer Woolly was already in the area
 2   where the call had been reported to originated from?
 3       A.   I believe he was, yes.
 4       Q.   Okay.  And do you know how long he had been in
 5   the area when he first made the communication that he
 6   was having difficulty finding people?  Or finding the
 7   incident?
 8       A.   I -- I don't know exactly how long he's been
 9   in the area, but I know that I went right when the call
10   was dispatched and it would have taken me, you know,
11   less than a couple minutes to get there.  So he
12   couldn't have been there that long.
13       Q.   Okay.  Eventually you did come across someone
14   who fit the description -- well, strike that.
15   Eventually you came across someone who waived you down,
16   correct?
17       A.   I did.
18       Q.   And you were in a marked patrol vehicle?
19       A.   I was.
20       Q.   Did you also have a Ford Explore?
21       A.   I did.
22       Q.   Okay.  And tell me what happened with this
23   person?
24       A.   It appeared to me as if he came off the
25   sidewalk, and he was wearing an orange shirt -- T
```

20

**DEPOSITION OF OFFICER TASHA DeCOSTA**

1    shirt, and what I remembered from dispatch was that the

2    guy with the knife was supposed to have a red shirt.

3    So, when I saw the guy pop out at the sidewalk with the

4    orange shirt, I had to try to figure out whether or not

5    this was the guy with the knife or if this was a

6    different person.

7         Q.   Right.

8         A.   So, what I did was got out of my car, because

9    I didn't want to be stuck sitting in my car if he came

10   up to my car, so I got out and spoke with that -- that

11   person.

12        Q.   And what location was that at?

13        A.   So, it was on O'Neill, and I believe the

14   driveway is O'Neill Commons.  It's to a, like, a condo

15   complex.  It was just probably a few feet south of that

16   drive way on the west side of the street.

17        Q.   And what -- did you notice any injuries to

18   this person?

19        A.   It was dark.  I didn't notice anything to him.

20        Q.   Did he tell you he was injured?

21        A.   No.

22        Q.   Did you ask him if he was injured?

23        A.   There was no time for me to ask him that.  He

24   ran -- he kind of started walking back north on

25   O'Neill.  He said some things to me and then he just

21

1   started walking away.

2        Q.   Okay.  And what did he tell you?

3        A.   He said you -- he said something to the effect

4   of -- and I may not quote him exactly, but it was

5   something to the effect of, "you gotta stop him", and

6   he pointed down the street back north and he said --

7   and he started walking that way.

8        Q.   He started towards the guy?

9        A.   He started walking north along the -- the west

10  side of the street.

11       Q.   In the same direction he pointed?

12       A.   Yes.

13       Q.   Okay.  So he said, "you gotta stop him", but

14  he didn't go in the opposite direction of --

15       A.   He started walking toward --  walking north,

16  yeah.

17       Q.   Did he tell you why you had to stop him?

18       A.   I don't -- I don't remember.

19       Q.   Do you recall describing this person as being

20  in a panic?  Like a panicked state?

21       A.   I would agree that -- yeah, he did appear you

22  know he popped out from the sidewalk and he starts

23  walking way, I was like, "okay, okay".  But, yeah, that

24  would -- it would look like a panic.  It wasn't casual.

25       Q.   Okay.  Did he tell you at that the time --

                                                        22

**DEPOSITION OF OFFICER TASHA DeCOSTA**

1    this person, you later learned his name is Oscar,

2    correct?

3         A.    Yes.

4         Q.    Okay.  And so if we refer to him as "Oscar",

5    we know you didn't know his name at the time, right?

6         A.    Right.

7         Q.    All right.  But that's who we are referring

8    to, the man in the orange shirt, right?

9         A.    Okay.

10        Q.    Okay.  So, according to the report, it quotes

11   he was saying that Oscar said, "stop him, stop him, he

12   has a knife".  Does that refresh your recollection that

13   Oscar told you he had a knife?  The man did?

14        A.    It probably is what he said.

15        A.    Okay.  And at some point after that, so it was

16   a very short interaction, right?

17        A.    Right.

18        Q.    Three or four seconds?

19        Q.    Not even that long.

20        A.    Okay.  Less than that.  And did Oscar run in

21   that direction or walk?

22        A.    I think it was walking, but it was fast.

23        Q.    Okay.  And did you see people where he was

24   walking towards?

25        A.    So there were a number of things happening at

                                                          23

**BARBARA J. BUTLER & ASSOCIATES - Certified Court Reporters**
**1659 Scott Blvd., Suite 15, Santa Clara, CA 95050  -  (510) 83-BUTLER (28853) or (408) 248-BUTLER (2885)**

**DEPOSITION OF OFFICER TASHA DeCOSTA**

1  one time.  There was Oscar that popped up at the

2  sidewalk  and told me, "stop him", or whatever he said.

3  "Stop him" or "he has a knife" or whatever, and then, I

4  looked north.  I had my flashlight in my hand, and I

5  could hear voices coming from the north.  So, as I was

6  looking with my flash light, at that point, Oscar

7  walked in -- ahead of me, and I could hear voices and

8  see two people in the -- in the street.

9      Q.   Could you tell whether one had a red shirt as

10  opposed to orange?  Or was it too far away?  I don't

11  know.

12      A.   I don't know that that stood out to me, but

13  what stood out to me was the commotion that was going

14  on in the street.

15      Q.   Did you hear their words?

16      A.   I heard the male.  And again, I don't want to

17  say the wrong like -- I don't want to guess what he

18  said now, but my best recollection was something like,

19  "you called the fucking police on me.  They are going

20  have to kill me".  It was something like that.

21      Q.   Sure.  I am going to read to you to refresh

22  your recollection.

23      A.   Okay.

24      Q.   Did you the hear the man in the -- the man in

25  the -- you could tell there was a man and a woman,

                                                        24

```
 1    right?

 2         A.    Right.

 3         Q.    Did you hear the man say something to the

 4    effect of, "don't call the police."  Or, "if you call

 5    the police, they are going to have to shoot me", and "I

 6    don't give a fuck.  If you call the police, they are

 7    going to have to shoot me"?

 8         A.    Yes.  That sounds like what he said.

 9         Q.    Okay.  At that time, could you see if the man

10    had any weapons in his hand?

11         A.    I couldn't see that at that point.

12         Q.    Okay.  How far were you?  How far away?

13         A.    I -- I don't -- I don't know that I could

14    estimate that now.  I probably did then, but it was,

15    you know, I -- I don't -- I don't know.  It was far

16    enough that I could -- I mean, it was close enough that

17    I could see it was two people, a man and a womman.  I

18    could hear them, but it was that haze from that smoky

19    day that they were -- it looked like -- as I walked --

20    I started to walk that way, and they were -- they were,

21    like, tussling in the middle of the street.  So that's,

22    I mean, I think the best --

23         Q.    Sure.

24         A.    -- thing that I saw.

25         Q.    And again, the question was could you see any
```

25

DEPOSITION OF OFFICER TASHA DeCOSTA

1  weapons?  So, you didn't see any weapons.

2      A.   Not at that point.

3      Q.   Okay.  And when you say that they were

4  tussling, did it look like a fight or was it just kind

5  of like their hands were kind of tussling with each

6  other?

7      A.   It didn't -- it wasn't like a fist fight, but

8  it was like they were grabbing on each other.  Either

9  she was either pulling okay and he was grabbing, or she

10  was grabbing, but there was this grabbing back and

11  forth is the best I can describe it.  Their hands were

12  on each other, and they were like trying to separate,

13  but not.  So I don't know who was grabbing who, but.

14      Q.   Right.  And so, you were on foot.  Were you --

15  I take it you were out of the car when you heard the

16  man say words to the effect of " you called the police

17  and they're going to have to shoot me"?

18      A.   Yes.

19      Q.   Okay.  At that time, I take it that raised a

20  question for you as to whether this could be suicide by

21  cop or event that could unfold?

22          MR. VIGILIA:  Objection.  Lacks foundation.

23  You can answer.

24          THE WITNESS:  It heightened my senses of, you

25  know -- now I think the guy in the orange shirt is not

26

**DEPOSITION OF OFFICER TASHA DeCOSTA**

1   anything to the effect of, "get away from him".  "Come

2   her -- come here" to the person that Mr. Gonzales was

3   with?

4       A.   No, I did not.

5       Q.   Okay.  Now, from the time you exited your

6   patrol vehicle to the time shots were fired, how much

7   time had lapsed?

8       A.   Maybe six to eight seconds.

9       Q.   Okay.  I take it if you had more time, the

10  only thing you would have done is call out to the girl,

11  "get away from him", "come here" something like that;

12  Is that right?

13              MR. VIGILIA:  Objection.  Calls for

14  speculation.  You can answer.

15      A.   I think -- yes.  Time gives a lot more

16  options.

17      Q.   Right.  And one thing officers are trained to

18  do when they respond to a situation like this one, if

19  possible, is to try the extend the time, right?  Make

20  the time.

21      A.   If possible, yes.

22      Q.   And the reason for that is time helps to -- to

23  do everything you need to do.  Establish a perimeter,

24  containment, get the person away from him, right?

25  Among other reasons.

33

**DEPOSITION OF OFFICER TASHA DeCOSTA**

 1      A.   Something was wrong.

 2      Q.   Yeah.  It looked like he needed some help,

 3  right?

 4      A.   It looked like she needed some help.

 5      Q.   Well --

 6      A.   I mean, I think that the whole situation

 7  needed help.

 8      Q.   Right.  Everyone involved.

 9      A.   Yes, absolutely.

10      Q.   And so, do you know of any reason why no one

11  took their taser out in this incident?

12           MR. VIGILIA:  Objection.  Calls for

13  speculation.

14      Q.   Well, and it might be foundationless.  I don't

15  know the answer.  Did you have your taser out?

16      A.   I did not.

17      Q.   You had a gun out, right?

18           MR. VIGILIA:  Objection, vague as to time.

19      A.   At one point I did, yes.

20      Q.   When was your gun out?

21      A.   After I came around the back of the truck and

22  heard Phil saying, "drop the knife, drop the knife",

23  "stop", or something like I that, and I came around and

24  I unholstered my gun at that point based on what --

25  well, the totality of what was happening.

                                                          44

**DEPOSITION OF OFFICER TASHA DeCOSTA**

1    Q.    Is that after shots had been fired?

2    A.    It was probably simultaneous.   And one of the

3  reasons why you pulled your gun out was because you

4  were hearing shots, correct?

5    A.    No, it was because I -- I was coming around

6  the back and was hearing Phil say, "drop the knife,

7  drop the knife".   And at that point, base on the type

8  of call, information that the guy had a knife, and then

9  Phil saying "drop the knife", and that I could see when

10  I went around initially the guy getting close to Phil

11  and walking toward him, at that point, it was pretty

12  close to about the same time when the shots were fired

13  that I withdrew my handgun.

14    Q.    Okay.

15    A.    So I don't know exactly, but it was really

16  close to the same time.

17    Q.    Weren't you trying to give them information,

18  the other officers at the scene, before shots were

19  fired?

20    A.    Initially, but they -- I don't believe could

21  hear me, initially, as they drove past me.

22    Q.    They drove right past you.  You were on-scene,

23  and they drove right past you, right?

24    A.    They did.

25    Q.    Okay.  And did they ever try to get

45

**DEPOSITION OF OFFICER TASHA DeCOSTA**

1      A.   Yes.

2      Q.   Okay.  So is there any reason they wouldn't

3  have seen you police car that you know, other than they

4  weren't looking?

5      A.   I don't know.

6      Q.   Okay.  Did they ever attempt to communicate

7  with you from the time of their arrival on-scene until

8  the shots were fired?

9      A.   No.

10     Q.   Okay.  In the information you were trying to

11  give them once they arrived on-scene, what was it?

12     A.   I was aways back and I was trying to tell

13  them -- I was saying something to the effect of "he's

14  threatening".  What I meant by that, to them, was -- it

15  was bases on the statements that I was hearing him make

16  that you're going to have to shoot me.  He's

17  threatening, and I'm trying -- what I was trying to say

18  was, "he's threatening.  You're going to have to shoot

19  him."  He's threatening what would be more commonly

20  known as, like, suicide by cop.

21     Q.   Didn't you tell them, "stop, he's

22  threatening"?

23     A.   I don't think so.

24     Q.   Okay.  Just, "he's threatening"; Is that

25  right?

47

**DEPOSITION OF OFFICER TASHA DeCOSTA**

1    A.   I think I said, "he's threatening", but I
2  stopped saying that, because I knew they couldn't --
3  didn't seem like -- I didn't know, but it didn't seem
4  like they could hear me, and they were involved in
5  something more critical.
6    Q.   How long before shots were fired did you say
7  he's threatening?
8    A.   I don't -- it would have been less than six
9  seconds.  I'm guessing.
10    Q.   Right.  How tall are you?
11    A.   5'7".
12    Q.   And were there -- was there street lighting in
13  the area?
14    A.   I believe so.  I had my flashlight, too.
15    Q.   And you had your flashlight.  It appeared to
16  you acting that Mr. Gonzalez was acting bizarre as if
17  he was psychotic or intoxicated, correct?
18    A.   That's correct.  Something was wrong with him.
19    Q.   It was obvious to you that there was something
20  wrong with his mental state, correct?
21    A.   Correct.
22    Q.   You told interviewers that it all happened
23  really fast and noted there was enough -- not enough
24  time to even coordinate with different force options
25  between the two officers; is that true?

48

**DEPOSITION OF OFFICER TASHA DeCOSTA**

1    as my gun's out, I'm okay, because that's not the case.

2         Q.   Well, I'm not saying that in all circumstances

3    that's true.   The other person has a gun, obviously

4    there's a problem, right?

5         A.   Well that is -- that would present a

6    problem --

7         Q.   Yeah.

8         A.   -- but if they have a knife, that could also

9    present a problem, too.

10        Q.   But it's much less of a problem when you have

11   three officers at the scene, and I take it, in your

12   view, since you -- well, strike that.   You've referred

13   to Officer Woolly as Phil.   Do you know him personally?

14        A.   From work.

15        Q.   Right, and you know him as a competent

16   officer, correct?

17        A.   Correct.

18        Q.   And what about Officer Clark?   Do you know him

19   personally.

20        A.   From work, yes.

21        Q.   And first name basis with him, as well?

22        A.   Correct.

23        Q.   Okay.   What did he say?   What's his name?

24        A.   Mike.

25        Q.   Mike.   Okay.   And they are both competent

51

1    officers correct?

2         A.    I believe so.

3         Q.    Okay.  So, you have three officers present.

4    You are competent, too, right?

5         A.    Yes.

6         Q.    All of you are competent; you all have been

7    trained on the taser; you all possess the taser,

8    correct?

9         A.    Correct.

10        Q.    You are all capable of moving?  Nobody has a

11   physical disability, right?

12        A.    Not to my knowledge.

13        Q.    Okay.  And if they did, they shouldn't be on

14   patrol right?

15        A.    Correct.

16        Q.    Okay.  So, you're all capable of moving.  Mr.

17   Gonzalez was never running at anyone, correct?

18        A.    I didn't see him run.

19        Q.    You saw him walking in a deliberate manner,

20   correct?

21        A.    I did.

22        Q.    Okay.  You didn't see any weapon in his hand,

23   correct?

24        A.    I didn't.

25             MR. VIGILIA:  Objection.  Assumes facts not in

                                                           52

**DEPOSITION OF OFFICER TASHA DeCOSTA**

1     correct?

2          A.    Yes.

3          Q.    Okay.   And here you had three officers at the

4     scene, all three lethal weapons, gun, and all three had

5     operable tasers, correct?

6          A.    Right.

7                MR. VIGILIA:   Objection.   Calls for

8     speculation.

9                MR. NISENBAUM:   Q.   Okay.   And at no point did

10    you tell any of the officers to -- I take that back.

11    You did make a statement, but you were not intending by

12    that statement to tell the officers to back off,

13    correct?

14         A.    No, I'm just trying to communicate what I

15    knew.

16         Q.    Okay.   And you were saying to hold on and were

17    telling them to wait?

18         A.    I was just trying to give them the

19    information.   I wasn't -- I couldn't tell them to wait.

20    in fact, I couldn't even keep talking.   I had to stop

21    talking so they could focus on that -- on what was

22    happening.   It would have been inappropriate for me to

23    keep talking.

24         Q.    Is that why you stopped talking?   For them to

25    focus?

                                                          80

**DEPOSITION OF OFFICER TASHA DeCOSTA**

1      A.   I stopped talking because I realized they

2   couldn't hear me, and if I were to continue to talk or

3   demand that they listen to me, it would diverted their

4   attention from what was going on in front of them.

5      Q.   Okay.

6      A.   So, I stopped talking for a couple reasons.

7      Q.   Now, you also have tools in your trunk,

8   correct?

9      A.   Yes, in my police car.

10      Q.   You're a sergeant and sergeants carry specific

11   weapons, correct?

12      A.   Yes.

13      Q.   And these are, like, tasers.  These are

14   weapons that can be used from a distance, correct?

15      A.   Yes.

16      Q.   And then, I'm sure you have like a lethal

17   firearm, like a rifle or something, but you also had a

18   40-millimeter, correct?

19      A.   Correct.

20      Q.   And what other -- what else did you have?

21      A.   I have a bean bag shotgun.

22      Q.   What is the purpose of the bean bag shotgun?

23      A.   It's a less lethal option.

24      Q.   What does it do?

25      A.   It works much like a shotgun.  It's a small

81

DEPOSITION OF OFFICER TASHA DeCOSTA

DECLARATION OF WITNESS

     I hereby declare I am the deponent in the within matter; that I have read the foregoing deposition and know the contents thereof, and I declare that the same is true of my knowledge except as to the matters which are therein stated upon my information or belief, and as to those matters, I believe them to be true.

     I declare under the penalties of perjury of the State of California that the foregoing is true and correct.

Executed this _____ day of _____, 20___, at _____, _____.
            (City)               (State)

_____
TASHA DeCOSTA

88

DEPOSITION OF OFFICER TASHA DeCOSTA

1    STATE OF CALIFORNIA    )
                               ) ss.
2    COUNTY OF CONTRA COSTA )

3

4        I, Angelica R. Gutierrez, a licensed Certified

5    Shorthand Reporter, duly qualified and certified as such

6    by the State of California;

7        That prior to being examined, the witness named in

8    the foregoing deposition was by me duly sworn to testify

9    to the truth, the whole truth,and nothing but the truth;

10        That the deposition was by me recorded

11    stenographically at the time and place first herein

12    mentioned, and the foregoing pages constitute a full,

13    true, complete and correct record of the testimony given

14    by the said witness;

15        That I am a disinterested person, not being in any

16    way interested in the outcome of said action, nor

17    connected with,nor related to any of the parties in said

18    action, or to their respective counsel, in any manner

19    whatsoever.

20

21               DATED:  January 28, 2020

22

23           ___/s/Angelica R. Gutierrez_____

24          ANGELICA R. GUTIERREZ, CSR No.  13292

25

89

**DEPOSITION OF OFFICER TASHA DeCOSTA**

```
 1                      WITNESS LETTER

 2   TO:  Officer Tasha DeCosta              Date: 03.06.20
          c/o Michael G. Vigilia, Sr. Asst. City Attorney
 3        CITY OF HAYWARD                    Depo: 01.28.20
          777 B Street                       Ref. #20012804B
 4        Hayward, CA  94541

 5   RE: AG.G...J.Aquino; K.Gonsalez v. City of Hayward, et al.

 6   Dear Officer DeCosta:

 7        Please be advised that the transcript of your
     deposition taken in the above matter has been completed
 8   and is now available at this office for your reading and
     signing.
 9        Please contact our office between the hours of 9:30
     a.m. and 5:00 p.m. Monday-Friday, to schedule an
10   appointment.  Or, if you prefer, contact the attorney to
     review and sign the copy of your deposition under penalty
11   of perjury.
          Read the transcript making any changes necessary.
12   In making any changes, please use the following guide:
          1. DO NOT WRITE on the original transcript.
13        2. SIGN UNDER PENALTY OF PERJURY at the end of the
             Deposition on the Certificate of Witness Page.
14        3. List each change on the Deposition Errata Sheet
             following this page. Signature is required at
15           the bottom of the Errata Sheet.
          4. Forward the signed Certificate of Witness Page
16           and signed Errata Sheet in addition to a copy of
             this letter to:
17                   Barbara J. Butler & Associates
                     Certified Court Reporters
18                   P.O. Box 3508, Santa Clara, CA  95055
                     (510) 832-8853 or (408) 248-2885.
19        Upon receipt of items requested in this letter, I
     will forward copies of same to all Counsel.
20        In the event you have not reviewed you deposition
     within 35 days or by trial date, whichever is sooner, the
21   original transcript will be sealed pursuant to applicable
     laws and thereafter mailed to the deposing attorney.
22
                          Sincerely,
23
                          /s/Barbara J. Butler
24                        Barbara J. Butler, CSR

25   cc:  All Counsel

                                                          90
```