# Exhibit G

DEPOSITION OF SERGEANT TREVOR VONNEGUT

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--o0o--

AG.G. a minor, by and through )
his guardian ad litem, JESSICA )
AQUINO; AR.G., a minor, by and )
through his guardian ad litem, )
JESSICA AQUINO; KARLA GONSALEZ )
individually; and AUGUSTIN     )
GONSALEZ, JR., individually,   )
                               )
            Plaintiffs,        )
                               )
     vs.                       ) CASE NO.: 4:19-cv-00697 DMR
                               )
CITY OF HAYWARD, a municipal   )
corporation; MARK KOLLER,      )
individually; PHILLIP WOOLEY,  )
individually; MICHAEL CLARK,   )
individually; TASHA DECOSTA,   )
individually; and DOES 1-100,  )
inclusive,                     )
                               )
            Defendants.        )
_____)    CERTIFIED COPY


DEPOSITION OF SERGEANT TREVOR VONNEGUT
(PMK and Scene Supervisor)

MONDAY, JANUARY 27, 2020


REPORTED BY:  KELLY L. MCKISSACK, CSR #13430

1

1   A.   Yes.
2   Q.   Can you tell me how the training is conducted.
3   A.   The training is conducted in a -- either one
4   of our rooms where we go through the PowerPoint.  So
5   classroom setting.  There'll be -- one of the PowerPoint
6   there's a test that's usually attached to it.  There's a
7   certification form that gets signed by the officers
8   saying that they've done the things that are required.
9        And then depending on the training that is set
10  up, there'll be transition drills.  So officers will
11  practice taking the Taser in and out of the holster.
12  There'll be transition drills between transitioning
13  between the Taser and a firearm.  Some of those
14  transitions will include verbal commands.  Some will
15  include actually giving commands to, you know, a suspect
16  of what they want them to do based on pulling the Taser
17  out.
18       Some will include firing the Taser.  We fire
19  two cartridges, two live cartridges during the training.
20  And then usually that will be attached to some sort of
21  maybe scenario-based training.
22  Q.   And do user or users of the Taser still go
23  through the experience of being tased?
24  A.   It is voluntary.  I like to think if officers
25  like to be tased.

16

**DEPOSITION OF SERGEANT TREVOR VONNEGUT**

1  Q.  Because these things are great when you first
2  buy them, but not so great afterwards.  All right.
3     What I'd like to do actually is to make this
4  Exhibit A.  And this is the Taser printouts, the
5  collection that we just reviewed.  Bates stamp 780, the
6  last three digits, through 833.
7     (Whereupon, Exhibit A was marked for
8     identification.)
9  BY MR. NISENBAUM:  Q.  Now, I assume that you've trained
10 officers as to the purpose of the Taser, correct?
11     A.  Correct.
12     Q.  What is your understanding of the purpose of
13 the Taser?
14     A.  So it's considered an intermediate use of
15 force where it can be used to, if deployed properly, it
16 could actually physically -- it's called Neuro Muscular
17 Incapacitation.  It actually will lock, best layman's
18 terms, it will lock muscles up for somebody who is
19 actively resisting.  And it gives officers an
20 opportunity to safely detain subjects while they're not
21 able to keep fighting, flail their arms, have access to
22 any weapons, anything like that.
23     Q.  Okay.  And do you train officers that the
24 Taser can be used -- or strike that.
25     Do you train officers that the Taser should be

25

1  used if you're at a reasonable distance from a person
2  against a person who is armed with a knife?
3       A.   It depends on the situation.  But generally on
4  a one-on-one situation, no.
5       Q.   Well, let's assume -- and that's because if
6  the Taser fails, then you have to transition to a gun,
7  correct, if the person were attacking you?
8       A.   I would hope the officers would, yes.
9       Q.   Okay.  But if you have multiple officers at
10  the scene, it's not a one-on-one situation.  Let's say
11  it's a three-on-one situation.  Then you would train
12  officers that you would use the Taser first with lethal
13  cover as backup, correct?
14       A.   We would not train officers to use a Taser
15  first.  But if time and distance allows, we train
16  officers to have lethal force, nonlethal force, an
17  arrest team, if possible, to go hands-on.  So we try to
18  get as many options available.  And then it's up to the
19  officers at the scene to decide what would be the most
20  appropriate.
21       Q.   Okay.  Well, I assume that you're familiar
22  with the department's Use of Force Policy, correct?
23       A.   Yes.
24       Q.   And the Use of Force Policy takes into
25  consideration the availability of less lethal

26

1   alternatives to lethal force, correct?
2        A.   Yes.
3        Q.   Okay.  And why does it do that, if you know?
4        A.   Well, all encounters we're trying to use the
5   least amount of force possible to effect an arrest or
6   detain somebody.
7        Q.   Right.  And in Taser training don't you train
8   officers that the Taser is a preferable option to lethal
9   force?
10       A.   I wouldn't say it's preferable.  It's just an
11  option that's used when intermediate force would be
12  appropriate.
13       Q.   Is it true that you train officers that if the
14  Taser is available and it would reasonably be expected
15  to stop an attack by a person holding a knife that --
16  and there are other officers who are available to act as
17  lethal cover, that you should use a Taser first?
18       A.   I wouldn't say we use them to use that -- I
19  wouldn't say we would have them use that first.  It's
20  really up to the officers on scene.  It depends what the
21  appropriate use of force would be.  The Taser is an
22  option that officers have at their availability.
23       Q.   But you do train officers that the
24  availability of a less lethal option could vitiate the
25  need for a lethal option or for a lethal use of force,

27

1  correct?
2      A.  It could, yes.
3      Q.  Okay.  And because the lethal use of force is
4  the end of it all, you would want to use the lesser
5  lethal option if it's reasonable to do so, correct?
6      A.  I think we always train that the least amount
7  of force possible is the most effective way to effect an
8  arrest.
9      Q.  Okay.  And is the most reasonable way to
10 effect an arrest, correct?
11     A.  Yes.
12     Q.  Okay.  Have you ever trained officers that you
13 should not use the Taser -- you should not use a Taser
14 if a person is armed with a weapon such as a knife?
15     A.  That we should not use the Taser?
16     Q.  Right.
17     A.  We -- not on a one-on-one situation, no.  We
18 don't train that way.
19     Q.  I understand.  On a one-on-one situation we
20 discussed that already.  But in a situation where you
21 have multiple officers present, let's say you have three
22 officers present, and all of them have Tasers and all of
23 them have guns, do you train officers that you should
24 not use the Taser against the person who is holding a
25 knife?

28

DECLARATION OF WITNESS

I hereby declare I am the deponent in the within matter; that I have read the foregoing deposition and know the contents thereof, and I declare that the same is true of my knowledge except as to the matters which are therein stated upon my information or belief, and as to those matters, I believe them to be true.

I declare under the penalties of perjury of the State of California that the foregoing is true and correct.

Executed this 13TH day of MARCH, 2020, at HAYWARD, CA.
(City)                  (State)

_____
TREVOR VONNEGUT

80

**DEPOSITION OF SERGEANT TREVOR VONNEGUT**

```
 1    STATE OF CALIFORNIA    )
 2                           )  ss.
 3    COUNTY OF ALAMEDA      )
 4
 5           I hereby certify that the witness, Trevor
      Vonnegut, in the foregoing deposition appeared before
 6    me, Kelly McKissack, a Certified Shorthand Reporter and
      a disinterested person.
 7
             Said witness was then and there at the time
 8    and place previously stated by me placed under oath to
      tell the truth, the whole truth and nothing but the
 9    truth in the testimony given on the date of the within
      deposition; that the deposition is a true record of the
10    witness' testimony as reported by me.
11           The testimony of the witness and all questions
      and remarks requested by Counsel was reported under my
12    direction and control, caused to be transcribed into
      typewritten form by means of Computer-Aided
13    Transcription.
14           I am a Certified Shorthand Reporter licensed
      by the State of California, and I further certify that I
15    am not interested in the outcome of the said action, nor
      connected with, nor related to any of the parties in
16    said action, nor to their respective counsel.  I am not
      of counsel or attorney for either or any of the parties
17    to the case named in the within caption.
18           IN WITNESS WHEREOF, I have hereunto affixed my
      signature this 10th day of February, 2020
19
20
21    __/s/Kelly McKissack_____
22    Kelly McKissack
      Certified Shorthand Reporter
23    California License No. 13430
24
25                           --o0o--
```

81

**DEPOSITION OF SERGEANT TREVOR VONNEGUT**

```
                         WITNESS LETTER

   TO:  Sgt. Trevor Vonnegut                    Date: 03.06.20
        c/o Michael G. Vigilia, Sr. Asst. City Attorney
        CITY OF HAYWARD                         Depo: 01.27.20
        777 B Street                            Ref. #20012703C
        Hayward, CA  94541

   RE: AG.G...J.Aquino; K.Gonsalez v. City of Hayward, et al.

   Dear Sgt. Vonnegut:

        Please be advised that the transcript of your
   deposition taken in the above matter has been completed
   and is now available at this office for your reading and
   signing.
        Please contact our office between the hours of 9:30
   a.m. and 5:00 p.m. Monday-Friday, to schedule an
   appointment.  Or, if you prefer, contact the attorney to
   review and sign the copy of your deposition under penalty
   of perjury.
        Read the transcript making any changes necessary.
   In making any changes, please use the following guide:
        1. DO NOT WRITE on the original transcript.
        2. SIGN UNDER PENALTY OF PERJURY at the end of the
           Deposition on the Certificate of Witness Page.
        3. List each change on the Deposition Errata Sheet
           following this page. Signature is required at
           the bottom of the Errata Sheet.
        4. Forward the signed Certificate of Witness Page
           and signed Errata Sheet in addition to a copy of
           this letter to:
                Barbara J. Butler & Associates
                Certified Court Reporters
                P.O. Box 3508, Santa Clara, CA  95055
                (510) 832-8853 or (408) 248-2885.
        Upon receipt of items requested in this letter, I
   will forward copies of same to all Counsel.
        In the event you have not reviewed you deposition
   within 35 days or by trial date, whichever is sooner, the
   original transcript will be sealed pursuant to applicable
   laws and thereafter mailed to the deposing attorney.

                            Sincerely,

                            /s/Barbara J. Butler
                            Barbara J. Butler, CSR

   cc:  All Counsel
                                                              82
```