UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AG. G. a minor, by and through his guardian ad litem, JESSICA AQUINO; AR. G., a minor, by and through his guardian ad litem, JESSICA AQUINO;   KARLA GONSALEZ, individually; and AUGUSTIN GONZALES JR.,  individually;<br><br>                    Plaintiffs,<br><br>        vs.<br><br>CITY OF HAYWARD, a municipal corporation; MARK KOLLER, individually; PHILLIP WOOLEY, individually; MICHAEL CLARK, individually; TASHA DECOSTA, individually; and DOES 1-100, inclusive,<br><br>                    Defendants. | Case No. 4:19-cv-00697 DMR<br><br>**DECLARATION OF BENJAMIN NISENBAUM IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br><br><br>**Date:  July 9, 2020**<br>**Time:  1:00 p.m.**<br>**Courtroom: 4**<br><br><br> **Hon. Donna M. Ryu** |

# EXHIBIT B

DEPOSITION OF OFFICER PHILLIP WOOLEY

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--

AG.G. a minor, by and through )
his guardian ad litem, JESSICA)
AQUINO; AR.G., a minor, by and)
through his guardian ad litem,)
JESSICA AQUINO; KARLA GONSALEZ)
individually; and AUGUSTIN    )
GONSALEZ, JR., individually,  )
                              )
            Plaintiffs,       )
                              )
      vs.                     )CASE NO.: 4:19-cv-00697 DMR
                              )
CITY OF HAYWARD, a municipal  )
corporation; MARK KOLLER,     )
individually; PHILLIP WOOLEY, )
individually; MICHAEL CLARK,  )
individually; TASHA DECOSTA,  )
individually; and DOES 1-100, )
inclusive,                    )
                              )
            Defendants.       )
_____)        CERTIFIED COPY

DEPOSITION OF OFFICER PHILLIP WOOLEY

TUESDAY, MARCH 24, 2020

REPORTED BY:  LISA M. BOSCHETTI-MAURINO, CSR #9389

1

1          DEPOSITION OF OFFICER PHILLIP WOOLEY

2          BE IT REMEMBERED that on Tuesday, March 24th,

3    2020, commencing at the hour of 10:00 a.m. thereof, at

4    the LAW OFFICES OF JOHN L. BURRIS, 7677 Oakport Street,

5    Suite 1120, Oakland, California 94621, before me, LISA

6    M. BOSCHETTI-MAURINO, a Certified Shorthand Reporter in

7    and for the State of California, personally appeared,

8    OFFICER PHILLIP WOOLEY, a witness in the above-entitled

9    court and cause, produced on behalf of the Plaintiffs

10   therein, who, being by me first duly sworn, was

11   thereupon examined as a witness in said action.

12                          --OOO--

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          5

DEPOSITION OF OFFICER PHILLIP WOOLEY

1              OFFICER PHILLIP WOOLEY,

2              having been sworn, was

3         examined and testified as follows:

4

5         EXAMINATION BY MR. NISENBAUM

6         MR. NISENBAUM:  Q.  Please state -- state and

7    spell your name.  Normally I would be sitting right

8    across from you, but --

9         A.    Yeah, I understand, sir.

10        Q.    -- we're distancing.

11        A.    My first name is Phillip, P-h-i-l-l-i-p.  My

12   last name is Wooley, and it's W-o-o-l-e-y.

13        Q.    All right.  And I understand that you're

14   currently retired.

15        A.    Technically, yes.  I was hired back a few

16   weeks ago as a part-time police officer, but I'm

17   assigned to the dispatch center just to help out

18   training new dispatchers and filling up holes in the

19   schedule.

20        Q.    Is that called double-dipping?

21        A.    Kind of, sort of, yes.

22        Q.    It means you get -- you're getting a pension

23   now, but you're also working on a impermanent basis?

24        A.    Part-time.

25        Q.    Part-time?

6

1       A.      Yes, sir.

2       Q.      Okay.  All right.  And how long were you a

3  police officer?

4       A.      29 years.  Well, let me rephrase that.  26

5  years as a police officer.  I had three years as a

6  community service officer; it basically means I was in

7  jail at the City of Hayward.

8       Q.      Okay.  I was asked going to ask you next, was

9  all that time working for the City of Hayward?

10       A.      Yes, sir.

11       Q.      So the police academy you attended would have

12  been around 1990?

13       A.      '89.  The end of 1989.

14       Q.      So what academy was that?

15       A.      Los Medanos in Pittsburg.  It was actually at

16  the community college there.  Los Medanos Community

17  College.

18       Q.      Right.

19       A.      I had to remember that.

20       Q.      I take it you've testified in court before?

21       A.      Yes, sir.

22       Q.      How many occasions would you estimate?

23       A.      50 to 70.

24       Q.      Okay.  And when you were at the police

25  academy, although it was a long time ago, and if you

7

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1      A.     Yes.

2      Q.     Okay.  And you've been trained that tactical

3   decisions are those decisions that you make that lead up

4   to an ultimate use of force, correct?

5          MR. VIGILIA:  Objection.  Lacks foundation.

6   Leading.

7          THE WITNESS:  Yes.

8          MR. NISENBAUM:  Q.  Okay.  And it's not

9   sufficient to say, well, the subject made the decisions,

10   it wasn't me.  Your job is to be the one who makes the

11   decisions, correct?

12          MR. VIGILIA:  Objection.  Leading.

13          THE WITNESS:  That's another question that's

14   difficult to answer, because the question you're asking

15   is taking things out of context.  I make decisions, but

16   ultimately the decisions I made are predicated by what

17   the suspect does.

18          MR. NISENBAUM:  Q.  Well, they are also

19   predicated by the information that you have, right?

20      A.     Yes.

21      Q.     And they are predicated by the force options

22   that are available to you, correct?

23      A.     If you can use them.

24      Q.     Sure.  But -- and I'm -- I'll get to this in a

25   moment, but let me just back up a second.

                                                        39

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

```
 1              Are you familiar with the term "SWATTing"?
 2      A.    Yes.
 3              MR. VIGILIA:  Objection.  Lacks foundation.
 4              THE WITNESS:  Yes, I am, sir.
 5              MR. NISENBAUM:  Q.  What is that?
 6      A.    It's when people call in fake calls to have
 7  the police department send their SWAT team out and
 8  surround house they can sit across the street and laugh,
 9  basically.
10      Q.    Okay.  And you've been -- you were familiar
11  with that prior to this incident, correct?
12              MR. VIGILIA:  Objection.  Lacks foundation.
13  Leading.
14              THE WITNESS:  Yes.
15              MR. NISENBAUM:  Q.  Okay.  And I -- and I
16  assume that that's just one context in which people can
17  give inaccurate information to dispatch, correct?
18      A.    Yes.
19      Q.    People can give inaccurate information
20  unintentionally to dispatch, correct?
21              MR. VIGILIA:  Objection.  Lacks foundation.
22  Leading.  Calls for speculation.
23              THE WITNESS:  Yes, sir.
24              MR. NISENBAUM:  Q.  Okay.  And you knew that
25  prior to this incident, correct?
```

40

1      A.     Yes.

2      Q.     So it was your understanding at the time of

3  this incident, that you might have information that came

4  in from other sources, but you should use your own eyes

5  and your owns ears as well, correct?

6              MR. VIGILIA:  Objection.  Lacks foundation.

7              MR. NISENBAUM:  Q.  Your own senses?

8              MR. VIGILIA:  Objection.  Lacks foundation.

9              THE WITNESS:  Yes.

10             MR. NISENBAUM:  Q.  Okay.  And it was your

11 understanding that a caller had reported that

12 Mr. Gonzalez had attacked him or threatened him with a

13 knife in this incident, correct?

14             MR. VIGILIA:  Objection.  Lacks foundation.

15 Assumes facts not in evidence.

16             THE WITNESS:  Yes, sir.

17             MR. NISENBAUM:  Q.  And of course we later

18 learned he didn't have a knife, correct?

19             MR. VIGILIA:  Objection.  Leading.  Lacks

20 foundation.

21             THE WITNESS:  Yes.

22             MR. NISENBAUM:  Q.  Yes, he did, or yes,

23 that's correct?

24     A.     No.  Yes, that's correct, yes, sir.

25     Q.     Okay.  In fact, what we learned was that he

41

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

```
 1   held a razor blade, a safety razor blade, right?
 2            MR. VIGILIA:  Objection.  Lacks foundation.
 3   Leading.
 4            THE WITNESS:  I honestly don't recall what
 5   kind of razor blade it was.
 6            MR. NISENBAUM:  Q.  Okay.  You didn't -- did
 7   you see it after the incident?
 8       A.   Briefly.
 9       Q.   Okay.  Let me ask you this, and if we have to
10   go under seal, I understand.  But it would probably
11   depend on what the answer is, and if you want a moment
12   to consult for that purpose, I understand.
13            Have you received any sort of a psychological
14   counseling or anything of that nature in connection with
15   this instance?
16            MR. VIGILIA:  Objection.  Calls for
17   information protected by the doctor/patient privilege,
18   and the therapist/patient privilege.
19            Don't answer.
20            MR. NISENBAUM:  No.  That depends on what the
21   answer is.  I'm entitled to an answer.  The question of
22   whether or not -- you know, whether I can get into the
23   substance of it is a different question.  But, you know,
24   so...
25            MR. VIGILIA:  What's the question again?
```

42

DEPOSITION OF OFFICER PHILLIP WOOLEY

1   you think that Mr. Gonsalez was approaching you with a

2   knife?

3       A.    Yes, I did.

4       Q.    Okay.  Did you see a knife?

5       A.    I saw something, I wasn't quite sure what it

6   was.

7       Q.    Okay.  And your vision is fine, right?

8       A.    That is correct.

9       Q.    And what time of day did this happen?

10      A.    It was nighttime.

11      Q.    Okay.  Was there lighting on Mr. Gonsalez?

12      A.    There was from the headlights of my car, the

13  patrol car.

14      Q.    Okay.  And the knife that you thought you saw,

15  describe what you thought you saw.

16      A.    I saw a quick glint of some -- something that

17  was metallic.  But you also have to understand what was

18  going on at the time, there was a lot of fires up in

19  California, and the skies were -- or the skies.  I'm

20  sorry.  It was a very dark area, and it was very, I

21  don't know what words you want to use, but alot of the

22  dust and the fallout from the fires were also in the

23  air, so it made vision a little bit worse.

24      Q.    Well we have video camera footage of the

25  incident, so -- but we can see with our own eyes what it

                                                        44

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1  looked like, right?

2      A.     I'm sorry.  What what looked like?

3      Q.     What the scene was, what the scene looked

4  like?

5      A.     Oh yes, sir.

6      Q.     Okay.  And of course you have flashlights?

7      A.     Yes, sir.

8      Q.     You carry those?

9      A.     Yes, sir.

10      Q.     And tell me what equipment you carry.

11      A.     On my gun belt?

12      Q.     On your person.

13      A.     On my person, I have a Sig Sauer, P-226.  It's

14  S-i-g S-a-u-er, I have two spare magazines.  I have a

15  body camera, a collapsible baton, two sets of handcuffs,

16  a Taser and I have a flashlight in my pocket.

17      Q.     Okay.  And did you feel that your -- you could

18  see well enough that you did not need additional

19  lighting?

20      A.     Yes, sir.

21      Q.     Okay.  So really you're not complaining about

22  the visual that you had, correct?

23      A.     No.  No, I am.

24      Q.     Okay.  So your visual was bad?

25             MR. VIGILIA:  Objection.  Misstates his prior

45

1    testimony.

2          THE WITNESS:  My eyesight vision was fine.

3          MR. NISENBAUM:  Q.  Okay.

4    A.    But the way the suspect came at me, I could

5    not completely identify what was in his hands --

6    Q.    Did he --

7    A.    -- because his hands were cupped together.

8    Q.    Did he run at you?

9    A.    He did not run.  He walked at a fast pace.

10   Q.    Okay.  Have you been trained that

11   redeployment, meaning changing your location is an

12   option to consider?

13         MR. VIGILIA:  Objection.  Lacks foundation.

14         Go ahead.

15         THE WITNESS:  It is an option to consider,

16   yes.  However, in this particular case, it was not an

17   option.

18         MR. NISENBAUM:  Q.  We'll get to that.  I'm

19   just asking you about your training.

20   A.    Okay.

21   Q.    So "redeployment," meaning changing your

22   location is an option to consider?

23   A.    Yes.

24         MR. VIGILIA:  Objection.  Lacks foundation.

25         MR. NISENBAUM:  Q.  And when you have multiple

46

1    people --

2              THE REPORTER:  If we can just slow down a bit.

3              THE WITNESS:  I apologize, that was my fault.

4              MR. NISENBAUM:  Q.  And when you have multiple

5    people, multiple officers present and one subject, and

6    you know where he is, then you have the ability to

7    redeploy multiple officers, correct?

8              MR. VIGILIA:  Objection.  Lacks foundation.

9    Incomplete hypothetical.

10             THE WITNESS:  Yes.

11             MR. NISENBAUM:  Q.  And we talked about

12   wanting -- trying to slow a situation down, correct?

13   A.    Yes.

14   Q.    And one way you can do that is by

15   redeployment, correct?

16             MR. VIGILIA:  Objection.  Leading.  Lacks

17   foundation.

18             THE WITNESS:  Yes.

19             MR. NISENBAUM:  Q.  Okay.  And Mr. Gonsalez

20   never ran at you, correct?

21   A.    No.

22   Q.    No, he did not?

23   A.    He did not run at me, no.

24   Q.    Okay.  And the object that you thought you

25   saw, you thought you saw a glint of something metallic,

47

```
 1    and you announced that you saw a knife at the scene,
 2    correct?
 3              MR. VIGILIA:  Objection.  Misstates the
 4    testimony.  Lacks foundation.
 5              MR. NISENBAUM:  Well, I'll strike that.
 6        Q.    Didn't you announce to other officers that
 7    he's got a knife --
 8              MR. VIGILIA:  Objection.
 9              MR. NISENBAUM:  Q.  -- meaning -- referring to
10    Mr. Gonsalez?
11              MR. VIGILIA:  Objection.  Leading.
12              THE WITNESS:  No, I did not.
13              MR. NISENBAUM:  Q.  What did you say?
14        A.    I told --
15              MR. VIGILIA:  Objection.  Lacks foundation.
16              MR. NISENBAUM:  Q.  Go ahead.
17        A.    I told Mr. Gonsalez to drop the knife.
18        Q.    Drop the knife.
19              Okay.  So describe to me, you said you saw
20    a -- a quick glint of something metallic.  What size was
21    the glint that you saw?
22        A.    I could not tell you.
23        Q.    Was it small; was it like an inch,
24    inch-and-a-half, or less than that?
25        A.    Again, I could not tell you.
```

48

1      Q.    Okay.  Tell me to the best of your

2  recollection, was it a foot long?

3      A.    No.

4      Q.    Okay.  Was it six inches long?

5      A.    No.

6      Q.    Okay.  Was it three inches long?

7      A.    It could have been.

8      Q.    Okay.  And what did you do to get a better

9  view of that?

10     A.    I didn't do anything.

11     Q.    Okay.  You stood in place, correct?

12     A.    Correct.

13     Q.    Okay.  And when you saw it, where was it?

14     A.    In his hands.

15     Q.    Which hand?

16     A.    That, I couldn't tell you.

17     Q.    Okay.  And his hands were clasped over each

18  other, correct?

19     A.    That is correct, sir.

20     Q.    And were his hands up high, like in a stabbing

21  motion towards you?

22     A.    They were pointing directly at me, so not high

23  in a stabbing motion, no.

24     Q.    Weren't they waist height?

25           MR. VIGILIA:  Objection.  Lacks foundation.

                                                          49

1      Q.    Okay.  Well, we'll watch it today, so --

2      A.    Okay.

3      Q.    -- you know, we'll -- we'll get to it, and I

4    think you'll see then, what his hand position was, and

5    where it was.

6          Now, we are confirmed for Thursday right?

7          MR. VIGILIA:  As far as I know.

8          MR. NISENBAUM:  Okay.  Give me one moment, I

9    just need to reconfirm.

10         THE REPORTER:  Do you want to go off the

11   record?

12         MR. NISENBAUM:  Sure.

13         (Brief break taken 10:46 a.m. to 10:46 a.m.)

14         MR. NISENBAUM:  Q.  I wanted to go back to

15   your Taser training.  What limitations have you been

16   trained in -- well, strike that.

17         Have you been trained that there are

18   limitations on the taser's effectiveness?

19         MR. VIGILIA:  Objection.  Lacks foundation.

20         THE WITNESS:  Yes.

21         MR. NISENBAUM:  Q.  Okay.  And what -- what is

22   your understanding of what those limitations are?

23     A.    Well, in order for a Taser to work, you have

24   to get what's called neuromuscular -- anyway, it's a

25   fancy term for locking up the muscle systems in the

                                                         51

1   body.  One of the biggest problems you have is that the

2   probes are not attaching properly to body due to their

3   clothing, your distance from them so the spread is not

4   long enough between the probes in order to get the good

5   lockup.  The person's under the influence of alcohol or

6   drugs.  And phasers -- well, phasers.  Tasers fail about

7   50 percent of the time.

8           MR. NISENBAUM:  Q.  Who told you Tasers fail

9   about 50 percent of the time?

10          MR. VIGILIA:  Objection.

11          MR. NISENBAUM:  Q.  Where did you hear that?

12     A.    It's a national average from what I've been

13   told for years.

14     Q.    From who; is that in training?

15     A.    Uh-huh.

16     Q.    So you have training that says Tasers fail 50

17   percent of the time?

18     A.    I have tased people where it's gotten complete

19   total 100 percent lockup on them, and they looked at me

20   and laughed and pulled the probes out and attacked me.

21     Q.    How many times has that happened?

22     A.    A couple.

23     Q.    How many times have you tased people?

24     A.    Personally?

25     Q.    Yes.

52

1       A.      20, 25.

2       Q.      Okay.  So that's two out of 20, 25 times?

3       A.      Uh-huh.

4       Q.      And were all those in probe deployment mode?

5       A.      In -- yes.

6       Q.      Okay.  The taser can also be used in a

7    different way, in touch-tase mode, correct?

8       A.      It's called drive-stun, yes, sir.

9       Q.      Right.  And drive-stun is just pain

10   compliance, correct?

11      A.      Yes.

12      Q.      So when we talk about the 20 or 25 times,

13   you're talking about probe mode?

14      A.      Yes.  I never drive-stunned anyone.

15      Q.      Okay.  And so if a person's wearing a

16   hoodie -- well, you talked about the clothing that a

17   person's wearing.  What you need is -- is sufficient --

18   the darts need to penetrate clothing sufficiently to hit

19   the skin, correct?

20      A.      Yes, sir.

21      Q.      All right.  So when a person's wearing a puffy

22   jacket, it can be a problem?

23      A.      Yes.

24      Q.      But if a person's not wearing a puffy jacket,

25   for example, if they are just wearing like a hoodie or

                                                        53

1      A.    Yes.

2      Q.    Is that your understanding of how the taser

3    should function and should work?

4      A.    That is correct.

5      Q.    Okay.  And the person's wearing a shirt,

6    right?

7      A.    Yes.

8            MR. NISENBAUM:  Okay.  And then I'll make this

9    Exhibit B.

10           And you have it already.

11           (Whereupon, Plaintiffs' Exhibit B was marked

12           for identification.)

13           THE WITNESS:  Thank you.

14           MR. NISENBAUM:  Q.  Exhibit B, this is from

15    the user manual for the X2.  I think I said M2, but

16    that's actually the old one, the X26, right?

17      A.    Yes.

18      Q.    Okay.  So the X2.  Do you know if you -- the

19    one that you had was the one that had dual cartridges,

20    correct?

21      A.    Yes, sir.

22      Q.    Okay.  So you had two cartridges, meaning if

23    one cartridge failed, you had a backup cartridge?

24      A.    Yes.

25      Q.    Okay.  Without having to change the cartridge?

                                                          58

DEPOSITION OF OFFICER PHILLIP WOOLEY

1      A.     Yes.

2      Q.     Okay.  And so we have a similar illustration,

3  and that is of a person -- this one the person's holding

4  a crowbar, apparently threatening the officer with a

5  crowbar.  The officer tases the person from a distance,

6  and they fall down, correct?

7      A.     Yes.

8      Q.     Again, this is -- this is what Taser says

9  should happen, correct?

10             MR. VIGILIA:  Objection.  Calls for

11  speculation.  Lacks foundation.

12             THE WITNESS:  Yes.

13             MR. NISENBAUM:  Q.  Okay.  And it was your

14  understanding that that's how the Taser is supposed to

15  work and function at the time that this incident

16  occurred, correct?

17      A.     That's another difficult question to answer

18  with just a yes or no answer.

19      Q.     Okay.  Explain.

20      A.     You're again talking in a perfect world.  And

21  I've already explained to you that half the time a Taser

22  does not work on a person.  So if you want to go by the

23  perfect world of what Taser International says, yes,

24  then it should have -- could have -- could have

25  functioned that way.

                                                       59

DEPOSITION OF OFFICER PHILLIP WOOLEY

```
 1        Q.    So instead of shooting him, you got out of
 2   your car, right?
 3        A.    Yes.
 4        Q.    Okay.  And what did you do?
 5        A.    I got out of my car, took out my gun, pointed
 6   it at him, and told him to drop the knife.
 7        Q.    And who else was present, what other officers?
 8        A.    No one.
 9        Q.    Okay.  And then he turned away from the person
10   he was talking to?
11              MR. VIGILIA:  Objection.  Lacks foundation.
12              MR. NISENBAUM:  Q.  Well, strike that.  Let me
13   go back.
14              I know that you said that he sounded angry,
15   right?
16              MR. VIGILIA:  Objection.  I don't -- misstates
17   the testimony.
18              MR. NISENBAUM:  Q.  You heard -- you couldn't
19   tell the words that Mr. Gonsalez was saying, but it
20   sounded like he was, what?
21        A.    I didn't hear anything he said at all, so I
22   couldn't tell you if he was angry or not.
23        Q.    Was he yelling?
24        A.    I -- that, I don't recall.
25        Q.    Did you see his face at that time?
```

67

1      A.    No.

2      Q.    Okay.  Did you see the other person's face?

3      A.    The girl?

4      Q.    Yeah.

5      A.    Yes.

6      Q.    Okay.  And what did her face look like?

7      A.    Scared.

8      Q.    Okay.  So she looked scared.  And did it look

9   like Mr. Gonsalez was holding on to her?

10     A.    He was -- he did not -- my recollection, he

11  was not touching her.

12     Q.    Okay.  So she looked scared.  But Mr. Gonsalez

13  was not touching her.  How close to her was she -- was

14  he?

15     A.    He was close enough to stab her.

16     Q.    How close was he to her, how many feet?

17     A.    A foot away.

18     Q.    One foot away.

19           Okay.  Because you would agree, I'm close

20  enough to stab you, right?

21     A.    Uh-huh.

22     Q.    Okay.  All right.  Now you're coming to this,

23  having been primed by the call that says there's a

24  knife, right?

25     A.    Yes.

                                                          68

1    Q.    Okay.  You arrive, you don't see a knife,
2  right?
3         MR. VIGILIA:  Objection.  Leading.  Misstates
4  the testimony.
5         MR. NISENBAUM:  Q.  You don't recall what you
6  see, but you don't have a recollection of seeing a
7  knife?
8    A.    Correct.
9    Q.    Okay.  You could tell that there is some
10 dispute between -- some confrontation between
11 Mr. Gonsalez and the other person, the woman, correct?
12   A.    Yes.
13   Q.    And what else did the call say?
14   A.    The dispatch call?
15   Q.    Yes, that you responded to.
16   A.    That he was trying to stab a male.
17   Q.    Okay.  And did you see the male?
18   A.    He was right in front of my patrol car.
19   Q.    Okay.  Did it look like he was -- had been
20 stabbed?
21   A.    No.
22   Q.    Okay.  He didn't appear to be injured at all,
23 correct?
24         MR. VIGILIA:  Objection.  Lacks foundation.
25         THE WITNESS:  Correct.

                                                      69

1              MR. NISENBAUM:   Q.   Okay.   And did you ask

2    him, what's going on?

3        A.     No.

4        Q.     Did you ask him any questions?

5        A.     No.

6        Q.     Did he give you any information?

7        A.     He said, that's the guy right there, and

8    pointed to Mr. Gonsalez.   Then he ran directly toward

9    him, and grabbed the girl and pulled her out of the way.

10       Q.     Okay.   So he grabbed the girl, pulled her out

11   of the way.

12              Did Mr. Gonsalez try to go after the girl at

13   that time?

14       A.     No.

15       Q.     Did he try to go after the man at that time?

16       A.     No.

17       Q.     Okay.   So the threat to that person, to the

18   girl had been removed, correct?

19       A.     No.

20       Q.     Okay.   Well, in what way?   He didn't run after

21   her?

22       A.     She was still in close proximity, so he could

23   at any time.

24       Q.     So he could at any time.

25              You never saw him threaten her?

                                                          70

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1          MR. VIGILIA:  Objection.  Lacks foundation.

2    Leading.  Calls for an expert opinion.  Calls for

3    speculation.

4          THE WITNESS:  It's possible.

5          MR. NISENBAUM:  Q.  Okay.  I mean, what else

6    would you take those words to mean?

7          MR. VIGILIA:  Objection.  Calls for

8    speculation.

9          THE WITNESS:  I've had people say that to me

10   before.

11         MR. NISENBAUM:  Q.  Okay.  So it could be

12   suicidal, could not be suicidal?

13   A.    Yes.

14   Q.    Did it appear that Mr. Gonsalez appeared to be

15   intoxicated?

16         MR. VIGILIA:  Objection.  Calls for

17   speculation.

18         THE WITNESS:  I could not tell.

19         MR. NISENBAUM:  Q.  Okay.  Did you smell like

20   the odor of alcohol from him?

21   A.    He would -- never got close enough to me to

22   smell that.

23   Q.    Okay.  So there was nothing specific that

24   appeared about him that caused you to think that he was

25   intoxicated, correct?

                                                    72

DEPOSITION OF OFFICER PHILLIP WOOLEY

1      A.    Correct.

2      Q.    Okay.  And there was nothing specific that

3 caused you to think that he was mentally impaired,

4 correct?

5      A.    Correct.

6      Q.    And there was nothing specific that caused you

7 to think that he was suicidal, correct?

8      A.    Correct.

9      Q.    Okay.  So you thought that he was not

10 threatening you?

11      A.    Yes.

12      Q.    Okay.  And you were at your patrol car?

13      A.    Just to the left of it, yes.

14      Q.    Okay.  Were you using the door as cover?

15      A.    Partially.

16      Q.    And this is the driver's side door?

17      A.    Yes.

18      Q.    Okay.  And were you standing kind of in the

19 "V" of the door?

20      A.    No.  I was a little bit further out.

21      Q.    A little bit further to the left, meaning left

22 of the driver's side door, or back closer to the trunk?

23      A.    No.  Left of the driver's side door.

24      Q.    Okay.  Was there anything that was blocking

25 you from behind?

73

DEPOSITION OF OFFICER PHILLIP WOOLEY

1      A.    I don't believe so.

2      Q.    Okay.  I take it you took a moment to glance

3  around at your surroundings?

4      A.    No.

5            MR. VIGILIA:  Objection.

6            MR. NISENBAUM:  Q.  You did not.

7            Okay.  Were you aware that -- were you aware

8  that you had the ability to change your location?

9      A.    Again, another difficult question to answer.

10 Yes, I was aware I could have moved.

11     Q.    Okay.  Now were you aware that other officers

12 were arriving?

13     A.    No.

14     Q.    You called it in, that you were responding,

15 correct?

16     A.    Yes.

17     Q.    Okay.  And you have your radio open, meaning,

18 I assume you had an earpiece in?

19     A.    No, I don't use an ear piece, and I don't use

20 a shoulder mic.

21     Q.    Were you able to hear your radio from your

22 car?

23     A.    Yes.  Right.

24     Q.    Okay.  So did you hear -- were you listening

25 to it?

74

DEPOSITION OF OFFICER PHILLIP WOOLEY

1      A.      Yes.

2      Q.      Okay.  Now is there any reason why you didn't

3 have your Taser at your disposal?

4      A.      You don't bring less lethal to a lethal force

5 encounter.

6      Q.      It doesn't make any sense.

7      A.      It makes perfect sense.

8      Q.      No.  I mean the taser -- the knife is only --

9 if there is a knife -- and you've used a taser, you

10 said, against people who have had weapons in their hand,

11 right?

12      A.      Yes.

13      Q.      Okay.  So what type of -- what type of weapons

14 have you used against people have had -- strike that.

15              What type of weapons have people had in their

16 hands that you've used a taser against?

17      A.      Meat cleavers.

18      Q.      Okay.

19      A.      Machetes.

20      Q.      These are deadly weapons, aren't they?

21      A.      Yes.

22      Q.      Far more deadly than razor blades, right?

23      A.      I didn't know he had a razor blade.  I thought

24 he had a knife.  That's the only information I had.

25      Q.      Well, I get that.  But you also have your

80

1   have shot him if you were aware that it was a razor

2   blade, right?

3        A.    That's not true at all.

4        Q.    Okay.  So -- so if it was a razor blade, it

5   doesn't matter.  Knife, razor blade, whatever, same

6   scenario, you knew it was a razor blade, you would have

7   shot him, correct?

8              MR. VIGILIA:  Objection.  Calls for

9   speculation.  Lacks foundation.  Incomplete

10  hypothetical.

11             THE WITNESS:  I can't answer that.

12             MR. NISENBAUM:  Q.  Why not?

13       A.    I just -- because I can't answer it.  I don't

14  have an answer for that question.

15       Q.    Okay.

16       A.    I can't -- I can't -- I've already explained

17  to you that there is very little black and white in

18  police work.  We operate in gray.  Okay?  So I can't

19  answer, oh, it was a razor blade, I would have shot him

20  anyway.  I don't know what I would have done.

21       Q.    Do you believe that three well-trained

22  officers encountering a man with a razor blade, who had

23  threatened people with a razor blade, who all three

24  officers have Tasers on their person, that they wouldn't

25  be able to take the person into custody without shooting

                                                        90

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

```
 1   him?
 2        A.    I didn't know --
 3              MR. VIGILIA:  Objection.  Calls for
 4   speculation.  Lacks foundation.  Incomplete
 5   hypothetical.  Compound.
 6              THE WITNESS:  Answer?
 7              MR. VIGILIA:  Yes.
 8              MR. NISENBAUM:  Q.  Yes.
 9        A.    I didn't know there were other two officers
10   there.  I thought I was alone.
11        Q.    Well, you didn't hear sirens approaching?
12        A.    No.
13        Q.    Why not?
14        A.    Lots of reasons.
15        Q.    Auditory exclusion?
16        A.    That's one of them.
17        Q.    Is that a term you've been...
18              THE REPORTER:  Excuse me?
19              MR. NISENBAUM:  Q.  Is that a term you've been
20   trained in?
21        A.    Yes.
22        Q.    So -- I'm sorry.  Did you actually ask for
23   backup?
24        A.    No.  As you said, I already knew they were
25   coming just via the radio.
```

91

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1      Q.    Okay.  But you don't recall listening to see
2  if you could tell how close they were?
3      A.    No.
4      Q.    No, you do not?
5      A.    No, I don't.  I don't recall listen --
6  assessing that at all.
7      Q.    I take it you don't recall assessing the use
8  of other force options short of lethal force, correct?
9            MR. VIGILIA:  Objection.  Misstates testimony.
10  Leading.
11            THE WITNESS:  I didn't have time.
12            MR. NISENBAUM:  Q.  You didn't do it --
13      A.    No --
14      Q.    -- correct?
15      A.    -- because I didn't have time.
16      Q.    My question to you, did you assess whether or
17  not other less lethal options would be viable?
18      A.    Yeah.
19      Q.    You did?
20      A.    I did, yes.
21      Q.    When did you do that, was it before you saw
22  the glinty thing, or after?
23      A.    Driving all the way up from where I was
24  originally all the way up to the call.
25      Q.    Okay.  So in driving, did you think -- what

93

1    did you think, how did you make your assessment?

2         A.    What do you mean by that?

3         Q.    Well, you said that you assessed other less

4    lethal force options.  How did you make that assessment?

5         A.    You always think about it.

6         Q.    What did you think about in this case?  Not

7    what you always think about.

8         A.    Taser, 40 millimeter launcher.

9         Q.    Okay.  And did you think Taser check, yes, I

10   have that on me, it's right on my belt here?

11        A.    Yeah, every day I go out.

12        Q.    I'm not asking every day.  I'm asking

13   specifically what you thought on this day, responding to

14   this scene?

15        A.    Yes, sir.

16        Q.    Okay.  So you thought taser.  So you knew you

17   had the taser available, correct?

18        A.    Yes.

19        Q.    And you thought OC spray, you had that

20   available?

21        A.    Yes.

22        Q.    What else did you think?  You said 40

23   millimeter launcher, you didn't have that in your car,

24   correct?

25        A.    I didn't, but I knew a sergeant was

                                                          94

1    responding.

2        Q.    Okay.  And you knew that these are weapons

3    that could only be used if they were out and available,

4    correct?

5        A.    Yes.

6             MR. VIGILIA:  Objection.  Argumentative.

7             MR. NISENBAUM:  Q.  Okay.  And did you think

8    how you would be able to use each of these force options

9    in the situation?  Did you think what you would do to be

10   able to use these force options?

11       A.    Yes.

12            MR. VIGILIA:  Objection.  Compound.

13            MR. NISENBAUM:  Q.  And what was your plan?

14       A.    Again, this is another one of those questions

15   that's very difficult to answer, because of the way

16   you're phrasing it.  You always have a plan if -- again,

17   and this is the big if, the suspect allows you to

18   implement it.  Again, you can laugh and shake your head

19   all you want, but he dictated what happened that night,

20   not me.  Had he just stood there in the middle of the

21   street and not come at me, we would have put together a

22   plan.  He didn't give me the time to do that.

23       Q.    What do you think -- what do you see your job

24   as?  What did you see your job as, the purpose of it?

25            MR. VIGILIA:  Objection.  Vague.

                                                        95

1          THE WITNESS:  My job at that moment of the
2    incident, or my job overall?
3          MR. NISENBAUM:  Q.  Your job as a police
4    officer, period, overall?
5          MR. VIGILIA:  Objection.  Vague.  Calls for a
6    narrative.
7          THE WITNESS:  My job overall is to protect our
8    public and enforce the laws of the State of California.
9          MR. NISENBAUM:  Q.  Okay.  And did you see
10   part of your job being to help people?
11      A.    Absolutely.
12      Q.    Okay.  But when you have a plan -- you said
13   you always come to a situation with a plan, right?
14      A.    Yes.
15      Q.    And the plan, you want to minimize the damage
16   that you inflict, correct?
17          MR. VIGILIA:  Objection.  Lacks foundation.
18          MR. NISENBAUM:  Q. You want to stop the harm
19   inflicted by others, but you want to also minimize the
20   damage that you inflict?
21          MR. VIGILIA:  Objection.  Lacks foundation.
22          THE WITNESS:  Whenever possible, yes, sir.
23          MR. NISENBAUM:  Q.  Okay.  And that's one of
24   the reasons -- you understood that was one of the
25   reasons why you've been given a taser, right?

                                                        96

1          MR. VIGILIA:  Objection.  Lacks foundation.
2     Leading.
3          THE WITNESS:  A Taser was not called for in
4     this situation.
5          MR. NISENBAUM:  Q.  I asked you, you
6     understood that one reason you've been given a Taser is
7     because it limits the harm that you inflict?
8     A.    Yes.
9     Q.    Okay.  And you say a Taser wasn't called for
10    in this situation, but you're -- you have no reason to
11    believe that the Taser would not have worked against the
12    man, correct?
13         MR. VIGILIA:  Objection.  Leading.  Lacks
14    foundation.  Calls for speculation.
15         THE WITNESS:  I have no reason to believe it
16    wouldn't have, no.
17         MR. NISENBAUM:  Q.  And he wasn't wearing a
18    puffy jacket, correct?
19         MR. VIGILIA:  Objection.  Lacks foundation.
20    Leading.
21         THE WITNESS:  To best of my recollection, no.
22         MR. NISENBAUM:  Q.  His clothing was
23    appropriate for the Taser to be used against, correct?
24         MR. VIGILIA:  Objection.  Vague and ambiguous
25    to the term "appropriate."  Lacks foundation.

97

DEPOSITION OF OFFICER PHILLIP WOOLEY

```
1              MR. NISENBAUM:  Q.  Based on your attorney.
2    A.    Yes.
3    Q.    Okay.  You couldn't tell that he was
4  intoxicated, correct?
5    A.    One more time.
6    Q.    You could not tell if he was intoxicated,
7  correct?
8    A.    Correct.
9    Q.    You couldn't tell that he was suffering from
10 any psychotic break that would have caused him to not
11 feel pain, correct?
12             MR. VIGILIA:  Objection.  Calls for expert
13 opinion.  Lacks foundation.
14             THE WITNESS:  Correct.
15             MR. NISENBAUM:  Q.  He didn't appear to be
16 suffering from excited delirium, right?
17             MR. VIGILIA:  Objection.  Lacks foundation.
18 Calls for expert opinion.
19             THE WITNESS:  No.
20             MR. NISENBAUM:  Q.  He wasn't sweating
21 profusely, correct?
22    A.    I couldn't tell that.
23    Q.    But you didn't see him sweating profusely,
24 correct?
25    A.    No.
```

98

```
 1              MR. VIGILIA:  Objection.  Misstates testimony.
 2    Lacks foundation.
 3              MR. NISENBAUM:  Q.  No, you did not?
 4    A.    No, I did not.
 5    Q.    Okay.  So -- and you've been trained that the
 6    taser should be of limited exposure against people who
 7    exhibit symptoms of excited delirium, correct?
 8              MR. VIGILIA:  Objection.  Lacks foundation.
 9              THE WITNESS:  Yes.
10              MR. NISENBAUM:  Q.  And that's not because a
11    Taser won't work against them, but because the Taser
12    could contribute to potentially killing them, correct?
13              MR. VIGILIA:  Objection.  Lacks foundation.
14              THE WITNESS:  That's correct.
15              MR. NISENBAUM:  Q.  Okay.  But those -- that
16    wasn't present in this case?
17    A.    No.
18    Q.    So if you were to use the taser against
19    Mr. Gonsalez and it's effective, then he's alive and
20    everyone is good, right?
21              MR. VIGILIA:  Objection.  Calls for
22    speculation.  Argumentative.
23              THE WITNESS:  I don't know.
24              MR. NISENBAUM:  Q.  So if you use a Taser
25    against him, how does he die?
```

99

DEPOSITION OF OFFICER PHILLIP WOOLEY

1           MR. VIGILIA:  Objection.  Calls for
2    speculation.
3           MR. NISENBAUM:  Q.  How does Mr. Gonsalez die?
4    A.    I don't know how Mr. Gonsalez died.  But I
5    could have died if I used a Taser and it didn't work.
6    Q.    I assume that once you use a Taser it's a
7    dynamic situation, and you could continue to do other
8    things such as redeploy, change your location, drop the
9    taser if it doesn't work, and then resort to lethal
10   force?
11   A.    By the time --
12          MR. VIGILIA:  Objection.  Objection.  Lacks
13   foundation.  Compound.  Calls for speculation.
14          THE WITNESS:  By the time I did that, he would
15   have already been on top of me, stabbing me.
16          MR. NISENBAUM:  Q.  Really?
17   A.    Really.
18   Q.    He wasn't running at you.
19   A.    It doesn't mean -- he could have changed and
20   started running at any time.
21   Q.    Things could change all the time, right?
22   A.    (Nods head.)
23   Q.    But you have to deal with what's been
24   happening.  He didn't show that indication, correct?
25   A.    Correct.

100

1     Q.    So it wasn't like he started to run, and then

2  you shot him, correct?

3     A.    Correct.

4     Q.    There was nothing about his pace that changed

5  causing you to shoot him, correct?

6     A.    No.

7     Q.    No, it was not?

8     A.    No.

9     Q.    I'm sorry.  No, it was not?

10     A.    No, it was not.  No.  He -- yeah, no.

11     Q.    Just prompting you because there was a double

12  negative in the question, so I just need to follow up to

13  make clear what you're asking -- what you're saying,

14  though, too.

15     A.    Okay.

16     Q.    So when you -- you say you always have a plan.

17  When you -- you came to this incident, and by the time

18  you got out of the car, your plan did not include the

19  use of less lethal alternatives, correct?

20     MR. VIGILIA:  Objection.  Lacks foundation.

21  Misstates the evidence.

22     THE WITNESS:  Correct.

23     MR. NISENBAUM:  Q.  Okay.  The only option

24  that you had was a lethal option at the time you shot

25  and killed him, because it was in your hand; is that

101

1   right?

2           MR. VIGILIA:  Objection.  Lacks foundation.

3           THE WITNESS:  Another hard question to answer.

4           MR. NISENBAUM:  Q.  Okay.  I'll rephrase it.

5   You -- if you had chosen to, you could have put the

6   lethal option away, and you could have pulled out the

7   less lethal option, the Taser, correct?

8           MR. VIGILIA:  Objection.  Incomplete

9   hypothetical.  Calls for speculation.

10          THE WITNESS:  Yes.

11          MR. NISENBAUM:  Q.  Okay.  Thank you.

12          And were you keeping that option open in your

13  mind?

14     A.    Yes.

15     Q.    Okay.  Well, with that in mind, we'll go

16  through the video with you.  Strike that.

17          Did you give him a warning that you would

18  shoot?

19     A.    I did not.

20     Q.    Okay.  Now you're familiar with -- with the

21  Hayward Police Department use of force policy, correct?

22     A.    Yes.

23     Q.    And aren't you supposed to give a warning that

24  you'll use lethal force against the person?

25     A.    When feasible.

                                                    102

1    Q.    Right.  You're supposed to say -- are there

2    particular words you're supposed to say?

3    A.    No.

4    Q.    Okay.  Well, you could say something like,

5    stop or I'll shoot, right?

6    A.    Yes.

7    Q.    Give a command followed by, or I'll shoot?

8    A.    Yes.

9    Q.    Some people say, or you'll be shot?

10   A.    Yes.

11   Q.    Okay.  Did you think about giving a warning in

12   this situation?

13   A.    That I would shoot him?

14   Q.    Yeah.

15   A.    No.

16   Q.    Okay.  And the reason you didn't give a

17   warning is that because he was already saying, you're

18   going to have to shoot me?

19   A.    Well, no.  It was pretty obvious, I was

20   pointing a gun at him, and I told him to stop.  I told

21   him to drop the knife three times, and stop.  It's

22   pretty obvious what was going to happen next.

23   Q.    Maybe to you, but you're not in his shoes.

24   A.    No.

25   Q.    You don't know whether or not he is suffering

                                                        103

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

1    from a mental impairment, or is intoxicated, or is not

2    comprehending the situation, correct?

3        A.    That's correct.

4        Q.    And so part of making sure that you give a

5    verbal warning is to reinforce the physical reality of

6    the situation, correct?

7              MR. VIGILIA:   Objection.   Lacks foundation,

8    leading.   Incomplete hypothetical.

9              THE WITNESS:   Correct.

10             MR. NISENBAUM:   Q.   Okay.   So when was the

11   last time that you gave consideration to using your

12   Taser in the situation?

13       A.    I don't recall.

14       Q.    Okay.   Do you recall ever giving consideration

15   to using your Taser?

16       A.    Yes.

17       Q.    Okay.   When was the first time that you recall

18   giving consideration to using your Taser in this

19   incident?

20       A.    While driving to the call.

21       Q.    Okay.   Do you recall giving further

22   consideration to using your Taser apart from while

23   driving?

24       A.    No.

25       Q.    Okay.   So it's your recollection, the first

                                                        104

1    and last time that you can recall giving consideration

2    to using your Taser was while you were driving to the

3    situation, correct?

4        A.    That's correct.

5        Q.    Okay.  And was that before you had actually

6    seen Mr. Gonsalez?

7        A.    Oh, yes.

8        Q.    Okay.  So the first and last time that you can

9    recall giving consideration to using your Taser was

10   while driving to scene before you had scene

11   Mr. Gonsalez, correct?

12       A.    Can you say that one more time.

13       Q.    The first and last time that you can recall

14   giving consideration to using your Taser was while

15   driving to the scene before you had seen Mr. Gonsalez,

16   correct?

17             MR. VIGILIA:  Objection.  Compound.  Asked and

18   answered.

19             Go ahead.

20             THE WITNESS:  Yes.

21             MR. NISENBAUM:  Q.  Okay.  Thank you.

22             THE REPORTER:  Are we going to go off the

23   record to look at the video?

24             MR. NISENBAUM:  What's that?

25             THE REPORTER:  Are we going to go off the

                                                      105

1    donated them to our -- we gave them to our friend who is

2    nurse, because she didn't have enough for her, so this

3    is like the last one, actually.

4              MR. NISENBAUM:  Q.  Okay.  So I'm playing from

5    a video file that is titled -- produced by the defense,

6    titled AXON Body 2 Video 2018-11-15, 2115.mp4.  And I'll

7    hit play.

8              (Video playing.)

9              MR. NISENBAUM:  Q.  It's at 11 seconds now.

10   It's silent, although there is video footage on it.

11             And the audio will pick up.

12   A.        That's the 30 second buffer.

13   Q.        I'll take the privacy screen off of it.

14   A.        I didn't even know it was on.

15   Q.        Rodgers made us put them on our computers.

16             I'll just go ahead and pause it here at 01:10.

17             Okay.  So first of all, the 30 second period

18   where there is video, but no audio, that's -- that 30

19   seconds will proceed when you activate the body cam,

20   correct?

21   A.        Correct.

22             MR. VIGILIA:  Objection.  Lacks foundation.

23             MR. NISENBAUM:  Q.  Okay.  And do you know --

24             I paused it at 01:10.

25             Are you already responding to the call, if you

                                                          107

1    know?

2        A.    Yes, sir.

3        Q.    And is the reason why you activated the body

4    cam, because you're responding to the call?

5        A.    Yes, sir.

6        Q.    Okay.  And so you've already got the

7    information from dispatch that the person had been

8    threatened with a knife?

9        A.    Yes, sir.

10       Q.    Okay.  And of course you knew nothing about

11   Mr. Gonsalez's background, correct?

12             MR. VIGILIA:  Objection.  Lacks foundation.

13   Leading.

14             THE WITNESS:  I did not.

15             MR. NISENBAUM:  Q.  Okay.  You didn't

16   recognize -- well, strike that.

17             You weren't even given his name, were you?

18       A.    No.

19       Q.    Okay.

20       A.    I only learned his name from about two or

21   three months after.

22       Q.    Okay.  We're continuing at 01:10.

23             So before I continue, it's fair to say that

24   nothing of Mr. Gonsalez's background informed your

25   conduct, correct?

108

DEPOSITION OF OFFICER PHILLIP WOOLEY

1          MR. VIGILIA:  Objection.  Lacks foundation.

2          THE WITNESS:  Correct.

3          MR. NISENBAUM:  Q.  Thank you.

4     Continuing at 01:10.

5          (Playing video.)

6          MR. NISENBAUM:  Q.  Pausing at 02:57.

7          Someone said, "What the fuck!," or something

8     like that?

9     A.     That was me.

10    Q.     Okay.  And what was that in response to?

11    A.     All I can hear was someone whistling.  I just

12    couldn't tell where he was whistling from, so I was

13    dumbfounded, where is this guy calling me from?  I

14    couldn't find him.

15    Q.     Okay.  Meaning there was a whistle you heard

16    outside the car --

17    A.     Yes, sir.

18    Q.     -- as opposed to from your radio?

19    A.     Yeah.

20    Q.     All right.  02:58, continue.

21         (Playing video.)

22         MR. NISENBAUM:  Q.  Let me ask you one other

23    question at 03:05, pausing that.

24         What -- you're familiar with this area; it's

25    your beat, right?

109

1    response was conditioned on your belief that he had a

2    knife, correct --

3              MR. VIGILIA:  Objection.

4              MR. NISENBAUM:  Q.  -- that Mr. Gonsalez had a

5    knife?

6              MR. VIGILIA:  Objection.  Lacks foundation.

7              THE WITNESS:  I would say it's fair to say.

8              MR. NISENBAUM:  Q.  Okay.  All right.  Now I'm

9    going to play from 03:51.

10             (Playing video.)

11             MR. NISENBAUM:  Q.  So how many shots did you

12   fire?

13             I paused it at 03:54.

14   A.    I don't know.  I have no idea.

15   Q.    Even as you sit here?

16   A.    Even as I sit here, I don't know.

17   Q.    Okay.  Once he stopped moving, why was he

18   shot?

19   A.    I don't understand the question.  Stopped

20   moving, where?

21   Q.    Towards you.

22   A.    I didn't see him stop moving.

23   Q.    Okay.  Well, at 03:54 -- let's go back.

24             Back to 03:49 for context.  And if you can

25   tell me -- I want you to watch this and tell me why he

                                                      130

DEPOSITION OF OFFICER PHILLIP WOOLEY

1    was shot after he stopped moving.

2              (Playing video.)

3              MR. NISENBAUM:  Q.  And again, he stopped

4    moving towards you?

5        A.    My perception at that time at that moment was

6    he was not stopping moving.  He was still coming at me.

7        Q.    But it's clear from the video that that's not

8    the case?

9        A.    I don't care about the video.  The video

10   doesn't mean anything.  You weren't the one standing

11   there.

12       Q.    Okay.

13       A.    I was.  In my perception, he was still moving

14   at that moment in time.

15       Q.    So --

16       A.    Remember, we're not going to do the hindsight

17   20/20 thing again, remember that?

18       Q.    I don't --

19       A.    So my perception at that moment in time was he

20   was coming at me.

21       Q.    Right.

22       A.    I don't care what the video says.

23       Q.    So you're saying that if your perception is

24   unreasonable, or if your -- strike that.

25              If your perception is inaccurate, then it

                                                      131

```
 1   doesn't matter --
 2               MR. VIGILIA:  Objection.  Argumentative.
 3               MR. NISENBAUM:  Q.  -- is that correct?
 4               MR. VIGILIA:  Objection.  Argumentative.
 5               THE WITNESS:  My perception was not inaccurate
 6   at the time.
 7               MR. NISENBAUM:  Q.  Well, I -- you've been
 8   trained that you're supposed -- that you shoot until the
 9   threat stops, correct?
10       A.    That is correct.
11       Q.    In this case, it's fair to say that the threat
12   stops once he stops moving towards you, correct?
13       A.    No.
14               MR. VIGILIA:  Objection.  Lacks foundation.
15               THE WITNESS:  That's not true at all.
16               MR. NISENBAUM:  Q.  Okay.  Well, how can he be
17   a threat if he's not moving towards you?
18       A.    He was moving toward me.  That was my
19   perception at the time was that he was moving toward me.
20       Q.    But we see the video.
21       A.    Again, I don't care what the video says.
22       Q.    So forget reality?
23       A.    We're not going to go back on the 20/20
24   hindsight.  At my time, standing right there, he was
25   coming at me.
```

132

DEPOSITION OF OFFICER PHILLIP WOOLEY

1    Q.    Okay.  So your view is that your judgment is

2  not to be questioned?  If the video is contrary to your

3  recollection, you know, your judgment, your recollection

4  is not to be questioned; is that correct?

5    A.    No.

6         MR. VIGILIA:  Objection.  That's

7  argumentative.

8         THE WITNESS:  You can question my rec- -- all

9  of -- I'm not saying that.

10        MR. NISENBAUM:  Q.  Well, you just said that.

11   A.    Okay.  I can only go off what was going on at

12  the time.

13   Q.    Okay.  Once he stops moving, you would agree

14  that there is no basis to shoot him, correct?

15   A.    No.

16        MR. VIGILIA:  Objection.  Incomplete

17  hypothetical.  Calls for speculation.

18        MR. NISENBAUM:  Q.  The reason you shot him is

19  because he was moving towards you with what you thought

20  was a knife, correct?

21   A.    That is correct.

22   Q.    Okay.  Once he stops moving towards you, you

23  would agree that there is no basis to shoot him?

24   A.    I would not agree.

25        MR. VIGILIA:  Objection.  Lacks foundation.

133

1          THE WITNESS:  So I just basically left my body
2     cam on until...
3          THE REPORTER:  So I just basically left my
4     body cam on until?
5          THE WITNESS:  The watch commander told me to
6     turn it off.
7          MR. NISENBAUM:  Q.  I understand.  And then
8     there is another body cam clip after this.
9          (Video playing.)
10         THE WITNESS:  And that was me again.
11         MR. NISENBAUM:  I understand.  I got it.  I'll
12    ask you questions.
13         THE WITNESS:  Okay.  I'm sorry.
14         (Video still playing.)
15         MR. NISENBAUM:  Q.  No, I get it.  But I just
16    have to review both of them and make sure I have
17    everything on it.
18         (Playing video.)
19         MR. NISENBAUM:  Q.  07:45, that was your voice
20    saying, "over a razor blade"?
21    A.    Uh-huh.
22    Q.    Okay.  And what is -- why were you saying
23    that, "over a razor blade"?
24    A.    I couldn't tell you.
25    Q.    Is it because you couldn't believe that it was

                                                        140

1   a razor blade and not a knife?

2       A.    I -- I could not tell you, sir.

3            MR. VIGILIA:  Objection.  Leading.

4            THE WITNESS:  I don't even remember saying it

5   until I just saw it.

6            MR. NISENBAUM:  Q.  I understand.  It's one of

7   those things where you're thinking out loud?

8       A.    It could have been.

9       Q.    All right.  07:46.  Continuing.

10           (Playing video.)

11           MR. NISENBAUM:  Q.  Pausing at 08:57.  That

12  was your voice saying, "Yeah, that's what he said.  He

13  came at me with a knife and he said, You're going to

14  have to shoot me"?

15      A.    Yes, that's my voice.

16      Q.    08:57.  Continuing.

17           (Playing video.)

18           MR. NISENBAUM:  Q.  Okay.  Now I'll go to the

19  next one.  And this is a file that is much shorter, it's

20  labeled -- or titled, AXON Body 2 Vid 8-11-15 2348.mp4.

21           (Playing video.)

22           MR. NISENBAUM:  I'll do it this way.

23      Q.    We are now at the next video is titled, AXON

24  Body 2 Video, 2018-11-15 2348.mp4.

25           And it's a 02:57 clip -- and 57 second clip,

                                                        141

**DEPOSITION OF OFFICER PHILLIP WOOLEY**

```
1    what you thought was a knife, what steps did you take to
2    reacquire sight of it?
3        A.    I just kept focusing on his hands.
4        Q.    Okay.  And you didn't see it again?
5        A.    That is correct.
6        Q.    And you would agree that the certain way to
7    ensure that a Taser does not work is to not use it --
8              MR. VIGILIA:  Objection.  Argumentative.
9              MR. NISENBAUM:  Q.   -- correct?
10             THE WITNESS:  A certain way?
11             MR. NISENBAUM:  Q.  To be the 100 percent
12   certain way to ensure that Taser will not work, is if
13   you don't use it, correct?
14             MR. VIGILIA:  Objection.  Argumentative.
15             THE WITNESS:  I guess so, yeah.
16             MR. NISENBAUM:  Thank you.  No further
17   questions.
18             MR. VIGILIA:  Thank you.
19             THE REPORTER:  Do you have any questions?
20             MR. VIGILIA:  No.
21             THE REPORTER:  And I just need to get copy
22   orders on the record.
23             MR. NISENBAUM:  Always, right.
24             THE REPORTER:  Yeah, yeah.
25             MR. VIGILIA:  A copy of what?
```

147

DEPOSITION OF OFFICER PHILLIP WOOLEY

```
 1            THE REPORTER:  Do you want -- you want it
 2    expedited, right?
 3            MR. VIGILIA:  Yes.
 4            THE REPORTER:  And did you have a particular
 5    date in mind, because they'll ask me for it.
 6            MR. VIGILIA:  For -- let's just say by next --
 7    what's next Friday?
 8            MR. NISENBAUM:  No, I'm sorry.  Let me go back
 9    on record.  I forgot one question.
10            THE REPORTER:  We're still on the record.
11
12            CONTINUED EXAMINATION BY MR. NISENBAUM
13            MR. NISENBAUM:  Okay.  Great.
14       Q.   I forgot one question.  Do you do a spark -- I
15    forgot one area.
16            Do you do a spark test at the start of your
17    shift?
18       A.   Yes.
19       Q.   So you knew that your taser was functioning?
20       A.   Yes.
21       Q.   Okay.  There is no issue about it being
22    charged, not being charged or functioning, not
23    functioning, correct?
24       A.   No.
25       Q.   It was charged and working?
```

148

DEPOSITION OF OFFICER PHILLIP WOOLEY

1    A.    Yes.

2         MR. NISENBAUM:  Thank you.  No further

3    questions.

4         THE WITNESS:  You're welcome.

5         MR. VIGILIA:  So by Friday, April 3rd.

6         THE REPORTER:  Friday?

7         MR. VIGILIA:  Yes, April 3rd.

8

9         (Deposition concluded at 12:31 p.m.)

10

11                --o0o--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

149

```
 1                    REPORTER CERTIFICATE
 2         I, Lisa M. Boschetti-Maurino, hereby certify that
 3    the witness in the foregoing deposition was by me placed
 4    under oath to testify to the truth, the whole truth and
 5    nothing but the truth in the within-entitled cause; that
 6    said deposition was taken at the time and place therein
 7    named; that the testimony of said witness was reported
 8    by me, a certified shorthand reporter and a
 9    disinterested person, and thereafter transcribed into
10    typewriting.
11         Pursuant to Federal Rule 30(e), transcript review
12    was requested.
13         I further certify that I have no interest in the
14    outcome of this action.  And I further certify that I am
15    not of counsel or attorney for either or any of the
16    parties to said deposition, nor in any way interested in
17    the outcome of the cause named in said caption.
18
19         In witness whereof, I have hereunto set my hand
20
21    this 3rd day of April 2020.
22
23
24    ___/s/Lisa M. Boschetti-Maurino_____
      Certified Shorthand Reporter
25    State of California, CSR#9389
```

                                                          151