UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AG. G. a minor, by and through his guardian ad litem, JESSICA AQUINO; AR. G., a minor, by and through his guardian ad litem, JESSICA AQUINO;   KARLA GONSALEZ, individually; and AUGUSTIN GONZALES JR.,  individually;<br><br>                      Plaintiffs,<br><br>          vs.<br><br>CITY OF HAYWARD, a municipal corporation; MARK KOLLER, individually; PHILLIP WOOLEY, individually; MICHAEL CLARK, individually; TASHA DECOSTA, individually; and DOES 1-100, inclusive,<br><br>                      Defendants. | Case No. 4:19-cv-00697 DMR<br><br>**DECLARATION OF BENJAMIN NISENBAUM IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br><br><br>**Date:  July 9, 2020**<br>**Time:  1:00 p.m.**<br>**Courtroom: 4**<br><br><br>**Hon. Donna M. Ryu** |

# EXHIBIT E

```
             IN THE UNITED STATES DISTRICT COURT

        IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

                        --oOo--

AG.G. a minor, by and through )
his guardian ad litem, JESSICA)
AQUINO; AR.G., a minor, by and)
through his guardian ad litem,)
JESSICA AQUINO; KARLA GONSALEZ)
individually; and AUGUSTIN    )
GONSALEZ, JR., individually,  )
                              )
               Plaintiffs,    )
                              )
          vs.                 )CASE NO.: 4:19-cv-00697 DMR
                              )
CITY OF HAYWARD, a municipal  )
corporation; MARK KOLLER,     )
individually; PHILLIP WOOLEY, )
individually; MICHAEL CLARK,  )
individually; TASHA DECOSTA,  )
individually; and DOES 1-100, )
inclusive,                    )
                              )
               Defendants.    )
_____)        CERTIFIED COPY




             DEPOSITION OF OFFICER MICHAEL CLARK

                 TUESDAY, JANUARY 28, 2020




REPORTED BY:  ANGELICA R. GUTIERREZ, CSR NO. 13292
```

1

1          Pursuant to Notice of Taking Deposition and on

2   Tuesday, January 28, 2020, commencing at the hour of 10:24

3   a.m., thereof, at the Law Offices of John L. Burris, 7677

4   Oakport Street, Suite 1120, Oakland, California, before

5   me, ANGELICA R. GUTIERREZ, CSR No. 13292, a Certified

6   Shorthand Reporter and Deposition Officer of the State of

7   California, there personally appeared:

8

9          OFFICER MICHAEL CLARK,

10

11  called as a witness by the Plaintiffs, who having been

12  duly sworn by me, to tell the truth, the whole truth and

13  nothing but the truth, testified as hereinafter set forth:

14

15                    ---oOo---

16

17

18

19

20

21

22

23

24

25

6

DEPOSITION OF OFFICER MICHAEL CLARK

1           OFFICER MICHAEL CLARK,

2  having been first duly sworn, testified as follows:

3           THE WITNESS:  (TO OATH)  Yes.

4           EXAMINATION BY BENJAMIN NISENBAUM

5           MR. NISENBAUM:  Q.  Can you please state and

6  spell your name?

7       A.    Michael Clark, M-I-C-H-A-E-L, C-L-A-R-K.

8       Q.    And what is your current occupation?

9       A.    Police officer.

10      Q.    Where are you employed at?

11      A.    City of Hayward.

12      Q.    Do you have any other experience as a police

13 officer or a peace officer?

14      A.    Yes.

15      Q.    Where?

16      A.    The city of Stockton.

17      Q.    When were you at Stockton?

18      A.    From '07 to '09.

19      Q.    Was that before their bankruptcy?

20      A.    Yes.  And -- Well, Yes.  Yes.  And -- and

21 both.

22      Q.    Got it.  I understand.  And was there break

23 in -- in employment at Stockton and city of Hayward?

24      A.    No.

25      Q.    Okay.  So while you were working at Stockton,

7

DEPOSITION OF OFFICER MICHAEL CLARK

```
1    shot and killed him, correct?
2              MR. VIGILIA:  Objection.  Misstates the
3    evidence, lacks foundation.
4              MR. NISENBAUM:  Q.  When you shot and killed
5    him, rephrase -- strike the past question.  In fact, he
6    was walking slowly towards you when you shot and killed
7    him, correct?
8              MR. VIGILIA:  Objection.  Again, misstates the
9    evidence, lacks foundation.
10             THE WITNESS:  Incorrect.
11             MR. NISENBAUM:  Q.  Okay.  How was -- was he
12   running towards you?
13        A.   No.
14        Q.   Okay.  Was he walking towards you?
15        A.   Yes.
16        Q.   Okay.  And so, it's incorrect in the sense
17   that the word "slowly"; is that right?
18        A.   Yes, I wouldn't say he was walking -- I would
19   say the proper use of the word -- the proper way to
20   describe it would be deliberately and with a purpose.
21        Q.   Okay.  Those seem like adjectives, but what
22   was his body motion?  He wasn't running, right?
23        A.   Correct.
24        Q.   He wasn't jogging?
25        A.   Correct.
```

43

DEPOSITION OF OFFICER MICHAEL CLARK

1    Q.   So, on the treadmill, you know you've got

2    different settings.  You've got walk, jog, and run,

3    right?

4    A.   Yes.

5    Q.   So, what's left?  Walk, right?

6    A.   Yes.

7    Q.   Okay.  Now, you sense that there was a purpose

8    in his walk, correct?

9    A.   Yes.

10    Q.   And you said "deliberately" correct?

11    A.   Yes.

12    Q.   Okay.  And we'll get back to that, but I want

13    to be clear that at the time you shot and killed

14    Mr. Gonzales, he was walking towards you, correct?

15         MR. VIGILIA:  I'm going to object again.

16    Misstates the evidence, lacks foundation.

17         THE WITNESS:  He wasn't running, and he wasn't

18    jogging, so he would be walking.

19    Q.   Okay.  And at the time you shot and killed

20    Mr. Gonzales, you had a taser, correct?

21    A.   Yes.

22    Q.   And that taser was located where?

23    A.   On my left hip.

24    Q.   Okay.  And I take it your taser worked, right?

25    A.   Correct.

44

DEPOSITION OF OFFICER MICHAEL CLARK

1      Q.    So you're familiar with that?

2      A.    Yes.

3      Q.    So you know that if a person is 9 feet away,

4  you should have about a foot spread between the probes?

5      A.    I'm -- I'm not familiar with the -- the break

6  down of it.  I -- overall just the general idea of how

7  it works.  I'm not -- I'm not a taser -- I'm not

8  trained specifically in the taser instruction

9  purposes -- for instruction purposes.

10      Q.    I understand that, but you are trained to use

11  a taser, right?

12      A.    Yes.

13      Q.    So you received this slide show?

14      A.    I think if -- what you are referring to is the

15  slide show that we have in the department, I've

16  received training, yes.

17      Q.    You don't have a 35-foot cartridge, correct?

18      A.    That's correct.

19      Q.    Okay.  I'm going to show you Bates 1938.  It

20  says, "smart use considerations when reasonable.  Use

21  the minimum force necessary to accomplish lawful

22  objectives.  Use force only on those that 'actively

23  resisted' or higher.  Finally, give a verbal warning

24  before the use of force".  Do you see that?

25      A.    Yes.

72

**DEPOSITION OF OFFICER MICHAEL CLARK**

```
1      Q.    Okay.  I read it correctly?

2      A.    Yes.

3      Q.    Did you give Mr. Gonzales a warning?

4      A.    I did not, personally.

5      Q.    Did you here anyone give warning?

6      A.    Yes.

7      Q.    Who?

8      A.    Officer Wooley.

9      Q.    What did he say?

10     A.    He said -- I believe he said something to the

11  nature of, "stop, show me your hands".  Something along

12  commands.

13     Q.    Okay.  Do you understand that's the difference

14  between a command and a warning?

15     A.    Yes.

16     Q.    Okay.  And what's the difference?

17     A.    A command is something you are telling someone

18  to do, and warning is when you warning them on

19  something like that.

20     Q.    So, basically the warning -- a warning would

21  be -- you can do a command and a warning.  "Stop or

22  I'll shoot", right?

23     A.    Yes.

24     Q.    So that would be a warning, correct?

25     A.    That would.
```

                                                          73

DEPOSITION OF OFFICER MICHAEL CLARK

1      Q.    "Or I'll shoot" is a warning?

2      A.    That could be used as a warning.  Could also

3   be -- it's also a command, too.

4      Q.    "I'll shoot"?  That's a command?

5      A.    "Stop" is a command.

6      Q.    Right, "stop" is a command.  So my question to

7   you is, did you hear a warning with respect to

8   Mr. Gonzales?  Did you here anyone give him a warning?

9      A.    I -- I think that the command is sufficient as

10  a warning.  It's -- it's -- when you're told -- when

11  you given a command, it's a warning in it's own -- in

12  it's own right.  The words may not have been

13  specifically said, but.

14     Q.    Is that consistent with Hayward Police

15  Department policy to your knowledge?

16     A.    The Hayward Police Department policy is you

17  should give commands if feasible -- if reasonable.

18     Q.    Doesn't it say you should give warnings if

19  reasonable or feasible?

20     A.    Warnings is what I meant to say.  Correct.

21  Sorry about that.

22     Q.    All right.  So that's what the Hayward Police

23  Department policy says, and they are not saying you

24  should give commands if reasonable, you're saying you

25  should give awarning if reasonable, correct?

74

DEPOSITION OF OFFICER MICHAEL CLARK

1       A.   I think it's all just a matter of
2  interpretation.   I think a command can be used as a
3  warning, as well as a warning can be used as a command.
4  It just depends on the inflection.
5       Q.   Okay.  So that's your personal opinion,
6  correct?
7       A.   I think that's just a real life general
8  observation of the facts, sir.
9       Q.   So it's your personal opinion?
10      A.   It is my personal opinion.  It's also a
11  statement of what I believe to be the facts.
12      Q.   Okay.  So you believe that -- that saying
13  "stop" is the same thing if you were -- used the proper
14  inflection.  Saying the word "stop" is the same thing
15  as saying "stop, or I'll shoot", right
16      A.   Depending on the situation, yes.
17      Q.   Okay.  And to be clear, is that your personal
18  view, or is that consistent with Hayward Police
19  Department policy?
20      A.   It's a -- I don't think the policy addresses
21  something like that.  I don't want to interpose my --
22  what the policy says versus what I'm saying because the
23  policy allows for discretion in those matters.
24      Q.   The discretion is "if reasonable", correct?
25      A.   If reasonable.

                                                    75

1    Q.   Okay.  So, if it's reasonable to give a

2  warning, then you're supposed to give a warning not

3  just a command, correct?

4    A.   It's your -- it's advised that you give a

5  warning.  It's not a must in all situations.

6    Q.   But if reasonable, you should, correct?

7    A.   You should, yes.

8    Q.   You should give a warning, correct, if it's

9  reasonable?

10    A.   Correct.

11    Q.   Did anybody give Mr. Gonzales a warning that

12  he would be shot if he didn't stop?

13    A.   Again, I'm going to -- I believe yes.  I don't

14  think it -- I know what you are saying.  You're asking

15  for direct, certain verbiage, but he was give a warning

16  without certain words being used.

17    Q.   Is there a warning shot fired?

18    A.   No.

19    Q.   Okay.  So, it wasn't a warning shot fired.

20  Was it the demeanor of the officers that gave the

21  warning?  It was your demeanor that was a warning?

22    A.   Yes, that's an aspect of it, as well.

23    Q.   Okay.  So, the fact that guns were pointed at

24  him and the demeanor of the officers along with the

25  commands being given to him, the commands to being

                                                          76

DEPOSITION OF OFFICER MICHAEL CLARK

1   stopped and similar commands, in totality constituted

2   the warning, correct?

3       A.   Yes, exactly.

4       Q.   Now, you have been trained in how to respond

5   to mentally impaired subjects, correct?

6       A.   Yes, I have.

7       Q.   And subjects who exhibit signs of mental

8   problems, correct?

9       A.   Yes, I have.

10      Q.   Okay.  And you've also been trained in how to

11  respond to subjects who exhibit symptoms of suicide by

12  cop, correct?

13      A.   Correct.

14      Q.   Okay.  And you have no training that says that

15  if a person is exhibiting signs of suicide by cop that

16  it's okay to then shoot them, correct.

17      A.   I'm sorry.  Can you repeat the question?

18      Q.   You don't have any training that says if a

19  subject is exhibiting suicide by cop that it is okay to

20  then shoot them?

21          MR. VIGILIA:   Objection, incomplete

22  hypothetical.

23          THE WITNESS:   Scenarios change.  Situations

24  change.  Trainings -- it's all scenario-based and it's

25  subjective to that actual particular incident at the

77

**DEPOSITION OF OFFICER MICHAEL CLARK**

1   time.

2        Q.   Let me be more specific.

3        A.   Sure.

4        Q.   Simply because a person is exhibiting signs of

5   being suicidal or they want to commit suicide by cop,

6   it doesn't mean that you are not still bound to -- to

7   follow department policy in law, correct?  You're still

8   bound by the policy in law of the department, correct?

9        A.   Yes.

10       Q.   Okay.  And the law state of California and the

11  United States of America, correct?

12       A.   Yes.

13       Q.   Okay.  And that law requires you to act

14  reasonably when you use force against subjects,

15  correct?

16       A.   Correct.

17       Q.   And that law requires you to take into

18  consideration whether the person appears to be mentally

19  impaired, correct.

20       MR. VIGILIA:  Objection.  Misstates the laws

21  and asks for legal conclusion.

22       THE WITNESS:  Its reasonable to consider all

23  those things if the circumstances allows.

24       MR. NISENBAUM:  Q.  You understand that your

25  department policy requires that, correct?

78

DEPOSITION OF OFFICER MICHAEL CLARK

```
 1    to put them in and annotate them into your detail.
 2         Q.   Okay.  Up until point when shots were fired,
 3    can you tell me what you had heard over the radio ?
 4         A.   Sure.  I got dispatched to a man that was
 5    brandishing a knife and threatening people with a
 6    knife.  Hispanic male, blue jeans, and a red, possibly
 7    black colored shirt at O'Neill and Orchard.  I
 8    continued to here that there was still an ongoing
 9    situation, had not solved itself, meaning that there
10    was still a need for us to respond.  As I got closer to
11    the scene, there was people -- I heard that there was
12    people -- I heard that there was updates of people
13    being flagged down, that the address had actually
14    changed to a physical address, or at least in front of
15    one, and that -- but at that time, I got out, I
16    ascertained the situation and made the decision, based
17    on my training and experience, what I perceived to be
18    my partner in immediate, bodily harm.  And I feared for
19    his death and his safety, so therefore I made the
20    decision, which I'm trained to do, which I realized at
21    the time was a need for a lethal force situation.
22         Q.   You never saw anything in mister -- when you
23    say -- strike that.  When you say you got out and saw
24    your -- your fellow officer and you were in fear of his
25    safety, and you did what you were trained to do, what
```

146

DEPOSITION OF OFFICER MICHAEL CLARK

1    you mean is you started shooting, correct?

2        A.    Not without --

3            MR. VIGILIA:   Objection, argumentative.

4            MR. NISENBAUM:   Q.   Okay.   What did -- what do

5    you mean?   You said you did what you were trained to

6    do?

7        A.    Sure.   Based on the information that I had, I

8    saw a man who matched the description who was -- I

9    heard in the -- the seven seconds that this whole event

10   unraveled, unfolded, there were -- I heard commands

11   that my partner was giving, which I believe to be a

12   warning and a command at the same time because, as I

13   mentioned earlier, requesting someone and showing the

14   gun -- pointing a gun at someone and telling them to

15   stop is as much an equal warning as it is a command.

16   And he was directly making pre-threat indicators

17   towards my partner as he walked towards him, and I

18   believed he was armed with a knife, so therefore,

19   because my partner's life was in jeopardy, I discharged

20   my firearm to stop the threat.

21       Q.    And so you shot him?

22       A.    I did.

23       Q.    Okay.   How many times?

24       A.    Three?   Two or three.   Somewhere around there.

25       Q.    And at the time that you shot him, you saw

                                                          147

DEPOSITION OF OFFICER MICHAEL CLARK

```
 1    that your partner had his gun out, correct?
 2         A.   I knew my partner had his gun out, yes.
 3         Q.   Who shot first, you or your partner?
 4         A.   I have no idea.
 5         Q.   Okay.  Did you see your partner shoot at all?
 6         A.   I didn't see him shoot, I heard him shoot.
 7         Q.   What's your partner's name?
 8         A.   Officer Wooley.
 9         Q.   What's his first name?
10         A.   Phillip.
11         Q.   Okay.  So when you saw Officer Wooley -- well,
12    when you heard Officer Wooly's shot, did they proceed
13    yours?
14         A.   I don't recall.  I think it was all the same
15    time.
16         Q.   How many shots did you hear from Officer
17    Wooley?
18         A.   I don't know.
19         Q.   Okay.  At no time did you see any weapon in
20    Mr. Gonzalez's hand, correct?
21         A.   I did not.  I was -- I didn't have the
22    opportunity to allow for the possibility for there to
23    be one or not.
24         Q.   And Mr. Gonzalez's was well-lit by headlights,
25    right?
```

DEPOSITION OF OFFICER MICHAEL CLARK

1      A.   There's no such thing as "well-lit" in the

2  dark, whether you have lights or not.

3      Q.   So your --

4      A.   You're well-lit.  You are well-lit, but if we

5  take the light out of this room and it's dark outside

6  and I put a flashlight on you, a spotlight, or

7  headlights on you, you're -- I can see you.  Doesn't

8  mean you're well-lit.

9      Q.   Could you see his hands?

10     A.   I could see his hands.

11     Q.   Was there any objects in his hands?

12     A.   I didn't see any objects in his hands, but he

13  was presenting his hands in a way as if he had

14  something --

15     Q.   Show me how he was presenting them.

16     A.   Something along the lines of this.

17     Q.   Please stand and show me.  He wasn't sitting,

18  was he?

19     A.   He wasn't sitting.  So, he had his hands out,

20  for the court purposes.

21     Q.   You're holding your hands together, you're

22  collapsing -- and I take it you have the correct hands,

23  if you can recall?

24     A.   It wouldn't really matter to know which hands.

25  Either way --

                                                    149

DEPOSITION OF OFFICER MICHAEL CLARK

1   dangerous.

2      Q.   Again, I'm here to get the facts of what you

3   observed?

4      A.   Sure.  That's what I observed.

5      Q.   So what you observed -- I'm not asking what is

6   equally dangerous.  I'm asking what you actually

7   observed.  So the way you're holding that your hands is

8   your best recollection of how he was holding his hands,

9   Mr. Gonzales, correct?

10     A.   Correct.

11     Q.   Okay.  And did you see anything, any object,

12  any item in his hands, whatsoever?

13     A.   I didn't time to see anything.

14     Q.   My question, yes or no?

15     A.   I did no see anything, no.

16     Q.   Thank you.

17     A.   May I sit down?

18     Q.   Yes.

19     A.   Thank you.

20     Q.   Thank you for asking.  Did you know that

21  Sergeant DeCosta was there?

22     A.   I knew she was -- I knew she was on scene,

23  yes.

24     Q.   Did you drive by her?

25     A.   At the time, I didn't know that I did.

                                                      152

1   seven seconds, but I still believe that you can

2   formulate a game plan, and you can formulate tactics,

3   and you can think about all these things.  The

4   application of which was not there, because there was

5   no time to do so.  There was one specific way to handle

6   this, unfortunately, and it was the way had -- it was

7   handled.

8       Q.   Did you see anything that blocked Officer

9   Wooley from moving backwards?

10      A.   There -- I don't know -- I didn't know

11  anything at the time.  I didn't see anything at the

12  time, but that's not say there wasn't.  I wasn't really

13  focused on what was behind Officer Wooley at the time.

14      Q.   And was Mr. Gonzales -- we've already

15  discussed he wasn't charging at Officer Wooley,

16  correct?

17      A.   I would say he was.

18      Q.   So walking towards Officer Wooley is charging

19  at him?

20      A.   In this situation yes.

21      Q.   Okay.  What is your definition of charge?

22      A.   When given commands to stop and you continue

23  in a -- in a way that is threatening, that would be

24  charging.

25      Q.   So, walking at -- with a methodical -- at a

                                                      155

DEPOSITION OF OFFICER MICHAEL CLARK

1   methodical pace, like, just walking with -- towards
2   Officer Wooley, that's charging?
3        A.   Based on this situation, yes.  It was.
4        Q.   Okay.  And he could have moved if he was
5   running, I take it?
6        A.   He could have moved faster, and he could have
7   moved slower, and he could have stopped.
8        Q.   He could have stopped or run in place?
9        A.   He could have run in place, too.
10       Q.   And so, at no time, did you ever see Officer
11  Wooley attempt to change his location, correct?
12       A.   I -- I knew where Officer Wooley was in
13  proximity to -- to me.  Again, I wasn't focused on what
14  Officer Wooley was doing.
15       Q.   Okay.  And you don't know who fired first --
16  you or Officer Wooley?
17       A.   Correct.
18       Q.   You know that neither of you had tasers out,
19  correct?
20       A.   That is correct.  Well, I didn't know -- I
21  didn't know at the time.  Let me reiterate.  I now know
22  after the fact of watching those videos that Officer
23  Wooley did not have his out at the time or didn't --
24  had it or did not have at the time.
25       A.   I thought you said you saw he had him at

156

DEPOSITION OF OFFICER MICHAEL CLARK

1   officers believe.   Lacks foundation.

2       A.    To answer your question, I -- I can't, you

3   know, say what other officers would do.  I can say that

4   it's -- you should not drink a gallon of whiskey, but

5   that doesn't mean can't do it if you really wanted to.

6   That's the metaphor.  Perhaps a poor one, but that's

7   the point I'm trying convey.

8       Q.    That's a pretty poor metaphor.

9       A.    But I think it's the point that I'm trying to

10  convey that should be taken out of that, not the

11  metaphor itself.

12      Q.    Got it.  I think I understand the metaphor.

13  Thank you.  Now, you heard Officer Wooley, before shots

14  were fired, saying, "Put down the knife.  Put down the

15  knife", correct?

16      A.    Correct.

17      Q.    Okay.  And you never saw Sergeant DeCosta at

18  the scene until after shots were fired, correct?

19      A.    That is correct.

20      Q.    And how far were you from Mr. Gonzales when

21  you shot him?

22      A.    Between 12 to 15 feet.

23      Q.    Okay.  And you were approaching him?

24      A.    I was.

25      Q.    Okay.  As you shot, were you walking?

160

DEPOSITION OF OFFICER MICHAEL CLARK

1      Q.   His left side?   Okay.   And did you believe
2   that you were about the same distance from Officer
3   Wooley as you were from Mr. Gonzales when you shot him?
4      A.   In close proximity.   About the same distance.
5      Q.   Okay.   Were you closer -- you were in a
6   straight line.   Were you closer to Mr. Gonzales than to
7   Officer Wooley?
8      A.   I would say I was probably slightly closer to
9   Officer Wooley, maybe.   Not by much, though.   Maybe a
10   foot or two.
11      Q.   So how long after you heard Officer Wooley
12   say, "put the knife down", did you -- the last time you
13   heard him say it did you fire?
14      A.   I heard him saying it as I was approaching
15   Mr. Gonzalez.
16      Q.   I understand that.   How long after you last
17   heard him say, "put the knife down" did you fire?
18      A.   Split second.
19      Q.   Was he still saying that when you fired?
20      A.   I don't recall.
21      Q.   Okay.   And last thing I want to do is watch
22   the video.   I want to make sure that I don't have any
23   other questions here.   Did you hear Officer Wooley say,
24   "put the knife down" or "he's got the knife"?
25      A.   I believe I heard both.

162

DEPOSITION OF OFFICER MICHAEL CLARK

1     Q.   A box cutter looks like a container that holds

2   a razor of some sort, right?

3     A.   Correct.

4     Q.   And typically it's retractable, correct?

5     A.   Correct.

6     Q.   And so, what -- do you recall the color of the

7   box cutter that you thought you saw?

8     A.   I just saw a silver object that I thought was

9   a box cutter.

10    Q.   And so, you obviously didn't get a good look

11   at it, correct?

12    A.   I saw a silver object that was a blade, and I

13   thought it was a box cutter.  It was later brought to

14   my attention it was just a razor blade.

15    Q.   Are you aware -- well, strike that.  As you

16   sit here, do you have a recollection of getting a good

17   look at this object at the scene?

18    A.   Not a good look, I just remember seeing a

19   bladed -- like I said, I thought I saw a box cutter.

20    Q.   And you can't say what color you thought it

21   was, correct?

22    A.   It was silver.

23    Q.   Okay.

24    A.   I remember seeing something silver.  I didn't

25   have time to exam it, though.

                                                    165

DEPOSITION OF OFFICER MICHAEL CLARK

1    you're running?

2         A.    That would fall under "should".

3         Q.    Okay.   Thank you.   No further questions.

4              (Deposition concluded at 3:13 PM)

5                         --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

191

DEPOSITION OF OFFICER MICHAEL CLARK

```
1    STATE OF CALIFORNIA    )
                            ) ss.
2    COUNTY OF CONTRA COSTA )

3

4        I, Angelica R. Gutierrez, a licensed Certified

5    Shorthand Reporter, duly qualified and certified as such

6    by the State of California;

7        That prior to being examined, the witness named in

8    the foregoing deposition was by me duly sworn to testify

9    to the truth, the whole truth, and nothing but the truth;

10       That the deposition was by me recorded

11   stenographically at the time and place first herein

12   mentioned, and the foregoing pages constitute a full,

13   true, complete and correct record of the testimony given

14   by the said witness;

15       That I am a disinterested person, not being in any

16   way interested in the outcome of said action, nor

17   connected with, nor related to any of the parties in said

18   action, or to their respective counsel, in any manner

19   whatsoever.

20

21            DATED:  January 28, 2020

22

23       ____/s/Angelica R. Gutierrez_____

24       ANGELICA R. GUTIERREZ, CSR No.  13292

25
```

193