UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

AG. G. a minor, by and through his guardian ad litem, JESSICA AQUINO; AR. G., a minor, by and through his guardian ad litem, JESSICA AQUINO;   KARLA GONSALEZ, individually; and AUGUSTIN GONZALES JR.,  individually;

Plaintiffs,

vs.

CITY OF HAYWARD, a municipal corporation; MARK KOLLER, individually; PHILLIP WOOLEY, individually; MICHAEL CLARK, individually; TASHA DECOSTA, individually; and DOES 1-100, inclusive,

Defendants.

Case No. 4:19-cv-00697 DMR

**DECLARATION OF BENJAMIN NISENBAUM IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**Date:  July 9, 2020**
**Time:  1:00 p.m.**
**Courtroom: 4**

**Hon. Donna M. Ryu**

# EXHIBIT G

**INTERVIEW WITH OFC. PHILLIP WOOLEY**
**Q=Det. Robert Purnell**
**Q1=Det. Mulhern**
**Q2=Atty. Harry Stern**
**Q3=DA Insp. Caesar Basa**
**Q4=DDA Autrey James**
**A=Ofc. Phillip Wooley**

Q:   All right, Officer Wooley, if I can have you take a seat there with, uh, Mr. Stern.

A:   Thank you.

Q:   (Unintelligible) from the District Attorney's Office, I'm gonna have you take a seat here if you would, please.

Man:   Yes, sir.

Q:   All right. I might even start the, uh, audio recording here. Uh, Detective Rob Purnell. It is November 18, 2018, approximately 1:02 pm. Uh, this is for the officer-involved shooting interview of Officer Phil Wooley. Uh, we'll start by going around the room.

Q1:   Detective Mulhern, uh, Hayward Police Department, Criminal Investigations Bureau.

A:   Officer Phillip Wooley, Hayward Police Department.

Q2:   I'm Harry Stern I'm a lawyer with Raines, Lucia, Stern, and I'm here representing Officer Wooley.

Q3:   Uh, Inspector Basa with the Alameda County District Attorney's Office.

Q4:   And Deputy District Attorney Autrey James, Alameda County District Attorney's Office.

Q:   All right. Good afternoon, Officer Wooley.

| 46 | A: | Good afternoon. |
| 47 | | |
| 48 | Q: | Appreciate you, uh, taking the time to meet with us today. First thing we're |
| 49 | | gonna go over is a modified, um, interview form. So I'm gonna go ahead and |
| 50 | | read that to you as I complete it. Entering the case number which is already on |
| 51 | | the form, 2018-94542. Today's date and my name. Officer Wooley, W-O-O- |
| 52 | | L-E-Y, is that correct? |
| 53 | | |
| 54 | A: | Correct. |
| 55 | | |
| 56 | Q: | Okay. Um, Officer Wooley, you're represented here at this interview by your |
| 57 | | attorney, Harry Stern. You are not in custody and you are free to conclude the |
| 58 | | interview at any time. You are not obligated to answer any questions. Any |
| 59 | | questions you do give may be used in a court of law. Having this in mind, do |
| 60 | | you wish to voluntarily proceed with the interview? |
| 61 | | |
| 62 | A: | Yes. |
| 63 | | |
| 64 | Q: | All right. Officer Wooley, I'll have you sign where it says signature of the |
| 65 | | officer, it's the first line. Mr. Stern, if you'd sign below him. |
| 66 | | |
| 67 | Q2: | Certainly. |
| 68 | | |
| 69 | Q: | And then I will sign the, uh, last line as the investigator. All right. So, Officer |
| 70 | | Wooley, we're gonna go over some, uh, background questions as we begin the |
| 71 | | interview here, just gonna go over some, uh, just information about your |
| 72 | | hiring, how long you've worked for the police department. We'll go from |
| 73 | | there into some specialized training, information about yourself, ask some, uh, |
| 74 | | questions about your uniform and, uh, your firearm, little bit about your |
| 75 | | vehicle. From there we'll go into a little bit about the scene conditions. Um, |
| 76 | | from there we'll probably have you, uh, roll into kind of a free narrative of the |
| 77 | | event from what you remember. Uh, when you - I'll do my best not to |
| 78 | | interrupt you as you do that, we'll just kind of let you roll through the entire |
| 79 | | thing. Uh, at the conclusion of that, uh, Detective Mulhern and I will probably |
| 80 | | have some questions - clarifying questions, um, to ask you. Um, from there |
| 81 | | we'll probably take a break, um, try to confer with everybody to see if anyone |
| 82 | | has any further questions. We'll come back in. Um, Detective Mulhern and I |
| 83 | | will ask any follow up questions that we feel we need. At that point we'll turn |
| 84 | | it over to the District Attorney's Office for any questions that they may have |
| 85 | | and then over to your attorney, Mr. Stern, for any follow up questions. Uh, if |
| 86 | | at any point you'd like to take a break, need to use the restroom, anything like |
| 87 | | that, please let - let myself or your attorney know, and we can certainly |
| 88 | | accommodate that. Okay? |
| 89 | | |
| 90 | A: | Okay. |

| | | |
|---|---|---|
| 91 | | |
| 92 | Q: | All right. So we'll start by, uh, if you can just provide your name, spelling it |
| 93 | | again for me, and your badge number. |
| 94 | | |
| 95 | A: | It's Phillip, P-H-I-L-L-I-P, middle initial is J, my last name is Wooley, W-O- |
| 96 | | O-L-E-Y, and my badge number is 306. |
| 97 | | |
| 98 | Q: | All right. And what is your date of, uh, hire with the Hayward Police |
| 99 | | Department? |
| 100 | | |
| 101 | A: | January 2, 1990. |
| 102 | | |
| 103 | Q: | Do you have any other law enforcement experience, uh, prior to this agency? |
| 104 | | |
| 105 | A: | No. |
| 106 | | |
| 107 | Q: | Any, uh, military service, anything like that? |
| 108 | | |
| 109 | A: | I spent 12 years in the United States Mersh- uh, sorry, United States Marine |
| 110 | | Corps as a machine gunner. Four years on active duty and eight years in the |
| 111 | | Reserves. |
| 112 | | |
| 113 | Q: | Did you serve overseas during that time in the Corps? |
| 114 | | |
| 115 | A: | Yes. |
| 116 | | |
| 117 | Q: | Okay. Any active conflicts or anything like that while you were in the Marine |
| 118 | | Corps? |
| 119 | | |
| 120 | A: | Beirut, Lebanon in 1983. |
| 121 | | |
| 122 | Q: | All right. Uh, on the night of this incident, what was your unit designation or, |
| 123 | | uh, radio call sign? |
| 124 | | |
| 125 | A: | Boy 32 or B32. |
| 126 | | |
| 127 | Q: | Um, and does the, uh, the B and the 32, do they, um, reference something |
| 128 | | about your area of responsibility and the shift that you work? |
| 129 | | |
| 130 | A: | Yeah. |
| 131 | | |
| 132 | Q: | Okay. |
| 133 | | |
| 134 | A: | B is for the Boy, B, which is the downtown area of Hayward. The 32 is for the |
| 135 | | midnight shift. |

| 136 | | |
|---|---|---|
| 137 | Q: | And when you refer to the midnight shift, what are the actual hours that you |
| 138 | | work? |
| 139 | | |
| 140 | A: | You want it in 24-hour clock? |
| 141 | | |
| 142 | Q: | If you would, please. |
| 143 | | |
| 144 | A: | 1800 to 0630 in the morning. |
| 145 | | |
| 146 | Q: | All right. What are your, uh, current days that you're working? |
| 147 | | |
| 148 | A: | I work Tuesday dayshift, Wednesday swing shift, and Thursday midnight. My |
| 149 | | team's referred to as Team 7. We're the relief shift. |
| 150 | | |
| 151 | Q: | And you said, uh, Tuesday dayshift, Wednesday swing shift, and Thursday |
| 152 | | graveyard? |
| 153 | | |
| 154 | A: | Correct. |
| 155 | | |
| 156 | Q: | Or midnight shift? And on Team 7, uh, who is your current supervisor? |
| 157 | | |
| 158 | A: | Sergeant Neula and Sergeant (Vonnegut), and Lieutenant (Dorn). |
| 159 | | |
| 160 | Q: | Which sergeant is responsible for the north end of town? |
| 161 | | |
| 162 | A: | Sergeant (Vonnegut). |
| 163 | | |
| 164 | Q: | You said Lieutenant (Dorn)? |
| 165 | | |
| 166 | A: | Correct. |
| 167 | | |
| 168 | Q: | All three of those supervisors were working the night of this incident? |
| 169 | | |
| 170 | A: | No. |
| 171 | | |
| 172 | Q: | Okay. Who was the a... |
| 173 | | |
| 174 | A: | Only - I'm sorry. Only Sergeant (Vonnegut) was working. |
| 175 | | |
| 176 | Q: | Okay. |
| 177 | | |
| 178 | A: | We had - Lieutenant (Cory) Linteo was the Watch Commander that night. |
| 179 | | There was SRU training, Lieutenant (Dorn)'s part of the SRU team, so he was |
| 180 | | not there and Sergeant Neula was on vacation. |

INTERVIEW WITH OFC. PHILLIP WOOLEY
Interviewer: Det. Robert Purnell
11-18-18/1:01 pm
Case # 2018-94542
Page 5

| | | |
|---|---|---|
| 181 | | |
| 182 | Q: | Were there any other supervisors working that night? |
| 183 | | |
| 184 | A: | Sergeant DeCosta was working from the swing shift. |
| 185 | | |
| 186 | Q: | Officer Wooley, have you attended or received any specialized training? |
| 187 | | |
| 188 | A: | In? Um, all kinds. Um, I'm a firearms instructor, that's probably my primary |
| 189 | | assignment I would say. I've attended 2 to 3000 hours' worth of specialized |
| 190 | | training when it comes to firearms, be it handguns, rifles, shotguns, sub- |
| 191 | | machine guns, edged weapons, all the above. Um, I've done a lot of training, |
| 192 | | when it comes to investigations I spent eight years in our Investigations |
| 193 | | Bureau. Sexual Assault Investigations, Child Abuse Investigations. I'm a |
| 194 | | Field Training Officer. I've gone to FTO school four or five times now. I'm |
| 195 | | also a Crime Scene Technician, so I've been to several different, you know, |
| 196 | | crime scene investigation courses. I'm a trained dispatcher, so I do work |
| 197 | | overtime in our Dispatch Center and I fill in there quite often when they're |
| 198 | | shorthanded. But pretty much, yeah, most of my training's around firearms. |
| 199 | | |
| 200 | Q: | Okay. You said 2 to 3000 hours? |
| 201 | | |
| 202 | A: | Yeah. |
| 203 | | |
| 204 | Q: | Okay. Um, and I know you mentioned that you worked as an investigator. |
| 205 | | Have you held any other, uh, special assignments such as the Gang Unit, |
| 206 | | Narcotics, um, Special Response Unit, any of those things? |
| 207 | | |
| 208 | A: | I worked our Special Duty Unit for six months, and I was a Vice officer for |
| 209 | | three years, and a Narcotics officer for three years. |
| 210 | | |
| 211 | Q: | Uh, just for the people that are in the room who are not aware, can you just |
| 212 | | explain kind of the duties of the Special Duty Unit? |
| 213 | | |
| 214 | A: | That was the original Gang Unit, when we - before we didn't have a Gang |
| 215 | | Unit, so we started having a gang problem. They took about 30 of us and put |
| 216 | | us out there and - to kind of clean up some of the gang problems, and then |
| 217 | | decided to start a specialized unit to deal with it, and, uh, Sergeant (Javier) |
| 218 | | and I were picked to do it when we were officers, to go out and be the Special |
| 219 | | Duty Unit. |
| 220 | | |
| 221 | Q: | Okay. |
| 222 | | |
| 223 | A: | So it was just the two of us, and Sergeant Lindbloom was the supervisor, and |
| 224 | | then it expanded from there. |
| 225 | | |

| | | |
|---|---|---|
| 226<br>227 | Q: | So you investigated gang-related crimes... |
| 228<br>229 | A: | Correct. |
| 230<br>231<br>232 | Q: | ...conducted, uh, specialized like enforcement on, uh, gang members, those types of things while you were out? |
| 233<br>234 | A: | Yes, sir. |
| 235<br>236<br>237 | Q: | Okay. Um, can you do the same for the Vice Unit, just ex- kind of explain your duties when you were assigned to the Vice Unit? |
| 238<br>239<br>240<br>241<br>242<br>243<br>244 | A: | Vice Unit? At that time we had a big problem with, uh, street level prostitution so my primary focus was the street level prostitution. I would run organized prostitution stings. The other big thing was ABC violations with the amount of alcohol problems we had in the city with different bars and the establishments selling alcohol. So we came down kind of hard on - with ABC licenses by restricting what they could sell, what they couldn't sell. |
| 245<br>246<br>247 | Q: | Narcotics Unit, I'm assuming is, uh, what the name implies, that you worked narcotics-related crimes? |
| 248<br>249 | A: | Correct. |
| 250<br>251<br>252 | Q: | Did you, uh, work in a - either an undercover or plainclothes role in either the Vice or the Narcotics Unit? |
| 253<br>254 | A: | Both of them. |
| 255<br>256<br>257 | Q: | As a Field Training Officer, what are some of your responsibilities with that role? |
| 258<br>259<br>260<br>261<br>262<br>263<br>264<br>265<br>266 | A: | You're tasked with training any of the new officers that come in, be if they're entry level or laterals. Laterals obviously are easier, you're just teaching them how things are done here in Hayward. Entry level's a little bit more difficult, 'cause you're teaching them from the ground up. How, you know, how to - you're their first line supervisor so you're teaching them how to write a report, how to make a traffic stop, how to get from point A to point B, how to position a car, officer safety tactics, all of it is involved in the FTO program. And this is the fourth time I've done it. |
| 267<br>268<br>269 | Q: | When you said the fourth time, is it, uh, is there a sort of rotation that you come in and out of that assignment? |
| 270 | A: | No, we just, well, this last time I was asked to do it, so they asked me to do it |

| 271 | | because the amount of new trainees we're getting. As you well know, we're |
|---|---|---|
| 272 | | getting a lot of retirement, a lot of people leaving, and it's a little difficult in |
| 273 | | this day and age to actually find qualified candidates that come in, so the ones |
| 274 | | we get, they want people that are patient and willing to work with them. |
| 275 | | |
| 276 | Q: | Okay. Uh, in the Marine Corps, did you receive any specialized training? |
| 277 | | |
| 278 | A: | I was a machine gunner, that was my primary MOS. Um, that would be my |
| 279 | | specialized training, was use of an M60 machine gun - which is old and |
| 280 | | outdated, and they don't even use anymore, so - 35, 40 years ago. |
| 281 | | |
| 282 | Q: | Did you receive any training in the Marine Corps about, um, I don't know, |
| 283 | | tactics or anything along those lines, in addition to your law enforcement |
| 284 | | training? |
| 285 | | |
| 286 | A: | No. Back then you were preparing - you know, in the early 80s the Cold War |
| 287 | | was still in bloom, so we were trained in digging a foxhole and, you know, |
| 288 | | going to Europe and pushing out the Soviet Union back, in case they invaded |
| 289 | | so no, all that stuff like FBUA, Fighting Built-Up Areas and close quarter |
| 290 | | battle came in after the Beirut bombing, which I was at, because of that instant |
| 291 | | we didn't know what we were doing, we had no clue. So, uh, yeah, that came |
| 292 | | after I was long gone. |
| 293 | | |
| 294 | Q: | All right. What was the last shift that you worked prior to, uh, the night of this |
| 295 | | incident? |
| 296 | | |
| 297 | A: | Swing shift, which is 1:30 - or I'm sorry - 1330 to 0200, and that would have |
| 298 | | been on Wednesday. |
| 299 | | |
| 300 | Q: | Uh, do you have any secondary jobs or did you work any extended hours on |
| 301 | | that, uh, swing shift? |
| 302 | | |
| 303 | A: | No. |
| 304 | | |
| 305 | Q: | Had you consumed any alcoholic beverages in the previous 24 hours before |
| 306 | | the shift or this incident? |
| 307 | | |
| 308 | A: | No, sir. |
| 309 | | |
| 310 | Q: | Do you have any medical conditions that might impact your judgment, um, or |
| 311 | | physical abilities? |
| 312 | | |
| 313 | A: | No. |
| 314 | | |
| 315 | Q: | When's the last time that you had slept prior to this incident, and if you could |

| | | |
|---|---|---|
| 316 | | provide how long and the number of hours? |
| 317 | | |
| 318 | A: | So I got off at 2:00, got home. I was probably in bed by 3:00 - I live in Dublin, |
| 319 | | so it doesn't take that long to get home, and I slept 11:00, noon. I got up, went |
| 320 | | to the gym like I always do, and then I came to work. I take a shower here |
| 321 | | before work, and change my uniform. I'm usually early to the lineup room, |
| 322 | | read the news. |
| 323 | | |
| 324 | Q: | So based on that timetable that you just provided, about eight to nine hours, is |
| 325 | | that correct? |
| 326 | | |
| 327 | A: | Yes, sir. |
| 328 | | |
| 329 | Q: | Okay. |
| 330 | | |
| 331 | A: | I've been trying to get good workouts in 'cause I'm leaving for Tahiti in a |
| 332 | | couple weeks, so... |
| 333 | | |
| 334 | Q: | Very nice. Did you receive any injuries as a result of this incident? |
| 335 | | |
| 336 | A: | No. |
| 337 | | |
| 338 | Q: | Do you wear glasses or contact lenses? |
| 339 | | |
| 340 | A: | I wear reading glasses. |
| 341 | | |
| 342 | Q: | Do you have any vision problems? |
| 343 | | |
| 344 | A: | No. |
| 345 | | |
| 346 | Q: | All right. From here we're gonna move into your uniform. Um, what class |
| 347 | | uniform were you wearing on the night of this incident? |
| 348 | | |
| 349 | A: | The Class C BDU uniform. |
| 350 | | |
| 351 | Q: | Were you photographed in that uniform? |
| 352 | | |
| 353 | A: | Yes, sir. |
| 354 | | |
| 355 | Q: | Do you wear a, uh, do you wear your ballistic vest inside that uniform, or do |
| 356 | | you wear an external carrier? |
| 357 | | |
| 358 | A: | Inside. |
| 359 | | |
| 360 | Q: | All right. Um, we can go from there, uh, from the center of your duty belt, |

HAY000632

| | | |
|---|---|---|
| 361 | | working right around your body, um, to your left side and then back to the |
| 362 | | center, can you name the items that are on that belt? |
| 363 | | |
| 364 | A: | Directly to the right is my handgun, it's a Sig Sauer P226 and 40 caliber. |
| 365 | | Directly behind that is gonna be my OC spray. Behind that's a pair of |
| 366 | | handcuffs, a second pair of handcuffs, then my Taser and my radio - then a |
| 367 | | magazine pouch, it has two spare magazines for the Sig. They're 12-round |
| 368 | | magazines. |
| 369 | | |
| 370 | Q: | Do you wear a baton or a flashlight anywhere on your belt? |
| 371 | | |
| 372 | A: | No. I carry a flashlight - I just usually stick it in my pocket. |
| 373 | | |
| 374 | Q: | Okay. In addition to your belt, do you carry anything in the cargo pockets of |
| 375 | | the BDU styles uniform? |
| 376 | | |
| 377 | A: | Not in the pants, I carry a backup weapon in my breast pocket. And that's a |
| 378 | | Glock 43, 380. It has six rounds in the magazine and one in the chamber. |
| 379 | | |
| 380 | Q: | When you say breast pocket, is that like the, uh, like the map type style pocket |
| 381 | | of that uniform, not in the actual, uh, um, pocket on the outside of the uniform |
| 382 | | itself? |
| 383 | | |
| 384 | A: | Correct. |
| 385 | | |
| 386 | Q: | Is that correct? Yeah. |
| 387 | | |
| 388 | A: | That's correct. |
| 389 | | |
| 390 | Q: | You said the right side? |
| 391 | | |
| 392 | A: | Yes, sir. I can reach it with either hand, my left or my right hand there. |
| 393 | | |
| 394 | Q: | Were you wearing a body-worn camera during this incident? |
| 395 | | |
| 396 | A: | Yes, sir. |
| 397 | | |
| 398 | Q: | Was it activated? |
| 399 | | |
| 400 | A: | Yes, sir. |
| 401 | | |
| 402 | Q: | Was there any damage to your uniform? |
| 403 | | |
| 404 | A: | No. |
| 405 | | |

HAY000633

| 406 | Q: | I know you just provided it but I'm gonna ask you again, could you provide |
| 407 | | the make and model of the, uh, firearm that you were carrying as your primary |
| 408 | | weapon? |
| 409 | | |
| 410 | A: | It's a Sig Sauer P226, in 40 caliber. |
| 411 | | |
| 412 | Q: | Is that a department-issued weapon? |
| 413 | | |
| 414 | A: | Yes, sir. I can give you the serial number if you want it. |
| 415 | | |
| 416 | Q: | If you, uh, have it memorized, that would be great. |
| 417 | | |
| 418 | A: | It's U as in Union, 686148. |
| 419 | | |
| 420 | Q: | Do you have any, uh, special modifications to the weapon, such as the, uh, the |
| 421 | | sights, the light of the - such as the sights, or do you have a light in addition to |
| 422 | | them or any, uh, modification to the grips and such? |
| 423 | | |
| 424 | A: | The only modification on that gun is the sights, they are night sights, |
| 425 | | TRUGLO night sights. |
| 426 | | |
| 427 | Q: | Uh, were you utilizing department-issued ammunition? |
| 428 | | |
| 429 | A: | Yes. |
| 430 | | |
| 431 | Q: | I know you mentioned that the, uh, magazines that you carried, they were all |
| 432 | | 12-round capacity? |
| 433 | | |
| 434 | A: | That's correct. |
| 435 | | |
| 436 | Q: | Okay. And were those, uh, magazines fully loaded to capacity? |
| 437 | | |
| 438 | A: | Yes, sir. |
| 439 | | |
| 440 | Q: | To 12? And a chamber round in your weapon? |
| 441 | | |
| 442 | A: | Yes, sir. |
| 443 | | |
| 444 | Q: | When was the last time that you qualified with that weapon? |
| 445 | | |
| 446 | A: | I seem to recall about three months ago. Mm-hm. Three - three months ago, |
| 447 | | right? |
| 448 | | |
| 449 | Q1: | I'm not certain, it was during transition training. |
| 450 | | |

| | | |
|---|---|---|
| 451<br>452<br>453 | A: | Yeah, about three months ago. Detective Mulhern's also a firearms instructor, so we were together when we did that. |
| 454<br>455<br>456 | Q: | Understood. Um, I know that you mentioned that you were also carrying the Glock 43 as a backup weapon. Was that weapon fired during this incident? |
| 457<br>458 | A: | No. |
| 459<br>460 | Q: | No other backup weapons or knives? |
| 461<br>462 | A: | No. |
| 463<br>464<br>465 | Q: | While we're on the gun, uh, you said the only modifications were the TRUGLO night sights? |
| 466<br>467 | A: | Correct. |
| 468<br>469<br>470 | Q: | You had trained with those night - TRUGLO night sights on that weapon system, right? |
| 471<br>472 | A: | Oh, absolutely, yes, sir. |
| 473<br>474<br>475 | Q: | All right. On the night of the incident were you driving a fully marked, uh, Hayward Police patrol vehicle? |
| 476<br>477 | A: | Yes, sir. |
| 478<br>479<br>480 | Q: | Okay. Can you, uh, describe that vehicle with the number, uh, make and model if you would, please. |
| 481<br>482<br>483<br>484<br>485 | A: | It's a Ford Explorer SUV and it's black and white, and the vehicle number is 226. It has Hayward Police emblems on both doors, the passenger and driver's side door. It's got fully marked lights, overhead emergency lights, spotlight. Very distinctively marked patrol car, police car. |
| 486<br>487 | Q: | Is this the normal vehicle that you drive? |
| 488<br>489 | A: | Yes, sir. |
| 490<br>491 | Q: | Were you the, uh, solo officer in this unit? |
| 492<br>493 | A: | Yes, sir. |
| 494<br>495 | Q: | Okay. No one - no ride alongs or other officers with you at the time of this incident? |

HAY000635



496

497    A:        No, sir.

498

499    Q:        Did you activate the emergency lights, um, or the spotlights at any point, uh,

500              while responding to or at the incident itself?

501

502    A:        I believe I turned on the overhead lights to get through a light or two going. I

503              was at D and Mission when the call came out, so I had to go south on Mission,

504              so I think I did turn them on a couple times to get through a couple of the, um,

505              lights at maybe Mission and, uh, Mission and D, in those areas.

506

507    Q:        Uh, not activated once you were on scene, is that correct?

508

509    A:        Correct.

510

511    Q:        No spotlights activated while you were on scene?

512

513    A:        No.

514

515    Q:        Okay. Uh, I'm gonna ask a little bit about the actual scene itself. Can you just

516              describe the area where this incident took place?

517

518    A:        It's a residential street, and there is some businesses that are on the east side,

519              but mostly it's residential. It's a north, south street and it's made of asphalt -

520              it's very dark. Uh, there wasn't a lot of street lighting there in the area. There

521              were cars on both sides, the no- or sorry, the east and west sides of the street,

522              blocking just, you know, parked up against the curb. Um, the people when I

523              got there, that I saw, were standing in front of a large white pickup truck.

524

525    Q:        Um, can you describe the weather conditions of the night of the incident?

526

527    A:        It was clear, not raining, not cloudy, but kind of smoky due to the fires up in

528              Butte County, but, you know, there's smoke all over the Bay Area right now,

529              so it was a little hazy from the smoke.

530

531    Q:        And I know you described it as dark. Can you actually describe the, uh, the

532              lighting conditions?

533

534    A:        I'm not quite sure of the question.

535

536    Q:        Oh, I'm sorry. Uh, was it daytime, nighttime?

537

538    A:        Oh, I'm sorry, it was nighttime, yeah. It was nighttime. It was dark outside

539              and the street lighting right in that area was not very good.

540

HAY000636

| | | |
|---|---|---|
| 541<br>542<br>543 | Q: | In addition to street lighting is there any other artificial lighting from either the, uh, residents or the commercial businesses that you talked about? |
| 544<br>545<br>546 | A: | There was some artificial lighting from a residence on the east - or sorry, the west side of the street. That and my patrol car light. |
| 547<br>548<br>549 | Q: | And when you, uh, refer to the patrol car lights, are we talking just the headlights of the vehicle? |
| 550<br>551 | A: | Just the headlights, yeah. |
| 552<br>553 | Q: | Uh, just the headlights themselves, or had you activated the brights? |
| 554<br>555 | A: | I did not. It was just the normal headlights. |
| 556<br>557 | Q: | Do you know the business that, uh, borders the street there? |
| 558<br>559 | A: | I think it's a car dealership. It's the back lot of a car dealership. |
| 560<br>561 | Q: | Do you use, uh, utilize a flashlight at any point during? |
| 562<br>563 | A: | No, I dropped it - I had it in my hand but I dropped it. |
| 564<br>565<br>566<br>567<br>568<br>569<br>570<br>571 | Q: | All right. So we've come to the point that I discussed kind of early in the, uh, interview, and that's kind of the free narrative of the event. So, um, if you would, just kind of take us back to that night. Um, describe how you became aware of the actual incident itself, um, any dispatch information that you recall, uh, where you responded from, how you got there, um, and then obviously, uh, as you come on scene, anything - anything you observed, um, and then take us through the actual incident itself if you would, please. |
| 572<br>573<br>574<br>575<br>576<br>577<br>578<br>579<br>580<br>581<br>582<br>583<br>584<br>585 | A: | I don't remember the exact time, somewhere around 10 o'clock I believe, I was going to the Lucky's on Mission Boulevard. It's 22555 Mission Boulevard, to take a stolen vehicle report. So I was going westbound on D Street approaching Mission when this all came out. It originally came out as a 415 ascertain, meaning there's something going on there at the intersection of Orchard and O'Neil. This is all being broadcast via the radio, 'cause my MDT, the computer in the car obviously had the call I was going to on it, so I didn't have the original call. So dispatch was broadcasting that there was a male there that had a knife and attempted to stab a roommate, and the information was very sketchy because the informant wasn't being a lot - forthcoming with the information. So since I was at Mission and D, I was about a mile away from that - it was about a mile away south from where I was, so I got on the radio and said, "Boy32 diverting to that," so I started heading down there. Dispatch updated us with the information that the suspect |

586  had on a black and white - check that, I'm sorry - a red and black striped shirt,
587  and he was armed with a knife and he was arguing with a roommate, and then
588  basically the phone line didn't go dead, it was just open, and the informant
589  that originally called wasn't giving any more information. I was at about
590  Mission, just north of Orchard. I activated my body-worn camera, turned it on,
591  and the only other information we had where these people were was they were
592  in an apartment complex at the intersection. So when I got there, there was
593  nothing obvious right in the middle of the intersection, and then I started
594  driving around the intersection saying, "Hey, there's a lot of apartment
595  complexes here. Do we have any more information of where this is?" So I
596  couldn't find anything. I'm basically driving in circles, trying to find
597  something. I was probably there maybe 30, 45 seconds when I started hearing
598  somebody whistling, yelling at me. It was coming from north on O'Neil. And
599  so I put that out on the radio, that "Someone's trying to flag me down."
600  Somewhere in this time I start driving up north, and Sergeant DeCosta says
601  that she's with the informant. I never saw her. I don't recall seeing her at all.
602  So I start driving north and I asked, "Where is - okay, we have the informant.
603  Do we know where the other person is?" Right about then I'm looking up over
604  the dashboard of a car, and I can see the guy in the black and red - or I'm
605  sorry, the red and black striped shirt. He was arguing with another person,
606  another male and a female. He had something in his hand, I really couldn't see
607  it. Um, because it was so dark I pulled my car up a little bit closer than I
608  would have liked to, but I need to use lights to see. They were arguing and he
609  had something in his hand. I was afraid, I'm thinking, um, he had either
610  stabbed or already had - or was gonna stab the roommate, so I was afraid he
611  was gonna stab the girl or the guy at that time. So as I got out of my car, I left
612  the door open, and he looked at me, the suspect looked at me. He had a very
613  blank, thousand-yard stare on his face, and he just looked at me and he said,
614  "You're gonna have to shoot me." So I had already had my gun out. I told
615  him, "Drop the knife, drop the knife, drop the knife." While I'm saying that,
616  he's walking toward me. And as he's walking toward me he had both of his
617  hands together, almost like in a shooting stance, more or less, and I could see
618  something in his hand, I believe it was his right hand - I thought it was a box
619  cutter, that's what my mind was going through. In the last few years, um,
620  we've been going through a lot of this training on, you know, putting a line in
621  the sand, and I had already formulated if he comes any closer than that line in
622  the sand, then he was gonna be an - an extreme threat to me by being -
623  stabbing me with that knife, or turned his attention back to these two people.
624  So I'm telling him, "Drop the knife, drop the knife," and I say, "Stop." He
625  doesn't stop. He keeps coming at me and that's when I made the decision to
626  fire, 'cause I thought he was gonna stab me with the knife and either kill me
627  or cause me great bodily injury. I don't recall the exact number of rounds I
628  fired. I probably fired anywhere from six to seven, maybe eight. At that same
629  time, roughly right when I started firing, I could see in my peripheral vision
630  Officer Clark show up. Uh, I could see Officer Clark also fired, I don't know

Case 4:19-cv-00697-DMR    Document 73-7    Filed 06/18/20    Page 16 of 45
INTERVIEW WITH OFC. PHILLIP WOOLEY
Interviewer: Det. Robert Purnell
11-18-18/1:01 pm
Case # 2018-94542
Page 15

| 631 | | how much. Right after I fired and the suspect went down. I said to him, |
| 632 | | "Don't move," he said, "I'm not moving." I got on the radio and said, "Shots |
| 633 | | fired." Somebody was transmitting and it didn't go out, but then I reque- and |
| 634 | | then Officer Gillett showed up and Officer Clark started handcuffing the |
| 635 | | suspect, and he was still alive at that point, he was moaning something, |
| 636 | | nothing coherent. And then I put out on the radio, once he was handcuffed, |
| 637 | | "It's clear, roll Fire in," and then I asked for more units to arrive, and then I |
| 638 | | asked for Sergeant (Vonnegut) to come, which is Sam 32. And really that's it. |
| 639 | | That's the incident as a whole. |
| 640 | | |
| 641 | Q: | All right. Well, I, uh, certainly appreciate you going through all that. We're |
| 642 | | gonna kind of go back and break a little bit of it down. Um, I do have some |
| 643 | | maps so we, uh, can kind of go through this, um, just kind of make sure that |
| 644 | | we're all on the same page as to where this occurred. |
| 645 | | |
| 646 | A: | Is it okay if I get my reading glasses? |
| 647 | | |
| 648 | Q: | Absolutely. All right, so you said it was about, uh, 10 o'clock at night and - |
| 649 | | when you'd been dispatched to Lucky's for a stolen vehicle, correct? Your |
| 650 | | initial.. |
| 651 | | |
| 652 | A: | Correct. |
| 653 | | |
| 654 | Q: | ...uh, and then, uh, while responding there, um, I think you said - you |
| 655 | | described it as a 415? |
| 656 | | |
| 657 | A: | 415 ascertain. |
| 658 | | |
| 659 | Q: | Okay. Um, and for somebody that doesn't know 415 as a code, what is that, |
| 660 | | disturbing the peace? |
| 661 | | |
| 662 | A: | The ascertain is one of those things that's vague, really not quite sure what's |
| 663 | | going on, something that's bad or has the potential to be bad, but we're not |
| 664 | | quite sure what's going on, usually because the informant's not telling us |
| 665 | | much. |
| 666 | | |
| 667 | Q: | Okay. |
| 668 | | |
| 669 | A: | So it's a higher priority than just a regular 415. |
| 670 | | |
| 671 | Q: | And then you, um, you hear the dispatcher, uh, tell you something about, |
| 672 | | "There's a male with a knife and he's attempted to stab a roommate," is that |
| 673 | | correct? |
| 674 | | |
| 675 | A: | Correct. |

HAY000639



676

677 Q:    Okay. Uh, so when you hear - between this 415 ascertain that's been put out
678       and then this, uh, there's a male with a knife who's attempted to stab a
679       roommate, in your mind, has a crime already occurred at this point?
680

681 A:    Yes, sir.
682

683 Q:    So, um, between those two dispatches, are you responding to a crime in
684       progress?
685

686 A:    Correct.
687

688 Q:    Okay. Um...
689

690 A:    They - while I was driving there, they actually updated the call to a 417,
691       which is a brandishing of a weapon.
692

693 Q:    Okay. So responding to a - a - I guess a cold ten-eight or a cold stolen vehicle
694       is fairly different than responding to a brandishing of a weapon, would that be
695       correct in your opinion?
696

697 A:    Absolutely.
698

699 Q:    Okay. Does that change your response or - or how you prepare yourself as
700       you're going to this call?
701

702 A:    Absolutely it does. You have a completely different mindset of what you're
703       conducting.
704

705 Q:    Okay.
706

707 A:    What's paramount when you're going to something like a 415 with a weapon,
708       be it a gun or a knife or a meat cleaver, is the safety of yourself, your partners,
709       and the general public, so that's what you're thinking about more than
710       anything. Where, you know, the train that you're going to dictates your
711       tactics. Where am I gonna position my car, where am I gonna position
712       myself? What is the lighting? It's obviously dark and nighttime out there, so
713       you're thinking about lighting, I need to be able to see. I have to be able to
714       ascertain if that weapon he actually has is a weapon. Things change, so I'm
715       going there - just because he was armed with a knife or that's the information
716       I had doesn't mean he was armed with a knife when I got there. He could have
717       dropped it, he could have thrown it, he could have put it someplace else,
718       someone could have taken it from him in that, you know, minute timeframe,
719       so got to be able to see that and know that he's actually armed or not. So all
720       that comes into play, it's going through your mind while you're driving there,

HAY000640



721      or it should be. That's how I train new officers is think of all the possible
722      contingencies. You play the "what if" game, what if this happens, what if that
723      happens, what if he did drop the knife, what if he does come at you with a
724      knife? What if he did stab her? What if he did stab him?
725

726   Q:      Uh, through your training and experience as an officer, and also as a firearms
727      instructor, is somebody with a knife a - a dangerous threat?
728

729   A:      Absolutely.
730

731   Q:      Okay. Um, what types of injuries have you seen through your training and
732      experience involving knives or edged weapons?
733

734   A:      Knives that are weapons can kill somebody, can cause their death. They can
735      cause great bodily injury by eviscerating tissue, cuts, tendons, you know,
736      slashes of muscle tissue, fat. It can tear up your intestines, it can tear up your
737      heart, lungs, legs. It could render limbs inoperable, put out your eye, your
738      nose, ears. It can do almost anything. It's considered in our line of work a
739      deadly force instrument. I train - again, back to my training - I train new
740      officers when they carry a knife, that that can be a backup weapon. If
741      somebody's trying to take your primary firearm away from you - a lot of
742      people like to put their knives on their, um, strong side. I tell them move it to
743      your weak side because one of your first training things is if someone tries to
744      take your gun away from you, what do you do? You take your strong arm and
745      you lock the gun into the holster. That's what you're trained from day one in
746      the police academy, you lock in. So your strong arm's out of play, you can't
747      use it anymore, so you're gonna have to use your weak hand. That's why I
748      decided to keep my backup firearm in a position I can get to it with my strong
749      or weak hand. So I tell them to take their knife, put it on their weak side so
750      they can get it out. If someone's trying to take their gun they can use that as a
751      deadly force weapon to get the person off of them.
752

753   Q:      Okay. The, uh, the suspect, in addition to being described as, uh, with a red
754      and black shirt and - and armed with this knife, is there - do you recall any
755      other specifics about the suspect being put out over the radio?
756

757   A:      I believe he also - they said he had blue jeans and he was white or Hispanic. I
758      honestly couldn't tell you what race he was right now, I mean he - he had that
759      blank look on his face that no matter what I told him or said, he was not gonna
760      respond to it.
761

762   Q:      Okay. Was the, uh, was the knife itself, was it described at all as you're
763      responding, or was it ever referred to anything else other than a knife?
764

765   A:      No.

HAY000641



766

767   Q:          Okay.

768

769   A:          It was just a knife.

770

771   Q:          And then you, uh, described that the phone line was open at that point. Did the
772               dispatcher tell you that the phone line was open?

773

774   A:          Yes, sir.

775

776   Q:          Okay. Um, as you're responding, were they updating you with anything that
777               they were hearing on the phone line or anything like that?

778

779   A:          They were saying that he could hear loud arguing in the background, and then
780               when I went on scene, about - around maybe 30, 40 seconds later, they said
781               that they could hear whistling that I was hearing, that he heard the same thing.

782

783   Q:          When you hear the whistling, do you actually see somebody whistling or - or
784               yelling at you?

785

786   A:          No, I couldn't see him, I could only hear it, and then as I got closer I could
787               just make out an image. I - I couldn't even describe the guy to you today. He
788               was there and I know Sergeant DeCosta talked to him, but I couldn't make - I
789               couldn't - all I know is that dispatch advised that that informant had on an
790               orange shirt that I remember, but I don't remember seeing him.

791

792   Q:          And you described that he was yelling. Could you make out what was being
793               said?

794

795   A:          No.

796

797   Q:          All right. And then from there you, uh, described that Sergeant DeCosta said
798               that she was with the informant. Was that - did she actually tell you that in
799               person, or was that also put out over the radio?

800

801   A:          That was over the radio. I didn't even seen her there. I mean that's how dark
802               the street was, I didn't even see her talking to the informant.

803

804   Q:          Then you described, um, as you were putting some information out over the
805               radio, you actually see over the dashboard, um, this person in the red and
806               black shirt. Did you take that person as the suspect that was described to you
807               in the radio dispatch?

808

809   A:          Yes, sir.

810

HAY000642

| | | |
|---|---|---|
| 811 | Q: | Okay. Um, and you described that he's arguing with people? |
| 812 | | |
| 813 | A: | He was arguing with a female and a male, yes. |
| 814 | | |
| 815 | Q: | Could you make out what was being said? |
| 816 | | |
| 817 | A: | No. |
| 818 | | |
| 819 | Q: | Could you describe the female and the male that he was arguing with? |
| 820 | | |
| 821 | A: | No. The female was white and the male was white, that's about all I can really |
| 822 | | remember about them. My focus and attention kind of shift to him at that |
| 823 | | point. Again, I'm - I'm thinking he's already stabbed somebody, is he gonna |
| 824 | | stab them too? That's kind of where my mindset was. I didn't want them to be |
| 825 | | stabbed. |
| 826 | | |
| 827 | Q: | So your understanding is as you're responding to this is somebody has already |
| 828 | | been stabbed? |
| 829 | | |
| 830 | A: | That's what we were told, that he stabbed a roommate. |
| 831 | | |
| 832 | Q: | Okay. |
| 833 | | |
| 834 | A: | So I'm working on, you know, off the information I've been given. |
| 835 | | |
| 836 | Q: | And you describe that you, uh, see something in his hand. Can you describe |
| 837 | | that at all? I know you, uh, you said that you needed to pull forward to get |
| 838 | | more lighting but... |
| 839 | | |
| 840 | A: | Right. I could see something in his hand originally when I got there, and he |
| 841 | | was holding it kind of weirdly, but odd. He was holding it oddly, not |
| 842 | | normally. But when he shifted his attention to me, like I said he came up in |
| 843 | | what I would call a shooting position. He had both hands clasped together like |
| 844 | | he was holding a gun. There's obviously not a gun in his hand but he had |
| 845 | | something in his right hand - I thought it was a box cutter. I took it to be a box |
| 846 | | cutter. |
| 847 | | |
| 848 | Q: | So when you see this object in his hand, um, is there anything that stands out |
| 849 | | about it? Um, does like - does the light reflect off of it? Is there anything that |
| 850 | | would lead you to believe what it is or what - what it's made out of that - as |
| 851 | | you approach? For somebody that doesn't understand what a shooting stance |
| 852 | | is, can you just - I know you started to describe it, but could you just describe |
| 853 | | it a little bit more in general what a shooting stance is? |
| 854 | | |
| 855 | A: | He had both hands clasped together as if he was holding something in what |

HAY000643



| | | |
|---|---|---|
| 856 | | would be considered a low ready position to me. A low ready position is a |
| 857 | | position that you take your handgun and put it in, basically about two inches |
| 858 | | below the waistline, so you can see the waistline and upper body, and that way |
| 859 | | you could actually bring the gun up quicker from there if you actually have to |
| 860 | | shoot somebody. So it looked to me like he had it in the low ready position, |
| 861 | | and he just walked straight towards me and said, "You're gonna have to shoot |
| 862 | | me." |
| 863 | | |
| 864 | Q: | In your opinion when somebody takes a shooting stance, is that a - an |
| 865 | | aggressive posture or... |
| 866 | | |
| 867 | A: | Yes. |
| 868 | | |
| 869 | Q: | Okay. Um, from your training and experience has somebody in that position |
| 870 | | ever become combative or presented as a threat to you in previous calls for |
| 871 | | service? |
| 872 | | |
| 873 | A: | Absolutely. Getting to - probably the thing that caught my attention more than |
| 874 | | anything was his demeanor. The look on his face, that blank stare, like, you |
| 875 | | know, in - in the combat zone you'd call it a thousand-yard stare. That just |
| 876 | | means you are - you're checked out. You are - you're - you're checked out. |
| 877 | | You're just there and you're seeing through people, and whatever decision |
| 878 | | you've made in your mind that you've got in your mind, you are gonna carry |
| 879 | | it out. You're purpose-driven, and nothing's gonna stop you. And that's the |
| 880 | | look he had. That was what alarmed me more than anything. That, combined |
| 881 | | with "You're gonna have to shoot me." I'm in a uniform and he just came |
| 882 | | straight at me. I mean aggressively - not fast but not slow. And I'm telling |
| 883 | | him, "Drop the knife, drop the knife, stop," and he continued to come. |
| 884 | | |
| 885 | Q: | Okay. So let's talk a little bit about that. Um, are you - is your window down |
| 886 | | in your, uh, patrol vehicle as a responding unit? |
| 887 | | |
| 888 | A: | Yeah. |
| 889 | | |
| 890 | Q: | Okay. So, when you hear, uh, the suspect say, "You're going to have to shoot |
| 891 | | me," where are you at in relation to the vehicle? |
| 892 | | |
| 893 | A: | I am direct- I got out of the car. When I got there and I saw him, I get out of |
| 894 | | the car, I get on the radio very quickly and said, "I got him in the middle of |
| 895 | | the street, give me a 10-3." 10-3 means for everyone to stop transmitting |
| 896 | | on that channel, leave it open for me or anyone else on that incident. I get out of |
| 897 | | the car. I could see what was in his hand, I immediately dropped my |
| 898 | | flashlight. That's when he said, "You're gonna have to shoot me." So I am |
| 899 | | right at the driver's side door, 'cause that was the only cover that I had |
| 900 | | available to me at that time. So I'm just directly standing in the door, getting |

HAY000644

| | | |
|---|---|---|
| 901 | | up. I'd just gotten out of the car. |
| 902 | | |
| 903 | Q: | Had you given him a command at this point prior to him saying, "You're |
| 904 | | gonna have to shoot me"? |
| 905 | | |
| 906 | A: | No. He said that before I told him to drop the knife. |
| 907 | | |
| 908 | Q: | Had you identified yourself as the police or anything like that? |
| 909 | | |
| 910 | A: | No, sir. |
| 911 | | |
| 912 | Q: | When he said, "You're gonna have to shoot me," what did you take that as? |
| 913 | | Did you take that as he understood that you were the police and that... |
| 914 | | |
| 915 | A: | Oh, yeah. |
| 916 | | |
| 917 | Q: | ...you had a firearm? |
| 918 | | |
| 919 | A: | He knew I was the police. He could tell just by looking at me. I mean as soon |
| 920 | | as I pulled up and I got out of the car, his attention and focus stopped arguing |
| 921 | | with the girl and the guy, and focused right on me. It was that quick. As soon |
| 922 | | as he saw me, he flipped his focus to me, which was good, 'cause it took it off |
| 923 | | them. So I - I kind of had them out of the picture at that moment in time to |
| 924 | | kind of, you know, shift his focus onto me, so I wasn't so much at that |
| 925 | | moment in time worried about them. |
| 926 | | |
| 927 | Q: | And then, uh, as you're saying this, is he already beginning to advance on |
| 928 | | you, or are you at that point telling him to drop the knife, which is when he |
| 929 | | begins to advance? |
| 930 | | |
| 931 | A: | If I remember correctly, I told him to drop the knife, and then that's when he |
| 932 | | started coming at me. |
| 933 | | |
| 934 | Q: | How many times do you think you said "Drop the knife"? |
| 935 | | |
| 936 | A: | Two or three times. You have to understand too, I was a lot closer than I really |
| 937 | | wanted to be. I did not want to be that close to the guy, and in a perfect world, |
| 938 | | it would have been daytime, I would have parked a little bit further back, but |
| 939 | | in this particular instance, again, I said your training dictates your tactics. I |
| 940 | | had to see the guy, so I had to be a little bit closer with the patrol car, and it |
| 941 | | was a very - I mean it was an uncomfortable feeling being that close with |
| 942 | | someone with a knife as they can close that distance very quickly and stab you |
| 943 | | with a knife, so but again, that was my mindset also. I'm closer than I want to |
| 944 | | be to this guy, but I didn't have a real choice in the matter. |
| 945 | | |

| 946 | Q: | Um, in your, um, estimation, how far are you from him? |
| 947 | | |
| 948 | A: | Five yards. |
| 949 | | |
| 950 | Q: | So, 15 feet? |
| 951 | | |
| 952 | A: | Yes. And I'm sure everyone here has heard of, you know, the whole, you |
| 953 | | know, 21 feet, and the average officer can draw and fire one round, put it on |
| 954 | | target in about 21 feet with someone with an edged weapon before they close |
| 955 | | that distance on them. So, I was well within that distance just getting out of |
| 956 | | my patrol car. And I gave him plenty of opportunities to drop the knife before |
| 957 | | he even closed the distance on me. |
| 958 | | |
| 959 | Q: | Uh, so you come out of the car, you put - ask for a 10-3. At what point do you |
| 960 | | draw your firearm? |
| 961 | | |
| 962 | A: | As I'm getting out of the car. |
| 963 | | |
| 964 | Q: | Why did you draw your firearm? |
| 965 | | |
| 966 | A: | Because he had a deadly weapon and you meet deadly force with deadly |
| 967 | | force. You don't bring a Taser to something that's gonna - has potential to kill |
| 968 | | you. You don't use OC spray, you don't use a baton on anything that's deadly |
| 969 | | force, and an edged weapon is considered deadly force. There's plenty of |
| 970 | | people get killed by being stabbed or with a machete or a sword or a meat |
| 971 | | cleaver across the United States every year, across the world. |
| 972 | | |
| 973 | Q: | So I think you're alluding to it, but in your opinion at this point in time you |
| 974 | | had no other options on your duty belt, other force options on your duty belt to |
| 975 | | utilize against the subject? |
| 976 | | |
| 977 | A: | No, there was no other options. Again, that close proximity, if I would have |
| 978 | | tried to use a Taser, by the time - if it didn't work, by the time I transitioned, I |
| 979 | | would have been stabbed. |
| 980 | | |
| 981 | Q: | At this point in time are you aware that you have any assistance from cover |
| 982 | | officers or anyone else in the area? |
| 983 | | |
| 984 | A: | No. |
| 985 | | |
| 986 | Q: | So at this point in time you believe you're by yourself, engaging this person? |
| 987 | | |
| 988 | A: | I knew they were coming, but I didn't know where they were. And like I said, |
| 989 | | right when I started firing, I saw Officer Clark in my peripheral vision. |
| 990 | | |

HAY000646

| | | |
|---|---|---|
| 991<br>992<br>993 | Q: | So as you're, um, uh, the subject's advancing to you, do you know where the other two people are that he was arguing with at this point in time? |
| 994<br>995 | A: | Yes, they were off to the left. |
| 996<br>997 | Q: | Okay. |
| 998<br>999 | A: | They had moved - the male took the girl and moved him off over to the curb. |
| 1000<br>1001 | Q: | So they're away from this subject as he's advancing towards you? |
| 1002<br>1003<br>1004<br>1005 | A: | Away - I wouldn't say well away, but away, yeah. They were not in the line of fire. There was no one behind me. I had a perfect backstop. I wasn't really concerned about that. I was... |
| 1006<br>1007<br>1008 | Q: | For somebody who doesn't know what a backstop is, can you describe what you're referring to? |
| 1009<br>1010<br>1011<br>1012<br>1013<br>1014<br>1015<br>1016<br>1017<br>1018 | A: | What was behind him. There was no other people standing behind him that I was worried about if one of the rounds missed, it would his somebody behind him. There was just cars and that type of stuff. So there was nothing I was worried about behind him. And again, those are all the things that are going through your mind, you know, what's the backstop and might you hit somebody else. And, you know, like I said, this happened within a second and a half roughly. I mean by the time I - from the time I got out of the car until I actually fired, maybe a second to a second and a half. I mean it just - it was quick. |
| 1019<br>1020<br>1021 | Q: | So in that second to a second and a half, in addition to you saying, "Drop the knife," did you give any other commands? |
| 1022<br>1023 | A: | I told him to stop. That was the last thing I said before I fired, I said "Stop." |
| 1024<br>1025 | Q: | Do you know how many times you said the word stop? |
| 1026<br>1027 | A: | Once. |
| 1028<br>1029 | Q: | And you said at this point you fire six, seven, or eight rounds? |
| 1030<br>1031 | A: | Somewhere in there, yes. |
| 1032<br>1033 | Q: | What is your intention when you're firing these rounds? |
| 1034<br>1035 | A: | To stop him from advancing on me and stabbing me. |

| | | |
|---|---|---|
| 1036<br>1037 | Q: | Are you assessing as you're firing these rounds? |
| 1038<br>1039 | A: | Yes. |
| 1040<br>1041 | Q: | Can you describe that for us. |
| 1042<br>1043<br>1044<br>1045<br>1046<br>1047<br>1048<br>1049<br>1050<br>1051<br>1052 | A: | The first few rounds I fired, to me, looked as if it didn't have an effect on him. He kind of - kind of winced a little bit, but he didn't - yeah, it's not the movies, it's not TV or Hollywood, he didn't drop immediately onto the ground. He turned a little bit to his right. As I continued to fire, he went down. But he never dropped whatever was in his hand, he always had it in his hand the entire time. Matter of fact, if I remember correctly, Officer Gillett took whatever it was out of his hand - I think it was a razor blade. He ended up taking it out of his hand, um, after he handcuffed him maybe. I'm not quite sure about that. It was either right before he handcuffed him or after. So, it looked like it had no effect on him. When... |
| 1053<br>1054 | Q: | When - I'm sorry, go ahead. |
| 1055<br>1056<br>1057<br>1058<br>1059<br>1060 | A: | When he went down and he was down, like I said, he was still holding - he was kind of in a fetal position, still holding whatever he had in his hand, and, um, I did not advance on him, I stayed where I was. That's when I had stopped firing, and then Officer Clark and Officer Gillett went up and handcuffed him. |
| 1061<br>1062<br>1063 | Q: | So you said, uh, after you fired and you come over, and then Officer Clark is there? |
| 1064<br>1065 | A: | Correct. |
| 1066<br>1067 | Q: | And he's firing... |
| 1068<br>1069 | A: | Yes. |
| 1070<br>1071<br>1072 | Q: | ...also? I believe you said you're not aware of how many rounds that Officer Clark... |
| 1073<br>1074 | A: | No. |
| 1075<br>1076<br>1077 | Q: | ...fires, is that correct? Okay. Are you aware that Officer Gillett is anywhere during this portion of the incident? |
| 1078<br>1079 | A: | No, sir. |
| 1080 | Q: | Okay. Once you, uh, the subject collapsed and you stopped firing, um, do you |

HAY000648

| 1081 | | tell Officer Clark to go up and handcuff him, or does Officer Clark go up on |
| 1082 | | his own and handcuff him? |
| 1083 | | |
| 1084 | A: | He goes up on his own. I put on the radio that there was shots fired, like I said |
| 1085 | | earlier, I got covered so that didn't go out. Apparently, Sergeant DeCosta had |
| 1086 | | already done that. And then I asked for more units and to start medical. |
| 1087 | | |
| 1088 | Q: | And this is - as Officer Clark and Gillett are handcuffing, this is the first time |
| 1089 | | you're aware Officer Gillett is also on scene? |
| 1090 | | |
| 1091 | A: | Correct. Then after that - after he was handcuffed, Officer Gillett rendered aid |
| 1092 | | to the suspect, victim, and I had requested the fire department to roll in, I said |
| 1093 | | the scene was secure, roll them in, and to block off the traffic, that type of |
| 1094 | | stuff, and then I asked for my immediate supervisor to come. |
| 1095 | | |
| 1096 | Q: | Um, in your opinion, handcuffing was for... |
| 1097 | | |
| 1098 | A: | Safety reasons because he was - he still was holding whatever it was he had, |
| 1099 | | and he wasn't out of the fight at all. It's standard procedure, you're gonna |
| 1100 | | handcuff them to control them. |
| 1101 | | |
| 1102 | Q: | Okay. And once the handcuffs are applied, medical aid is rendered almost |
| 1103 | | immediately? |
| 1104 | | |
| 1105 | A: | Yes. |
| 1106 | | |
| 1107 | Q: | By Officer Gillett? |
| 1108 | | |
| 1109 | A: | Correct. And I checked on Officer Clark, made sure he was okay, he said he |
| 1110 | | was okay. I said, "I'm good." Um, all that was already issued, then I put over |
| 1111 | | the radio that there was no officers injured. Um, you know, we had dispatch - |
| 1112 | | being a dispatcher, you know, you're in this little room ten miles away from |
| 1113 | | what's going on. It's nice for them to know that everyone out here is okay, so |
| 1114 | | I let everyone know that we were all okay there. |
| 1115 | | |
| 1116 | Q: | When you check on Officer Clark, do you have a conversation about what has |
| 1117 | | just occurred? |
| 1118 | | |
| 1119 | A: | No. I just asked him if he was okay. I think I said, "Are you good?" And he |
| 1120 | | said, "Yes." |
| 1121 | | |
| 1122 | Q: | Are you approached by anyone else while you're at the scene? Uh, Hayward |
| 1123 | | police staff or personnel? |
| 1124 | | |
| 1125 | A: | Sergeant DeCosta came up to me. She said something along the lines of, "He |

| | | |
|---|---|---|
| 1126 | | said you're gonna have to shoot him?" I go, something like, "Yeah, I know," |
| 1127 | | something like that. And then Lieutenant Linteo showed up, who was - (Cory) |
| 1128 | | Linteo showed up, who was the Watch Commander that night. Um, he did not |
| 1129 | | ask me what happened or occurred. Sergeant (Vonnegut) did not ask me what |
| 1130 | | happened or occurred. He did ask me how many rounds I fired for the public |
| 1131 | | safety issue of it, and that's all he asked me. Uh, that's it that I recall. |
| 1132 | | |
| 1133 | Q: | Okay. |
| 1134 | | |
| 1135 | A: | I left my body-worn camera on until Lieutenant Linteo told me to turn it off. |
| 1136 | | |
| 1137 | Q: | Um, so I know you said that he's handcuffed by Officer Clark and Gillett, |
| 1138 | | Officer Gillett renders aid. Um, you have these, uh, kind of brief interactions. |
| 1139 | | Do you do anything else out at the scene in addition to these things? |
| 1140 | | |
| 1141 | A: | No. Nothing - there were a couple peo- couple of looky-loos came out, I told |
| 1142 | | them to go back inside their house. No, that was it. |
| 1143 | | |
| 1144 | Q: | At this point in time you're then brought back to the police department with |
| 1145 | | an escort? |
| 1146 | | |
| 1147 | A: | Yeah, Officer Ferreyra - (Justin) Ferreyra. He brought me back here to the |
| 1148 | | station. |
| 1149 | | |
| 1150 | Q: | Uh, prior to being photographed, did you change or remove anything - any |
| 1151 | | items on your person? |
| 1152 | | |
| 1153 | A: | No. |
| 1154 | | |
| 1155 | Q: | And there was no, uh, no reloading or - or change of magazine in your |
| 1156 | | weapon, is that correct? |
| 1157 | | |
| 1158 | A: | No. |
| 1159 | | |
| 1160 | Q: | All right. Um, I'm gonna show you these maps. Okay, they're just Google |
| 1161 | | Map into this. So, uh, at the, uh, very top of this, um, image is obviously |
| 1162 | | going north, uh, that'll be south, uh, of course at the bottom here. Um, you'll |
| 1163 | | see, uh, O'Neil running kind of, uh, just northwest, southeast. Uh, down here |
| 1164 | | at the very bottom is Orchard Avenue. Uh, Mission Boulevard will be, uh, off |
| 1165 | | to the right or the, uh, east of. Do you recognize this area? |
| 1166 | | |
| 1167 | A: | Absolutely. |
| 1168 | | |
| 1169 | Q: | And, uh, it is kind of an accurate, uh, representation of the area in which this |
| 1170 | | incident occurred? |

| 1171 | | |
|------|------|------|
| 1172 | A: | Yes, sir. |
| 1173 | | |
| 1174 | Q: | Okay. Um, if you would, please, can you take, um, this red marker and just |
| 1175 | | indicate, um, where you, um, stop your vehicle when you see this suspect? |
| 1176 | | |
| 1177 | A: | I want to say right about here. |
| 1178 | | |
| 1179 | Q: | Okay. And I think you described that he's approximately 15 feet in front of |
| 1180 | | you? |
| 1181 | | |
| 1182 | A: | Correct. |
| 1183 | | |
| 1184 | Q: | Okay. And you don't move your vehicle at any point during this, is that |
| 1185 | | correct? |
| 1186 | | |
| 1187 | A: | No. |
| 1188 | | |
| 1189 | Q: | Okay. I'm gonna show you a little, uh, closer up image. Again, you recognize, |
| 1190 | | uh, this area? |
| 1191 | | |
| 1192 | A: | Yeah. |
| 1193 | | |
| 1194 | Q: | Okay. So, um, to the right or east of O'Neil Avenue, does that kind of |
| 1195 | | describe the car dealership that you referenced earlier in the interview? |
| 1196 | | |
| 1197 | A: | Yeah. |
| 1198 | | |
| 1199 | Q: | Okay. Um, do you, uh, do you see the diamonds in the middle of the street? I |
| 1200 | | believe that's a speed bump. Do you, uh, recall where in relation that speed |
| 1201 | | bump is to where you stopped? |
| 1202 | | |
| 1203 | A: | Uh, I was behind - I believe I was right about there. |
| 1204 | | |
| 1205 | Q: | So just north of or in front of the speed bump, the south? |
| 1206 | | |
| 1207 | A: | Correct. |
| 1208 | | |
| 1209 | Q: | Okay. Do you have anything that I haven't covered before we take a break? |
| 1210 | | |
| 1211 | Q1: | Just a couple things. Uh, so you had said originally that you got closer than |
| 1212 | | you wanted to? |
| 1213 | | |
| 1214 | A: | Correct. |
| 1215 | | |

HAY000651

INTERVIEW WITH COOLEY
Interviewer: Det. Robert Purnell
11-18-18/1:01 pm
Case # 2018-94542
Page 28

| | | |
|---|---|---|
| 1216 | Q1: | And that was for the purpose of... |
| 1217 | | |
| 1218 | A: | Lighting. |
| 1219 | | |
| 1220 | Q1: | And the lighting being from... |
| 1221 | | |
| 1222 | A: | The patrol car. |
| 1223 | | |
| 1224 | Q1: | Yeah. |
| 1225 | | |
| 1226 | A: | ...lights. |
| 1227 | | |
| 1228 | Q1: | So with that being said, you said you dropped your flashlight? |
| 1229 | | |
| 1230 | A: | Correct. |
| 1231 | | |
| 1232 | Q1: | So, uh, the lighting at the time was provided by the headlights? |
| 1233 | | |
| 1234 | A: | Correct. |
| 1235 | | |
| 1236 | Q1: | What kind of lighting did that provide? |
| 1237 | | |
| 1238 | A: | I could see perfectly clear with that lighting there. I could see him, I could see the girl, the guy, what I thought was a box cutter. It was illuminated well enough for me to see and make everything out, so I didn't really need the flashlight. I'd rather have two hands on my gun than one. |
| 1239 | | |
| 1240 | | |
| 1241 | | |
| 1242 | | |
| 1243 | Q1: | And that illumination also allowed you to see that facial expression that you described as a thousand-yard stare? |
| 1244 | | |
| 1245 | | |
| 1246 | A: | Correct. |
| 1247 | | |
| 1248 | Q1: | In your career, how many times have you seen that look? |
| 1249 | | |
| 1250 | A: | Dozens. |
| 1251 | | |
| 1252 | Q1: | And how's it usually - what's the usual result of that? Would it turn to - how's the contact or confrontation for lack of better terms? |
| 1253 | | |
| 1254 | | |
| 1255 | A: | Usually we end up in a fight with somebody 'cause they're not listening or obeying commands. |
| 1256 | | |
| 1257 | | |
| 1258 | Q1: | Okay. Um, two things, it's kind of two-fold. It's like you said you had a line in the sand? |
| 1259 | | |
| 1260 | | |

HAY000652

| 1261 | A: | Correct. |
| 1262 | | |
| 1263 | Q1: | Uh, was that line in the sand between you and him, unobstructed? Was there |
| 1264 | | anything in between you guys that he would have to go around or go through |
| 1265 | | to get to you? |
| 1266 | | |
| 1267 | A: | No. |
| 1268 | | |
| 1269 | Q1: | Okay. An estimate, um, you said five yards away when you pulled up. At the |
| 1270 | | time of the shooting what's approximately the distance between you and the |
| 1271 | | subject? |
| 1272 | | |
| 1273 | A: | Two to three yards. |
| 1274 | | |
| 1275 | Q1: | So, uh, about six to nine feet? |
| 1276 | | |
| 1277 | A: | Correct. |
| 1278 | | |
| 1279 | Q1: | Okay. I know earlier we discussed the type of injuries that a knife or edged |
| 1280 | | weapon kind of generically, but specifically, in relation to what you believe to |
| 1281 | | be a box cutter, in your training and experience, what kind of injuries are you |
| 1282 | | familiar with that could be caused by such a device? |
| 1283 | | |
| 1284 | A: | Took down the World Trade Center. Those guys had box cutters and took |
| 1285 | | over that plane and blew up the World Trade Center, so that's one thing, but, |
| 1286 | | um, massive cuts, slashes, you know, you can - hemorrhaging, you can die |
| 1287 | | from, you know, loss of blood, get your tendons ripped up, like I said, your |
| 1288 | | heart, kidneys. Remember your body armor is not meant to stop edged |
| 1289 | | weapons, it's meant to stop projectiles, so it's not - it does afford some slash |
| 1290 | | protection, but it's not made to stop an edged weapon, so it can go through |
| 1291 | | that like a hot knife through butter and get into your vital organs, your heart, |
| 1292 | | your lungs, that type of thing. |
| 1293 | | |
| 1294 | Q1: | Earlier you had alluded to the 21-foot rule. For those that don't really |
| 1295 | | understand that, can you kind of just give us a breakdown of what the 21-foot |
| 1296 | | rule is and where it comes from? |
| 1297 | | |
| 1298 | A: | Yeah, it - it came by a guy named (Dev Tooler), he's a deputy in Salt Lake |
| 1299 | | City, and he came up with a - a shooting drill where he took a bunch of police |
| 1300 | | officers and he had someone run, and they'd have him - the officers draw and |
| 1301 | | fire one round in a center mass of a target. The average officer could fire that |
| 1302 | | one round from the holster while the person covered approximately 21 feet. |
| 1303 | | So that meant basically that an average individual can cover 21 feet by the |
| 1304 | | time the officer would draw and fire one round. So in that zone there's an |
| 1305 | | obvious threat to you. It's a - they're a threat. He never said shoot somebody |

| | | |
|---|---|---|
| 1306 | | who was 21 feet away with a gun - it's been distorted and changed over the |
| 1307 | | years. That's not what he said. He is just saying that that is a threat to them. |
| 1308 | | He never said to shoot just because they were that distance away, it's just a |
| 1309 | | threat zone. |
| 1310 | | |
| 1311 | Q1: | So ba- basically you were put in that threat zone when you got out of the car? |
| 1312 | | |
| 1313 | A: | I was in that threat zone when I got out of the car. |
| 1314 | | |
| 1315 | Q1: | And earlier you had made a comment about, uh, "Checked out." Is that a |
| 1316 | | mental state that you were referring to? Mental, state of mind? |
| 1317 | | |
| 1318 | A: | Yes. |
| 1319 | | |
| 1320 | Q1: | Okay. |
| 1321 | | |
| 1322 | A: | Yeah, that's the perception I got from the suspect when I got there, was that |
| 1323 | | he was checked out. He was purpose-driven in what he was gonna do. |
| 1324 | | Whatever he - was in his mind at that time, that blank stare, that comment and |
| 1325 | | just his mannerisms, and - you don't advance with a weapon on a uniformed |
| 1326 | | armed police officer. That doesn't make a lot of sense, with a gun pointed at |
| 1327 | | you, so that - just that look he had to me, he was checked out. Whatever |
| 1328 | | decision he made, he had it made and he was gonna follow through with it, |
| 1329 | | and I don't know what it was. |
| 1330 | | |
| 1331 | Q1: | Okay. |
| 1332 | | |
| 1333 | A: | I can't get into his mind, but I don't know what his decision was gonna be. |
| 1334 | | |
| 1335 | Q1: | Did you ever feel that you were afforded the opportunity to like start a |
| 1336 | | dialogue? |
| 1337 | | |
| 1338 | A: | No. |
| 1339 | | |
| 1340 | Q1: | That's because of... |
| 1341 | | |
| 1342 | A: | It - it was too fast, it was rapidly unfolding. As soon as I got out of that car, he |
| 1343 | | said "You're gonna have to shoot me," and he started toward me. It was so |
| 1344 | | fast there was no time for it. Um, retreat really wasn't an option. I was afraid |
| 1345 | | if I started backing up that - the guy and the girl was still there, was he gonna |
| 1346 | | turn his attention back to them, and go over and stab them and force the issue |
| 1347 | | another way? So, that wasn't an option either. Plus I didn't know what was |
| 1348 | | going - behind me, backing up and shooting, as you know is not all that easy |
| 1349 | | to do. Um, so there's all these other variables for the retreat aspect. I didn't |
| 1350 | | know where my nearest cover was. I knew I had cover with the door of the |

HAY000654

| | | |
|---|---|---|
| 1351 | | patrol car, and again, the lighting situation I had there. Behind me I wasn't |
| 1352 | | quite sure. |
| 1353 | | |
| 1354 | Q1: | At that point in time were you... |
| 1355 | | |
| 1356 | A: | (Unintelligible). |
| 1357 | | |
| 1358 | Q1: | ...were you able to confirm that anybody had been stabbed or injured at that |
| 1359 | | point in time, or is it still unknown? |
| 1360 | | |
| 1361 | A: | Correct. I did not know. |
| 1362 | | |
| 1363 | Q1: | Okay. I was trying to ask if you had any knowledge of any injuries. |
| 1364 | | |
| 1365 | A: | No. |
| 1366 | | |
| 1367 | Q1: | That's all I have. |
| 1368 | | |
| 1369 | Q: | I think we've talked about it, um, but in - that this weapon can be - or an |
| 1370 | | edged weapon, you know, can do all these different things, but I don't know |
| 1371 | | that we actually asked you specifically, as he's advancing on you, what is |
| 1372 | | your mindset? What are you feeling is about to occur? |
| 1373 | | |
| 1374 | A: | I thought he was gonna try to kill me. |
| 1375 | | |
| 1376 | Q: | So, um, fair to say that you feared for your own safety at this point, that he's |
| 1377 | | going to advance on you and kill you? |
| 1378 | | |
| 1379 | A: | Yes. That's what he looked like to me. He had that blank, checked out |
| 1380 | | mindset. I mean I - if you're asking my opinion, my opinion was he was |
| 1381 | | gonna kill me. He was coming at me again. I'm in uniform with a gun pointed |
| 1382 | | at you, telling you "Drop it, stop," and he's not and he's still coming at me, he |
| 1383 | | was gonna kill me, or try. |
| 1384 | | |
| 1385 | Q: | Um, did you ever approach the subject and see his face at any point during |
| 1386 | | this interaction? |
| 1387 | | |
| 1388 | A: | I did, later on. |
| 1389 | | |
| 1390 | Q: | Did you recognize that person from any previous interactions? |
| 1391 | | |
| 1392 | A: | No, sir. I still don't know his name. |
| 1393 | | |
| 1394 | Q: | Um, so if I say the name, um, Agustin Gonsalez, do you recognize that name |
| 1395 | | from any, uh, previous interactions? |

INTERVIEW WITH OFC. KYLE COOLEY
Interviewer: Det. Robert Purnell
11-18-18/1:01 pm
Case # 2018-94542
Page 32

| | | |
|---|---|---|
| 1396 | | |
| 1397 | A: | No, sir. |
| 1398 | | |
| 1399 | Q: | I do have a single photograph of him that I'm gonna show you here. Um, it is |
| 1400 | | a little dated, but, um, do you recognize the person in that photograph? |
| 1401 | | |
| 1402 | A: | No. |
| 1403 | | |
| 1404 | Q1: | Can you just indicate on there and sign it please. |
| 1405 | | |
| 1406 | A: | That I don't know him? |
| 1407 | | |
| 1408 | Q: | So I know you said, um, as he's advancing you can't really make it out, but at |
| 1409 | | some point you see what you believe is a - did you describe it as a razor blade |
| 1410 | | or a box cutter? |
| 1411 | | |
| 1412 | A: | Yes. |
| 1413 | | |
| 1414 | Q: | I - I didn't - I don't recall what - which did you refer to it as? |
| 1415 | | |
| 1416 | A: | A razor blade. Officer Gillett took it out of his hand and again, I don't |
| 1417 | | remember if it was before or after he was handcuffed, and he - he said - I think |
| 1418 | | he said, "This is what he had," and I - I could see it, I'm like, "Razor blade." |
| 1419 | | |
| 1420 | Q: | Okay. I'm gonna show you a crime scene photograph. Do you recognize, uh, |
| 1421 | | what's in that photograph? |
| 1422 | | |
| 1423 | A: | No. |
| 1424 | | |
| 1425 | Q: | Okay. You're unsure if that is what you saw that night as the razor blade, |
| 1426 | | Officer Gillett saw? |
| 1427 | | |
| 1428 | A: | Correct. |
| 1429 | | |
| 1430 | Q: | You - you are un- unsure? |
| 1431 | | |
| 1432 | A: | Unsure, yes. |
| 1433 | | |
| 1434 | Q: | Okay. |
| 1435 | | |
| 1436 | Q1: | And sign? |
| 1437 | | |
| 1438 | Q: | We'll go - come back and have him sign all the photographs. All right. At this |
| 1439 | | time we're gonna take a break, so we're gonna pause the interview at, uh, |
| 1440 | | 1409 pm. |

HAY000656

| | | |
|---|---|---|
| 1441 | | |
| 1442 | Q1: | Do you need a water or something? |
| 1443 | | |
| 1444 | A: | No. |
| 1445 | | |
| 1446 | Q1: | Harry? |
| 1447 | | |
| 1448 | Q2: | I'm okay. |
| 1449 | | |
| 1450 | Man: | (Unintelligible). |
| 1451 | | |
| 1452 | Q: | Just show him - close this door please. Thank you, sir. All right. So we're |
| 1453 | | gonna restart the interview at 1418 hours. Officer Wooley, I just have a couple |
| 1454 | | of follow up questions for you. Um, I noticed or, um, I know that you noted |
| 1455 | | that you wear, um, reading glasses. Were you actually wearing those glasses |
| 1456 | | during this incident? |
| 1457 | | |
| 1458 | A: | No. |
| 1459 | | |
| 1460 | Q: | Okay. And in addition to Officer DeCosta putting out that she is with the |
| 1461 | | informant, do you recall any other radio traffic that you're hearing from either |
| 1462 | | Sergeant DeCosta or anyone else who's responding to the scene, about what's |
| 1463 | | going on or that they're with anybody else or anything like that while the |
| 1464 | | incident's actually occurring? |
| 1465 | | |
| 1466 | A: | No. |
| 1467 | | |
| 1468 | Q: | Okay. No other - not making out any other yelling from officers or anyone |
| 1469 | | else out there, anything that's being said? |
| 1470 | | |
| 1471 | A: | No. |
| 1472 | | |
| 1473 | Q: | Okay. Um, I know we discussed the, um, what's referred to as the 21-foot rule |
| 1474 | | and we described, you know, kind of what that goes into but you, um, you |
| 1475 | | noted or you described, um, a - what you called a line in the sand. Can you |
| 1476 | | just describe for us what you mean by a line in the sand? |
| 1477 | | |
| 1478 | A: | It means that was as close as I was gonna allow him to get without using some |
| 1479 | | sort of force in order to get him to stop. I would allow him to get to that point |
| 1480 | | and no further, because at that point he was way too close for my safety. I |
| 1481 | | mean, again, I thought he was gonna kill me, so once he reached that line, that |
| 1482 | | was it. I - I gave him enough opportunities to stop his actions on his own |
| 1483 | | without me resorting to using any force on him and he didn't take them. |
| 1484 | | |
| 1485 | Q: | Was that a specific line that you're referring to or was it like fluid, like as he's |

| | | |
|---|---|---|
| 1486 | | advancing you - you just turn it in your mind that that is the point already? |
| 1487 | | |
| 1488 | A: | That is the point, yes. |
| 1489 | | |
| 1490 | Q: | Okay. About how far away was that line when you - when this unfolded? |
| 1491 | | |
| 1492 | A: | About the same two to three yards. |
| 1493 | | |
| 1494 | Q: | So six to nine feet? |
| 1495 | | |
| 1496 | A: | Yes. |
| 1497 | | |
| 1498 | Q: | Okay. We talked about the - this thousand-yard stare, but you also noted he - |
| 1499 | | or, uh, you also noted that he changed and focused on you. Did you actually |
| 1500 | | make eye to eye contact with him? |
| 1501 | | |
| 1502 | A: | Yes. |
| 1503 | | |
| 1504 | Q: | Did it - did you feel like you got any response out of that or... |
| 1505 | | |
| 1506 | A: | No. Not at all, he just - he had that blank look. Whatever he was - whatever |
| 1507 | | decision he made in his mind he was gonna do, he was gonna do it, he was |
| 1508 | | gonna carry it out. And he just looked at me and just said, "I'm gonna shoot |
| 1509 | | you" - or "You're gonna have to shoot me," and just advanced toward me. |
| 1510 | | |
| 1511 | Q: | Okay. You don't have anything for him? |
| 1512 | | |
| 1513 | Q1: | No. |
| 1514 | | |
| 1515 | Q: | All right. Uh, at this point I'm gonna turn it over to, uh, the gentlemen from |
| 1516 | | the District Attorney's Office for any questions they may have. Go ahead, |
| 1517 | | Caesar. |
| 1518 | | |
| 1519 | Q3: | Okay. Uh, just - body-worn camera, did you activate it? |
| 1520 | | |
| 1521 | A: | Yes, sir. |
| 1522 | | |
| 1523 | Q3: | Did you have a chance to review that prior to this interview? |
| 1524 | | |
| 1525 | A: | Yes. |
| 1526 | | |
| 1527 | Q3: | And when was that? |
| 1528 | | |
| 1529 | A: | Uh, about 30 minutes prior to the original interview. |
| 1530 | | |

| 1531 | Q3: | Okay. Was that the only time that you reviewed this... |
| 1532 | | |
| 1533 | A: | Yes. |
| 1534 | | |
| 1535 | Q3: | ...uh, body-worn camera footage? |
| 1536 | | |
| 1537 | A: | Yes. |
| 1538 | | |
| 1539 | Q3: | And, uh, and so it's clear to me, uh, you guys used the word informant. Is that |
| 1540 | | like the reporting person or the - 'cause you know there's different meanings |
| 1541 | | to informant, so for people that don't know, what does that mean to your - to |
| 1542 | | you? |
| 1543 | | |
| 1544 | A: | It's the reporting person, the person who made the original phone call. |
| 1545 | | |
| 1546 | Q3: | Okay. Prior to you seeing the suspect, the, uh, the only information that you |
| 1547 | | had on this, it was a knife, correct? |
| 1548 | | |
| 1549 | A: | Correct. |
| 1550 | | |
| 1551 | Q3: | Or was there any other information that came out, that it was a box cutter, a |
| 1552 | | blade, or whatever else? |
| 1553 | | |
| 1554 | A: | No, just a knife. |
| 1555 | | |
| 1556 | Q3: | And you're very well versed on the 21, um, feet rule. 'Cause you talked about |
| 1557 | | it a little bit, as to who made the study, whatnot. Are you aware of - do you |
| 1558 | | know of any study that was made in dispute of that 21-feet rule, to dispute |
| 1559 | | that? |
| 1560 | | |
| 1561 | A: | Not off the top of my head, no, sir. |
| 1562 | | |
| 1563 | Q3: | And you said you heard the suspect say, you know, "Shoot me" or something |
| 1564 | | of that effect, correct? As he - he was advancing towards you, towards your |
| 1565 | | position, was he saying anything at all? |
| 1566 | | |
| 1567 | A: | No. |
| 1568 | | |
| 1569 | Q3: | Okay. That's all I have. |
| 1570 | | |
| 1571 | Q: | You can go. |
| 1572 | | |
| 1573 | Q4: | Now as you, um, you were going through this, uh, recapping the events for us, |
| 1574 | | I understand that the first information you had was that this was a 415 |
| 1575 | | ascertain? |

| | | |
|---|---|---|
| 1576 | | |
| 1577 | A: | Correct. |
| 1578 | | |
| 1579 | Q4: | Okay. And just so I'm clear, what level of priority is that type of call for this |
| 1580 | | agency? |
| 1581 | | |
| 1582 | A: | Priority two. |
| 1583 | | |
| 1584 | Q4: | Okay. And Priority two means what? |
| 1585 | | |
| 1586 | A: | We have one through five basically. The only ones the police deal with are 1 |
| 1587 | | and 3, so it would be like a medium level. |
| 1588 | | |
| 1589 | Q4: | Okay. |
| 1590 | | |
| 1591 | A: | Priority 3 would be like a cold police report. Priority 2 is a crime in progress |
| 1592 | | or something of that nature, a Priority 1 would be like a shooting, a rape, |
| 1593 | | something of that nature, uh, domestic violence. |
| 1594 | | |
| 1595 | Q4: | Okay, okay. And as I understand it you said as you were proceeding to the |
| 1596 | | location that you had been given, at some point you hear that it's a 417, |
| 1597 | | brandishing? |
| 1598 | | |
| 1599 | A: | Correct. |
| 1600 | | |
| 1601 | Q4: | Okay. And then at some point did you say that you were told that a roommate |
| 1602 | | had been stabbed? |
| 1603 | | |
| 1604 | A: | Correct. I believe that was the initial broadcast, that he had stabbed a |
| 1605 | | roommate. |
| 1606 | | |
| 1607 | Q4: | Oh, okay, so that was the first thing? Okay. And we know you get there. As I |
| 1608 | | understand it you don't see, uh, Sergeant DeCosta. Do you notice Sergeant |
| 1609 | | DeCosta's, uh, patrol vehicle? |
| 1610 | | |
| 1611 | A: | No. |
| 1612 | | |
| 1613 | Q4: | Okay. You stopped your vehicle, and when you stop your vehicle, how far |
| 1614 | | away are you from the - the man you believe had a knife and the other two |
| 1615 | | people? How - what's that distance? |
| 1616 | | |
| 1617 | A: | Approximately five yards. |
| 1618 | | |
| 1619 | Q4: | Okay. |
| 1620 | | |

HAY000660

| 1621 | A: | Fifteen feet. |
| 1622 | | |
| 1623 | Q4: | Okay. So approximately five yards at that point? At that point, when you're |
| 1624 | | 15 feet away, or approximately 15 feet away, can you see his hands? |
| 1625 | | |
| 1626 | A: | Yes. |
| 1627 | | |
| 1628 | Q4: | Okay. And what do you note about his hands? |
| 1629 | | |
| 1630 | A: | The way he was holding his hands to me looked like he had a box cutter or |
| 1631 | | some sort of knife in his hands. |
| 1632 | | |
| 1633 | Q4: | Okay. Can you show me - I mean we're on video here, so can you show me |
| 1634 | | what it looked like from your position? |
| 1635 | | |
| 1636 | A: | When I got there, he was holding - and he turned - I wasn't really sure what he |
| 1637 | | was doing when he was arguing with the people but when he turned his |
| 1638 | | attention to me, he was holding his hands like this. |
| 1639 | | |
| 1640 | Q4: | Okay. |
| 1641 | | |
| 1642 | Q: | So just for the audio recording, uh, Officer Wooley is standing. He has his |
| 1643 | | hands together, uh, with his - act- his hands actually clasped together and he's |
| 1644 | | pointing them out in front of his body. |
| 1645 | | |
| 1646 | Q4: | Okay. So now that's the point where he turns towards you, is that correct? |
| 1647 | | |
| 1648 | A: | Yes, sir. |
| 1649 | | |
| 1650 | Q4: | Prior to that, um, I believe you said that he was engaged in - in either |
| 1651 | | argument or talking with the other two people, the male and the female that |
| 1652 | | were there? |
| 1653 | | |
| 1654 | A: | Yes, sir. |
| 1655 | | |
| 1656 | Q4: | Okay. You could not hear what they were saying? |
| 1657 | | |
| 1658 | A: | No. |
| 1659 | | |
| 1660 | Q4: | How were his hands at that point? |
| 1661 | | |
| 1662 | A: | I wasn't quite sure. He kind of looked like he had one hand back and the other |
| 1663 | | one - they were just kind of arguing. |
| 1664 | | |
| 1665 | Q4: | Okay. |

HAY000661

| 1666 | | |
|------|------|------|
| 1667 | A: | But at the same time I'm getting out of the car, so I would lose sight of him |
| 1668 | | back and forth. |
| 1669 | | |
| 1670 | Q4: | Okay. So you get out of the car. When you get out of the car, do you - do you |
| 1671 | | remain, uh, behind your door? |
| 1672 | | |
| 1673 | A: | Yes. |
| 1674 | | |
| 1675 | Q4: | Okay. When he turns towards you, you're behind your door? Does he |
| 1676 | | immediately start advancing towards you, or does he take a moment, or how |
| 1677 | | does that happen? |
| 1678 | | |
| 1679 | A: | Split second, he said, "You're gonna have to shoot me," then he starts |
| 1680 | | advancing toward me. |
| 1681 | | |
| 1682 | Q4: | Okay. You can sit down. |
| 1683 | | |
| 1684 | A: | Oh, boy. |
| 1685 | | |
| 1686 | Q4: | All right. Oh, okay. So now, he starts to advance toward you, and I believe |
| 1687 | | you said it wasn't really, uh, fast and it wasn't really slow? Okay. I mean can |
| 1688 | | you give me a little better description of it? |
| 1689 | | |
| 1690 | A: | The best way I can describe is he was purpose-driven. He made a decision of |
| 1691 | | whatever it was he was gonna do, and he was carrying it out. |
| 1692 | | |
| 1693 | Q4: | Okay. |
| 1694 | | |
| 1695 | A: | And methodically. |
| 1696 | | |
| 1697 | Q4: | Okay. |
| 1698 | | |
| 1699 | A: | He wasn't rushed, but he wasn't slow... |
| 1700 | | |
| 1701 | Q4: | Okay. |
| 1702 | | |
| 1703 | A: | ...either. It was - this is what I'm gonna do, I'm gonna carry it out to the end. |
| 1704 | | |
| 1705 | Q4: | Okay. And at some point you told us that you thought, um, or you had the |
| 1706 | | mindset is what you said, that it was a box cutter? |
| 1707 | | |
| 1708 | A: | Correct. |
| 1709 | | |
| 1710 | Q4: | How did you get there? |

HAY000662

| 1711 | | |
|------|------|------|
| 1712 | A: | Just from the way he was holding it, and it kind of looked like the blade of a |
| 1713 | | box cutter. That's about the only thing I could say. I mean just - just the little |
| 1714 | | bit of the glimpse that I could see looked like a blade of - that would be on a |
| 1715 | | box cutter. |
| 1716 | | |
| 1717 | Q4: | Okay. So you could see something? |
| 1718 | | |
| 1719 | A: | Something, yes. I just wasn't 100% sure. It looked to me - I - I thought it was |
| 1720 | | a box cutter. |
| 1721 | | |
| 1722 | Q4: | When you saw what - what you just described as some type of blade, or in |
| 1723 | | your mind, a box cutter, um, what were you thinking at that point? |
| 1724 | | |
| 1725 | A: | He was gonna stab me with it. |
| 1726 | | |
| 1727 | Q4: | Okay. Now, you've used box cutters before? |
| 1728 | | |
| 1729 | A: | Mm-hm. |
| 1730 | | |
| 1731 | Q4: | Okay. I just want to make sure now. I mean is a box cutter something that you |
| 1732 | | think of as a stabbing weapon or a slashing weapon or... |
| 1733 | | |
| 1734 | A: | It could be used as both. |
| 1735 | | |
| 1736 | Q4: | Okay. Now, he gets to how close before you start to fire? |
| 1737 | | |
| 1738 | A: | Two to three yards, so six to nine feet, roughly. |
| 1739 | | |
| 1740 | Q4: | Okay. So he's at six to nine feet, you fire. I believe you told us that you were |
| 1741 | | assessing as you were firing, is that correct? |
| 1742 | | |
| 1743 | A: | Correct. |
| 1744 | | |
| 1745 | Q4: | Okay. Now when you were assessing, was it, you know, fire one, take a |
| 1746 | | moment, assess and then fire more, or how were you going about the |
| 1747 | | assessment? |
| 1748 | | |
| 1749 | A: | As I was firing I was continually assessing it. |
| 1750 | | |
| 1751 | Q4: | Okay. And prior to that continual assessment, you were watching him? |
| 1752 | | |
| 1753 | A: | Correct. |
| 1754 | | |
| 1755 | Q4: | Okay. Can you describe to me from when you fired, you know, that first shot |

HAY000663

| 1756 | | until you stopped firing, what his body motions were? |
| 1757 | | |
| 1758 | A: | After the first couple of gunshots he stopped, so when he stopped, he kind of - |
| 1759 | | I would say he winced a little bit, and then he turned slightly to the right, and - |
| 1760 | | but he didn't drop whatever was in his hand, so then that's why I continued to |
| 1761 | | fire. Then he kind of crumpled and went down, but he was still holding onto |
| 1762 | | whatever he had. And I fired some more. He went down to the ground. When |
| 1763 | | he went down to the ground, he was in a fetal position, still holding onto |
| 1764 | | whatever it was he had, and that's when I stopped firing, 'cause he was down |
| 1765 | | and no longer advancing toward me, so pretty much at that moment in time, |
| 1766 | | the threat was neutralized, it was over with. So that's when I stopped firing. |
| 1767 | | |
| 1768 | Q4: | Okay. And you said he didn't drop, uh, what he had in his hand? Um, you |
| 1769 | | could still see it in his hand that entire time? |
| 1770 | | |
| 1771 | A: | I could - no, I wasn't focused in on that anymore. I was more focusing on the |
| 1772 | | front sighting him, but, um, I know, but I could see he still had his hands |
| 1773 | | clasped the same way he had it before. |
| 1774 | | |
| 1775 | Q4: | Okay. |
| 1776 | | |
| 1777 | A: | When he originally started advancing on me. |
| 1778 | | |
| 1779 | Q4: | Okay. And when you fired the first shot, was he still moving towards you? |
| 1780 | | |
| 1781 | A: | Yes. |
| 1782 | | |
| 1783 | Q4: | Okay. If you can recall, approximately how many shots before he got to that |
| 1784 | | point where you said he stopped? |
| 1785 | | |
| 1786 | A: | Uh, probably two or three, roughly. |
| 1787 | | |
| 1788 | Q4: | Okay. And at that point though he was still standing, is that correct? |
| 1789 | | |
| 1790 | A: | Yes. |
| 1791 | | |
| 1792 | Q4: | All right. At some point he does, you say, I think start to turn towards his |
| 1793 | | right? |
| 1794 | | |
| 1795 | A: | Correct. |
| 1796 | | |
| 1797 | Q4: | Okay. Is he in profile to you at that point? |
| 1798 | | |
| 1799 | A: | Not completely. |
| 1800 | | |

| | | |
|---|---|---|
| 1801 | Q4: | Okay. |
| 1802 | | |
| 1803 | A: | Partially, yes, but not completely. Not a complete side, no. |
| 1804 | | |
| 1805 | Q4: | All right. And at that point you can still see both his hands? |
| 1806 | | |
| 1807 | A: | Yes. |
| 1808 | | |
| 1809 | Q4: | All right. Now you become aware of the other officer - Officer Clark I believe |
| 1810 | | you said was his name, is that right? |
| 1811 | | |
| 1812 | A: | Correct. |
| 1813 | | |
| 1814 | Q4: | And you said that's out of your peripheral vision? |
| 1815 | | |
| 1816 | A: | Correct. |
| 1817 | | |
| 1818 | Q4: | Okay. Um, at that point did you know whether or not Officer Clark was |
| 1819 | | firing? |
| 1820 | | |
| 1821 | A: | I can't tell you which point it was. I... |
| 1822 | | |
| 1823 | Q4: | Okay. |
| 1824 | | |
| 1825 | A: | Somewhere in there, in that second timeframe, I could - I could see him firing. |
| 1826 | | |
| 1827 | Q4: | Okay, okay. And were you still firing at the same time that he was firing? |
| 1828 | | |
| 1829 | A: | Yes. |
| 1830 | | |
| 1831 | Q4: | Okay. All right. And then you believe - I'm sorry, you said that one of the |
| 1832 | | other officers - I'm sorry, did you say Officer Gillett? |
| 1833 | | |
| 1834 | A: | Officer Gillett, yeah, like the razor. |
| 1835 | | |
| 1836 | Q4: | Yeah. Okay. I wanted to make sure I wasn't... |
| 1837 | | |
| 1838 | A: | Okay. |
| 1839 | | |
| 1840 | Q4: | All right. So Officer Gillett is the one who you said took the weapon, uh, from |
| 1841 | | him? |
| 1842 | | |
| 1843 | A: | Yes. |
| 1844 | | |
| 1845 | Q4: | Okay. And then you - you saw it out there, but you just don't remember |

HAY000665

| | | |
|---|---|---|
| 1846 | | whether or not the photo we showed you was it? Okay, okay. |
| 1847 | | |
| 1848 | A: | It was a three-second - he just said, "This is what he had," and I kind of said, |
| 1849 | | "A razor blade?" Or something... |
| 1850 | | |
| 1851 | Q4: | Okay. |
| 1852 | | |
| 1853 | A: | ...like that, like all this over that kind of - that's my - that was what I was |
| 1854 | | thinking, like - so. |
| 1855 | | |
| 1856 | Q4: | Okay. When he said, "You're gonna have to shoot me," did you - was - I'm |
| 1857 | | sorry, was he coming towards you at that point? |
| 1858 | | |
| 1859 | A: | No. He said that and then came toward me. |
| 1860 | | |
| 1861 | Q4: | Okay. When he said that, was he facing towards the other two people he had |
| 1862 | | been engaged with, or was he turned towards you? |
| 1863 | | |
| 1864 | A: | No, he's turned toward me. We had made eye contact at that point. |
| 1865 | | |
| 1866 | Q4: | Okay. Caesar, you have anything else? No? |
| 1867 | | |
| 1868 | Q3: | No, sir. |
| 1869 | | |
| 1870 | Q: | Mr. Stern? |
| 1871 | | |
| 1872 | Q2: | No, thank you. |
| 1873 | | |
| 1874 | Q: | Officer Wooley, is there anything that we haven't asked you about that you |
| 1875 | | feel is important to this investigation? |
| 1876 | | |
| 1877 | A: | No. |
| 1878 | | |
| 1879 | Q: | Do you have anything that you'd like to add before we conclude? |
| 1880 | | |
| 1881 | A: | No. |
| 1882 | | |
| 1883 | Q: | Okay. I want to ask that you take, uh, this first Google Map image that we |
| 1884 | | showed you, can you just take a pen, if you could, uh, just denote a one on |
| 1885 | | there, and then sign and date it, and again, today's date, 11/18/2018. And if |
| 1886 | | you'd take the second map image that was showed you, denote a number 2 on |
| 1887 | | there please, sign and date it and again, 11/18/2018. |
| 1888 | | |
| 1889 | A: | Woops, sorry about that. |
| 1890 | | |

| 1891 | Q: | No problem. Uh, this is the photograph that we showed you of the individual. |
| 1892 | | I know that you've already signed it, could you also date it for me please, and |
| 1893 | | again, 11/18/2018. |
| 1894 | | |
| 1895 | A: | Want me to put number 3 on there? |
| 1896 | | |
| 1897 | Q: | No, that's fine, it's a separate picture. I just wanted to make sure we knew |
| 1898 | | which maps we'd showed you first. And in addition, the photograph of the |
| 1899 | | razor blade that I know you said you didn't recognize, but if you could also |
| 1900 | | sign it just to say that we showed it to you, and again date it - yeah, it's |
| 1901 | | probably hard on the actual picture itself. And again, 11/18/2018. All right. |
| 1902 | | |
| 1903 | Q2: | I - I do actually have one... |
| 1904 | | |
| 1905 | Q: | Okay. |
| 1906 | | |
| 1907 | Q2: | ...last question if you all don't mind. |
| 1908 | | |
| 1909 | Q: | Not at all, sir. |
| 1910 | | |
| 1911 | Q3: | And it kind of relates to the photo of the razor blade. |
| 1912 | | |
| 1913 | Q: | Did you want the photograph? |
| 1914 | | |
| 1915 | Q3: | Nah, that's okay. Um, you made a - kind of your last comment in response to |
| 1916 | | a question by Mr. James, uh, you said in your mind you're thinking all this |
| 1917 | | over that. What do you mean by that? |
| 1918 | | |
| 1919 | A: | Just all of it could have been avoided if he just would have dropped it to begin |
| 1920 | | with, the whole thing would be avoided. |
| 1921 | | |
| 1922 | Q3: | Okay. All right, thank you. |
| 1923 | | |
| 1924 | Q4: | You know what, I'm sorry. But, uh, this map reminded me of something. As I |
| 1925 | | recall, looking at the second map, the X that you put on here shows where |
| 1926 | | your vehicle stopped? |
| 1927 | | |
| 1928 | A: | That's correct. |
| 1929 | | |
| 1930 | Q4: | Okay. Could you put an A, showing us where the, uh, subject was when you |
| 1931 | | first stopped your car? |
| 1932 | | |
| 1933 | A: | Okay. |
| 1934 | | |
| 1935 | Q4: | And then a B where he was when you began to fire? And I realize that this is |

HAY000667

Case 4:19-cv-00697-DMR   Document 73-7   Filed 06/18/20   Page 45 of 45

INTERVIEW WITH OFFICER WOOLEY
Interviewer: Det. Robert Purnell
11-18-18/1:01 pm
Case # 2018-94542
Page 44

| 1936 | | all... |
|------|------|------|
| 1937 | | |
| 1938 | Q: | Probably use the marker, Officer Wooley, it'll probably show up a little bit |
| 1939 | | better. All right. So, Officer Wooley's indicated an A that is, uh, north in the |
| 1940 | | Google Map image near a tree, and then a B that is south of that, uh, closer to |
| 1941 | | the X that he has designated as his patrol car. |
| 1942 | | |
| 1943 | Q4: | Thank you. |
| 1944 | | |
| 1945 | Q: | Are there any other questions from anyone in the room? Okay. |
| 1946 | | |
| 1947 | Q2: | No, thanks. |
| 1948 | | |
| 1949 | Q: | Uh, Officer Wooley, again, we thank you for coming in to speak with us |
| 1950 | | today, and we'll conclude the interview at 1438 pm. |
| 1951 | | |
| 1952 | | |
| 1953 | | The transcript has been reviewed with the audio recording submitted and it is an accurate |
| 1954 | | transcription. |
| 1955 | | Signed_____ |