UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AG. G. a minor, by and through his guardian ad litem, JESSICA AQUINO; AR. G., a minor, by and through his guardian ad litem, JESSICA AQUINO;   KARLA GONSALEZ, individually; and AUGUSTIN GONZALES JR.,  individually; | Case No. 4:19-cv-00697 DMR<br><br>**DECLARATION OF BENJAMIN NISENBAUM IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs, | |
| vs. | |
| CITY OF HAYWARD, a municipal corporation; MARK KOLLER, individually; PHILLIP WOOLEY, individually; MICHAEL CLARK, individually; TASHA DECOSTA, individually; and DOES 1-100, inclusive, | **Date:  July 9, 2020<br>Time:  1:00 p.m.<br>Courtroom: 4** |
| Defendants. | **Hon. Donna M. Ryu** |

# EXHIBIT H

DEPOSITION OF OFFICER TASHA DeCOSTA

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--

AG.G. a minor, by and through )
his guardian ad litem, JESSICA)
AQUINO; AR.G., a minor, by and)
through his guardian ad litem,)
JESSICA AQUINO; KARLA GONSALEZ)
individually; and AUGUSTIN    )
GONSALEZ, JR., individually,  )
                              )
            Plaintiffs,       )
                              )
      vs.                     )CASE NO.: 4:19-cv-00697 DMR
                              )
CITY OF HAYWARD, a municipal  )
corporation; MARK KOLLER,     )
individually; PHILLIP WOOLEY, )
individually; MICHAEL CLARK,  )
individually; TASHA DECOSTA,  )
individually; and DOES 1-100, )
inclusive,                    )
                              )
            Defendants.       )
_____)          CERTIFIED COPY

DEPOSITION OF OFFICER TASHA DeCOSTA

TUESDAY, JANUARY 28, 2020

REPORTED BY:  ANGELICA R. GUTIERREZ, CSR NO. 13292

1

DEPOSITION OF OFFICER TASHA DeCOSTA

1          Pursuant to Notice of Taking Deposition and on

2   Tuesday, January 28, 2020, commencing at the hour of 3:48

3   p.m., thereof, at the Law Offices of John L. Burris, 7677

4   Oakport Street, Suite 1120, Oakland, California, before

5   me, ANGELICA R. GUTIERREZ, CSR No. 13292, a Certified

6   Shorthand Reporter and Deposition Officer of the State of

7   California, there personally appeared:

8

9          OFFICER TASHA DECOSTA,

10

11  called as a witness by the Plaintiffs, who having been

12  duly sworn by me, to tell the truth, the whole truth and

13  nothing but the truth, testified as hereinafter set forth:

14

15          ---oOo---

16

17

18

19

20

21

22

23

24

25

5

DEPOSITION OF OFFICER TASHA DeCOSTA

1    deescalation. I don't know to what level that

2    information is absorbed for each person.

3        Q.   Okay.  When you're training, are there tests

4    afterwards to determine whether a person has retained

5    information?

6        A.   In which training?  The deescalation?

7        Q.   Yes.

8        A.   I don't recall if there was a test.  Sometimes

9    training does have a test and sometimes it doesn't.  I

10   don't recall if this particular one did or did not.

11       Q.   And is the one you're thinking of the ICAT

12   training?

13       A.   Actually, I'm thinking of the most recent

14   training we had because it's fraction -- I think we had

15   it last month on deescalation.  They -- that one, I

16   believe, was maybe a year or more ago.  So, I think the

17   one I'm thinking of is the most recent deescalation

18   training we had.

19       Q.   And you're a sergeant, right?

20       A.   Yes.

21       Q.   And how long have you been a sergeant?

22       A.   I believe seven years.

23       Q.   So going back to roughly 2013?

24       A.   About 2012, 2013.

25       Q.   What are your duties as a sergeant?

12

1     A.    Well, there's a lot.

2     Q.    Sure.

3     A.    In just my overall duties would be

4   supervision, I'm a risk manager, I'm a supervisor, I am

5   overseeing a patrol team.  At the time, I worked

6   different assignments, but as a sergeant in control of

7   where I am now.  I oversee a team that typically has

8   between nine and 12 people, and I would be the primary

9   supervisor for half of that team, assigned to a certain

10  area of town.  I would be respond to calls that could

11  be political.  Calls that could be -- well, I could

12  respond to any calls, but the ones that supervisor

13  probably should respond to in uses of force, any

14  political issues, any -- anything that could become a

15  sensitive issue, any complaints, I respond to

16  complaints from the public.  I would oversee the

17  officers in their daily duties, because I do evaluate

18  them, so I do go to their calls to be able to observe

19  their performance and, you know, ultimately evaluate

20  them.

21        Let me see.  What else?  I mean, there's so

22  many things that come up.  I answer questions for

23  dispatch when it's a question of should we send officer

24  out to a call or should we not.  I kind of sift through

25  those problems, work through those problems.  I go to

13

1    anything that would -- that would take -- typically

2    that would take a plan.  Make sure a plan has come

3    together, so any tactical issues that come up on my

4    team, if we're going to approach that we would -- the

5    supervisor present for.  I would, you know, any --

6    let's see.  What else?  Any crashes involving

7    employees, any incidents involving employees that could

8    lead to discipline.  That type of thing.  I would go to

9    that.  When there's a critical incident that happens on

10   your watch, is that something you're required to go to?

11        A.    Required?  Not always.  If you mean -- how do

12   you moan "on my watch", like.

13        Q.    Good question.  If you are on duty and there's

14   a critical accident that arises --

15        A.    Okay.

16        Q.    -- what happens in terms of supervisory

17   responsibility?

18        A.    So, I may or may not go.  It depends on the

19   time of day, where it is, or -- it doesn't mean I can't

20   go, but there may be other things going on, so.  If

21   there is a critical incident, and it's the middle of

22   the day, and it's my team, I'm going to be there.

23        Q.    Okay.

24        A.    So, yes.

25        Q.    All right.

                                                              14

1       A.    Yes.

2       Q.    Okay.  And do you recall, in responding to

3    this incident involving Mr Gonzales, whether there

4    were -- what was it -- communication that was preceded

5    by three beeps?

6       A.    I don't recall.

7       Q.    Okay.  And we'll preview the tape later.

8       A.    Okay.

9       Q.    But, in any event, at some point, you did

10   responded to this incident, correct?

11      A.    Yes.  Sure.

12      Q.    Okay.  Why did you respond?

13      A.    I was on duty.  I was somewhat close to the

14   area.  It's not uncommon I wouldn't -- that I would

15   respond.  I respond to calls all day, whether they're

16   critical or not, whether they're my people or not.  But

17   I think the biggest reason why I went this was a man

18   with a knife call, and -- or at least that's how it

19   came out, and I was probably a mile or so away.

20      Q.    Okay.  And, by the way, do you recall what

21   officers you were supervising on your shift this day?

22      A.    I don't recall.  I was working an overtime

23   shift.

24      Q.    Okay.  So one of the reasons you responded was

25   you were close?

                                                        16

DEPOSITION OF OFFICER TASHA DeCOSTA

```
 1        A.   Correct.
 2        Q.   All right.  And because the report, anyway,
 3   was a man with a knife?
 4        A.   Correct.  That the man had been involved in
 5   some sort of altercation, correct?
 6        A.   Yes.
 7        Q.   Okay.  Was there any indication that the man
 8   had infliced any injuries on anyone?
 9        A.   I don't think so.
10        Q.   Okay.  Was it a call that would rise to the
11   level of the critical incident response?
12        A.   It's kind of -- I wouldn't call it a critical
13   incident response because that term, "critical
14   incident", usually, to me, comes out of -- afterwards.
15   Like, okay, that was critical incident.
16        Q.   Right.
17        A.   Typically it's something that unfolds and
18   becomes a critical incident.  So, an emergency
19   response, yeah, I think it -- on a -- if you are asking
20   on the level of importance, I think it was important.
21   If you have -- I mean, what I knew was there was a man
22   a knife.
23        Q.   Right.
24        A.   And there was one or more people that were
25   being threatened by the knife.
```

17

DEPOSITION OF OFFICER TASHA DeCOSTA

1      A.    Sure.  Yes.

2      Q.    And you've also received training in

3  identifying subjects who are emotionally disturbed or

4  mentally impaired, correct.

5      A.    Correct.

6      Q.    Okay.  And there's this section in that

7  training for recognition, correct?

8      A.    Correct.

9      Q.    And the ICUT has a section titled "crisis

10 recognition" right?

11     A.    I suppose.  Okay.

12     Q.    You can read it upside down if you want.  I

13 don't know if you remember it, but I knew -- you know a

14 person who's disturbed when yousee them?

15     A.    I do.

16     Q.    Okay.  And it was pretty clear to you that the

17 person in the red shirt was acting in a manner that was

18 consistent with being emotionally disturbed, correct?

19        MR. VIGILIA:  Objection.  Misleading.

20 Assumption facts not in evidence.  Lacks foundation.

21 You can answer.

22        THE WITNESS:  I think there's a whole range of

23 emotionally disturbed and whether it's we're dealing

24 with a drunk person, then it could be that.  But, I

25 guess if you're calling all people that appear to be

28

1    heightened emotionally disturbed, then yes.

2       Q.   Okay.  You could be drunk and be emotionally

3    disturbed, right?

4       A.   Right.

5       Q.   In fact, you might be more likely to be

6    emotionally disturbed if you are drunk, right?

7       A.   I would agree.

8       Q.   Okay.  But when you here someone say words to

9    the effect of, "Don't call the police.  If you call the

10    police, they are going to have to shoot me", and "I

11    don't give a fuck.  You call the police, they are going

12    have to shoot me".  That's a fairly high level of

13    disturbance that the point, right?

14       A.   Sure.

15       Q.   Unless they are saying in -- which didn't

16    appear be the case, right?

17       MR. VIGILIA:  Objection.  Calls for

18    speculation.

19       THE WITNESS:  He appeared -- yes, he appeared

20    to be heightened, or emotionally disturbed, or drunk,

21    or something other than what I would consider casual or

22    normal behavior of people.

23       MR. NISENBAUM:  Q.  Certainly agitated.

24       A.   Appeared so, yes.

25       Q.   Okay.  And in any event, in all the training

29

1  anything to the effect of, "get away from him".  "Come

2  her -- come here" to the person that Mr. Gonzales was

3  with?

4       A.   No, I did not.

5       Q.   Okay.  Now, from the time you exited your

6  patrol vehicle to the time shots were fired, how much

7  time had lapsed?

8       A.   Maybe six to eight seconds.

9       Q.   Okay.  I take it if you had more time, the

10 only thing you would have done is call out to the girl,

11 "get away from him", "come here" something like that;

12 Is that right?

13           MR. VIGILIA:   Objection.  Calls for

14 speculation.  You can answer.

15      A.   I think -- yes.  Time gives a lot more

16 options.

17      Q.   Right.  And one thing officers are trained to

18 do when they respond to a situation like this one, if

19 possible, is to try the extend the time, right?  Make

20 the time.

21      A.   If possible, yes.

22      Q.   And the reason for that is time helps to -- to

23 do everything you need to do.  Establish a perimeter,

24 containment, get the person away from him, right?

25 Among other reasons.

                                                      33

1      A.    Right.

2      Q.    And then, I assume that you walked in that

3 direction and parked and tried to find out what was

4 happening?

5      A.    I did.

6      Q.    Okay.  When you were walking in that -- from

7 the point in time you arrived on-scene, the point in

8 time when shots were fired, did you see any weapon in

9 Mr. Gonzales' hands?

10      A.    No.

11      Q.    Okay.  How far were you from -- approximately

12 from Mr. Gonzales when shots were fired?

13      A.    I was probably just about behind officer

14 Wooley's Ford Explore running to the right side.  So,

15 that distance from where he was to -- to the back of

16 the Ford Explore.  So, I don't know how many feet, but

17 maybe -- maybe 15, 20 feet.

18      Q.    Okay.  And as I understand it, you did not

19 actually see the event when shots were fired?

20      A.    I'm sorry.

21      Q.    Your view was blocked when the shots were

22 actually fired?

23      A.    When they were fired, yes.  I was behind the

24 Ford Explore coming around to the right side.  I -- I

25 had a view before I came that way.

                                                      35

1    ground once I got around the right side.  I don't know

2    at what point, but I saw it on the ground after the

3    shooting.

4         Q.    Okay.  Was that before Mr. Gonzalez had been

5    handcuffed?

6         A.    I don't know.

7         Q.    Okay.  Do you have any training that says you

8    should not use the taser against a person armed with a

9    knife or an edged weapon?

10        A.    I don't believe there's training that

11   specifically says that, no.

12        Q.    Right.  That the training that you have is

13   that the taser is the appropriate weapon and at a safe

14   distance against the person armed with the knife,

15   correct?

16             MR. VIGILIA:  Objection.  Lacks foundation,

17   assumes facts not in evidence.  You can answer.

18             THE WITNESS:  I don't have training that says

19   that, either.  I think it would depend on the

20   circumstance.  Sometimes that maybe appropriate and

21   sometimes it may not.

22             MR. NISENBAUM:  Q.  All right.  I'm going to

23   show you a couple of exhibits.  I'm going to show you

24   Exhibit E and B.  This is Mark's deposition.  But

25   before I do that, I'm going to ask you this:  Have you

                                                          37

1    been -- when you received the taser, did you get the

2    user manual?

3         A.    I think the user manual is in the training.

4    I -- I did have a copy of the user manual.

5         Q.    Okay.

6         A.    Not as a user, but as an instructor.

7         Q.    You're a taser instructor?

8         A.    I have been.

9         Q.    Okay.  All right.  And as a taser instructor,

10   then you are aware that Taser has promoted themselves

11   as a company that gives you weapons that are useful

12   against individuals who possess weapons, correct?

13        A.    They can be, yes.

14        Q.    Right.  And particularly non-firearm weapons,

15   correct?

16        A.    They can be, yes.

17        Q.    Okay.  Had you -- the taser company promotes

18   the use of the taser against individuals who posses

19   weapons like crowbars and baseball bats, correct?

20             MR. VIGILIA:  Objection.  Lacks foundation,

21   assumes facts not in evidence.  You can answer if you

22   want.

23             THE WITNESS:  I don't -- I don't know when

24   that would have -- I haven't seen any promotion of

25   Taser that I can remember.

                                                        38

DEPOSITION OF OFFICER TASHA DeCOSTA

1    Q.   Oh, okay.  But the taser company does use

2    examples of the taser being used against people with

3    knives in their training, correct?

4    A.   I don't recall seeing any recent taser

5    training with -- with that, but I -- I could just not

6    know.  Is it effective sometimes against knives,

7    absolutely given certain circumstances.

8    Q.   And that would be because you're at a distance

9    and a person is capable of being tased and they're not

10   wearing a puffy coat or something, then you can hit

11   them with a taser that could cause the neuromuscular

12   incapacitation that would make them lose, essentially,

13   control of their muscles, correct?  If it works

14   properly.

15   A.   Right.  That alone, no, but with other

16   factors, yes.

17   Q.   Well, I'm going to show you Exhibit E and

18   Exhibit D.  First, you were trained on the X26?

19   A.   Yes.

20   Q.   Okay.  I'm going to show you page 5 of the

21   user manual of the X26.  There's a heading that says

22   neuromuscular incapacitation; do you see that?

23   A.   Uh-hum.

24   Q.   And that has a drawing of a police officer

25   using a taser against a person with a baseball bat,

39

DEPOSITION OF OFFICER TASHA DeCOSTA

1      Q.   Okay.  Now, I'm going to show you Exhibit D.
2    This is the X2 manual.
3      A.   Okay.
4      Q.   And this is similar diagram, but the person
5    has crowbar?
6      A.   Okay.
7      Q.   And the crowbar, of course, can be used in the
8    manner and can be extraordinarily deadly, right?
9      A.   Yes.
10     Q.   Just like a razor blade that could be used in
11   a manner that could be dangerous, correct?
12     A.   Yes.
13     Q.   Okay.  So, at Hayward Police Department, is
14   there some policy that prohibits police officers from
15   backing up or changing their location when they respond
16   to a person?
17     A.   No.
18     Q.   Okay.  For example, and I ask because
19   sometimes officers say, "well, I don't have to
20   retreat".  Like, somehow it's reasonable to shoot a
21   person when you could just take a few steps back.  It's
22   never made sense to me, but Hayward doesn't have that
23   type of policy, right?
24     A.   We don't, no.  Not that I know of.
25     Q.   Right.  You recognize that officers, when they

42

1  respond to subjects, shouldn't expect all the time that

2  subjects should be fully compliant with them, right?

3      A.    I hope they would be, but that case is that

4  they are not sometimes.

5      Q.    Well, there's hope and then there's realty.

6  If everyone did what they are supposed, you'd be in a

7  different line of work, right?

8      A.    So would you, I would image.

9      Q.    Well, I would probably be a lawyer still, just

10 a different --

11     A.    That would lessen the case load, I guess.

12     Q.    It wouldn't be on this.

13     A.    Right, yes.

14     Q.    Hopefully not corporate law, right?  You know,

15 in any event -- and there's expectation in your job --

16 strike that.  You are trained to -- to expect that

17 there are times when people will be resistent, and your

18 job is to keep your cool, respond to them

19 appropriately, and help them too, right?

20          MR. VIGILIA:  Objection.  Lacks foundation,

21 assumes facts not in evidence.

22          THE WITNESS:  Yes, as best we can.

23     Q.    All right.  And a person like Mr. Gonzalez, it

24 was clear that he was going through it.  He was having

25 some emotional problems.  You could tell that, right?

43

DEPOSITION OF OFFICER TASHA DeCOSTA

1      A.    Something was wrong.

2      Q.    Yeah.  It looked like he needed some help,

3   right?

4      A.    It looked like she needed some help.

5      Q.    Well --

6      A.    I mean, I think that the whole situation

7   needed help.

8      Q.    Right.  Everyone involved.

9      A.    Yes, absolutely.

10     Q.    And so, do you know of any reason why no one

11  took their taser out in this incident?

12          MR. VIGILIA:  Objection.  Calls for

13  speculation.

14     Q.    Well, and it might be foundationless.  I don't

15  know the answer.  Did you have your taser out?

16     A.    I did not.

17     Q.    You had a gun out, right?

18          MR. VIGILIA:  Objection, vague as to time.

19     A.    At one point I did, yes.

20     Q.    When was your gun out?

21     A.    After I came around the back of the truck and

22  heard Phil saying, "drop the knife, drop the knife",

23  "stop", or something like I that, and I came around and

24  I unholstered my gun at that point based on what --

25  well, the totality of what was happening.

44

DEPOSITION OF OFFICER TASHA DeCOSTA

1  Q.  Is that after shots had been fired?

2  A.  It was probably simultaneous.  And one of the

3  reasons why you pulled your gun out was because you

4  were hearing shots, correct?

5  A.  No, it was because I -- I was coming around

6  the back and was hearing Phil say, "drop the knife,

7  drop the knife".  And at that point, base on the type

8  of call, information that the guy had a knife, and then

9  Phil saying "drop the knife", and that I could see when

10  I went around initially the guy getting close to Phil

11  and walking toward him, at that point, it was pretty

12  close to about the same time when the shots were fired

13  that I withdrew my handgun.

14  Q.  Okay.

15  A.  So I don't know exactly, but it was really

16  close to the same time.

17  Q.  Weren't you trying to give them information,

18  the other officers at the scene, before shots were

19  fired?

20  A.  Initially, but they -- I don't believe could

21  hear me, initially, as they drove past me.

22  Q.  They drove right past you.  You were on-scene,

23  and they drove right past you, right?

24  A.  They did.

25  Q.  Okay.  And did they ever try to get

45

1    information from you?  Prior to shots being fired?

2         A.   I think there was some exchange.  I don't know

3    if it was through dispatch and Phil, or me and Phil,

4    but when they drove past me, there was no -- there was

5    no conversation between that and when they confronted

6    Mr. Gonzalez.

7         Q.   When they drove past you, had Oscar already

8    ran away from you?

9         A.   Yes.

10        Q.   Okay.  So, you are on foot, do you know if

11   they saw you or not?

12             MR. VIGILIA:  Objection.  Calls for

13   speculation.

14             MR. NISENBAUM:  Q.  My question is do you know

15   if they saw you.  You might have found it out after the

16   fact.

17        A.   I didn't know at the time if they saw me.

18        Q.   Did you find out later whether or not they saw

19   you?

20        A.   Yes.  My understanding is that they did not --

21   or at least I think I heard Phil say that they didn't

22   see me, or he didn't see me.  I don't know if Mike saw

23   me or not.

24        Q.   When they drove past you, would they have

25   turned past your car, as well?  Your Ford Explorer.

46

1    A.   I think I said, "he's threatening", but I

2  stopped saying that, because I knew they couldn't --

3  didn't seem like -- I didn't know, but it didn't seem

4  like they could hear me, and they were involved in

5  something more critical.

6    Q.   How long before shots were fired did you say

7  he's threatening?

8    A.   I don't -- it would have been less than six

9  seconds.  I'm guessing.

10   Q.   Right.  How tall are you?

11   A.   5'7".

12   Q.   And were there -- was there street lighting in

13  the area?

14   A.   I believe so.  I had my flashlight, too.

15   Q.   And you had your flashlight.  It appeared to

16  you acting that Mr. Gonzalez was acting bizarre as if

17  he was psychotic or intoxicated, correct?

18   A.   That's correct.  Something was wrong with him.

19   Q.   It was obvious to you that there was something

20  wrong with his mental state, correct?

21   A.   Correct.

22   Q.   You told interviewers that it all happened

23  really fast and noted there was enough -- not enough

24  time to even coordinate with different force options

25  between the two officers; is that true?

48

1    are all kind of moving fast at that point.

2        Q.   Is that when you said "stop"?  Or was that

3    when you said, "he's threatening"?

4        A.   No, it was before that.

5        Q.   Okay.  Officer Clark hadn't arrived yet? or

6    was just arriving?

7        A.   Probably happening at the same time.

8        Q.   Okay.

9        A.   But it was at least after Phil passed me.

10       Q.   Okay.  What I want to do is look at a video --

11   your video.  Off the record real quick.

12            (Recess taken from 5:01 PM to 5:03

13            PM.)

14            MR. NISENBAUM:  Q.  I'm going play a video

15   entitled Axon body two video, 2018/11/15, 2118.MP4.

16   This is the first of the videos and was produced by the

17   defense of your body cam.

18       Q.   Pausing at 15 seconds.  You hear yourself

19   saying, "Hold on, hold on, he's threatening"?

20       A.   Uh-hum.

21       Q.   What were you -- why were you saying "hold on,

22   hold on"?

23       A.   I don't why I was saying hold on, if I was

24   talking to the guy in the orange, or if I was trying to

25   get out to the officers that he was threatening.  What

                                                          61

DEPOSITION OF OFFICER TASHA DeCOSTA

```
1    appeared to be, like I said earlier, a suicide by cop.
2        Q.   Right.  And by saying, "hold on, hold on" you
3    are trying to tell them back off, back off, right?
4        A.   I don't --
5            MR. VIGILIA:  Objection.  Misstates the
6    evidence.
7            THE WITNESS:  What I was trying to tell them
8    was what I knew.  I wasn't able to get it out, so I had
9    to stop.
10       Q.   Well, right as you stop, the shots are being
11   fired.  We just heard a couple of them, right?
12       A.   We did.
13       Q.   Okay.
14       A.   Not yet.
15       Q.   I thought we did?
16       A.   No, not yet.
17       Q.   We'll just back it up.  I paused it at eleven.
18       A.   Not until I get right here.
19       Q.   Okay.  We paused it at eleven, and we'll
20   restart it at -- we paused at fifteen, and we'll
21   restart it at twelve seconds.
22            So, "hold on, hold on, he's threatening", but
23   you were trying to say, you weren't describing him
24   threatening the officers at that time.  Whay you were
25   trying to get out was, hold on, hold on, he's
```

                                                             62

DEPOSITION OF OFFICER TASHA DeCOSTA

1    threatening suicide by cop, basically.  That's the

2    information you are trying to get out, correct?

3        A.    That would be threatening the officers, right?

4    I mean, that's my mind set is that, you know, oh, no,

5    the officers are going to walk into something that -- I

6    am hearing them say that you are going to have to shoot

7    me.

8        Q.    Right.

9        A.    So, I'm trying to convey just that piece of

10   information to them so they know that.

11       Q.    But I'm saying, you're not -- that's not a --

12   that's not a present sense impression of you saying

13   observing him threatening the officers at that the

14   moment.  You were trying to communicate to the officers

15   that he was threatening suicide by cop, correct?

16       A.    Yes, I was.

17       Q.    That's what you were trying to comminate?

18       A.    I was.

19       Q.    Okay.  Thank you.

20       A.    Uh-hum.

21       Q.    Again, that he was trying to commit suicide by

22   cop, correct?

23       A.    That he made statements to that.

24       Q.    Okay.  Thank you.  And the video was paused at

25   29 seconds for the record.  Did you hear him say on

63

DEPOSITION OF OFFICER TASHA DeCOSTA

```
1        A.   Well, they know that I'm supervisor if I'm
2   coming, but it's really -- it really shouldn't change
3   their job duties, because they're -- they are the
4   decision makers.  I'm overseeing it, but shouldn't
5   change what they do.
6        Q.   Well, you the first officer on scene, correct?
7        A.   I don't know if I was.  I thought that others
8   were there before me, but I couldn't find hum.
9        Q.   Okay.
10       A.   And then I was there when Oscar popped out.
11       Q.   Right.
12       A.   So, I saw Oscar first, I believe, but I think
13   they had been also looking for where this commotion was
14   happening.
15       Q.   And the question probably was not a good
16   question.  But, if I understand correctly, you are out
17   of your car when both officers Clark and Officer Woolly
18   drive past during in their cars, correct?
19       A.   Yes.
20       Q.   And there were no other officers at the scene?
21       A.   Not that I saw.
22       Q.   For all intensive purposes, you were the first
23   officer on the scene, correct?
24       A.   I -- I think I was the first one out of my
25   car, but I do think Officer Woolly, and maybe others,
```

72

1    had driven past that same spot in attempt to locate and

2    had been circling looking for where the incident was.

3    So, I was the first to encounter Oscar and seemingly

4    the first to hear Mr. Gonzalez down the street.

5         Q.   Did you communicate over dispatch that you

6    were stopping and talking to someone?

7         A.   Yes, I did, because I asked the color of the

8    shirt for clarification.

9         Q.   Right, and that - you had confirmed it was the

10   person, did you let -- did you let dispatch know or

11   communicate to over the radio that you were -- that you

12   had, essentially, located the caller?

13        A.   I didn't even know he was the caller yet. I

14   mean, I -- I was figuring that he was since he was

15   pulling away from me and he was -- and he said, "you

16   gotta stop him".  So I was figuring out that he wasn't

17   the guy with the knife, or it didn't seem like he was.

18   I wouldn't have completely ruled him out at the point,

19   because he could have turned around and been the guy

20   with the knife.  I don't know.

21        Q.   Sure.  And it could have turned out that he

22   didn't have a knife, right?

23             MR. VIGILIA:  I'm going to object as to when

24   you say "he didn't a knife".  Are you referring to

25   Mr. Cifaros --

73

1    correct?

2        A.   Yes.

3        Q.   Okay.  And here you had three officers at the

4    scene, all three lethal weapons, gun, and all three had

5    operable tasers, correct?

6        A.   Right.

7            MR. VIGILIA:  Objection.  Calls for

8    speculation.

9            MR. NISENBAUM:  Q.  Okay.  And at no point did

10   you tell any of the officers to -- I take that back.

11   You did make a statement, but you were not intending by

12   that statement to tell the officers to back off,

13   correct?

14       A.   No, I'm just trying to communicate what I

15   knew.

16       Q.   Okay.  And you were saying to hold on and were

17   telling them to wait?

18       A.   I was just trying to give them the

19   information.  I wasn't -- I couldn't tell them to wait.

20   in fact, I couldn't even keep talking.  I had to stop

21   talking so they could focus on that -- on what was

22   happening.  It would have been inappropriate for me to

23   keep talking.

24       Q.   Is that why you stopped talking?  For them to

25   focus?

                                                          80

**DEPOSITION OF OFFICER TASHA DeCOSTA**

1    A.   I stopped talking because I realized they

2    couldn't hear me, and if I were to continue to talk or

3    demand that they listen to me, it would diverted their

4    attention from what was going on in front of them.

5    Q.   Okay.

6    A.   So, I stopped talking for a couple reasons.

7    Q.   Now, you also have tools in your trunk,

8    correct?

9    A.   Yes, in my police car.

10   Q.   You're a sergeant and sergeants carry specific

11   weapons, correct?

12   A.   Yes.

13   Q.   And these are, like, tasers.  These are

14   weapons that can be used from a distance, correct?

15   A.   Yes.

16   Q.   And then, I'm sure you have like a lethal

17   firearm, like a rifle or something, but you also had a

18   40-millimeter, correct?

19   A.   Correct.

20   Q.   And what other -- what else did you have?

21   A.   I have a bean bag shotgun.

22   Q.   What is the purpose of the bean bag shotgun?

23   A.   It's a less lethal option.

24   Q.   What does it do?

25   A.   It works much like a shotgun.  It's a small

81

DEPOSITION OF OFFICER TASHA DeCOSTA

1    cartridges.

2        Q.   Okay.  So that gives you an even longer range

3    than the 15-foot cartridge, right?

4        A.   It does give a longer distance, yes.  The

5    range is difficult because it's, like, when you throw a

6    ball and it logs, it becomes more challenging at a

7    greater distance than, you know, say, ten to 15 feet.

8        Q.   Okay.  So if you use it over a longer

9    distance, then it's harder to -- your accuracy is

10    diminished.

11        A.   Correct.

12        Q.   Okay.  Does the whole department -- do they

13    have -- the entire department, is that 25-foot taser

14    cartridges?

15        A.   We all have the same.

16        Q.   Okay.

17        A.   Nobody has -- to my knowledge, nobody has

18    anything different unless, potentially, the SRU team

19    could, and I don't know about their equipment.  But, to

20    my knowledge, the officers on the street have the same.

21        Q.   Okay.

22        A.   Thank you.

23        (Deposition concluded at 5:37 PM)

24            --o0o--

25

87

DEPOSITION OF OFFICER TASHA DeCOSTA

```
1    STATE OF CALIFORNIA      )
                              ) ss.
2    COUNTY OF CONTRA COSTA )

3

4         I, Angelica R. Gutierrez, a licensed Certified

5    Shorthand Reporter, duly qualified and certified as such

6    by the State of California;

7         That prior to being examined, the witness named in

8    the foregoing deposition was by me duly sworn to testify

9    to the truth, the whole truth,and nothing but the truth;

10        That the deposition was by me recorded

11   stenographically at the time and place first herein

12   mentioned, and the foregoing pages constitute a full,

13   true, complete and correct record of the testimony given

14   by the said witness;

15        That I am a disinterested person, not being in any

16   way interested in the outcome of said action, nor

17   connected with,nor related to any of the parties in said

18   action, or to their respective counsel, in any manner

19   whatsoever.

20

21             DATED:  January 28, 2020

22

23        ___/s/Angelica R. Gutierrez_____

24        ANGELICA R. GUTIERREZ, CSR No.  13292

25

                                                        89
```