UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AG. G. a minor, by and through his guardian ad litem, JESSICA AQUINO; AR. G., a minor, by and through his guardian ad litem, JESSICA AQUINO;   KARLA GONSALEZ, individually; and AUGUSTIN GONZALES JR.,  individually;<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF HAYWARD, a municipal corporation; MARK KOLLER, individually; PHILLIP WOOLEY, individually; MICHAEL CLARK, individually; TASHA DECOSTA, individually; and DOES 1-100, inclusive,<br><br>Defendants. | Case No. 4:19-cv-00697 DMR<br><br>**DECLARATION OF BENJAMIN NISENBAUM IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br><br><br>**Date:  July 9, 2020**<br>**Time:  1:00 p.m.**<br>**Courtroom: 4**<br><br><br> **Hon. Donna M. Ryu** |

# EXHIBIT N

DEPOSITION OF LIEUTENANT MARK ORMSBY

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--

AG.G. a minor, by and through )
his guardian ad litem, JESSICA)
AQUINO; AR.G., a minor, by and)
through his guardian ad litem,)
JESSICA AQUINO; KARLA GONSALEZ)
individually; and AUGUSTIN    )
GONSALEZ, JR., individually,  )
                              )
            Plaintiffs,       )
                              )
       vs.                    )CASE NO.: 4:19-cv-00697 DMR
                              )
CITY OF HAYWARD, a municipal  )
corporation; MARK KOLLER,     )
individually; PHILLIP WOOLEY, )
individually; MICHAEL CLARK,  )
individually; TASHA DECOSTA,  )
individually; and DOES 1-100, )
inclusive,                    )
                              )
            Defendants.       )
_____)        CERTIFIED COPY


DEPOSITION OF LIEUTENANT MARK ORMSBY - PMK

MONDAY, JANUARY 27, 2020


REPORTED BY:  KELLY L. MCKISSACK, CSR #13430

1

1          Pursuant to Notice of Taking Deposition, and

2     on Monday, January 27, 2020, commencing at the hour of

3     10:01 a.m., thereof, at 7677 Oakport Street, Suite 1120,

4     Oakland, California 94621, before me, KELLY MCKISSACK,

5     CSR No. 13430, a Certified Shorthand Reporter and

6     Deposition Officer of the State of California, there

7     personally appeared:

8

9               MARK ORMSBY,

10

11    called as a witness by the Plaintiffs, who having been

12    duly sworn by me, to tell the truth, the whole truth and

13    nothing but the truth, testified as hereinafter set

14    forth:

15

16                    --o0o--

17

18

19

20

21

22

23

24

25

                                                          5

1                    MARK ORMSBY,

2      having been first duly sworn, testified as follows:

3              THE WITNESS:   (TO OATH) I do.

4

5                    EXAMINATION

6  BY MR. NISENBAUM:   Q.   Can you please state and spell

7  your name.

8        A.    Yes.   Mark Ormsby, M-A-R-K, O-R-M-S-B-Y.

9        Q.    And what is your current occupation?

10       A.    Police officer.

11       Q.    It's my understanding that you're a

12  lieutenant; is that correct?

13       A.    Correct.

14       Q.    Okay.   And I'm going to -- well, I won't

15  attach it.   I'll just read it.   You've been produced by

16  the defense in connection with Plaintiffs' deposition

17  notice as a, "person most knowledgeable pursuant to FRCP

18  30(b)(6) regarding all policies, procedures and training

19  of Hayward Police Department officers in using

20  deescalations," misspelling there with the S, "tactics

21  against subjects who they are responding to."

22              Is that your understanding?

23       A.    Yes.

24       Q.    Okay.   And could you briefly -- and I think

25  your -- put you down twice.   In any event, sorry about

                                                          6

1   correct?

2       A.    Correct.

3       Q.    All right.  So on the second page, Bates stamp

4   2015, it says what this training covers.  Skills you

5   already use on a daily basis.  Pulls those skills

6   together.  Applies them to non-firearms critical

7   incidents.  Emphasis on teamwork.  Focus on persons in

8   crisis, in quotations, suicide by cop, close quote,

9   situations, correct?

10      A.    Correct.

11      Q.    Okay.  So these are -- the training from ICAT

12  applies to suicide by cop situations in non-firearm

13  critical incidents?

14      A.    Correct.

15      Q.    What does that term mean, non-firearm critical

16  incidents?

17      A.    A subject that does not have a firearm.

18      Q.    Okay.  So the subject might have a weapon like

19  a knife and it would apply, correct?

20      A.    Circumstantially.

21      Q.    Right.  Okay.  And to be clear, what the

22  subject is about -- I'm sorry.  What the -- what the

23  deescalation training is about is about increasing an

24  officer's options, correct?

25      A.    Correct.

18

1    Q.    Okay.  In other words, not saying you just

2    walk away.  It's not saying, well, we're going to put

3    you in an unwinnable situation.  And it's not saying you

4    can't use reasonable force when it's appropriate?

5    A.    Correct.

6    Q.    But if you apply the tactics of the training,

7    hopefully you'll be able to bring the situation down to

8    where you use less force or no force, correct?

9    A.    Potentially.

10   Q.    You mean, hopefully, yes?

11   A.    Hopefully.

12   Q.    Yes.  But you have to apply the tactics in

13   order to do that, correct?

14   A.    Correct.

15   Q.    Okay.  Now, skipping to Bates 18, the last two

16   digits.  It says four key areas.  Patrol officer

17   response, non-firearms incident.  So, again, that states

18   that this applies where the subject is not armed with a

19   firearm, correct?

20   A.    Correct.

21   Q.    And, if you know, is that because with a

22   firearm a person can become almost instantaneously

23   lethal?

24   A.    Correct.

25   Q.    So it applies where there's time and

19

1    opportunity to apply the tactics?

2        A.    Correct.

3        Q.    And the purpose, again, this is Bates 19, is

4    to gain voluntary compliance when possible?

5        A.    Correct.

6        Q.    Turning to Page 20 it says four key areas.

7    And the last one of these which is in bold, "Officer

8    safety and wellness:   Physical, emotional, legal."

9    What's discussed in that area?

10       A.    When we talk about use of force instances,

11   whether it's involved in a shooting or major use of

12   force and the potential for being sued, we talk about

13   the stresses of the processes and things like that.   And

14   physically it's when you get into a fight there's a

15   potential for you to be injured also in the middle of

16   using a use of force.

17       Q.    I assume part of the ICAT training includes

18   techniques for how -- for an officer to try to keep

19   their own cool?

20       A.    Correct.

21       Q.    And to try not to overreact?

22       A.    Correct.

23       Q.    As part of that is there discussion about

24   using reasonably available less lethal alternatives in

25   the ICAT training?

20

1   tactics are trained on at Hayward Police Department?

2       A.   I would say one of.  Because we do have a

3   deescalation course in CIT that the department has put

4   on a few times.  And I believe we have someone come in

5   and talk about that today.

6       Q.   Okay.  That would be the other deescalation

7   PMK?

8       A.   Yes.

9       Q.   Okay.  And do you know how this training

10  differs from that training?

11      A.   I do not.

12      Q.   Okay.  You've been trained in both?

13      A.   I have.

14      Q.   Okay.  So step one, this is Bates 30, collect

15  information.  How do you train officers to collect

16  information?

17      A.   A lot of time the information we talk about

18  here is from dispatch.  And us asking questions if there

19  are some things that we'd like to have more information

20  on that would allow us more time if -- if it was

21  available.

22      Q.   Sure.  Are officers trained that part of

23  collecting information is to once they arrive on scene

24  use their own senses to collect information?

25      A.   Yes.

                                                        26

DEPOSITION OF LIEUTENANT MARK ORMSBY

1    Q.   In other words, what you see, what you

2    personally see, what you hear, might be different than

3    the information you get from dispatch, correct?

4    A.   Correct.

5    Q.   And so officers should be -- well, strike

6    that.

7         Are officers trained that while they ought to

8    keep the information from dispatch in mind, if what they

9    see is different than dispatch, they don't disregard

10   what they see?

11   A.   Correct.

12   Q.   Okay.  Are you familiar with the term

13   swatting?

14   A.   Yes.

15   Q.   What is swatting?

16   A.   Where an individual would call in to dispatch

17   with a pretty serious critical incident in hopes of

18   getting all of the police resources there and usually

19   finding that it's a hoax.

20   Q.   Meaning that someone will call in a false

21   threat on another person forcing a massive police

22   response, a SWAT-type response, to that person with

23   false information, correct?

24   A.   I don't think I necessarily see it the same

25   way you do.  I think you're -- if I'm getting you

27

DEPOSITION OF LIEUTENANT MARK ORMSBY

1    correctly, you're saying that someone, like, I have a
2    problem with Mike. And so I call on this information on
3    Mike to bring all the resources there just to make his
4    life miserable?
5        Q. Yeah.
6        A. I don't see swatting as that. And that hasn't
7    been my experience of swatting. My experience of
8    swatting has been more of a rogue person just picking an
9    address and calling as more of a practical joke than it
10   is to set somebody up.
11       Q. I got that.
12       A. Okay.
13       Q. But still calling with false information to
14   cause a massive police response to the person; is that
15   correct?
16       A. Correct.
17       Q. Okay. What steps -- I assume that officers at
18   Hayward are trained to consider those possibilities as
19   well, that the information provided may not be accurate
20   by the caller?
21       A. I would say we've probably done lineup
22   training, not formal CPT training. But because we've
23   had some instances over the last year where we've had
24   some swatting instances. So I would say there's been
25   lineup training, not formal training.

28

DEPOSITION OF LIEUTENANT MARK ORMSBY

1      Q.    When did that training first begin?

2      A.    I guess it would have been based on each

3  individual watch commander to decide when and how that

4  training was conducted, if everybody even covered it.

5  So it wasn't a mandate that came out that says, hey, you

6  need to have training on swatting.  Because we had

7  several calls.  And it's in the watch commanders log.

8          And I would say most watch commanders are

9  going to read that and say, hey, I probably should talk

10  to my officers about this so they have an understanding

11  what's going to happen.

12     Q.    Do you have an understanding of whether there

13  was any lineup training conducted prior to this

14  incident?

15     A.    I do not.

16     Q.    Okay.  And you understand by this incident I'm

17  referring to the Augustin Gonsalez incident?

18     A.    Correct.

19          MR. VIGILIA:  Just for clarification, lineup

20  training regarding swatting?

21          MR. NISENBAUM:  Yes.

22     Q.    But even without that training, I assume that

23  officers are, to your knowledge, are trained

24  particularly as part of the critical decision-making

25  model to try to confirm the information received from

                                                      29

DEPOSITION OF LIEUTENANT MARK ORMSBY

1  information that would have shown both that there was a

2  threat inside the house, but not a threat outside the

3  house, correct?

4       A.   Correct.

5       Q.   And that because of that they would be able to

6  do like a surrounding call-out type thing?

7       A.   Correct.

8       Q.   Okay.  Something that would slow the situation

9  down and not put anyone in harm's way unless the subject

10 essentially came barreling out of the house?

11      A.   Right.  Which is one of the reasons we like to

12 show this video is because the subject is isolated.  And

13 when you go back to Exhibit B, the immediacy and

14 severity of the threat to the officers and others, this

15 is in that situation where it could have slowed down.

16      Q.   I see.  And so the next slide, number 34,

17 "Assess" -- "Step 2: Assess Situation, Threats and Risk.

18 Ask yourself...Do I need to take immediate action?"

19           And, again, that depends on what immediate

20 threat the subject is, correct?

21      A.   Correct.

22      Q.   Okay.  And are officers trained that as part

23 of the deescalation that if they do at some point put

24 themselves in harm's way by being too close to the

25 individual, that if they can step back from the

                                                      32

1   individual rather than shoot him, they should do that,

2   simply moving away from the individual?

3          A.    Again, I think it depends on the totality of

4   the circumstances.  It's not just the officers that's at

5   threat.  They have to take who else is at threat.  If

6   it's just the officer that's at threat, then yeah.  If

7   there's an opportunity to give yourself time and

8   distance, we would encourage time and distance.

9          Q.    And the training would dictate that, correct?

10         A.    Correct.

11         Q.    Okay.  "Am I trained and equipped to handle

12  this situation myself?"  That's a question that officers

13  should consider, correct?

14         A.    Correct.

15         Q.    And "What is the threat/risk?"  Correct?

16         A.    Correct.

17         Q.    And part of that would be to use your eyes to

18  assess what the threat and risk is, correct?

19         A.    Correct.

20         Q.    Now, the next one, Bates 35, threat

21  assessment.  I think that was the first factor.  This

22  pertains to the first factor in the Use of Force Policy,

23  correct?

24         A.    Correct.

25         Q.    And it says, "Accurately assess the person,

33

1  object or environmental factors that could put

2  officer/public at risk."  How are officers supposed to

3  do that?

4      A.   Again, taking a look at the situation that

5  they're coming on.  And finding out what barriers may be

6  between them and a subject, a subject and others.  What

7  kind of access do they have to weapons, to people, to

8  them.  So a whole totality of things that they're

9  looking at and evaluating as they're coming on scene.

10     Q.   Okay.  And officers are trained that -- well,

11  strike that.

12          Is it true that officers are trained that they

13  should take steps to try to slow the incident down if

14  reasonable to do so in order to make that assessment?

15     A.   If we -- yes.

16     Q.   It says, "Guard against officer complacency."

17  That's underlined.

18     A.   Yes.

19     Q.   What does that discuss?

20     A.   A lot of times we can have contact with the

21  same individual over and over.  Particularly when we're

22  dealing with mental health issues.  If we do -- and we

23  may have built a rapport with them at times.  And we may

24  let our guard down unduly or unnecessarily, which could

25  potentially put themselves at risk and other people at

34

1    Again, this is a video, and the video I don't have.

2    What is discussed?

3         A.    We didn't have this video.

4         Q.    Okay.  All right.  Now, Bates 40.  This is,

5    "Step 4: Identify Options, Determine Best Course of

6    Action."  Says, "Ask yourself... What am I trying to

7    achieve?  What options do I have?  What contingencies

8    must I consider if I choose a particular option?  Do I

9    need to act now or can I wait?"

10        So it looks fairly self-explanatory.  But I

11   have a question.  When it refers to what options do I

12   have, does that include force options?

13        A.    Correct.

14        Q.    Okay.  And that would include, for example,

15   Tasers, correct?

16        A.    Correct.

17        Q.    And officers are trained at Hayward Police

18   Department -- strike that.

19        At Hayward Police Department are all officers

20   required to carry a Taser?

21        MR. VIGILIA:  I'm going to object.

22   BY MR. NISENBAUM:  Q.  If you know.

23        MR. VIGILIA:  Outside the scope of the PMK

24   categories.  His answer is his answer as an individual

25   officer, not the answer of the agency.

37

1    Q.    Okay.  And so -- and you train officers in the

2    critical decision-making model and under that type of

3    scenario, correct?

4    A.    Correct.

5    Q.    Okay.  Thank you.  And it says here at

6    Bates 43, if the incident is not resolved after

7    executing the initial plan spin the wheel or spin the

8    model, rather, correct?

9    A.    Correct.

10   Q.    Meaning, meaning what?

11   A.    You try to gain more information, new

12   information and assess and maybe even come up with a

13   different plan if that plan's not working.

14   Q.    Now, looking at Bates 47 of the critical

15   decision-making model.  Benefits of the CDM.  Better

16   decisions up front.  Quote, I didn't have time to think,

17   close quote.  Very few situations where that is really

18   the case.  What's trained there?

19   A.    We talk about having a plan.  And so if you

20   have a plan then your reaction to those contingencies

21   that we talked about tend to go a little smoother.  And

22   whereas if you -- if you didn't have time to think, it

23   means you didn't plan appropriately.

24   Q.    Right.  And is it true -- does it also discuss

25   that you could do things to create more time to think?

43

1      A.    You could or could not?

2      Q.    That you can take actions to create more time

3   to think?

4      A.    You could.

5      Q.    And is that trained?

6      A.    It is.

7      Q.    And what are you supposed to do?  What type of

8   actions are you supposed to take to create more time to

9   think?

10     A.    Sometimes we could -- going back to it says,

11  "Are you the right person for the job?"  We may switch

12  roles from being the primary person talking, to someone

13  else.  They may have a way to relate to them

14  differently.  And so that would give us a little more

15  time by giving another person an option to communicate

16  with the subject.

17     Q.    Going to crisis recognition.  This is

18  Bates 53.  The question to consider, what are the key

19  challenges police officers face when dealing with

20  persons in behavioral crisis?  And this is something

21  that you present on, correct?

22     A.    Correct.

23     Q.    And the very next slide is recognizing a

24  person in crisis, correct?

25     A.    Correct.

                                                        44

1      Q.    So what are officers trained to do under your

2  training in order to recognize a person in crisis?

3      A.    To look at the individual's behavior is

4  usually what we're asking them to do here.  We want them

5  to see what are they doing.  Are they posing a threat?

6  Is there opportunities for us to have a conversation

7  with them?  Is there an opportunity for them to

8  cooperate with us?

9      Q.    And would a person slowly approaching officers

10  with an apparent thousand yard stare and making

11  statements along the lines of just shoot me, would that

12  be something that would indicate a behavioral crisis?

13      A.    Yes.

14      Q.    Okay.  On Bates 57 there's a slide that says,

15  "Why should I care?"  So why should officers care about

16  that?

17      A.    One of the questions I ask after that is what

18  did they say when they tried to get the job as a police

19  officer.  And the standard answer for most people is I

20  got into this business because or I want to be a police

21  officer because I want to contribute to society and I

22  want to help people.

23            So if you wanted to help people then why do

24  you not want to help people now.  And we have a

25  conversation about what happens to police officers

45

DEPOSITION OF LIEUTENANT MARK ORMSBY

1    during Day 1 and Day 6,000.

2        Q.    I've asked that question in depositions a few

3    times.  And I've been very surprised at the answers I've

4    gotten.  But then when I've asked was it to help people,

5    of course.  And that's why they got into it.  But some

6    are long down the line.

7            Crisis recognition, Bates 58.  Mental illness.

8    Perception disorder, thought disorder, mood disorder,

9    PTSD.  And then there's within a diamond all arrows

10   pointing to emotionally distressed person.  What's

11   discussed here?

12       A.    So I do preface in the beginning of these

13   slides that we are not clinicians.  We are not here to

14   diagnose and to treat.  And we cover that again in a few

15   slides later I believe.  But we talk about how people

16   having mental illness can fall into an EDP, emotionally

17   disturbed person.  And so we talk about how each of

18   these things potentially could manifest itself as a

19   person who could be disturbed that day.

20       Q.    And could cause some to do things like walk

21   slowly towards officers with a razor blade in their hand

22   with a thousand yard stare saying, "just shoot me,"

23   right?

24       A.    I don't necessarily use that specific

25   scenario.

                                                          46

DEPOSITION OF LIEUTENANT MARK ORMSBY

1      Q.    But you understand that that would be an

2   indicator of an emotionally distressed person?

3      A.    Sure.

4      Q.    Okay.   What is the Bates 59, the optional

5   video, if you know, Mentor for the Philadelphia Veterans

6   Court?

7      A.    So this wasn't available during the 2016

8   training but became available after.   And I did show

9   this at one of the follow-up trainings, I believe, in

10  2018.   And this was an individual who suffered from PTSD

11  who got into a lot of trouble with the police and

12  fighting with the police.

13         And he kind of talks about his experiences and

14  how when you're contacting an individual that may be

15  going through PTSD there are some things you can be

16  sensitive to.   One in particular that we cover and we

17  talk about probably the most is if you were a Marine

18  probably not a good idea to bring someone from reserve

19  Coast Guard to try to see eye to eye.   Or for someone to

20  say, I know exactly what you've been through, when

21  everybody's experience over in war is different based on

22  their experiences.   And so we talk about not treating

23  everybody as the same individual or using catch phrases.

24      Q.    On Bates 65 under Crisis Recognition, people

25  with mental illness and the criminal justice system.

                                                              47

DEPOSITION OF LIEUTENANT MARK ORMSBY

1      A.    Correct.

2            MR. NISENBAUM:  All right.  Do you have

3     anything, James?

4            MR. COOK:  Nothing.

5            MR. NISENBAUM:  Thank you.

6            THE COURT REPORTER:  Would you like a

7     transcript?

8            MR. VIGILIA:  Yes, please.

9     (Whereupon, at 11:17 a.m., the deposition of Mark Ormsby

10    was concluded, this date.)

11

12

13                              --------------------------

14                              Mark Ormsby

15

16

17                        --oOo--

18

19

20

21

22

23

24

25

                                                          67

DEPOSITION OF LIEUTENANT MARK ORMSBY

```
 1     STATE OF CALIFORNIA     )

 2                             )  ss.

 3     COUNTY OF ALAMEDA       )

 4


 5             I hereby certify that the witness, Mark
       Ormsby, in the foregoing deposition appeared before
 6     me, Kelly McKissack, a Certified Shorthand Reporter and
       a disinterested person.
 7

 8             Said witness was then and there at the time
       and place previously stated by me placed under oath to
       tell the truth, the whole truth and nothing but the
 9     truth in the testimony given on the date of the within
       deposition; that the deposition is a true record of the
10     witness' testimony as reported by me.

11             The testimony of the witness and all questions
       and remarks requested by Counsel was reported under my
12     direction and control, caused to be transcribed into
       typewritten form by means of Computer-Aided
13     Transcription.

14             I am a Certified Shorthand Reporter licensed
       by the State of California, and I further certify that I
15     am not interested in the outcome of the said action, nor
       connected with, nor related to any of the parties in
16     said action, nor to their respective counsel.  I am not
       of counsel or attorney for either or any of the parties
17     to the case named in the within caption.

18             IN WITNESS WHEREOF, I have hereunto affixed my
       signature this 10th day of February, 2020
19

20

21     __/s/Kelly McKissack_____

22     Kelly McKissack
       Certified Shorthand Reporter
23     California License No. 13430

24

25                             --oOo--
```

69