UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AG. G. a minor, by and through his guardian ad litem, JESSICA AQUINO; AR. G., a minor, by and through his guardian ad litem, JESSICA AQUINO;   KARLA GONSALEZ, individually; and AUGUSTIN GONZALES JR.,  individually;<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF HAYWARD, a municipal corporation; MARK KOLLER, individually; PHILLIP WOOLEY, individually; MICHAEL CLARK, individually; TASHA DECOSTA, individually; and DOES 1-100, inclusive,<br><br>Defendants. | Case No. 4:19-cv-00697 DMR<br><br>**DECLARATION OF BENJAMIN NISENBAUM IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br><br>Date:  July 9, 2020<br>Time:  1:00 p.m.<br>Courtroom: 4<br><br> Hon. Donna M. Ryu |

# EXHIBIT O

Declaration of Benjam Nisenbaum in support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment 1
GONSALEZ, et al. v. CITY OF HAYWARD, et al.

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--

AG.G. a minor, by and through )
his guardian ad litem, JESSICA )
AQUINO; AR.G., a minor, by and )
through his guardian ad litem, )
JESSICA AQUINO; KARLA GONSALEZ )
individually; and AUGUSTIN     )
GONSALEZ, JR., individually,   )
                               )
            Plaintiffs,        )
                               )
       vs.                     ) CASE NO.: 4:19-cv-00697 DMR
                               )
CITY OF HAYWARD, a municipal   )
corporation; MARK KOLLER,      )
individually; PHILLIP WOOLEY,  )
individually; MICHAEL CLARK,   )
individually; TASHA DECOSTA,   )
individually; and DOES 1-100,  )
inclusive,                     )
                               )
            Defendants.        )
_____)   CERTIFIED COPY


DEPOSITION OF SERGEANT FAYE MALONEY - PMK

MONDAY, JANUARY 27, 2020


REPORTED BY:  KELLY L. MCKISSACK, CSR #13430

1

```
 1          Pursuant to Notice of Taking Deposition, and
 2   on Monday, January 27, 2020, commencing at the hour of
 3   2:57 p.m., thereof, at 7677 Oakport Street, Suite 1120,
 4   Oakland, California 94621, before me, KELLY MCKISSACK,
 5   CSR No. 13430, a Certified Shorthand Reporter and
 6   Deposition Officer of the State of California, there
 7   personally appeared:
 8
 9                    FAYE MALONEY,
10
11   called as a witness by the Plaintiffs, who having been
12   duly sworn by me, to tell the truth, the whole truth and
13   nothing but the truth, testified as hereinafter set
14   forth:
15
16                       --oOo--
17
18
19
20
21
22
23
24
25
                                                            5
```

```
 1                    FAYE MALONEY,
 2   having been first duly sworn, testified as follows:
 3         THE WITNESS:  (TO OATH) I do.
 4
 5                      EXAMINATION
 6   BY MR. NISENBAUM:  Q.  Can you please state and spell
 7   your name.
 8         A.   My name is Faye Maloney, F-A-Y-E.  My last
 9   name is Maloney, M-A-L-O-N-E-Y.
10         Q.   Okay.  And it's my understanding you're a
11   Hayward police officer?
12         A.   Yes, I am.
13         Q.   And what rank are you?
14         A.   I'm a police sergeant.
15         Q.   How long have you been a sergeant?
16         A.   Since August 21, 2017.
17         Q.   All right.  Have you had your deposition taken
18   before?
19         A.   No, I haven't.
20         Q.   Have you testified in court?
21         A.   Yes, I have.
22         Q.   And when you were at the police academy did
23   you receive training in providing courtroom testimony?
24         A.   Yes, I have.
25         Q.   Okay.  A deposition is very much like
```

6

1  negotiator, the person hasn't already acquiesced to the
2  police?
3       A.   Is that like submitted?
4       Q.   Right.
5       A.   Yes.
6       Q.   And the whole point of using the deescalation
7  and negotiation is to gain their compliance, correct?
8       A.   Safely, yes.
9       Q.   Right.  Is to safely gain their compliance.
10 So initially they're not trying to get taken into
11 custody, but then ultimately they acquiesce if it's
12 successful?
13      A.   Yes.
14      Q.   Okay.  How important is the concept of time in
15 crisis negotiation?
16      A.   If allowable, it's suggested.  If it's
17 feasible.
18      Q.   Isn't it ultimately necessary?
19      A.   It's not every single situation.  So depends
20 on the safety of others.  So depends on the situation.
21 If you're communicating with someone that's alone,
22 isolated, and that's having a crisis, yes, time --
23 time's, you know, in your essence.  If there's someone
24 else in danger, time, you don't really have that luxury.
25      Q.   Do you have any training with respect to how

10

1  you try to make time, in other words, how you try to
2  elongate time?
3      A.  Elongate time speaking to the person in
4  crisis?
5      Q.  Yes.  So that a situation isn't rushed.
6      A.  Yes.  It's a part of our deescalation
7  training.  But it's also dependent on what you're
8  responding to.  We're not allowed time if there's
9  another person that's in danger.
10     Q.  Right.  But you're trained to try to contain
11 the person within a perimeter, correct?
12     A.  Yes, when feasible.  Yes.
13     Q.  Right.  Well, you have to try to do it first,
14 right?
15     A.  Not necessarily.  If it's a situation
16 unfolding, if you have someone that's actively going
17 after someone.  If you have, like, for example, an
18 active shooter you don't know what you're going into.
19 That's not a situation where we're going to have the
20 luxury of making time.
21     Q.  I get that.  But I'm saying where it's
22 reasonable.  Where it's reasonably possible to do it?
23     A.  Yes, where it's reasonable possibly to do it,
24 yes.
25     Q.  Okay.  But in order to do that you have to

11

1  actually take the steps to do it, correct?
2      A.   By containment.
3      Q.   Yes.
4      A.   Yes.
5      Q.   And so how -- what is your understanding of
6  how officers are supposed to contain a person, let's say
7  they're not holed up in a room, but they're out on the
8  street and they've got people sufficiently say at least
9  15 feet away from the person?
10     A.   Well, you'd have to first ensure if it's on
11 the street that certain areas, walkways, streets are
12 blocked so that person is truly contained and that
13 person has no access to anywhere where he would get out
14 of that containment area.
15          And so, for example, if they're in a vehicle,
16 that's a containment.  Because you can block off
17 roadways.  You can block off areas where that person can
18 go into either businesses.  You know, or if there's
19 homes nearby, that would be a containment.  But it's
20 really situational.  I can't really pinpoint to one
21 incident or just on the street.
22     Q.   But if you're attempting to establish a
23 perimeter around someone for purposes of containing
24 them, what you would want to do, correct me if I'm
25 wrong, what you'd want to do is try to create space

                                                        12

1  around the person and have sufficient officers around
2  the person where the person wouldn't be able to flee
3  past them if they chose to?
4      A.  Again, it's depending.  It's not the same for
5  every situation.  Because you could be in the middle of
6  a street and you can contain that person, but you're not
7  going to be able to be so close to them that you're
8  containing them from going into a building or a, you
9  know, a house yard or getting into a car and fleeing.
10 So it really depends.  I can't really answer broadly.
11 It has to be situation-specific with knowing the
12 environment that's around you.
13     Q.  Okay.  But you would have to take steps to do
14 that?  If you were to attempt to establish containment,
15 first you want to establish a perimeter, correct?
16     A.  Yes.
17     Q.  Okay.  To establish a perimeter that means a
18 perimeter around the person, correct?
19     A.  Yes.
20     Q.  And if they're not holed up in a room but on a
21 street, is there a particular distance as optimal?
22     A.  It, again, it depends on what that person is
23 going through.  It depends on what you're responding to.
24 So if it's an unarmed person that's going -- having
25 either a mental crisis or they're on drugs and they're

13

1  coming off that and they're in a psychotic or
2  hallucinative state of mind, you have more control.
3  Because they're first off unarmed.  So if they start to
4  deviate from the area that you're containing them, it's
5  a lot easier for you to move with them.
6          But it really it's situational based.  I can't
7  stick to one way or another.  Because it's situationally
8  based.
9      Q.  Okay.  How about if they're armed with this?
10 They're holding that.  I'm showing you a picture of a
11 razor blade.  It was previously marked as the second
12 page of Plaintiffs' Exhibit F.  If that's the only
13 weapon that they're holding.
14     A.  Um-hmm.
15     Q.  Is that something where officers would be
16 unable to establish a perimeter?
17     A.  It, again, it depends on the situation.
18     Q.  Okay.  Well, you said one of the factors is
19 whether they're armed or not?
20     A.  Um-hmm.
21     Q.  Obviously, anything could be a weapon?
22     A.  Yes.
23     Q.  So assuming that the person has that razor
24 blade that I just showed you.
25     A.  Yes.

14

1  Q.  Now, let's say they're holding it and they're
2  walking slowly.  Is that a situation where officers
3  should be able to form a perimeter around them?
4  A.  Yes.  Depending on the danger that it's
5  showing to everyone around them.
6  Q.  And with that type of weapon, that razor
7  blade, it's dangerous obviously if it gets close to an
8  officer, correct?
9  A.  Yes.
10 Q.  And so officers are trained to be able to have
11 a moving perimeter, correct?
12 A.  Not always.  We do not have the duty to
13 retreat.
14 Q.  I'm confused.
15 A.  So if you're faced with a person with a weapon
16 and you have to be able to contain them.  You're going
17 to have to be really careful on where you're moving.
18 Because if you're moving to an area that you're not
19 aware of, you're -- behind you, next to you, where are
20 you taking them on the street, you have to -- you have
21 to face the threat that's coming at you.
22      So you can -- you can try to stop it as it's
23 coming.  But if someone's walking at you with that and
24 they're not listening to your commands, you have to be
25 cognizant of what's in your surroundings before you make

15

1   that determination where you're going to start making
2   decisions to moving people.  Because these things are
3   unfolding very rapidly.
4        Q.   I get that.  But you said something, I thought
5   I heard you say, "We don't have a duty to retreat"?
6        A.   So if we are faced with a threat, we do not --
7   we do not have the duty to leave the threat and walk
8   away.
9        Q.   I thought for a moment you were saying you
10  didn't have, if it was reasonable, to just step out of
11  the way, for example?
12       A.   Oh, no.
13       Q.   To step back.
14       A.   No.  That's not what I meant.
15       Q.   Okay.  I want to be clear on that.
16       A.   Yes.  If it's reasonable, yes.
17       Q.   Right.  Exactly.  If the choice is you either
18  shoot the person or you step back, you just step back,
19  right?
20       A.   Yes.
21       Q.   Okay.  Thank you.  All right.
22            So if you're able to establish -- I assume
23  that perimeters themselves are a dynamic things, too, in
24  that they can change and they can move?
25       A.   Yes.

                                                           16

DEPOSITION OF SERGEANT FAYE MALONEY

```
 1   wouldn't even need police, right?
 2        A.   Correct.
 3        Q.   So, I mean, we're assuming here that there is
 4   some level of resistance, some level of contrariness
 5   where the person doesn't want to be taken into custody
 6   or the person might be -- strike that.
 7             Where the person has indicators of suicide by
 8   cop where they're saying, you know, shoot me as they
 9   walk towards the officer, what next -- what should the
10   officer do?  They've got a box cutter in their hand, the
11   person does, and they're saying shoot me.
12        A.   You would have to give them commands to stop,
13   to drop what's in their hands and try to communicate
14   with them if you have the time.
15        Q.   And would you say to another officer, tase
16   them?
17        A.   If you're actively engaging and communicating
18   with that person you might not be able to.  You might
19   have opportunities to, but it depends on how fast the
20   situation is unfolding.
21        Q.   And ultimately you would have to think about
22   saying that in order to say that, correct?  You have to
23   consider it?
24        A.   Yes.  And, you know, our department is trained
25   on that.  So it just depends on how to deal with the
```

33

BARBARA J. BUTLER & ASSOCIATES - Certified Court Reporters
1659 Scott Blvd., Suite 15, Santa Clara, CA 95050  -  (510) 83-BUTLER (28853) or (408) 248-BUTLER (2885)

1  situation.
2      Q.   So, and everyone in your department is trained
3  on that?
4      A.   On deescalation?
5      Q.   On using deescalation.
6      A.   Yes.
7      Q.   And everyone is trained on using the Taser as
8  a less lethal alternative to lethal force?
9      A.   Yes.
10     Q.   Okay.  And everyone is trained that if the
11 Taser is as reasonable or as capable of use as a gun,
12 that the Taser should be used instead of the gun?
13     A.   When feasible, yes.
14     Q.   Okay.  I don't have any other questions.
15 Thank you.
16     A.   Thank you.
17          THE COURT REPORTER:  Again, would you like a
18 transcript?
19          MR. VIGILIA:  Yes, please.  Thanks.
20 (Whereupon, at 3:32 p.m., the deposition of Faye Maloney
21 was concluded, this date.)
22
23
24                              --------------------------
25                              Faye Maloney

34

```
 1    STATE OF CALIFORNIA    )
 2                           )  ss.
 3    COUNTY OF ALAMEDA      )
 4
 5           I hereby certify that the witness, Faye
      Maloney, in the foregoing deposition appeared before
 6    me, Kelly McKissack, a Certified Shorthand Reporter and
      a disinterested person.
 7
             Said witness was then and there at the time
 8    and place previously stated by me placed under oath to
      tell the truth, the whole truth and nothing but the
 9    truth in the testimony given on the date of the within
      deposition; that the deposition is a true record of the
10    witness' testimony as reported by me.
11           The testimony of the witness and all questions
      and remarks requested by Counsel was reported under my
12    direction and control, caused to be transcribed into
      typewritten form by means of Computer-Aided
13    Transcription.
14           I am a Certified Shorthand Reporter licensed
      by the State of California, and I further certify that I
15    am not interested in the outcome of the said action, nor
      connected with, nor related to any of the parties in
16    said action, nor to their respective counsel.  I am not
      of counsel or attorney for either or any of the parties
17    to the case named in the within caption.
18           IN WITNESS WHEREOF, I have hereunto affixed my
      signature this 10th day of February, 2020
19
20
21    __/s/Kelly McKissack_____
22    Kelly McKissack
      Certified Shorthand Reporter
23    California License No. 13430
24
25                         --o0o--
```

36