1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

AG. G. a minor, by and through his guardian ad litem, JESSICA AQUINO; AR. G., a minor, by and through his guardian ad litem, JESSICA AQUINO;   KARLA GONSALEZ, individually; and AUGUSTIN GONZALES JR.,  individually;

Plaintiffs,

vs.

CITY OF HAYWARD, a municipal corporation; MARK KOLLER, individually; PHILLIP WOOLEY, individually; MICHAEL CLARK, individually; TASHA DECOSTA, individually; and DOES 1-100, inclusive,

Defendants.

Case No. 4:19-cv-00697 DMR

**DECLARATION OF BENJAMIN NISENBAUM IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**Date:  July 9, 2020**
**Time:  1:00 p.m.**
**Courtroom: 4**

 **Hon. Donna M. Ryu**

# EXHIBIT Q

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER



# USE OF DEADLY FORCE REVIEW



**TO:**      Toney Chaplin, Chief of Police

**FROM:**      Will Deplitch, Captain – Patrol Division Commander

**SUBJECT:**      Use of Deadly Force Review Board - Administrative Investigation **#18FA-009**

**DATE:**      October 15, 2019

---

## BACKGROUND:

The purpose of this memorandum is to summarize the outcome of a Use of Deadly Force Review Board and to provide you with recommendations resulting from an analysis of this administrative investigation.  The administrative investigation was conducted by Sergeant James Javier (HPD Internal Affairs Unit) and the following is a summary of the event.

## SUMMARY:

On November 15th, 2018, at about 21:13 hours, HPD Dispatch received a 911 emergency call transfer from the California Highway Patrol. The call was regarding a man with a knife who was threatening the reporting party (RP). HPD Dispatch broadcast this information and officers began to drive towards the area of Orchard Ave. and O'Neil Ave. Officer Wooley and Officer Clark were among the officers responding to the call. As officers responded, dispatch could hear an argument between the RP and a male (later identified as Agustin Gonzalez) who was described as having a knife. Additionally, the RP provided a description of the clothing Gonzalez was wearing. HPD Dispatch provided updates, via the police radio, as officers converged on the area to look for the involved parties.

Officer Wooley was driving on O'Neil Ave and was flagged down by the RP. Officer Wooley then saw Gonzalez at which time Officer Wooley exited his patrol car. Officer Wooley, believing Gonzalez was armed with a knife (later discovered to be a razor blade), told Gonzalez to drop it. Gonzalez ignored his commands and walked towards Officer Wooley. Officer Wooley continued to order him to put the knife down and stop however, Gonzalez continued to advance towards Officer Wooley. Officer Wooley feared for his life, so he discharged his firearm multiple times at Gonzalez.

Officer Clark had parked to the rear of Officer Wooley upon Officer Wooley contacting Gonzalez. Officer Clark exited his patrol car and heard Officer Wooley giving commands to Gonzalez to drop the knife and to stop. Officer Clark saw Gonzalez continue to advance towards Officer Wooley. Officer Clark feared for Officer Wooley's life, so he discharged his firearm at Gonzalez.

**HAY00000000895**

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

Gonzalez was struck multiple times. He was transported to Eden Hospital where he succumbed to his injuries.

**REVIEW BOARD PARTICIPANTS:**

On October 15th, 2019, a Use of Deadly Force Review Board was convened.  The Review Board met in the Chief's Conference room and the following HPD personnel were participants:

Captain Will Deplitch – Patrol Division Commander (Board Chairperson)
Acting Captain Bobbie Koller – Investigations Division Commander
Acting Captain Guy Jakub – Special Operations Division Commander
Lieutenant Mark Ormsby – Use of Force Instructor
Acting Sergeant Ricardo Flores – HPOA President

**POLICY COMPLIANCE:**

After a careful and complete review of the facts/documents associated with this incident, the Review Board reached a consensus.  The Review Board recommends the actions by Officer Phillip Wooley be deemed *within policy*.

After a careful and complete review of the facts/documents associated with this incident, the Review Board reached a consensus.  The Review Board recommends the actions by Officer Michael Clark be deemed *within policy*.

Respectfully submitted,

Will Deplitch
Captain – Patrol Division Commander

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER



# PERSONNEL COMPLAINT DISPOSITION

OES No. **18FA-009**

| | |
|---|---|
| Number of Employees Accused in Complaint | 2 |

Complaint Date **11-15-18**      Report No. **18-94542**      Citation No.

| | |
|---|---|
| Complainant Name | Internal |
| Complainant Address | |
| Home Number | Work Number | Cellular Number |
| Complainant Name | |
| Complainant Address | |
| Home Number | Work Number | Cellular Number |

**Incident and Complainant's Allegations**

During a brandishing with a knife and an assault with a deadly weapon detail, officers were confronted by the suspect holding a razor blade. The suspect charged the officers in a threatening manner. Two officers discharged their pistols to defend their lives which resulted in the suspect's death.

| Employee | Officer Phillip Wooley | | Division | Field Operations |
|---|---|---|---|---|

| Policy No. & Description | | Unfounded | Exonerated | Not Sustained | Sustained |
|---|---|---|---|---|---|
| 300.3 Use of Force Policy | | ☐ | ☒ | ☐ | ☐ |
| 300.4 Use of Force - Deadly Force Applications | | ☐ | ☒ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |

**D. C.'s Comments / Recommended Discipline**

USE OF FORCE / USE OF DEADLY FORCE W/IN POLICY.

| | | | |
|---|---|---|---|
| D. C. Review Date | 10/18/19 | Division Commander | Captain Will Deplitch |
| Chief's Review Date | 10/25/19 | Chief of Police | Chief Toney Chaplin |
| Complainant Notification Letter sent on | | By | |

HAY00000000897

**HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER**



# PERSONNEL COMPLAINT DISPOSITION

OES No. **18FA-009**

| Number of Employees Accused in Complaint | 2 | Complaint Date **11-15-18** | Report No. **18-94542** | Citation No. |
|---|---|---|---|---|

| | |
|---|---|
| Complainant Name | **Internal** |
| Complainant Address | |
| Home Number | Work Number | Cellular Number |
| Complainant Name | |
| Complainant Address | |
| Home Number | Work Number | Cellular Number |

**Incident and Complainant's Allegations**

During a brandishing with a knife and an assault with a deadly weapon detail, officers were confronted by the suspect holding a razor blade. The suspect charged the officers in a threatening manner. Two officers discharged their pistols to defend their lives which resulted in the suspect's death.

| Employee | **Officer Michael Clark** | Division | **Field Operations** |
|---|---|---|---|

| | | Unfounded | Exonerated | Not Sustained | Sustained |
|---|---|---|---|---|---|
| Policy No. & Description | 300.3 Use of Force Policy | ☐ | ☒ | ☐ | ☐ |
| Policy No. & Description | 300.4 Use of Force - Deadly Force Applications | ☐ | ☒ | ☐ | ☐ |
| Policy No. & Description | | ☐ | ☐ | ☐ | ☐ |
| Policy No. & Description | | ☐ | ☐ | ☐ | ☐ |
| Policy No. & Description | | ☐ | ☐ | ☐ | ☐ |
| Policy No. & Description | | ☐ | ☐ | ☐ | ☐ |

| | |
|---|---|
| D. C.'s Comments / Recommended Discipline | USE OF FORCE / USE of DEADLY FORCE w/in Policy. |
| D. C. Review Date | 10/10/19 | Division Commander | Captain Will Deplitch |
| Chiefs Review Date | 10/25/19 | Chief of Police | Chief Toney Chaplin |
| Complainant Notification Letter sent on | | By | |

**HAY00000000898**

**HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER**





# CONFIDENTIAL

## ADMINISTRATIVE INVESTIGATION

September 4, 2019

| | |
|---|---|
| TO: | Toney Chaplin, Chief of Police |
| THROUGH: | Will Deplitch, Captain<br>Field Operations Division |
| FROM: | James Javier, Sergeant<br>Internal Affairs Unit |
| SUBJECT: | Administrative Investigation No. **18FA-009**<br>Officer Michael Clark (Badge 315)<br>Officer Phillip Wooley (Badge 306) |

**Summary:**
This administrative investigation is the result of an incident where Officer Michael Clark and Officer Phillip Wooley discharged their Department issued pistols while on duty (Officer Involved Shooting – hereafter referred to as OIS). The purpose of this administrative investigation is to determine if the actions of Officer Clark and Officer Wooley were within HPD Policy.

On November 15, 2018, Officer Wooley and Officer Clark were detailed to the area of O'Neil Avenue and Orchard Avenue regarding a man with a knife being threatening to the reporting party Oscar Cisneros. The officers contacted the male, later identified as the suspect Agustin Gonsalez, in the middle of the street. Officer Wooley exited his marked patrol vehicle as Mr. Gonsalez yelled he was going to have to shoot him. Mr. Gonsalez immediately advanced towards Officer Wooley with his hands extended out with an object in his hand. Officer Wooley believed Mr. Gonsalez was armed with a box cutter. Officer Wooley ordered Mr. Gonsalez several times to drop the knife and to stop. Mr. Gonsalez did not comply and continued to advance towards Officer Wooley. Fearing Mr. Gonsalez was going to kill or greatly injure him with the edged weapon, Officer Wooley fired his Department issued pistol multiple times at Mr. Gonsalez.

Officer Clark was positioned on the front passenger side quarter panel of Officer Wooley's patrol vehicle after he arrived on scene to cover Officer Wooley. Fearing Mr. Gonsalez was advancing to kill or cause great bodily harm to Officer Wooley, Officer

**HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER**

Clark fired his Department issued pistol striking Mr. Gonsalez multiple times. Emergency medical personnel were summoned and Mr. Gonsalez was transported to Eden Hospital where he succumbed to his injuries.

## Applicable Department Policies:

*300.3 USE OF FORCE POLICY*
*Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.*

*The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.*

*Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.*

*It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.*

*While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.* **[See exhibit A]**

*300.4 USE OF FORCE POLICY - DEADLY FORCE APPLICATIONS*
*Use of deadly force is justified in the following circumstances:*
  *(a) An officer may use deadly force to protect him/herself or others from what he/she reasonably believes would be an imminent threat of death or serious bodily injury.*
  *(b) An officer may use deadly force to stop a fleeing subject when the officer has probable cause to believe that the person has committed, or intends to commit, a felony involving the infliction or threatened infliction of serious bodily injury or death, and the officer reasonably believes that there is an imminent risk of serious bodily injury or death to any other person if the suspect is not immediately apprehended. Under such circumstances, a verbal warning should precede the use of deadly force, where feasible.*

**HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER**

*Imminent does not mean immediate or instantaneous. An imminent danger may exist even if the subject is not at that very moment pointing a weapon at someone. For example, an imminent danger may exist if an officer reasonably believes any of the following:*

1. *The person has a weapon or is attempting to access one and it is reasonable to believe the person intends to use it against the officer or another.*
2. *The person is capable of causing serious bodily injury or death without a weapon and it is reasonable to believe the person intends to do so.*
   [See exhibit A]

## Involved Employees:
Officer Michael Clark (Badge 315)
Field Operations Division – Patrol
Relief Shift – Tuesday (0600-1830 hours), Wednesday (1330-0200 hours), Thursday (1800-0630 hours)

Officer Phillip Wooley (Badge 306)
Field Operations Division – Patrol
Relief Shift – Tuesday (0600-1830 hours), Wednesday (1330-0200 hours), Thursday (1800-0630 hours)

## Involved Employees' Representative:
Harry Stern – Attorney at Law
Rains Lucia Stern St. Phalle & Silver, PC
2300 Contra Costa Boulevard, Suite 500
Pleasant Hill, Ca 94523
Phone: (925) 609-1699

## Witness Employee:
Sergeant Tasha Decosta

## Investigating Personnel:
Detective Jason Mosby - Lead Investigator
Detective Eric Mulhern - Assisting Investigator

## Alameda County District Attorney's Office Personnel:
Deputy District Attorney Autrey James
7677 Oakport Street, Suite 750
Oakland, Ca 94612
Phone: (510) 615-5300

District Attorney Investigator Caesar Basa
1225 Fallon Street, Room 201
Oakland, Ca 94612
Phone: (510) 272-6282

---

**HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER**

**Suspect:**
Agustin Andrew Gonsalez (DOB: 06/22/1989)
Hispanic Male, 5'11", 210 pounds, brown hair, brown eyes

Home Address:
13218 Cedar Brook Way
Lathrop, CA 95530

**Witnesses:**
Oscar Paniagua Cisneros
24631 O'Neil Avenue
Hayward, Ca 94544
Phone: (510) 712-4360

Christina Rodrigues
24633 O'Neil Avenue
Hayward, Ca 94544
Phone: (510) 563-9944

Christopher Juan Carlos Martinez
24697 O'Neil Avenue
Hayward, Ca 94544
Phone: (510) 861-9224

**INVESTIGATION:**
On November 15, 2018, around 2130 hours, I was off duty at a conference in Reno, Nevada when Hayward Police Officers' Association (HPOA) President Ricardo Flores contacted me via cellular phone. HPOA President Flores informed me Officer Phillip Wooley and Officer Michael Clark had been involved in an officer involved shooting (OIS). I telephoned Lieutenant Angela Averiett and informed her about the OIS. I was not able to respond to the scene that night so Lieutenant Averiett responded for the Internal Affairs Unit. I subsequently returned for the interviews of Officer Wooley and Officer Clark on November 18, 2018. I was assigned the internal affairs investigation.

On November 18, 2018, at 1000 hours, I met with Lieutenant Averiett who briefed me with the following information regarding the incident: On November 15, 2018, at 2346 hours, Lieutenant Averiett attended a briefing in the HPD Assembly Room conducted by Sergeant Trevor Vonnegut. Sergeant Vonnegut briefed the group of the following in summary:

On November 15, 2018, at approximately 2113 hours, HPD Communications received a 911 call in which the caller reported he was being chased by a male with a knife. The reported location of the incident was in the area of O'Neil Avenue and Orchard Avenue. Officer Wooley arrived on scene first immediately followed by Officer Clark. Officer Wooley located the suspect, later identified as Agustin Gonsalez, in front of 24697 O'Neil Avenue.

---

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

Officer Wooley exited his patrol vehicle and took a position at his driver's side door while Officer Clark took a position on the passenger side of Officer Wooley's patrol vehicle. Mr. Gonsalez advanced towards Officer Wooley and Officer Wooley gave him commands to drop the knife, however he failed to comply. Officer Wooley and Officer Clark fired multiple rounds striking Mr. Gonsalez multiple times. Mr. Gonsalez was provided medical attention at the scene and was subsequently transported to Eden Medical Center where he succumbed to his injuries.

Sergeant Vonnegut advised Mr. Gonsalez's girlfriend, Christina Rodrigues, lives at 24633 O'Neil Avenue, which is north of the scene. Apparently, Mr. Gonsalez and Ms. Rodrigues were involved in some type of dispute and her neighbor, Oscar Cisneros, intervened. Mr. Cisneros confronted Mr. Gonsalez and Mr. Gonsalez brandished a knife at him. Mr. Gonsalez chased Mr. Cisneros around a vehicle prompting Mr. Cisneros to call 911.

Mr. Cisneros, Ms. Rodrigues, and another witness, later identified as Christopher Martinez, were transported to HPD to be interviewed by detectives and officers.

CIB Sergeant John Racette advised Lieutenant Averiett that Detective Jason Mosby was going to be the lead CIB Investigator and Detective Eric Mulhern was going to be the assisting CIB Investigator.

Detective Ryan Sprague and CST Mary Marquez processed Officer Wooley and Officer Clark at HPD.  This included photographs of them in uniform, collection of their uniforms, equipment and collection of the firearms they used in the incident.

Lieutenant Averiett responded to the OIS scene.  She informed me the area where the OIS occurred had already been secured with yellow crime scene tape and marked police vehicles.  Officer Mark Starr was managing the "HPD Crime Scene Log".  Officer Starr logged Lieutenant Averiett into the area where the OIS occurred at 2307 hours. Lieutenant Averiett surveyed the area where the OIS occurred and noted its condition.

The OIS occurred in the street in front of 24697 O'Neil Avenue. HPD patrol vehicle #226 (Officer Wooley's black and white Ford Explorer) was parked in the roadway in front and to the right of HPD patrol vehicle #275 (Officer Clark's black and white Ford Explorer). Officer Wooley's patrol vehicle was running with only the headlights on. The emergency lights and side spotlights were off. The driver's side door was open and its window down. There were six silver .40 caliber expended casings on the pavement marked with six white bent Field Identification Cards outside the open driver's side door. There were two more silver .40 caliber expended casings marked with two white bent Field Identification Cards located on the windshield, one on the driver side windshield wiper and the other on the passenger side windshield wiper. Another silver .40 caliber expended casing was subsequently located under the driver's seat along the center console.

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

On the passenger side about four feet away from Officer Wooley's patrol vehicle were two silver 9mm expended casings on the pavement marked with two white bent Field Identification Cards.

Approximately four feet in front of Officer Wooley's patrol vehicle was a pair of blue jeans with suspected blood stains. The jeans appeared to have been cut by medical personnel. In front of Mr. Gonsalez's pants were a key FOB, red pair of shoes, and a pool of suspected blood. A single edged razor blade was located in the street between the pool of blood and the driveway of 24697 O'Neil Avenue. There was also a Philip's-head screwdriver along the west curb at the north end of the driveway of 24697 O'Neil Avenue. The crime scene was also documented with a Leica scanner.

It should be noted once the criminal investigation was completed and provided to me, I reviewed the diagram created by the Leica Scanner as well as the associated photographs.  I found them to accurately depict the area where the OIS occurred as described by Lieutenant Averiett.

Lieutenant Averiett left the area where the OIS occurred and Officer Starr logged her out at 2316 hours.

Later that night, I was contacted by Lieutenant Averiett.  Lieutenant Averiett advised me Officer Wooley was going to be interviewed on Sunday, November 18, 2018 at 1300 hours and Officer Clark at 1800 hours at the HPD.

On May 31, 2019, Detective Mosby provided me with a copy of his OIS investigation, including all supplemental reports and attachments. [**See exhibit B**]

At this time Detective Mosby informed me there were several discrepancies between the gunshot wounds described in the Coroner's Autopsy Protocol and the coroner's autopsy photographs. Detective Mosby contacted the coroner, Dr. Michael Ferenc. Dr. Ferenc informed Detective Mosby there were errors in the Autopsy Protocol and he would complete a corrected report which would supersede the original.

I reviewed Detective Mosby's investigation, which was approved by CIB Sergeant Greg Velasquez. I found it to be thorough and accurately documented the events leading up to and following the OIS by Officer Wooley and Officer Clark.

On July 13, 2019, I received Detective Mosby's Supplemental Report dated July 9, 2019, that contained the Coroner Investigator's Report and the amended Autopsy Protocol and Wound Diagram authored by Dr. Ferenc. The amended report addresses the discrepancies Detective Mosby discovered in the original Autopsy Protocol and the coroner's autopsy photographs.

It should be noted that several eyewitnesses were located at the OIS scene.  They were interviewed and provided statements regarding their observations.

**HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER**

## Detail Call For Service Report:

I reviewed the Detail Call For Service Report and learned the following in summary. The initial call was a 911 transfer from the California Highway Patrol. The 911 call was logged at 21:13:44 hours with Communications Operator Ruth Tia as the call taker. She noted the reporting party (Mr. Cisneros) was very uncooperative. Mr. Cisneros reported his neighbor's boyfriend (Mr. Gonsalez) had a knife and was threatening him. Mr. Cisneros described Mr. Gonsalez as an unknown race male wearing a red shirt with black stripes and jeans.

Officer Clark was assigned to the call as the primary officer at 21:14:38 hours. Officer Starr and Officer Darin Beyer were dispatched at 21:14:43 hours. Officer Wooley was diverted from a prior call at 21:14:44 hours.

Between 21:14:47 and 21:18:25 hours Communications Operator Tia noted she had an open line with a heated argument in the background. Mr. Cisneros was not answering any questions and kept yelling at Mr. Gonsalez. Mr. Gonsalez was cursing and Mr. Cisneros was yelling back he was not scared. Communications Operator Tia continued to note a heated argument over an open line with Mr. Cisneros still not responding to any questions. She also noted a male say, "I f***** put the knife down" and then heard whistling or something similar.

Officer Wooley arrived on scene first at 21:15:56 hours. Officer Clark arrived next on scene at 21:17:53 hours.

At 21:19:25 hours Communications Operator Tia described hearing screaming and sounds like shots fired.

At 21:20:03 Communications Operator Janice McKee noted shots fired, one down, and HFD (Fire) was started. At 21:20:11 she noted the scene was secure for fire to enter.
[See exhibit C]

## Radio Traffic:

I reviewed the Radio Traffic from Channel One. The detail begins with three tones as Communications Operator Janice McKee broadcast, "North end units, getting a report of a male with a knife. RP (reporting party) is at O'Neil and Orchard, says it's the neighbor's boyfriend who's threatening the RP." Communications Operator McKee detailed Adam 31 (Officer Beyer) and Charles 33 (Officer Starr) to the brandishing a knife detail (417 PC). Boy 32 (Officer Wooley) advises he is breaking from his current call for service and he is re-routed to this detail.

The next traffic heard is Communications Operator McKee stating dispatch can hear a heated 415 (disturbance) in the background. She describes the suspect as an unknown race male wearing a red shirt with black stripes and jeans. Officer Wooley advises he is on scene at Orchard Avenue. Communications Operator McKee updates the units that dispatch only has an open line. Officer Wooley advises he sees and hears nothing in

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

the area. Communications Operator McKee advised they have no address yet and they still have an open line with no one answering them.

Officer Wooley advises someone is trying to flag him down. Sergeant Tasha Decosta advises "the other guy" is flagging her down in the middle of the street at O'Neil Commons and he is dressed in an orange shirt. Communications Operator McKee advises the suspect had a red shirt and she updates the units dispatch hears someone say put the knife down and someone is whistling. Officer Wooley advises dispatch they have him (the male in the orange shirt). Communications Operator McKee again advises the male in a red shirt with black stripes and blue jeans is supposed to be the person with the knife and it is the only person she has a description on.

Sergeant Decosta initiates another communication with dispatch, "Sam 21", but she is interrupted by Officer Wooley, "(inaudible) in the middle of the street, hold on, give me a 10-3" (radio code to keep the channel clear of any other transmissions).

Communications Operator McKee acknowledges the 10-3 and an intermittent audible tone is broadcast in the background. Approximately twelve seconds later, Sergeant Decosta broadcasts shots fired and one person is down. Communications Operator McKee acknowledges and advises she started HFD (fire). Sergeant Decosta directs dispatch to stage fire. Officer Wooley requests fire and ambulance. Communications Operator McKee replies they are already en route and attaches all available units to the detail. Officer Wooley advises the scene is secure and to let fire respond. [See exhibit D]

### BWC Footage from Officer Phillip Wooley:
During this investigation I reviewed Officer Wooley's Body Worn Camera (BWC) footage and noted the following in summary. Relevant BWC video timeframes are noted in brackets and refer to the recorded play times. The video player on Evidence.com at HPD allows the video to be viewed at 6 frames per second. The video was 9 minutes and 33-seconds in duration.

The operating system for the AXON BWC worn by Officer Wooley operates on a constant loop when the device is turned on and not activated. Once the device is activated it retains the video footage of the previous thirty seconds prior to the activation, however it does not retain the audio portion associated to the video. [See exhibit E]

The BWC footage starts with Officer Wooley driving to the detail. The first 30 seconds of the video does not have any audio. Upon his arrival Officer Wooley broadcast he is on Orchard Avenue [00:39]. He does an area check and broadcasts there was nothing found at the intersection but there are a whole bunch of apartment complexes there. He advises he was not hearing anything. Communications Operator McKee advises they were trying to get further information from the reporting party who was still on the line. She also advises she checked the reporting party's phone number and was unable to find any history which might help in locating him.

---

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

Communications Operator McKee broadcasts they still had an open line with the reporting party, and he was not answering their questions. Whistling can be heard in the background as Officer Wooley broadcasts someone was trying to flag him down [02:28 – 02:45]. Whistling continues in the background along with a voice yelling. Officer Wooley comments to himself, "Where you yelling from?" The whistling continues as Officer Wooley checks the area [02:52- 03:08].

Sergeant Decosta broadcasts information about being flagged down at O'Neil Commons. Communications Operator McKee advises there was whistling and in the background of the call someone could be heard saying, "Put the knife down." [03:09 – 03:26]

Communications Operator McKee broadcasts the male with the knife was wearing a red shirt with black stripes and jeans. As Officer Wooley is driving, a male voice I suspect is Mr. Gonsalez can be heard saying, "fuck the po-po." [03:31 – 03:38]

Afterwards a male I suspect is Mr. Cisneros is yelling, "right there, right there." Officer Wooley then broadcasts they are in the middle of the street and asks radio for a 10-3 (radio code for keeping the radio channel clear of any other transmissions). [03:39 – 03:43]

Officer Wooley opens his door and gets out of his police vehicle, and as he is doing so a male I suspect is Mr. Gonsalez can be heard saying something to the effect of "You're going to have to shoot me!" [03:43 – 03:46] Once Officer Wooley is outside of his vehicle, he stands at the driver's side door and Mr. Gonsalez is in the southbound side of O'Neil Avenue facing west. Mr. Gonsalez is near the front of the white flatbed truck parked along the west curb line.

Ms. Rodrigues is also there and is standing in the street between the white flatbed truck and a red Ford Mustang parked south of it along the west curb line. As Ms. Rodrigues is screaming, "stop… please stop", Mr. Gonsalez immediately starts advancing towards Officer Wooley with his hands extended out in front of him. [03:46-03:47] Mr. Gonsalez's left hand is next to his right hand/wrist and both hands are closed as if holding something. Mr. Gonsalez takes seven steps towards Officer Wooley who takes a step back all the while yelling, "Put the knife down! Put the knife down! Put it down! Stop!" [03:47 – 03:51]

Mr. Gonsalez does not stop and continues to advance forward. As this is happening, Mr. Cisneros runs up to Ms. Rodrigues on the west sidewalk and grabs her and pulls her back towards the sidewalk. As Mr. Gonsalez is taking his eighth step and walks onto the speed hump where the front of Officer Wooley's vehicle is parked, Officer Wooley discharges his firearm multiple times at Mr. Gonsalez [03:51]. Mr. Gonsalez first bends forward at the waist [03:51 (frame 5) – 03:52 (frame 2)] and takes a step backwards [03:52 (frame 1-4], turning to his right before falling to the ground on his right side [03:52 (frame 4) - 03:53 (frame 6)].

**HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER**

After Mr. Gonsalez falls, Officer Clark advises he is going to go "hands on" and moves up to Mr. Gonsalez. Officer Wooley also moves towards Mr. Gonsalez and tells him to not move his hands. Mr. Gonsalez replies he is not going to move. Officer Gillett then arrives and assists Officer Clark with handcuffing Mr. Gonsalez. Officer Wooley requests via radio fire and ambulance personnel respond [04:20]. Officer Wooley broadcasts the scene is secure and for fire to roll in [04:45].

After Officer Clark and Officer Gillett roll Mr. Gonsalez onto his back (supine), Officer Gillett finds a razor blade which was underneath Mr. Gonsalez before he was rolled over [04:58]. Officer Gillett moves the razor blade over towards the west side of the street where it is subsequently collected. Officer Wooley asks if that is what Mr. Gonsalez had, and Sergeant Decosta comments Mr. Gonsalez was yelling he (Officer Wooley) was going to have to shoot him. Officer Wooley confirmed he heard that also. Before the video ends, Officer Wooley walks over to the driver's side door, which was open, and picks up his flashlight from the ground and stands by until Lieutenant Cory Linteo arrives. **[See exhibit F]**

**BWC Footage from Officer Michael Clark:**
During this investigation I reviewed Officer Clark's Body Worn Camera (BWC) footage and noted the following in summary. Relevant BWC video timeframes are noted in brackets and refer to the recorded play times. The video was 7 minutes and 27-seconds in duration.

Officer Clark did not activate his BWC at the beginning of the contact. He had to turn it on, and he immediately activated it after he and Officer Wooley had already fired their pistols.

The operating system for the AXON BWC worn by Officer Clark operates on a constant loop when the device is turned on and not activated. Once the device is activated it retains the video footage of the previous thirty seconds prior to the activation, however it does not retain the audio portion associated to the video. By turning his BWC on and immediately activating it, Officer Clark's video footage starts with audio as there is no 30 second loop stored as the device was previously turned off.

Officer Clark's BWC footage begins with Mr. Gonsalez lying on his right side on the pavement with his head pointing north and his feet pointing south in the northbound lane of O'Neil Avenue. In the background to Officer Clark's left is Mr. Cisneros who is standing but bent over at the waist trying to comfort a wailing Ms. Rodrigues. They are near a driveway in front of a white flatbed truck. Ms. Rodrigues first words are unintelligible but at the beginning of the footage she continues with, "Oh my God…Oh my God…no…I want to see him…no".

As Officer Clark approaches Mr. Gonsalez, Officer Clark says, "Phil (Officer Wooley), I'm going to go hands on bud" as he walks over to handcuff Mr. Gonsalez. In the background Officer Jason Gillett states, "Coming up, coming up". Officer Gillett and Officer Clark handcuff Mr. Gonsalez in the prone position. There is suspected blood on

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

the red and black shirt at the right elbow area. There is also suspected blood on the blue clothing covering the upper right buttocks area. In the background Officer Wooley is on the radio telling dispatch the scene is secure and fire can come in.

Officer Gillett and Officer Clark roll Mr. Gonsalez into a supine position. Officer Gillett removes a small silver object from underneath Mr. Gonsalez and places it away from him on the pavement. He advises the other officers on scene it is a razor blade. There is suspected blood on Mr. Gonsalez's upper right front blue jeans and a suspected bullet wound on his left hip. Officer Gillett starts to provide medical treatment to Mr. Gonsalez.

Officer Clark goes to a patrol vehicle and cleans his hands with disinfectant wipes. Officer Clark then walks south of the crime scene and stops a vehicle that is approaching them in the northbound lane of O'Neil Avenue. Officer Clark tells the driver to turn his vehicle around. He walks back towards his patrol vehicle and asks Officer Joseph Fiandor to start securing the area with crime scene tape.

Officer Clark is later approached by Sergeant Vonnegut who checks his welfare and then asks him for a public safety statement. Officer Clark informs Sergeant Vonnegut he shot 2-3 times and points in the direction of his gunfire. Officer Clark is standing in the general area of where he shot. Officer Clark points out two expended casings on the ground and marks them with a folded white field identification card before he is removed from the scene. [See exhibit G]

### BWC Footage from Sergeant Tasha Decosta:
During this investigation I reviewed Sergeant Decosta's Body Worn Camera (BWC) footage and noted the following in summary. Relevant BWC video timeframes are noted in brackets and refer to the recorded play times. The video was 5 minutes and 29-seconds in duration.

Sergeant Decosta did not activate her BWC at the beginning of her contact with Mr. Cisneros. She had to turn it on, and she activated it after locating him.

The operating system for the AXON BWC worn by Sergeant Decosta operates on a constant loop when the device is turned on and not activated. Once the device is activated it retains the video footage of the previous thirty seconds prior to the activation, however it does not retain the audio portion associated with the video. By turning her BWC on and immediately activating it, Sergeant Decosta's video footage starts with audio as there is no 30 second loop stored as the device was previously turned off.

Sergeant Decosta's BWC footage begins with Mr. Cisneros walking away from her south bound on O'Neil Avenue in the north bound lane of traffic along a line of vehicles parked along the curb line. Mr. Cisneros looks back at Sergeant Decosta and says, "He's right there. Can you go over there and stop him please?" [00:04]

**HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER**

Sergeant Decosta replies, "I got you, I got you." The video is obstructed as Sergeant Decosta reaches up and gets on her portable radio, "Sam 21". In the background a male I suspect was Mr. Gonsalez is yelling. His initial communication is unintelligible but he later yells, "Fuck the po-po! I don't give a fuck…unintelligible". [00:11]

As the video resumes Sergeant Decosta uses her flashlight to illuminate Mr. Gonsalez, who is 3-5 car lengths in front of her. Officer Wooley exits the driver's side door of his patrol vehicle and is now between Sergeant Decosta and Mr. Gonsalez. A patrol vehicle pulls up to Sergeant Decosta's right side and Officer Clark exits the driver's side door. Sergeant Decosta yells out, "Hold on, hold on, he is, he is threatening!" Sergeant Decosta redirects her light down towards the ground and away from Officer Wooley. [00:15]

In the background and at the same time Sergeant Decosta was speaking above, there are several voices heard yelling at the same time. I could hear the male I suspect was Mr. Gonsalez yell, "Shoot me!" [00:13] as Officer Wooley is heard yelling, "Put the knife down! Put the knife down! Put it down". [00:14 – 00:18] At this time Officer Clark runs to the front passenger side quarter panel area of Officer Wooley's patrol vehicle. Sergeant Decosta follows Officer Clark's path and then gunshots are heard in the background. [00:18]

When the shooting starts, Sergeant Decosta is behind Officer Clark and to his right. She has her pistol drawn and her camera view displays Officer Clark to her far left with O'Neil Avenue taking up most of the camera frame with parked vehicles to her right. Three (3) expended shell casings from Officer Clark's pistol can be seen falling towards the pavement [00:19 frame 5]. Mr. Gonsalez can be seen landing on all fours (arms and legs) on the pavement at the 00:20 frame 6 mark. Mr. Gonsalez then rolls over to his right side. When the movement completes is difficult to determine as Sergeant Decosta's pistol magazine obstructs the video. [00:21 frame 1 – 00:22 frame 3]

Two (2) of the expended shell casings come to a stop on the pavement to the right of the white diamond on the pavement while the third one continues bouncing to the right off the video. [00:21 frame 6]

Sergeant Decosta's video is obstructed when she advises HPD Dispatch shots were fired and one person was down [00:27]. HPD Dispatch acknowledges and starts fire. When her video is unobstructed, Officer Clark is in the process of handcuffing Mr. Gonsalez when Officer Gillett responds to assist him. [00:38]

For the remainder of the video, Sergeant Decosta performs administrative duties at the scene. [**See exhibit H for frame photographs and I for BWC video**]

## Interview of Oscar Cisneros:

On November 16, 2018 at 0335 hours, Detective Mosby and Detective Mulhern interviewed Oscar Cisneros in interview room 222 located within the HPD Criminal Investigation Bureau (CIB). Mr. Cisneros related the following in summary:

---

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

Mr. Cisneros lives at 24631 O'Neil Avenue, which is in front of Christina Rodrigues' residence. Ms. Rodrigues lives with her 3-year-old son and her parents Isaac and Olga Rubio. Mr. Cisneros has known Ms. Rodrigues for about two years. Mr. Cisneros works at Classic Amusement which is next door to his residence at 24615 O'Neil Avenue.

About 2000 hours, Mrs. Olga Rubio called Mr. Cisneros and asked him to check on her daughters, Ms. Rodrigues and Ms. Deanna Rubio, because they were hearing noises. Ms. Deanna Rubio does not live at the house and was staying there with her sister while her parents were away. When Mr. Cisneros checked on them, Ms. Rodrigues and Ms. Deanna Rubio noted two chairs were missing from outside the front door. After checking around the house and finding nothing else, Mr. Cisneros gave his telephone number to Ms. Deanna Rubio and returned to work.

About 2100 hours, Ms. Deanna Rubio called him and said they were still hearing sounds which were coming from the backyard. Mr. Cisneros went over to their house again and walked around the backyard. As they did so, they found a vape smoking device and a beer in the backyard. They also noticed a fence board was broken. Mr. Cisneros said one of their neighbors was outside and said he heard someone hop the fence and run off. Ms. Rodrigues said it was Mr. Gonsalez because she recognized the vape device as belonging to him. Mr. Cisneros believed Mr. Gonsalez was spying on Ms. Rodrigues and was walking around the house.

Mr. Cisneros left to close Classic Amusement's yard so he could stay with Ms. Rodrigues and Ms. Deanna Rubio. When he got to the street, he saw Mr. Gonsalez south on O'Neil Avenue on the east sidewalk. He knew Mr. Gonsalez because Mr. Gonsalez would visit Ms. Rodrigues when they were dating.

Mr. Cisneros walked up to Mr. Gonsalez and they met in the street. Mr. Cisneros confronted Mr. Gonsalez and told him he was scaring the girls. Mr. Cisneros asked Mr. Gonsalez, "what the fuck," he was doing. Mr. Cisneros said this was when Mr. Gonsalez had the knife (razor blade). Mr. Gonsalez told Mr. Cisneros he was going to cut himself and kill himself. As Mr. Cisneros explained this, he made a slicing motion over his left wrist with his right hand. Mr. Cisneros was not sure if Mr. Gonsalez cut himself or not but noted Mr. Gonsalez made the cutting motion twice.

Mr. Cisneros was close enough to Mr. Gonsalez so he tried to get the razor away from him. Mr. Gonsalez pulled away and then swung his right hand with the razor at Mr. Cisneros' neck area. Mr. Cisneros was able to get out of the way and avoid being cut. After swinging the razor at Mr. Cisneros, Mr. Gonsalez started chasing him around a Toyota pickup truck that was parked across the street.

Mr. Cisneros described Mr. Gonsalez as being very angry and it appeared Mr. Gonsalez wanted to rip something up. When asked by Detective Mulhern to describe the razor blade, Mr. Cisneros said he did not actually see it. Mr. Cisneros clarified Mr. Gonsalez told him it was a razor blade, and he additionally saw something shiny in Mr. Gonsalez's hand. Mr. Cisneros considered a razor blade a deadly weapon.

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

Mr. Cisneros called the police to report the incident and was on the phone with the operator as he was being chased around the pickup truck. Mr. Cisneros ran circles around the truck because he did not want Mr. Gonsalez to catch him.

Mr. Cisneros described seeing a police vehicle turn onto O'Neil Avenue from Orchard Avenue; however, the police vehicle then made a U-turn and started driving in the other direction. Mr. Cisneros tried to get the officer's attention by yelling and waving his arms at which time the officer turned around and drove toward him.

When Mr. Gonsalez saw the police vehicle, Mr. Gonsalez started walking north on O'Neil Avenue. When the officer drove up to Mr. Cisneros, he pointed out Mr. Gonsalez and told the officer Mr. Gonsalez had a knife and was crazy.

Mr. Gonsalez was in the street when he met Ms. Rodrigues, who had walked south from her house. As the officer drove up to where Mr. Gonsalez and Ms. Rodrigues were located, Mr. Cisneros also walked north and passed the officer as he was getting out of his police vehicle. Mr. Cisneros grabbed onto Ms. Rodrigues because she wanted to be near Mr. Gonsalez, but Mr. Cisneros felt she would get in the way of the police doing their job.

Mr. Cisneros described Mr. Gonsalez as saying something and walking towards the police vehicle. The officer told Mr. Gonsalez to drop the knife two or three times, but Mr. Gonsalez did not comply. Mr. Gonsalez continued to walk towards the officer. As Mr. Cisneros said this, he raised his clenched right hand above his shoulder. Detective Mulhern asked Mr. Cisneros if his clenched hand was mimicking Mr. Gonsalez holding a razor. Mr. Cisneros did not see the razor blade, but knew Mr. Gonsalez had one because Mr. Gonsalez told him he had one earlier and had swung a shiny object at him.

When Mr. Gonsalez did not listen to the officer's command to drop the knife and was walking towards the officer, the officer shot Mr. Gonsalez. He thought the officer shot three times and was not sure which officer had shot. Mr. Cisneros held onto Ms. Rodrigues as she was trying to get to Mr. Gonsalez.

Mr. Cisneros and Ms. Rodriguez were on the driver's side of the police vehicle and in front of it. Mr. Gonsalez was about ten feet behind them in the street and was walking towards the police vehicle. Mr. Cisneros thought the officer was either in front of the police vehicle or behind the driver's door, and Mr. Gonsalez was about eight feet from the officer.

Mr. Cisneros recognized the officer as being a police officer due to the police vehicle and uniform. Mr. Cisneros said the police vehicle was a black and white colored police SUV with emblems. Mr. Cisneros noted anyone would recognize the officer as being a police officer and the vehicle as being a police vehicle.

Detective Mulhern asked Mr. Cisneros if Mr. Gonsalez was aggressive in his approach towards the officer. Mr. Cisneros heard Mr. Gonsalez say something but could not make out what was said. Mr. Gonsalez was doing something with his hands as he

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

approached the officer and was not listening to him. Mr. Cisneros described Mr. Gonsalez's walk as not being normal by reason of the strides being longer. Mr. Cisneros explained Mr. Gonsalez was not running but was moving faster than a normal walk. Mr. Cisneros described the walk as threatening and noted Mr. Gonsalez was already "pissed off." Even though Mr. Cisneros was not sure what Mr. Gonsalez said, he felt Mr. Gonsalez wanted to fight the officer.

Mr. Cisneros further explained he believed Mr. Gonsalez wanted to get shot. He spoke to Mrs. Olga Rubio after the incident via telephone, and she told him Mr. Gonsalez wanted to die but did not have "the balls" to do it. Detective Mulhern asked Mr. Cisneros if he thought this was suicide-by-cop. Mr. Cisneros said based on what Mrs. Olga Rubio told him, he thought it was and stated the officer did not have any other choice and did the right thing.

Detective Mosby showed Mr. Cisneros a photograph of the razor located by Officer Gillett underneath Mr. Gonsalez. Mr. Cisneros looked at the photograph and stated he did not see the object, but knew Mr. Gonsalez had something in his fingers. [**See exhibit J**]

### Interview of Christina Rodrigues:

Detective Purnell and Detective Riley interviewed Christina Rodrigues in Interview Room #218 on the second floor of the Hayward Police Department. During the interview Ms. Rodrigues related the following in summary:

Ms. Rodrigues lived with her son and parents, Isaac and Olga Rubio. Ms. Rodrigues explained her parents had been in Lincoln at Thunder Valley (Casino) during the incident.  Ms. Rodrigues was home with her sister Deanna Rubio, who was staying with her from Fremont to make her feel more comfortable.  Ms. Rodrigues confirmed her sister was aware she was broken up with Mr. Gonsalez and of his issues.

Ms. Rodrigues began dating Mr. Gonsalez in August of 2017 and they were engaged on January 5, 2018.  Ms. Rodrigues noted 4-5 months ago she began seeing signs Mr. Gonsalez was severely depressed and would "take things too far" when they were in an argument. She was not optimistic about their relationship. Ms. Rodrigues said Mr. Gonsalez began throwing "tantrums" when he was drunk, accusing her of not loving him, and threatening to slit his arm.

Ms. Rodrigues said Mr. Gonsalez's arm was covered in a bunch of scars and believed he slit his arm sometime around his birthday (June 22, 2018). She believed he slit his arm with a debit card and was admitted to Oakland Kaiser after police picked him up, and at some point he was prescribed Zoloft. During another incident, Mr. Gonsalez used a box cutter to cut his arm, which required suturing. Ms. Rodrigues noted she cut herself while trying to take the box cutter away. He also threatened to kill himself three to four times in the past.

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

A few months ago, Ms. Rodrigues and Mr. Gonsalez separated; however, they stayed in touch with each other. Regardless, their relationship ended in October 2018.

In the days leading up to November 15, 2018, there were a series of text messages between Ms. Rodrigues and Mr. Gonsalez. It started on November 12, 2018, when Ms. Rodrigues sent a message to Mr. Gonsalez indicating her parents were leaving that week and suggested they could talk about things. Ms. Rodrigues did not respond to Mr. Gonsalez when he asked questions about when he could meet with her. As a result, Mr. Gonsalez became upset and the argument started. Ms. Rodrigues was fed up with his "shit" and told him via text to "fuck off" and to "grow up and be a man." Mr. Gonsalez responded by asking why he got a tattoo with her name on it yesterday and he wanted his engagement ring returned. Mr. Gonsalez also told her he did not love her anymore. Mr. Gonsalez texted she was worse than his ex-girlfriend, since his ex-girlfriend at least cried when they broke up.

Ms. Rodrigues felt Mr. Gonsalez wanted the engagement ring back as an excuse to come over to her house. Ms. Rodrigues did not want him there and believed if he did her sister would tell their father who did not want Mr. Gonsalez around the house because of his tantrums.

Ms. Rodrigues felt Mr. Gonsalez was "casing" her house on November 15, 2018. Ms. Rodrigues explained she and her sister were outside smoking marijuana when Mr. Gonsalez sent her a message about how she cared more about marijuana than him. After that, Ms. Rodrigues and her sister went inside the home and started making dinner. Around 1600 or 1700 hours, two police officers arrived and said someone was complaining about a crying baby. Ms. Rodrigues thought it was strange and asked the officer who the caller was. The officer said he did not know (HPD Incident 2019-94501).

After the police left and throughout the rest of the evening, Ms. Rodrigues and her sister heard noises outside her house as if someone was walking around. There were also banging noises, and someone even tried to open the doors to the house. Ms. Rodrigues and her sister called their neighbor, Mr. Cisneros, to help them.

Ms. Rodrigues explained there were two chairs she and her family used outside of their house. The chairs were left by the door near the driveway. However, both chairs were no longer there. One of the chairs belonged to her mother while the other belonged to Mr. Gonsalez. Mr. Cisneros found her mother's chair between their respective houses, but Mr. Gonsalez's chair was not located.

Later in the evening, Ms. Rodrigues and her sister went outside to finish the joint as her son was asleep and the noises outside had subsided. Ms. Rodrigues walked between her mother and her sister's vehicles and noticed a motion light activated at Mr. Cisneros' residence. Ms. Rodrigues heard what sounded like someone shifting in the dirt and the hose faucet turning on. Ms. Rodrigues called out, "Who the fuck is there?" Ms. Rodrigues and her sister heard footsteps towards the shed in the backyard. Her sister shined a flashlight into the backyard and yelled out they knew someone was back

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

there, and they were going to call the police. They heard fast footsteps and what sounded like someone climbing over the fence. A few seconds later, the neighbor who lived south of them came outside and said someone had ran through their yard.

Mr. Cisneros came back to help Ms. Rodrigues and her sister. Ms. Rodrigues found a vape device and a Modelo beer that was half empty on the south side of the house between the southern property fence and the house. There is no entrance to the house on that side; however, there was a crawl space door. Ms. Rodrigues recognized the vape device as belonging to Mr. Gonsalez. Ms. Rodrigues called Mr. Gonsalez, but he did not answer.

Mr. Cisneros worked next door at the business called Classic Carnival, so he left to close the business before looking for Mr. Gonsalez. Ms. Rodrigues stayed on the porch, nervous Mr. Gonsalez was going to throw another tantrum. Her sister was also there and was "freaking out". Shortly after, Mr. Gonsalez called Ms. Rodrigues and accused her of sending Mr. Cisneros after him. Mr. Gonsalez said he, "knocked him the fuck out." Mr. Gonsalez also said he did not care and would, "fucking kill him!" Ms. Rodrigues explained she did not think Mr. Gonsalez was going to actually kill Mr. Cisneros but meant what he said as if they were fighting. Before she could get more information from Mr. Gonsalez, he hung up on her.

Ms. Rodrigues then called her mother and told her Mr. Gonsalez hit Mr. Cisneros. Ms. Rodrigues was scared and not sure if Mr. Gonsalez was so angry he would want to kill her, so she ran in the house and armed herself with a blue and silver screwdriver and a green box cutter. Ms. Rodrigues told her sister to stay in the house with her son.

Ms. Rodrigues left the house and started looking for Mr. Gonsalez. When she walked down her driveway and down the street, she saw a police vehicle with its lights off. She then started running as she felt something bad was about to happen.

Ms. Rodrigues stopped in front of a tow truck and saw Mr. Gonsalez walking into the street. Mr. Gonsalez was yelling at someone while on his cellular phone. At the time, Ms. Rodrigues did not know it was her mother and Mr. Gonsalez on the phone. However, Ms. Rodrigues later spoke to her mother who confirmed it was her on the phone. Ms. Rodrigues said Mr. Gonsalez told her mother he wanted to kill himself and felt no one was there for him.

Ms. Rodrigues said one of the police vehicles drove southbound and two others drove northbound. She could hear Mr. Gonsalez screaming but could not remember what was being said before he got off the phone. Ms. Rodrigues said Mr. Gonsalez was "angry, upset" and in the heat of the moment. Ms. Rodrigues additionally described Mr. Gonsalez's facial expression as being angry and said it was like he had "blacked out" and was only seeing "red."

Ms. Rodrigues explained Mr. Gonsalez appeared tense, was moving fast, and was carrying a small razor blade in his outstretched hand. Ms. Rodrigues called out to Mr.

**HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER**

Gonsalez as Mr. Cisneros pointed to Mr. Gonsalez and told officers he was "right there" and had a "knife". The officers stopped, and Mr. Gonsalez started to move towards her; however, she backed away from Mr. Gonsalez as she was scared to touch him. Ms. Rodrigues yelled at him, asking what he was doing. Mr. Gonsalez told her he did not care anymore and was going to kill himself. Ms. Rodrigues told Mr. Gonsalez not to and told him she loved him. Mr. Gonsalez yelled this was hurtful.

Ms. Rodrigues said the officers exited their vehicle. One officer was behind the driver's door of his vehicle while the other officer was on the passenger side. As the officers drew their weapons, she yelled not to shoot him. The officers told Mr. Gonsalez to drop what he had, but he did not drop it. Instead, Mr. Gonsalez walked towards the officers and said, "I don't give a fuck, just shoot me." Ms. Rodrigues described Mr. Gonsalez's walking speed as not being a run but a "decent faster pace." It should be noted Ms. Rodrigues initially said Mr. Gonsalez's hands were outstretched but thought he had pointed them up or had them around his mid-section. She was unsure if he still had the razor blade or had thrown it away. Ms. Rodrigues advised she was just a few feet from Mr. Gonsalez.

Ms. Rodrigues said the officers then shot Mr. Gonsalez seven times. She stated Mr. Gonsalez never threatened to kill anyone but himself. Ms. Rodrigues did not know why the officers shot Mr. Gonsalez so many times as his hands were out to cut himself. She noted Mr. Gonsalez was shot three times in the chest when another officer fired. Ms. Rodrigues understood Mr. Gonsalez brought this on himself but questioned why the officers shot "so many fucking times." As Mr. Gonsalez was being shot, Mr. Cisneros held her and carried her because she was crying. Mr. Cisneros escorted her to a bench where she was later contacted by officers.

Ms. Rodrigues said if someone was going to say Mr. Gonsalez assaulted Mr. Cisneros with a weapon, she would say that was not true because Mr. Gonsalez was not like that. Ms. Rodrigues described Mr. Gonsalez would not instigate a physical confrontation with Mr. Cisneros, but then stated, "maybe this time was different." Ms. Rodrigues advised she has never heard Mr. Gonsalez say he was going to kill anyone with a knife.

Detective Riley asked Ms. Rodrigues why she thought Mr. Gonsalez was shot. Ms. Rodrigues said the officers saw a "big ass dude" in the street, acting crazy, with a blade or "whatever" before stopping and saying honestly, she thought Mr. Gonsalez was shot because Mr. Cisneros said he had a knife. Ms. Rodrigues confirmed Mr. Gonsalez had walked toward the officers, not run, and had yelled "I don't give a fuck, just shoot me."

Detective Riley asked about the officers and Ms. Rodrigues described the first officer as a "big fat white dude" with a cap on, after noting she did not remember what they looked like. Ms. Rodrigues noted the officer had yelled something like to drop his razor blade or "whatever the hell". Ms. Rodrigues said they yelled one thing, Mr. Gonsalez did not comply, and they started shooting. Ms. Rodrigues confirmed she could not remember what the officer said, if it was "stand back", "get down", or what command was given.

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

Ms. Rodrigues did not remember the officers' faces and said their vehicle headlights were shining toward her. Ms. Rodrigues stated it all happened very fast and she did not believe the second officer said anything.  Ms. Rodrigues thought the first officer had shot Mr. Gonsalez in the chest and the second officer the arm and rest of the body.  Ms. Rodrigues noted she had seen three officers and was not sure if all three had shot as it was dark and the headlights were pointed at her.  Ms. Rodrigues said one officer said something loud or they said something together.  Ms. Rodrigues confirmed the officers said it one time and, in her opinion, they did not give him any warning before they started shooting.  Ms. Rodrigues was just a few feet from Mr. Gonsalez and said she could hear it was different guns firing in different directions as she has shot guns in the past.  Ms. Rodrigues said she heard 4, 5, or 6 gunshots.

Detective Riley showed Ms. Rodrigues a photograph of the razor blade located at the scene. Ms. Rodrigues identified it as the one Mr. Gonsalez had in his hand. She stated Mr. Gonsalez was pinching the razor blade and holding it to his outstretched arm. Ms. Rodrigues said Mr. Gonsalez was doing this for attention because he thought he was losing her.

Detective Riley also showed Ms. Rodrigues a photograph of the screwdriver found at the scene. She identified the screwdriver as being hers. Detective Riley further showed Ms. Rodrigues a photograph of Mr. Gonsalez, and she identified him in the photograph.

Detective Riley brought Ms. Rodrigues' mother into the interview room when he notified Ms. Rodrigues that Mr. Gonsalez was deceased.  Ms. Rodrigues was visibly upset, crying and yelling.  Her mother tried to calm Ms. Rodrigues noting Mr. Gonsalez wanted this to happen. [See exhibit K]

### Interview of Christopher Martinez:
Officer Beyer interviewed Christopher Martinez at HPD. Officer Beyer obtained his written statement and used his BWC to record the interview. Mr. Martinez related the following in summary:

Mr. Martinez lives at 24697 O'Neil Avenue. Mr. Martinez was on his porch, which is above ground, so he was looking down and over the top of the cars parked on the street. He also noted the area is generally dark and even with the streetlight north of the area and the police vehicle lights he could not make out any faces or provide any further description of the subjects.

Mr. Martinez was outside when he heard an argument between two males. He heard Mr. Gonsalez say, "I'll put the knife down if he will just fight me," while Mr. Cisneros was telling him to put the knife down. He saw the police arrive and tell Mr. Gonsalez to drop the knife. Mr. Gonsalez said, "fuck this," and, "no, no, no." Mr. Gonsalez ran towards the officers with his hands in the air. Mr. Martinez could not see if Mr. Gonsalez had anything in his hands. The officers then shot Mr. Gonsalez approximately seven times. [See exhibit L]

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

**Interview of Sergeant Tasha Decosta:**

Detective Mosby and Detective Mulhern interviewed Sergeant Decosta on November 18, 2018, at 1131 hours in the HPD YFSB Conference Room. It should be noted that Lieutenant Averiett and I observed the interview from the Internal Affairs Office on the computer via video feed. Our role was limited to that of observers and we did not ask questions or otherwise participate.  Detective Mosby recorded this interview on his Digital Audio Recorder (DAR) and the original recording is attached to the CIB investigative file. In summary Sergeant Decosta related the following about the incident:

On November 15, 2018, Sergeant Decosta was working as a police sergeant assigned to the patrol division's swing shift (1330 hours to 0200 hours) team. She was working in an overtime capacity as her normal working hours were dayshift (0600 hours to 1830 hours) on Saturday, Sunday, and Monday. Her unit designation was "S21", in which the "S" stood for her being a sergeant and the "21" meaning she was assigned to the swing shift and north side of Hayward. Sergeant Decosta noted she had a civilian ride-a-long that night, Julia Cohen.

Sergeant Decosta confirmed she reviewed her Body Worn Camera (BWC) video for this incident a few minutes before the interview started. She further confirmed she was not involved in any physical altercation during the incident.

Sergeant Decosta was asked to describe the scene as she saw it on November 15, 2018. Sergeant Decosta said it was an "eerie" night due to the smoke from the fires in the state. She described the visibility as being "cruddy" and noted there were a lot of people wearing masks due to the poor air quality. At the time of the incident, it was dark out, and the streetlights on O'Neil Avenue were on. The lights made it hazy, almost like it was foggy outside.

Sergeant Decosta described O'Neil Avenue as being a north and south running street with one lane in each direction. There were cars parked on both sides of the street, and she had stopped at the driveway to O'Neil Commons. She was not sure of the addresses and said the incident took place north of where she stopped but south of Kino Court.

Sergeant Decosta said she was driving through the Lucky Supermarket (22555 Mission Boulevard) parking lot near Mission Boulevard and A Street when HPD Communications beeped a call. She said this meant to pay attention as something was about to be broadcasted, and the beeping tone was usually reserved for more serious calls. Sergeant Decosta recalled HPD Communications broadcasting something to the effect about a male with a knife. She said it sounded like a domestic, like an argument, and the male may have brandished the knife at somebody. Sergeant Decosta recalled information about there being a lot of screaming and yelling and the emergency operator was trying to obtain more information. Sergeant Decosta thought the location for the call was at Sycamore Avenue and Orchard Avenue.

---

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

Sergeant Decosta responded to the call. As she was driving west bound on Sycamore Avenue, she did not see anyone and was not sure where the incident was happening. Sergeant Decosta heard another officer, who she thought was Officer Wooley, broadcast that nothing related to the call was located either.

Sergeant Decosta turned southbound onto O'Neil Avenue and drove slowly; however, she still did not see anyone until she got to the driveway of O'Neil Commons. Once she got to O'Neil Commons, she saw a male in an orange shirt, later identified as Mr. Cisneros, frantically waiving her down. Mr. Cisneros was on the west sidewalk just south of the driveway to O'Neil Commons. She described Mr. Cisneros as being in a "panic" and was waiving his hands in the air. Sergeant Decosta got out of her patrol vehicle and turned her BWC on. Mr. Cisneros was walking towards her and at the time she was not sure if he was the person armed with a knife or not, due to him wearing an orange shirt. Sergeant Decosta was aware the suspect description provided via radio was for a red shirt; however, she noted orange and red could be confused with each other. Sergeant Decosta told Mr. Cisneros to stop, and she broadcasted on the radio where she was and that she was being flagged down. Sergeant Decosta advised she also saw headlights further south near O'Neil Avenue and Orchard Avenue but was not sure if the headlights were from a patrol vehicle or not.

Mr. Cisneros pointed north towards another male, later identified as Mr. Gonsalez, and told Sergeant Decosta to stop Mr. Gonsalez because he had the knife. Mr. Cisneros said, "Stop him. Stop him. He has a knife," and started walking northbound in the direction of Mr. Gonsalez and Ms. Rodrigues. Sergeant Decosta looked north and then saw Mr. Gonsalez and a female, later identified as Ms. Rodrigues, in the street. She estimated they were about 30 yards away.

Sergeant Decosta stated Mr. Gonsalez and Ms. Rodrigues were arguing as there was a lot of screaming and yelling but noted the male was yelling more. Sergeant Decosta also described them as "tussling" in the street. She believed Ms. Rodrigues was pulling on Mr. Gonsalez and noted their hands were on each other's arms or bodies. Sergeant Decosta could not hear exactly what they were saying to each other but recalled hearing Mr. Gonsalez say something to the effect of, "Don't call the police," or "If you call the police they're gonna have to shoot me," and "I don't give a fuck. You call the police; they're gonna have to shoot me." Sergeant Decosta said besides Mr. Cisneros, no one else was outside at the time.

Sergeant Decosta started walking north towards Ms. Rodrigues and Mr. Gonsalez as two marked patrol vehicles drove north past her. She later learned it was Officer Wooley and Officer Clark who had passed her with Officer Wooley being in the first car and Officer Clark in the second car. Officer Wooley stopped on the west side of the street, which would be the southbound side, in front of 24697 O'Neil Avenue, while Officer Clark stopped his patrol vehicle on the east side, which would be the northbound side, slightly south of Officer Wooley's vehicle.

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

Sergeant Decosta recalled trying to say, "hey wait," noting she was told Mr. Gonsalez had a knife and he was saying, "they're gonna have to shoot me," so she tried to say, "hey he's threatening." She clarified what she was trying to convey was Mr. Gonsalez was threatening suicide-by-cop. Sergeant Decosta thought Officer Wooley was too far from her to hear her and thought he certainly would not have heard her as he drove by. Sergeant Decosta said Officer Wooley got out his patrol vehicle on the driver's side and Officer Clark drove up and stopped his car behind Officer Wooley's. Mr. Gonsalez was about fifteen to twenty feet in front of Officer Wooley's vehicle. Sergeant Decosta said Mr. Gonsalez was close to the front of the patrol vehicle and noted Officer Wooley remained on the driver's side. She was not sure if Officer Wooley's driver's door was open or if there were any obstructions between Mr. Gonsalez and Officer Wooley. She noted Officer Clark got out of his patrol vehicle and ran to the passenger side of Officer Wooley's patrol vehicle, stopping near the passenger side "A" pillar (this would be where the passenger side spotlight is located on Officer Wooley's vehicle).

Sergeant Decosta said when Officer Wooley got out of his patrol vehicle, Mr. Gonsalez started moving towards him. She was not sure if Mr. Gonsalez was walking or running and felt as if Mr. Gonsalez's hands were out in front of him. Sergeant Decosta last remembered seeing Mr. Gonsalez's hands when he was "tussling" with Ms. Rodrigues.

Sergeant Decosta noted Officer Wooly gave Mr. Gonsalez commands, "drop the knife, drop the knife." Sergeant Decosta explained based on the totality of what she had heard thus far and recalled: (1) Mr. Gonsalez stated, "They're gonna have to shoot me," (2) Mr. Cisneros telling her Mr. Gonsalez had a knife, (3) the original call was about a subject armed with a knife, and (4) Officer Wooley's repeated commands to drop the knife; she felt, "uh oh, this is not good." This prompted her to run around the right (passenger side of Officer Wooley's car) behind Officer Clark and to unholster her firearm as there was an armed subject near the officers. As she was running by the rear of Officer Wooley's vehicle, she lost sight of Mr. Gonsalez due to the vehicle itself and heard shooting.

Initially, Sergeant Decosta thought it was just Officer Wooley who had discharged his firearm. Sergeant Decosta could not see Mr. Gonsalez from where she initially was on the passenger side of the patrol vehicle until she moved up near Officer Clark. She noted Mr. Gonsalez was on the ground in front of Officer Wooley's vehicle and the threat he posed was now neutralized; therefore, she did not discharge her firearm. Sergeant Decosta recalled the volley of gunshots was very fast.

Sergeant Decosta then changed her attention to securing the scene and broadcasted via radio shots were fired and one was down. She noted medical (referring to HFD) was going to respond; however, she had them stage at that time as she did not know who else was going to come out of the house nearby. She also noticed Mr. Cisneros, who she lost sight of as she ran behind Clark right before the shots were fired, was now holding onto Ms. Rodrigues on the west side of the street and slightly north of Mr. Gonsalez. Mr. Cisneros was keeping Ms. Rodrigues from the scene.

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

Sergeant Decosta said she was looking around for other people and witnesses and noticed one of the houses to the left of her. The screen door had opened and closed, and it appeared someone walked outside. She later directed officers to conduct witness attempts at this location.

Sergeant Decosta explained Officer Gillett arrived and gave first aid to Mr. Gonsalez while she checked on Officer Wooley and learned Officer Clark was also a shooting officer.

When asked about how much time transpired between the time Officer Wooley got out of his vehicle and when she heard shots, Sergeant Decosta explained time became distorted so she did not want to guess; however, she noted there was enough time for Officer Wooley to give more than one command. She further stated there was enough time that she heard Mr. Gonsalez say, "You're gonna have to shoot me," and for Officer Wooley to say at least two times to drop the knife before the gunshots. She said it all happened really fast and noted there was not enough time to even coordinate a different force option between the two officers.

Sergeant Decosta went on to explain it did not seem like there was enough time to develop a dialog with Mr. Gonsalez and noted it was very chaotic. She talked about how Mr. Gonsalez was yelling and making comments like, "you're gonna have to kill me." She said he was the one talking and was not going to listen to anyone else talking. Sergeant Decosta advised she did not recognize or have any prior law enforcement contact with Mr. Gonsalez, Ms. Rodrigues, or Mr. Cisneros.

When asked about the call she was responding to, and hearing about the brandishing of a knife, Sergeant Decosta noted to her it sounded as if there was arguing and it was "heated". She also said there was a period where it sounded like the reporting party was not answering questions or the call was dropped. However, she remembered the information was about somebody with a knife or somebody brandished one. It also sounded like two or more people were involved. Sergeant Decosta was close to the detail at the time and since she was a crisis negotiator for ten years, she might be of help so she responded.

Sergeant Decosta further recalled when the call was dispatched it was classified as a 417 PC – brandishing a weapon, but to her it seemed to be a domestic based on the details. She noted brandishing is a criminal offense and she and the officers were dispatched to investigate a reported crime.

Sergeant Decosta noted it is dangerous when dealing with someone armed with an edged weapon. She noted a Hayward PD officer was killed with a knife in the past, referring to Officer Benjamin Worchestor (Hayward PD Case #87-03-3002). She then described she saw Ms. Rodrigues with Mr. Gonsalez and both were in an argument. Mr. Gonsalez was acting bizarre as if he was in some type of psychosis or was intoxicated. He was acting very "heightened" and was screaming. He was acting "unpredictable",

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

armed with a knife and saying the police were going to have to shoot him. Sergeant Decosta described Mr. Gonsalez as being a threat.

Sergeant Decosta said there was a danger element that had to be dealt with before having the ability to have a conversation with Mr. Gonsalez, and this was why the command to drop the knife was appropriate. Sergeant Decosta advised as such Mr. Gonsalez posed a danger to Ms. Rodrigues and Mr. Cisneros also.

When asked if she saw the weapon itself in Mr. Gonsalez's hands, Sergeant Decosta said she did not. After the shooting occurred, she saw a razor blade on the ground in front of Officer Wooley's car and described it as being for a box cutter. She did not know if it was what Mr. Gonsalez had but assumed it was based on the totality of what happened. She further expressed she used to work in a factory and would use a box cutter as part of her employment to cut boxes. She said a razor blade is an edged weapon and sharp. She recalled cutting herself many times while working at the factory. She said a razor blade was a knife just as any other knife, and it could be used to kill or hurt someone.

We took a break during the interview from about 1219 hours to 1230 hours. After that, the interview continued in YFSB as Detective Mulhern asked her some clarifying questions, and Sergeant Decosta further noted the following in summary:
Upon initial contact with Mr. Cisneros, he was on the west side of O'Neil Avenue on the sidewalk. Mr. Cisneros had his hands in the air and was waving her down. When she got out of her patrol vehicle, Mr. Cisneros started to walk towards her, but she told him to stop as she did not yet know his involvement in the call for service. Mr. Cisneros pointed north and said, "Stop him, he has a knife." She responded saying something to the effect of, "Okay, I got you." She looked north and then saw Mr. Gonsalez in the middle of the roadway.

Sergeant Decosta heard Mr. Gonsalez say he did not give a "fuck" and "they" were going to have to shoot him. This coupled with the information about him having a knife, meant to her he was suicidal or had a mindset towards that. She then explained what she meant earlier by characterizing Mr. Gonsalez's behavior as "suicide-by-cop." Sergeant Decosta said that meant for whatever reason, a person was going to challenge the police in such a way to force police to stop that challenge, whether the consequences meant dying. If the person died as a result, this was "suicide-by-cop" as it meant challenging the officer enough to force the officer to defend himself or herself from an attack to get the officer to kill them.

She noted when Officer Wooley drove by, he passed her quickly and there was no opportunity to say anything. She believed she was trying to say something on the radio but could not due to it beeping, referring to someone else already broadcasting. She believed she said "wait" as she could see this event unfolding. With Mr. Gonsalez saying something about the police having to shoot him and then the two officers now having to confront him, she felt that Mr. Gonsalez was going to force the officers to shoot him. She said something about, "he's threatening," and explained she could not

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

get out that he was threatening suicide. It was too much to say in such a small amount of time and she did not want to divert the officers' attention to her in the time it would take to convey that message.

With regards to her ride-a-long Ms. Cohen, Sergeant Decosta noted that at the beginning of the ride, she told Ms. Cohen to stay with her unless she told her to stay in the car. Sergeant Decosta advised she normally gives her ride-a-longs this admonishment. Sergeant Decosta said Ms. Cohen stayed in the front passenger seat of the police car during the incident and was later transported by Officer Sheryl Mitchell back to her own car to leave. Sergeant Decosta advised she had the waiver and contact information for Ms. Cohen and spoke to her after the incident. They did not discuss any details about the event as she advised Ms. Cohen that detectives would contact her. She told Ms. Cohen to just tell the police what happened from her point of view. In a subsequent interview of Ms. Cohen, HPD detectives discovered she did not witness the shooting from her vantage point in the patrol vehicle.

Sergeant Decosta further noted she spoke to Officer Wooley to make sure he was okay but that was the extent of their post-shooting conversation.

When asked if there was any information about the blade disclosed during the incident or if anyone described it as such, Sergeant Decosta advised she saw the razor blade only after the shooting on the ground. Prior to seeing it there, all the information learned was it was a knife. Sergeant Decosta said a razor blade is a knife to her. [See exhibit M]

### Interview of Officer Phillip Wooley:
The following is a summary of the interview of Officer Wooley (the unedited transcript of this interview is attached to the CIB investigative file in section 8). The interview was conducted on November 18, 2018, at 1301 hours in the HPD YFSB Conference Room and was facilitated by the following personnel: Detective Purnell, Detective Mulhern, Alameda County Deputy District Attorney Autrey James, and Alameda County District Attorney Investigator Cesar Basa. Officer Wooley was represented by his attorney, Harry Stern, from the law firm Rains, Lucia, Stern, St. Phalle & Silver, PC. Detective Mosby read and completed the Modified Miranda Admonishment Form with Officer Wooley. Officer Wooley agreed to voluntarily proceed with the interview.

It should be noted Lieutenant Averiett, Sergeant Velasquez, and I observed the interview from Sergeant Velasquez's office on the second floor of HPD on his computer via video feed. Our role was limited to that of observers and we did not ask questions or otherwise participate. Detective Mosby recorded this interview on his Digital Audio Recorder (DAR) and the original recording is attached to the CIB investigative file. In summary Officer Wooley related the following about the incident:

Detective Purnell began asking Officer Wooley some basic identifying information (e.g. full name, badge number, etc.). During the beginning stages of the interview, Officer Wooley described his law enforcement experience, prior work history, his issued

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

equipment, his current work schedule, and his call sign/assignment on Thursday, November 15, 2018.

Officer Wooley was hired by the Hayward Police Department on January 2, 1990 and had no previous law enforcement experience.  Officer Wooley had served in the United States Marine Corps. prior for 12 years as a machine gunner (4 years active duty and 8 years with the reserves).  Officer Wooley served overseas and during the conflict in Beirut, Lebanon in 1983.

Officer Wooley noted on the night of the incident he was working as "Boy 32" working the "Boy Beat" in downtown and during the midnight shift.  Officer Wooley stated the hours for the midnight shift as 1800-0630 hours with his work schedule Tuesday dayshift, Wednesday swing shift, and Thursday midnight shift referred to as "Team 7", the relief team. Officer Wooley's supervisors are Lieutenant Dorn, Sergeant Vonnegut (north end sergeant), and Sergeant Nuela however only Sergeant Vonnegut was working the night of the incident. Lieutenant Linteo was the watch commander that night and Sergeant Decosta was working for the swing shift.

When asked about receiving specialized training, Officer Wooley stated he is a Firearms Instructor with 2000-3000 hours of firearms related training; spent 8 years in Investigations to include sexual assault investigations and child abuse investigations; a Field Training Officer; Crime Scene Technician; and a trained Dispatcher.  Officer Wooley has also worked the Special Duty Unit for six months, as a Vice Officer for 3 years, and as a Narcotics Officer for 3 years. Officer Wooley described the Special Duty Unit as the original gang unit with investigations and enforcement activity related to gangs, the Vice Unit as specifically dealing with street level prostitution and ABC (Alcohol Beverage Control) alcohol violations, and the Narcotics Unit as dealing with narcotics related crimes. Officer Wooley worked in an undercover capacity in both the Vice and Narcotics roles. Officer Wooley explained the responsibilities of a Field Training Officer as training new and lateral officers, noting this is the fourth time he has held the position.

Officer Wooley said his training in the Marine Corps. was in the use of the M60 Machine Gun, which is no longer in use.  Officer Wooley explained his training was during the Cold War and in pushing the Soviet Union back, not in close quarters battle type training that came after the Beirut bombing.  Officer Wooley noted his previous shift to the night of the incident was Wednesday, swing shift from 1330-0200 hours with no secondary job or extended hours.  Officer Wooley had not consumed any alcoholic beverages in the previous 24 hours to the shift of the incident and had no medical conditions which impacted his judgement or physical abilities.  Officer Wooley had slept from 0300 to 1100 or 1200 hours (8-9 hours) before getting up to go to the gym.  Officer Wooley sustained no injuries as a result of this incident and noted he does wear reading glasses but has no vision problems.

Officer Wooley was wearing the Class C BDU (Battle Dress Uniform) and none of his equipment was damaged during the incident. Officer Wooley provided the make and

**HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER**

model of his firearm as a Sig Sauer P226, .40 caliber. The weapon is department issued with Serial Number U686148. Officer Wooley noted the only modification to the pistol is Tru Glo night sights (which Detective Mulhern later confirmed Officer Wooley had trained with) and he was utilizing department issued ammunition. Officer Wooley confirmed all his magazines have a capacity of 12 rounds and were fully loaded with a chambered round in his weapon. Officer Wooley thought he had qualified three months ago with the pistol.  Officer Wooley also carries a backup, Glock 43, .380 caliber firearm with a six round magazine and a chambered round. Officer Wooley confirmed he was wearing a Body Worn Camera and had activated it during the incident. Officer Wooley confirmed the Glock 43 was not fired during this incident and he had no other backup weapons or knives.

Officer Wooley said on the night of the incident he was driving fully marked Ford Explorer SUV #226.  Officer Wooley confirmed the vehicle is black and white, has Hayward Police emblems on both doors, overhead emergency lights, and spotlights; describing it as a very distinctively marked police car. Officer Wooley stated this is the normal vehicle he drives, and he was a single unit.

Officer Wooley described the scene as a residential street with business on the east side, running north south, very dark, with cars on both the east and west sides of the street along the curb. Officer Wooley noted upon his arrival, the people he saw were standing in front of a large white pickup truck. Officer Wooley said the weather conditions were clear, not cloudy, but noted it was hazy from the smoke from the Butte County fires. Officer Wooley confirmed it was nighttime, dark outside, with not very good street lighting, some artificial lighting from the residences, and the normal headlights of his patrol vehicle. Officer Wooley thought the business along the street was the back of a car dealership. Officer Wooley initially had his flashlight in his hand but had dropped it during the incident.

Detective Purnell asked Officer Wooley to explain the dispatch information, his response, and the incident.  Officer Wooley said around 2200 hours he was responding to the Lucky's at 22555 Mission Blvd for a stolen vehicle report when this call came out as a "415 Ascertain" as he was westbound on B Street nearing Mission Boulevard. Officer Wooley heard this being broadcast over the radio as his MDT (Mobile Data Terminal) had the stolen vehicle detail displayed.  Dispatch broadcast there was a male with a knife, and he had attempted to stab a roommate.  Officer Wooley described the information as sketchy because the informant was not being forthcoming with the information.  Officer Wooley estimated he was about a mile away from the new detail and asked to be diverted to it.  Dispatch updated the suspect had a red and black striped shirt, armed with a knife, and was arguing with a roommate.  At this point dispatch relayed the phone line was just open with no more information coming in from the informant.

Officer Wooley activated his Body Worn Camera on Mission Boulevard north of Orchard Avenue. The only information he had was the people were in an apartment complex near the intersection. Officer Wooley initially did not find anything and asked dispatch if

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

they had any more information because there were a lot of apartment complexes in the area.

About 30-45 seconds after he arrived on scene, Officer Wooley heard whistling coming from north of O'Neil Avenue. He advised dispatch someone was trying to flag him down. As Officer Wooley drove north, Sergeant Decosta broadcast she was with the informant, but Officer Wooley did not recall seeing her. Officer Wooley asked dispatch where the other subject was located because he only saw the male in the red and black shirt arguing with another male and female. Officer Wooley noted the suspect had something in his hand, but he could not see what it was. Officer Wooley pulled his vehicle closer in order to use his lights to see what object was in the suspect's hand. Officer Wooley explained they were arguing, and he was concerned the suspect had already or was going to stab the roommate/male and female.

As Officer Wooley exited the vehicle, he stated the suspect looked at him with a very blank, thousand-yard stare and exclaimed, "You're going to have to shoot me".  Officer Wooley already had his firearm drawn and ordered the suspect to drop the knife, drop the knife.  As Officer Wooley ordered the suspect to stop, the suspect kept walking toward him. The suspect's hands were together in a shooting stance with something in what he believed was his right hand.  Officer Wooley thought the object was a box cutter.

Officer Wooley discussed he has been trained about "putting a line in the sand". Officer Wooley formulated in his mind if the suspect got any closer than that line, he was an extreme threat to him. Officer Wooley was also concerned the subject could turn his attention back to the other people.  Officer Wooley ordered the suspect to stop but he did not comply. The subject continued to come at him, so he made the decision to fire thinking the suspect would stab him with the knife either killing him or causing him great bodily injury.  Officer Wooley did not recall the exact number of rounds he fired, believing it to be 6, 7, or 8.  Officer Wooley also saw Officer Clark show up and fire an unknown number of rounds as he was discharging his pistol.

When the suspect went down, he told him not to move to which the suspect responded he was not moving.  Officer Wooley broadcast shots fired but noted someone else was also transmitting and his transmission did not broadcast over the radio.  Officer Gillett arrived and assisted Officer Clark with handcuffing the suspect.  Officer Wooley noted the suspect was still alive and moaning so he cleared the Fire Department to enter the scene.

Detective Purnell asked to go back over the information Officer Wooley had provided and confirmed he had initially been dispatched to the stolen vehicle detail. They discussed the call coming out as a "415 Ascertain" in what Officer Wooley described as a disturbing the peace in which they were not really sure what was going on.  Officer Wooley said it had the potential to be bad and was a higher priority than a "regular 415".

**HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER**

Officer Wooley confirmed he also heard information a roommate had attempted to stab someone. Officer Wooley thought a crime had occurred and a crime was in progress. While he responded dispatch updated the call to a "417", which is the brandishing of a weapon.  Detective Purnell and Officer Wooley discussed the difference in responding to a cold stolen vehicle and the brandishing of a weapon detail. Officer Wooley noted it changed the mindset of what he was conducting as the safety of the officers and public was paramount.  Officer Wooley described the call type dictated the tactics to include positioning of his vehicle, himself, lighting, whether the subject actually has a weapon or is still armed.  Officer Wooley explained all these things should be going through your mind as you respond and was how he trained new officers to plan for all the contingencies.

Officer Wooley confirmed through his training and experience someone with a knife is a dangerous threat to include causing death and great bodily injuries such as damage to tissue and organs or rendering limbs inoperable.  Officer Wooley noted a knife is considered a "deadly force instrument" and he even trains officers to place their knives as a backup weapon.

In addition to wearing a red and black shirt and possessing a knife, Officer Wooley believed the suspect was also wearing blue jeans and was White or Hispanic.  Officer Wooley again noted the suspect's blank look in which it seemed no matter what Officer Wooley said he was not going to respond to it.  Officer Wooley confirmed the knife was not described any further and it was not referred to as anything else. Detective Purnell confirmed the dispatcher had told Officer Wooley the phone line was open as he referenced and he was told they could hear loud arguing and the whistling that Officer Wooley heard upon his arrival on scene.

Officer Wooley said he could only hear the whistling and did not see anyone upon his arrival.  Officer Wooley explained he could not describe the informant as he did not remember seeing him, but he did remember he was told he had on an orange shirt. Officer Wooley confirmed Sergeant Decosta had said over the radio she was out with the informant and he did not see her there either. Detective Purnell confirmed Officer Wooley was broadcasting radio traffic when he saw the suspect in the red and black shirt through his front windshield. The suspect was arguing with a male and female but he could not make out what was being said, nor could he describe the people other than to say both were White. Officer Wooley noted his attention focused on the suspect as he had already stabbed someone and wondered if he was going to stab them too.

Detective Purnell confirmed Officer Wooley's understanding as he responded to the incident. Officer Wooley believed someone had already been stabbed based on the radio traffic. He believed the suspect had stabbed a roommate. Officer Wooley acknowledged he was working off the information he had been given. Detective Purnell asked about the object in the suspect's hand. Officer Wooley described the suspect was holding it kind of "weirdly". When the suspect shifted his attention to Officer Wooley, the suspect went into a low ready shooting position. The suspect had both hands clasped together like he was holding a gun.  Officer Wooley said it was obvious the suspect did

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

not have a gun, but there was something in the suspect's right-hand. Officer Wooley thought it was a box cutter.

Officer Wooley stated the suspect walked straight toward him and said, "You're going to have to shoot me". Officer Wooley confirmed in his opinion (as a firearms instructor) a shooting stance is an aggressive posture. He perceived it as a threat to become combative from his training and experience in the military and as a police officer. Officer Wooley explained the blank stare on the suspect's face had caught his attention more than anything.  Officer Wooley noted in his military combat experience (Beirut 1983), it is referred to as a "thousand yard" stare; describing it as meaning you are "checked out".  Officer Wooley described "checked out" as being whatever decision you have made up in your mind when "checked out", you are going to carry out that decision and nothing will stop you. This alarmed Officer Wooley more than anything else, even when being combined with the statement you're going to have to shoot me.  Officer Wooley described the suspect advanced towards him at a pace that was not fast, but also not slow as he ordered him to stop and drop the knife.  Officer Wooley stated the suspect continued to advance.

Officer Wooley confirmed the window was down as he responded into the area.  Officer Wooley described he had exited the vehicle when he saw the suspect and broadcast he had the suspect in the middle of the street and asked for a "10-3", to leave the radio channel open for him.  Officer Wooley said when he saw what was in the suspect's hand, he dropped his flashlight and the suspect at that point stated he was going to have to shoot him.  Officer Wooley explained he was at the driver's side door as this was the only cover he had available to him at that time.  Officer Wooley confirmed he had given the suspect no commands or identified himself as the police prior to him stating Officer Wooley was going to have to shoot him.  Officer Wooley explained he took the statement as the suspect understood he was the police and described as soon as he pulled up the suspect's attention was focused on him, noting it was quick.  Officer Wooley noted in his mind the shift in focus was good as he was not as worried about the male and female standing nearby.  After Officer Wooley told the suspect to drop the knife is when he began advancing on him.  Officer Wooley told the suspect to drop the knife 2-3 times.

Officer Wooley explained he was a lot closer than he wanted to be.  Officer Wooley described "in a perfect world" it would have been daytime and he would have parked further back.  Officer Wooley stated he needed to see the suspect so he needed to be closer, but it was an uncomfortable feeling being that close to someone with a knife as they could close the distance very quickly and stab him with it.

Officer Wooley estimated he was 5 yards (15 feet) from the suspect. Officer Wooley discussed the "21 foot" rule, which is the distance the average officer could draw and fire one round on target in about 21 feet on someone with an edged weapon before they could close the distance. Officer Wooley confirmed he was well within that distance just exiting the patrol vehicle. Officer Wooley gave the suspect plenty of opportunity to drop the knife before he even began closing the distance on him.

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

Officer Wooley confirmed he drew his firearm as he exited the patrol vehicle because the suspect had a deadly weapon.  Officer Wooley explained you bring deadly force to deadly force, as you did not bring a Taser, OC Spray, or a baton to something that has the potential to kill you.  Officer Wooley noted plenty of people get stabbed with edged weapons across the United States each year. Officer Wooley confirmed he had no other force options available to him at the time. Officer Wooley noted if the Taser had not worked, by the time he transitioned he would have been stabbed and believed he was engaging the suspect alone. Officer Wooley said it was not until he began firing that he saw Officer Clark in his peripheral.

Officer Wooley described as he was being advanced upon, the male witness had taken the female off over to the curb and confirmed they were not in his line of fire.  Officer Wooley explained he had a "perfect backstop" of cars, saying there was no one behind the suspect if he missed. Officer Wooley stated this occurred within 1-1 ½ seconds from the time he exited the vehicle until he fired. In that 1-1 ½ seconds in addition to ordering the suspect to drop the knife, Officer Wooley also told the suspect to stop once, describing it as the last thing he said before he fired.

Officer Wooley had fired 6, 7, or 8 rounds and he stated his intention in firing the rounds was to stop the suspect from stabbing him. Officer Wooley was assessing as he fired the rounds, noting the first few rounds seemed to not have an effect on the suspect. Officer Wooley said it was not television or Hollywood and the suspect did not drop immediately onto the ground.  Officer Wooley described the suspect turned a little to his right and as Officer Wooley continued to fire, the suspect went down in a fetal position but did not drop the object in his hand. Ofc Wooley said Officer Gillett had to remove the razor blade from the suspect's hand.

Officer Wooley explained he did not advance on the suspect. He stopped firing, at which point Officer Clark and Officer Gillett moved up and handcuffed the suspect.  Officer Wooley was not aware of how many rounds Officer Clark fired and was not aware of Officer Gillett's presence at this point in the incident. Officer Wooley said Officer Clark had gone up on his own accord to handcuff and was not told by Officer Wooley to do so. Officer Wooley discussed his radio broadcast of shots fired which was covered by other radio traffic, asking for more units, and to start medical.  Officer Wooley saw Officer Gillett rendered aid to the suspect after he was handcuffed.  Officer Wooley confirmed the suspect was handcuffed for safety reasons because the suspect continued to hold what he had.  Officer Wooley explained it as standard procedure to control the suspect. Officer Wooley said he checked on Officer Clark, confirming he only asked if he was ok and did not discuss what had just occurred.  Officer Wooley said Sergeant Decosta had come up to him after the shooting and she said something along the lines of the suspect told Officer Wooley he was going to have to shoot him.

Officer Wooley was later contacted by Lieutenant Linteo and Sergeant Vonnegut. Sergeant Vonnegut asked Officer Wooley public safety questions and Officer Wooley answered them. Officer Wooley left his Body Worn Camera on until he was instructed by Lieutenant Linteo to turn it off. Officer Wooley took no other action at the scene other

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

than to tell people to go back in their house before he was escorted to the station by Officer Ferreyra. Officer Wooley confirmed he did not change or remove any items on his person prior to being photographed and did not reload or change the magazine in his pistol.

Detective Mulhern asked about the "line in the sand" and Officer Wooley confirmed there were no obstructions the suspect would have had to get through to get to him. At the time of the shooting, Officer Wooley estimated the suspect was 2-3 yards (6-9 feet) from him. Detective Mulhern asked about a box cutter specifically and what could be caused by such an instrument, to which Officer Wooley noted it took down the World Trade Center and could cause massive cuts and death. Officer Wooley further noted his body armor is not meant to stop edged weapons. Detective Mulhern asked more about the "21-foot rule" and Officer Wooley described it was developed by Deputy Dennis Tuller in Salt Lake City in which someone would run at the officer as they drew and fired one round at the target. Officer Wooley noted the average officer could fire one round from the holster with the person covering approximately 21 feet. Officer Wooley described in that zone, the person is an obvious threat to you but confirmed Tuller never said shoot someone who is 21 feet away. Officer Wooley confirmed he was in that threat zone when he exited his vehicle.

Detective Mulhern asked what Officer Wooley meant by "checked out" and Officer Wooley described the suspect had a blank stare and was purpose driven to do whatever he had in his mind. Officer Wooley noted it did not make a lot of sense and you do not advance on a uniformed police officer with a weapon when you have a gun pointed at you. Officer Wooley confirmed he did not have an opportunity to start a dialogue and could not retreat as the suspect may turn his attention back to the male and female to stab them. Officer Wooley discussed shooting while walking backward is difficult, he again did not know where his cover officer(s) were and would have lost the lighting from the headlights. Officer Wooley confirmed he had not been able to confirm at this time if anyone had been stabbed or injured and his mindset as the suspect advanced on him was he was going to try and kill him (Officer Wooley). Officer Wooley further confirmed he did fear for his own safety.

Detective Purnell asked Officer Wooley if he saw the suspect's face during the incident and he confirmed he did and did not recognize him from previous interactions. Officer Wooley did not recognize the name Agustin Gonsalez from previous interactions nor did he recognize him in the photograph Detective Purnell showed him. Detective Purnell showed Officer Wooley a crime scene photograph of the razor blade collected at the scene and he was unsure if it was what he saw that night pointed out by Officer Gillett.

Officer Wooley confirmed he was not wearing his reading glasses during the incident. Officer Wooley did not recall any other radio traffic or yelling from officers while the incident was unfolding. Detective Mulhern asked about Officer Wooley's reference to a "line in the sand" and Officer Wooley explained it as the closest he was going to allow the suspect to get without using some sort of force to stop him. Officer Wooley noted he would allow him to get to that point and no further, as at that point he was too close for

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

his own safety. Officer Wooley described he gave the suspect enough opportunity to stop his actions on his own without Officer Wooley resorting to the use of force. Officer Wooley stated that point was the 2-3 yards (6-9 feet).  Officer Wooley confirmed he had made eye to eye contact with the suspect but got no response, again discussing the blank look and the decision the suspect had already made in his own mind.

Detective Purnell turned the interview over to the District Attorney's Office.  Officer Wooley confirmed he had reviewed his Body Worn Camera video 30 minutes prior to the interview and that was the only time he viewed it.  DA Inspector Basa confirmed the word informant refers to the reporting person of the incident.  Officer Wooley again confirmed the weapon had only been described as a knife and never a box cutter or similar. Officer Wooley was not aware of any study to refute the "21-foot rule".  Officer Wooley explained the suspect said nothing as he advanced after saying Officer Wooley was going to have to shoot him.

DDA James asked about the priority levels for a response and Officer Wooley noted this call was a priority 2 or medium level. Officer Wooley confirmed he was made aware the call was a brandishing as he responded and a roommate had been stabbed as the initial broadcast. DDA James confirmed Officer Wooley had not seen Sergeant Decosta or her patrol vehicle upon his arrival.  Officer Wooley described the distance when he stopped from the suspect at 15 feet.  Officer Wooley explained the suspects hands were outstretched and seemed to indicate he had a box cutter.  Officer Wooley indicated the suspects hands or hand was back prior to exiting the car, but noted he lost sight of him as he exited.  Officer Wooley confirmed he remained behind his door and within a split second the suspect said you are going to have to shoot me and began advancing.  Officer Wooley described the suspect's advance as purpose driven, methodical, not rushed but not slow.  DDA James asked how Officer Wooley had gotten to a box cutter in the suspect's hand and Officer Wooley noted it was the way he was holding it and the little glimpse of what he could see, appearing to look like a blade from a box cutter. Officer Wooley confirmed he could see something.  Officer Wooley again confirmed he thought the suspect would stab him with it and thought of a box cutter as both a stabbing or slashing weapon.

Officer Wooley again confirmed he was within 6-9 feet of the suspect when he fired and was continually assessing as he did.  Officer Wooley described the suspect winced after the first few shots, turned slightly to the right, but did not drop what was in his hand. Officer Wooley continued to fire as the suspect went down but again did not drop the object so Officer Wooley fired some more.  Officer Wooley stopped firing when the suspect was down on the ground, in a fetal position and no longer advancing on him. Officer Wooley explained the threat was neutralized and over.  Officer Wooley noted he could not see the object in the suspect's hand the entire time as he was more focused on the front sight and him but could see his hands were still clasped.  Officer Wooley estimated he fired 2-3 shots before the suspect stopped but was still standing.  DDA James asked if the suspect was seen in a side view when he turned towards him, which Officer Wooley replied not completely and he could still see his hands.

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

DDA James asked about Officer Clark. Officer Wooley explained he was aware at some point Officer Clark was firing and confirmed he was still firing as Officer Clark did so. Officer Wooley confirmed Officer Gillett had taken the razor blade from the suspect and expressed he seemed shocked that it was all over a razor blade.  DDA James confirmed that the suspect was facing Officer Wooley and they had made eye contact when he said he was going to have to shoot him.

The interview was turned over to Mr. Stern who declined to ask any questions. Detective Purnell asked Officer Wooley if there was anything he had not asked about that he felt was important to which he responded no. Mr. Stern asked Officer Wooley about the comment "all this over that" (razer) and Officer Wooley stated all of it could have been avoided if the suspect had just dropped it to begin with.  **[See exhibit N]**

**Interview of Officer Michael Clark:**
The following is a summary of the interview of Officer Clark (the unedited transcript of this interview is attached to the CIB investigative file in section 9).  The interview was conducted on November 18, 2018, at 1509 hours in the HPD YFSB Conference Room and was facilitated by the following personnel:  Detective Purnell, Detective Mulhern, Alameda County Deputy District Attorney Autrey James, and Alameda County District Attorney Investigator Cesar Basa.  Officer Clark was represented by his attorney, Harry Stern, from the law firm Rains, Lucia, Stern, St. Phalle & Silver, PC.  Detective Purnell read and completed the Modified Miranda Admonishment Form with Officer Clark. Officer Clark agreed to voluntarily proceed with the interview.

It should be noted Lieutenant Averiett, Sergeant Velasquez, and I observed the interview from Sergeant Velasquez's office on the second floor of HPD on his computer via video feed. Our role was limited to that of observers and we did not ask questions or otherwise participate. Detective Purnell recorded this interview on his Digital Audio Recorder (DAR) and the original recording is attached to the CIB investigative file. In summary Officer Clark related the following about the incident:

Detective Purnell began asking Officer Clark some basic identifying information (e.g. full name, badge number, etc.).  During the beginning stages of the interview, Officer Clark described his law enforcement experience, prior work history, his issued equipment, his current work schedule, and his call sign/assignment on Thursday, November 15, 2018.

Officer Clark was hired in July of 2009 with the Hayward Police Department and had been with the Stockton Police Department for just under 2 years prior as a sworn police officer.  Officer Clark was in the Marine Corps. for 4 years as an administrator and did a combat tour in Iraqi in 2002-2003.  On the day of the incident, Officer Clark was assigned to the David Beat in the north end of the city with a call sign designator of David 34. Officer Clark said "34" was for the graveyard shift of 1800-0630 hrs.  Officer Clark explained that his hours change and he works Tuesday 0600-1830, Wednesday 1330-0200, and Thursday 1800-0630 for "Team 7".  Officer Clark is supervised by Sergeant Nuela, Sergeant Vonnegut, and Lieutenant Dorn but only Sergeant Vonnegut

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

who is responsible for the north end of the city was present on the night of the incident. Lieutenant Linteo was also noted as working the night of the incident.

Officer Clark described he has received specialized training as a Field Training Officer and with the Gang Investigation Unit in Stockton.  In the Marine Corps., Officer Clark had received extensive hand to hand combat training, firearms instruction, and gas mask/NBC (Nuclear, Biological, Chemical) training. Officer Clark noted as a Field Training Officer he is responsible for training and mentoring newly hired police officers. Officer Clark explained he was a trainee in the plainclothes Stockton PD Gang Investigation Unit, learning what the detectives did and documenting gang members. Officer Clark confirmed he has not been assigned to any other specialized assignments at the Hayward Police Department.

Officer Clark last worked Wednesday from 1330-0200 hours prior to the shift of the incident, held no secondary jobs, and did not work any extended hours.  Officer Clark stated he had consumed a 12-ounce beer around 0900 hours on Thursday.  Officer Clark confirmed he has no medical conditions that would affect his physical abilities and had slept for 5-6 hours prior to the incident shift.  Officer Clark sustained no injuries as a result of this incident and does wear contacts which he was wearing on the night of the incident.  Officer Clark has no other vision problems.

Officer Clark was wearing a Class B PDU (Patrol Duty Uniform) and none of his equipment was damaged on the shift of the incident, but his boots were collected as evidence. Officer Clark was wearing a Body Worn Camera and did activate it during this incident. Officer Clark identified the firearm he was carrying as a department issued Sig (Sauer) P320, 9mm.  Officer Clark said there was no modifications to the pistol and he was carrying department issued ammunition.  Officer Clark's magazines hold 17 rounds and another chambered round in the firearm. Officer Clark stated he had qualified on the firearm last month.  Officer Clark noted he was not carrying a backup gun but does carry a folding pocketknife clipped to his vest.

Officer Clark said he was driving Ford Explorer #275 but noted it was not his usual vehicle.  Officer Clark described the vehicle as black and white, Hayward Police Department insignias on the doors, Hayward Police on the back, and exterior emergency lighting and sirens.  Officer Clark confirmed he activated the emergency lights while responding to go through the intersection at Winton Avenue and Jackson Street and did not recall activating the emergency lights on scene other than to possibly turn the back lighting on to warn cars.  Officer Clark did note he had turned on the driver's side spotlight and confirmed he was a single unit.

Officer Clark explained the scene conditions as mid-block O'Neil Avenue, which is a city street with residential homes and apartments.  Officer Clark noted it was clear, normal temperature, with the air quality bad from the fires (Camp Fire near Paradise, Ca). Officer Clark said the street does have streetlights and porch lights, but he recalled it being more illuminated by headlights and spotlights.

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

Detective Purnell asked Officer Clark to explain the dispatch information, his response, and the actual incident itself.  Officer Clark stated it was around 2100 hours and he was parked under the overpass at the dead end of Review Way.  Officer Clark described a single beep tone was used to alert the officers of a significant call in progress.  Officer Clark heard dispatch broadcast a Hispanic male with a knife threatening people in the area of O'Neil Avenue and Orchard Avenue.  Officer Clark said they had a lot of officers working overtime on their shift, so he self-attached himself to the call to help out.  Officer Clark responded from Review Way, activated his emergency lights at Winton Avenue/Jackson Street, continued eastbound on Jackson Street, southbound on Silva Avenue, to Sycamore Avenue, Whitman Street, Mardie Street, Joanne Street, to Orchard Avenue and then to O'Neil Avenue.

As Officer Clark got to the intersection of O'Neil Avenue/Orchard Avenue, he heard Sergeant Decosta and Officer Wooley saying they were being flagged down.  Sergeant Decosta put out the name of the apartment complex on O'Neil Avenue.  Officer Clark drove northbound on O'Neil Avenue, passing a police vehicle without anyone in it.  Officer Clark parked near another police vehicle, which he thought was Officer Wooley's.  Officer Clark explained as he exited his vehicle, he saw Officer Wooley off to his left and did not see Sergeant Decosta at that point.  Officer Clark described he began walking to the front of Officer Wooley's car and saw a male wearing a red and black Pendleton walking, at a "methodical pace" toward Officer Wooley with his hand extended out.

Officer Clark believed the subject was going to hurt Officer Wooley, hearing "put down the knife, put down the knife".  Officer Clark said "he" told them the subject had a knife, the subject was continuing to approach Officer Wooley, and Officer Clark believed Officer Wooley's life was in danger, so he fired what he believed was two rounds and stopped the threat.  Officer Clark approached the subject and handcuffed him before Officer Gillet took over and rendered medical aid until the Fire Department and Paramedics could arrive.

Detective Purnell noted Officer Clark had covered a lot of information so he asked him to go back and break it down.  Detective Purnell asked Officer Clark to describe a "significant incident".  Officer Clark described it as the dispatcher making the officer aware of something like a robbery, stabbing, or shooting; something that requires immediate attention.  Detective Purnell confirmed the initial call had been a Hispanic Male with a knife and Officer Clark also noted the subject was out on the street and threatening people with the knife.  Officer Clark described that "upped the ante" and he would get there in a hurry based on the information someone was threatening with a knife.  Officer Clark did not recall any mention of someone being harmed with the knife from the original dispatch and stated he believed they had provided a clothing description of a Hispanic male in blue jeans and a red colored shirt.  Officer Clark did not recall the knife ever being described in the radio traffic nor did he recall it being referenced as anything else.

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

Officer Clark explained attaching to the call, noting he was not initially dispatched to the call, but self-dispatched via his computer so an overtime officer did not have to take a paper call (report). Officer Clark confirmed as he responded there was updated information the subject was still out with the knife, but he did not recall the details. Officer Clark described it as an ongoing situation and said it was significant in his mind as it had been going on for a while.

Officer Clark was concerned for the public and his partners as he responded, noting a knife invokes a sense of fear for the safety of anyone. Detective Purnell asked why he would fear for his safety when a knife is referenced and Officer Clark explained you could be stabbed/hurt or citizens could be hurt. Officer Clark confirmed he has responded to incidents involving knives in which he has seen it cause someone's death or great bodily injury.

Officer Clark described "flagged down" as a citizen waving down Officer Wooley and Sergeant Decosta. Officer Clark did not know the circumstances but heard them update on the radio they were being flagged down by a citizen to tell them the threat was in close proximity. Officer Clark did not know whose patrol car he had passed, but now believed it was Sergeant Decosta's. Officer Clark explained he positioned his patrol vehicle behind and to the right of Officer Wooley's and stopped in the middle of the street. Officer Clark had activated the driver's side spotlight at Orchard Avenue and O'Neil Avenue, confirming it was on as he drove up the street.

Officer Clark described his initial impression of the scene as chaos and noted he heard frantic people; people talking loudly and something making them come outside late at night. Officer Clark saw the subject going toward Officer Wooley with his hand out. The subject matched the description of the person they were being sent out to look for and he heard Officer Wooley giving the suspect commands. Officer Clark described the suspect as a Hispanic male wearing a black and white Pendleton, and explained it was obvious to him that this was the subject armed with the knife. Officer Clark heard Officer Wooley say "hey he has the knife in his hand" or something to that affect, the suspect was not obeying the commands given to him by Officer Wooley, and walked with a purpose that indicated to Officer Clark from his training and experience the suspect was a viable threat at the time to Officer Wooley.

Officer Clark estimated he was 10-15 feet from the suspect as he walked around Officer Wooley's vehicle; as was Officer Wooley from the suspect. Officer Clark heard Officer Wooley commanding the suspect to drop the knife and put the weapon down. Officer Clark again noted Officer Wooley said the suspect had the knife, but he could only see the suspect had his hands pointed out toward Officer Wooley, not something specifically in his hands. Officer Clark said the suspect had a blank stare on his face as he walked toward Officer Wooley and did not care nor would he follow instructions. Officer Clark explained he felt the suspect had a purpose to harm Officer Wooley or himself as a result of walking toward Officer Wooley. Officer Clark did not hear the suspect saying anything at this point and did not recall hearing anyone else on the street saying

**HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER**

anything either. Detective Purnell confirmed Officer Clark's mindset as he walked around the patrol vehicle was the suspect was armed and advancing on Officer Wooley.

Officer Clark drew his firearm when he saw the suspect advancing on Officer Wooley, explaining he had stopped near the hood on the front passenger side of Officer Wooley's vehicle.  Officer Clark did not give commands and asked to back track, confirming he now recalled the incident took place directly on the speed bump because he had marked his casing between the speed bumps with an FI (Field Interview) card.

Officer Clark felt he had no other force options available to him as the incident was evolving quickly and there was no time to do anything other than to discharge his firearm to protect Officer Wooley's life. Detective Purnell confirmed it was Officer Clark's mindset he was protecting Officer Wooley's life and asked if he feared for his own safety at any point.  Officer Clark noted he did not feel like he was the target but described it was outlaying in his mind that it could come very quickly in his direction.

Officer Clark noted the other people he had described were now on the sidewalk to their left and away from the suspect they were contacting. Officer Clark confirmed the suspect never turned toward him or made eye contact with him.  Officer Clark was certain he had fired two, possibly three rounds and assessed after he had fired the rounds the threat was stopped, as the suspect stopped advancing and fell to the ground. Officer Clark was aware Officer Wooley had fired during the incident and as far as he knew only, he and Officer Wooley were engaging the suspect at the time, not knowing where Sergeant Decosta was. Officer Clark described looking over to see if Officer Wooley was okay and told him he was going to move up to handcuff the suspect.  Officer Clark indicated he has been trained to handcuff the suspect and wanted to make sure he was no longer a threat by accounting for his hands. Officer Clark explained as he handcuffed the suspect, Officer Gillet arrived.

Officer Clark checked on Officer Wooley, but only to ask if he was ok. Officer Clark confirmed Officer Gillett provided medical care to the suspect. Officer Clark remembered Officer Wooley requesting fire and an ambulance to the scene. Officer Clark described he had no conversations with anyone at the scene other than to provide Sergeant Vonnegut with a public safety statement. Officer Clark also placed index cards over two casings he had located at the scene (between the two speed bumps). Officer Clark was escorted back to the police department by Officer Whites.

Officer Purnell asked Officer Clark if he recognized the suspect when he handcuffed him as someone he had contacted before to which he responded no. Officer Clark did not recognize Gonsalez's name and did not recognize Gonsalez in the single photo Officer Purnell showed him.

Detective Purnell asked about weapons at the scene and Officer Clark said he saw a box cutter under the suspect when they rolled him over to handcuff. Detective Purnell showed Officer Clark a photograph of the razor blade at the crime scene and Officer Clark said he did not recognize it from the scene. Detective Mulhern asked about the

---

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

original call type to which Officer Clark thought it was Penal Code 417, a brandishing of a weapon. Officer Clark confirmed as he was responding in his mind he was going to a criminal event. Officer Clark discussed the event was continuing to go on and thinking of the proper protection for himself and the citizens to eliminate or stop the threat. Officer Clark confirmed the weapon mentioned in this incident was a knife and he did not recall it referred to as anything else.

Detective Mulhern discussed the spotlight and headlights illumination and confirmed Officer Clark did not ever lose sight of the suspect. Officer Clark confirmed the people on the sidewalk were within a few houses of the suspect and described it appeared the suspect had been out there awhile and had drawn a crowd as a result. Officer Clark believed the people who had come out were at risk. Detective Mulhern asked about the suspect walking with a purpose and whether it fell under the term of a pre-assault indicator to which Officer Clark said it would. Officer Clark noted the suspect was within the 10-15 feet indicated when he began firing and interpreted the suspect's hands as he had something in them with the intent to harm Officer Wooley.

Detective Purnell asked about Officer Clark using a flashlight. Officer Clark only used a flashlight after the incident to check the scene. Detective Purnell turned the interview over to the District Attorney's Office.

DA Inspector Basa asked about Officer Clark reviewing his Body worn Camera video, to which he noted he had reviewed it prior to the interview.  DA Inspector Basa asked about Officer Wooley telling the suspect to drop the knife and Officer Clark described Officer Wooley had said he's got the knife to him (Officer Clark) and Sergeant Decosta. Officer Clark confirmed Officer Wooley had discharged his own firearm about the same time that he (Officer Clark) discharged his and noted he only heard it.  DA Inspector Basa discussed distances with Officer Clark who described the initial contact had taken place 20 feet from Officer Wooley and the suspect had moved to within 10 feet of Officer Wooley when Officer Clark discharged his weapon. Officer Clark confirmed he did not hear the suspect say anything or make any sounds as he approached Officer Wooley.

DDA James discussed Officer Clark's arrival on scene, passing the first patrol vehicle and stopping behind Officer Wooley's patrol vehicle. Officer Clark explained positioning behind the hood of Officer Wooley's vehicle, looking over the top of the vehicle seeing the suspect the entire time, and utilizing the vehicle as a barrier and buffer between him and the suspect.  Officer Clark described hearing Officer Wooley saying drop the knife or he's got a knife around the passenger door.  Officer Clark described Officer Wooley giving repeated commands until there was no other option.  Officer Clark explained he saw the suspect coming at Officer Wooley with his hands extended in a way to harm Officer Wooley when he fired. Officer Clark indicated the suspect had his hands clinched/cupped together but again confirmed he could not see what was in his hands. Officer Clark told DDA James the suspect was continuing to advance on Officer Wooley when he fired.

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

Officer Clark described the box cutter under the suspect as a metal 4" standard box cutter and noted he was not looking when asked if he saw anything else. Officer Clark confirmed he had not searched the suspect and did not recall hearing anyone had been injured as he responded to the scene.  Officer Clark thought he recalled the argument was over something with a boyfriend/girlfriend.  DA Inspector Basa asked about Officer Clark's backdrop to which Officer Clark noted it was a white van, essentially the engine block.  Detective Purnell confirmed Officer Clark had not moved his vehicle after the incident and that he heard Officer Wooley say he has the knife and not over the radio. Officer Clark recalled hearing no other radio traffic from Officer Wooley or Sergeant Decosta during the incident.  Detective Purnell turned the interview over to Mr. Stern who asked about Officer Clark activating his body worn camera. Officer Clark noted he had activated it right after the incident but due to being told to curtail productivity due to the smoke/air quality it was not initially turned on for his shift.  [**See exhibit O**]

## Agustin Gonsalez' Injuries:
On November 15, 2018, Mr. Gonsalez was transported in an ambulance to Eden Medical Center with multiple gunshot wounds. Mr. Gonsalez was admitted to the Emergency Room at 2136 hours and his death was pronounced by Dr. J. Lesher at 2302 hours after life saving measures failed.

Based on the Amended Autopsy Report of Mr. Gonsalez by Chief Forensic Pathologist Doctor Michael Ferenc, photographs, and the supplemental reports, Mr. Gonsalez suffered from multiple gunshot wounds. He had penetrating gunshot wounds to the following areas: right chest, left upper arm, right upper abdomen, right buttock, right groin, back of right thigh, right thigh, and right calf. He also had perforating gunshot wounds to the right lower back, right thigh, left thigh, left hip, left chest/abdomen, and proximal left thigh.

Dr. Ferenc also noted Mr. Gonsalez had superficial sharp force injuries to his right hand and left wrist as well as superficial blunt injuries to his right elbow. He also had multiple linear scars approximately 2-3 inches in length on his left forearm. These injuries are consistent to that of a razor blade or similar object.

Dr. Ferenc listed Mr. Gonsalez' cause of death was from multiple gunshot wounds. [**See exhibit P**]

## Weapons Status and Range Qualification:
Officer Wooley's Department issued pistol is described as follows:  Sig Sauer model P226, .40 caliber semi-automatic pistol, serial number U686276.  Officer Wooley's Department issued pistol was collected and examined at the HPD by Detective Sprague with assistance from CST Marquez.

During the examination, Detective Sprague noted the following:  the magazine recovered from the pistol's magazine well contained three (3) live WIN .40 caliber S&W cartridges (these magazines are designed to hold twelve (12) live cartridges) and there was one (1) live WIN .40 caliber S&W caliber cartridge inside of the pistol's chamber.

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

Detective Sprague also recovered two (2) pistol magazines from Officer Wooley's duty belt.  Upon examination, the two (2) magazines each contained twelve (12) live WIN .40 caliber S&W cartridges.

It should be noted that the number of live .40 caliber cartridges in Officer Wooley's pistol immediately following this OIS was consistent with the number of expended cartridges recovered at the scene (thirteen (13) total cartridges (twelve (12) in the magazine and one (1) in the chamber prior to the OIS) – nine (9) cartridges (expended during OIS) = four (4) live cartridges in his pistol).

In addition to Officer Wooley's Department issued firearm, he was also carrying a personally owned back-up firearm. The back-up firearm was a Glock 42, .380 caliber, serial number was AAWH750.  There was one magazine which was the one that had been inside the firearm.  The magazine had a maximum capacity of 6 rounds. Detective Sprague noted the following:  the magazine recovered from the pistol's magazine well contained six (6) live .380 caliber cartridges and there was one (1) live .380 caliber cartridge inside of the pistol's chamber. Detective Sprague removed all the rounds from the magazine and there was a total of 6. All the rounds were .380 caliber. CST Marquez photographed the firearm, magazine, and rounds of ammunition. The firearm, magazine, and ammunition were returned to Officer Wooley.

I obtained Officer Wooley's range qualification records and additional pertinent training records from the HPD Personnel and Training Division for the calendar year 2018 (dates prior to the OIS).  They are listed below:

- Range Qualification (September 8, 2018) – Sig Sauer P226 .40 cal
  (S/N U686148)  Qualified: Yes   Instructors: Officer Harden **[See exhibit Q]**

- Policy 300 Use of Force Update Sign Off Sheet (April 20, 2018) – Signed by Officer Wooley on April 24, 2018. **[See exhibit R]**

Officer Clark's Department issued pistol is described as follows:  Sig Sauer model P320, 9mm semi-automatic pistol, serial number 58L379548.  Officer Clark's Department issued pistol was collected and examined at the HPD by Detective Sprague with assistance from CST Marquez.

During the examination, Detective Sprague noted the following:  the magazine recovered from the pistol's magazine well contained thirteen (13) live WIN 9mm caliber S&W cartridges (these magazines are designed to hold seventeen (17) live cartridges) and there was one (1) live WIN 9mm caliber S&W cartridge inside of the pistol's chamber.  Detective Sprague also recovered two (2) pistol magazines from Officer Clark's duty belt. Upon examination, the two (2) magazines each contained seventeen (17) live WIN 9mm caliber S&W cartridges.

It should be noted that the number of live cartridges in Officer Clark's pistol immediately following this OIS was not consistent with the number of expended 9mm cartridges

---

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

recovered at the scene (eighteen (18) total cartridges (seventeen (17) in the magazine and one (1) in the chamber prior to the OIS) – three (3) cartridges (expended during OIS) = fourteen (14) live cartridges in his pistol). Officer Clark's live cartridges in his pistol totaled thirteen (13). There are several reasons that can explain the one unaccounted for cartridge.

There was one unaccounted for live cartridge missing from Officer Clark's pistol before the OIS or a missing expended cartridge was not located at the scene.

Based on Sergeant Decosta's BWC footage, I can see Officer Clark fire three rounds, which is the number of expended cartridges recovered at the scene. An assumption can be made is Officer Clark's loaded pistol at the time of the OIS only contained 17 cartridges instead of the full capacity of 18 (one duty loaded in the chamber and a full magazine of seventeen cartridges). This can occur when an officer loads a full magazine of seventeen rounds into the pistol and charges the weapon without adding another cartridge to the magazine to replace the one that was just loaded into the chamber.

I obtained Officer Clark's range qualification records and additional pertinent training records from the HPD Personnel and Training Division for the calendar year 2018 (dates prior to the OIS).  They are listed below:

-   Range Qualification (October 15, 2018) – Sig Sauer P320 9mm
    (S/N 58L379548)  Qualified: Yes   Instructors: Officer Wooley and Officer Agustin
    **[See exhibit S]**

-   Policy 300 Use of Force Update Sign Off Sheet (April 20, 2018) – Signed by
    Officer Clark on May 24, 2018. **[See exhibit T]**

**Exhibits:**

    A. HPD Policy 300 – Use of Force
    B. OIS Criminal Investigation and Attachments (thumb drive)
    C. Detail Call For Service Report
    D. Radio Traffic (thumb drive)
    E. Axon Body 2 Camera Specifications
    F. Officer Wooley's BWC Video (thumb drive)
    G. Officer Clark's BWC Video (thumb drive)
    H. Sergeant Decosta BWC still photographs
    I.  Sergeant Decosta BWC Video (thumb drive)
    J. Oscar Cisneros Interview (thumb drive)
    K. Christina Rodrigues Interview (thumb drive)
    L. Christopher Martinez Interview (thumb drive)
    M. Sergeant Decosta Interview (thumb drive)
    N. Officer Wooley Interview (thumb drive)
    O. Officer Clark Interview (thumb drive)
    P. Amended Autopsy Protocol Memorandum

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

Q.  Officer Wooley's Range Qualification Record
R.  Officer Wooley's Policy 300 Update Sign Off Record
S.  Officer Clark's Range Qualification Records
T.  Officer Clark's Policy 300 Update Sign Off Record
U.  Force Science Information and Reports

**Conclusions:**

Based on a review of the evidence in this case, including the interviews of Officer Wooley, Officer Clark, and the identified witnesses, I was able to determine the following:  Based upon the totality of the circumstances, Officer Wooley  reasonably believed Mr. Gonsalez posed an imminent threat of death and/or serious bodily injury to himself as well as to Mr. Cisneros and Ms. Rodrigues.  During the encounter Mr. Gonsalez gave Officer Wooley a very blank, thousand-yard stare and exclaimed, "You're going to have to shoot me".  Mr. Gonsalez disobeyed several orders from Officer Wooley to "put the knife down" and "stop" as Mr. Gonsalez advanced on him with an edged weapon.

If Officer Wooley did not stop Mr. Gonsalez from advancing towards him with an edged weapon, Mr. Gonsalez could have cut or stabbed Officer Wooley creating great bodily injury or death. Fearing for his life and for the safety of others, Officer Wooley fired his Department issued pistol, striking Mr. Gonsalez multiple times until he stopped his advance. Officer Wooley's fear of death and/or serious bodily injury, combined with his training/experience, led to his decision to fire his Department issued pistol at Mr. Gonsalez. Based on Officer Wooley's BWC video and audio, from the time Officer Wooley opened his vehicle door, got out and drew his pistol, verbalized commands (to put the knife down and stop) and fired his first shot was approximately 8 seconds. Officer Wooley fired his eight shots in approximately two seconds, which is verified in the BWC video.

Officer Wooley fired his first shot after Mr. Gonsalez advanced on him with a blank stare and a suspected knife in his hand after he was ordered to stop and drop the knife several times. Based on the testimony, BWC video, and Mr. Gonsalez's injuries as listed on the updated Autopsy Protocol and Schematic Injury Diagram, I suspect Officer Wooley's initial shots hit Mr. Gonsalez in the front torso and upper legs. About a second after the initial shot, Mr. Gonsalez steps back with his right foot and does a quarter turn to his right. I suspect several rounds then strike the exposed left side of Mr. Gonsalez as he continues to rotate right to expose his back as he falls to the pavement landing on his right side after another second passes. I suspect several rounds strike the rear lower half of Mr. Gonsalez body.

Once Mr. Gonsalez was on the ground and no longer an active threat, Officer Wooley stops firing his pistol and gives Mr. Gonsalez verbal commands to not move his hands. Officer Wooley covers Officer Clark and Officer Gillett as they handcuff Mr. Gonsalez.

Officer Clark was positioned on the front passenger side quarter panel of Officer Wooley's patrol vehicle after he arrived on scene to cover Officer Wooley. Fearing Mr.

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

Gonsalez was advancing to kill or cause great bodily harm to Officer Wooley, Officer Clark fired his Department issued pistol striking Mr. Gonsalez multiple times. Based on Sergeant Decosta's BWC video and audio, from the time Officer Clark opened his vehicle door, got out and drew his pistol, and took a position of cover by Officer Wooley's vehicle and fired three rapid shots was approximately 8 seconds. Officer Clark fired his three shots within two seconds, which is verified in the BWC video.

Officer Clark fired his first shot after he saw Mr. Gonsalez advance on Officer Wooley with a suspected knife in his hand after he heard Officer Wooley ordering, "put down the knife, put down the knife". Officer Clark feared Officer Wooley's life was in danger so he fired to stop the threat. Officer Clark did not have his BWC activated at the time of the shooting. Sergeant Decosta had her BWC activated as she stood to the rear and right of Officer Clark. Her BWC video does not show Officer Clark's view of Mr. Gonsalez during the shooting as her pistol obstructs the view. Her video shows Officer Clark's three expended shell casings from his pistol fall towards the pavement and approximately a second later Mr. Gonsalez can be seen falling on the pavement.

Based on the testimony, BWC video, and Mr. Gonsalez's injuries as listed on the updated Autopsy Protocol and Schematic Injury Diagram, I suspect Officer Clark's shots hit Mr. Gonsalez on either the left side or rear of his body. This is based on Officer Clark's positioning to the left of Mr. Gonsalez and the fact Mr. Gonsalez rotated to his right and away from Officer Clark. Officer Clark stopped shooting before Mr. Gonsalez landed on the pavement.

Officer Clark approached the subject and handcuffed him before Officer Gillett took over and rendered medical aid until the Fire Department and Paramedics could arrive.

Emergency medical personnel were summoned and Mr. Gonsalez was transported to Eden Hospital where he succumbed to his injuries.

I have attended training by the Force Science Institute (FSI) and received certification at the completion of the training. I referred to published information regarding action and reaction times produced by the Force Science Institute, which also includes publications from Law Enforcement Executive Forum, Active Response Training, and The Police Marksman to evaluate this shooting. [**See exhibit S**]

FSI research reported the following timing results for an officer to recognize a threat stimulus sound of a buzzer and to respond with a single firearm discharge:

* Finger on trigger, simple, unsighted reaction time = .35 second

* Finger on frame, simple unsighted reaction time = .45 second

FSI research reported the following regarding average shooting response times from a low ready downward position:

---

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

* Weapon in low ready (45-degree angle) with the finger on frame, raise the weapon, acquire sight picture, fire one round = .83 second

* Time to move the weapon from the low-ready position to a position on target = .64 second

* Time to acquire a sight picture after moving the weapon from between 6-22 inches to a position on target = .18 second

The FSI has conducted studies on the time it takes for an officer to recognize a threat has been stopped and to stop shooting. This type of study evaluates the time it takes for an officer to not only react to a stimulus to shoot, but also the reaction time to recognize the elimination of the threat and to stop shooting. The Tempe Study by FSI reported officers fire on average two additional shots, sometimes three, after receiving a stimulus cue to stop shooting. This study applied to officers who were instructed to shoot rapidly until seeing the stop shoot stimulus.

Officer Wooley and Officer Clark have received training throughout their careers to fire two shots and assess the threat. Officer Wooley and Officer Clark's training and the known reaction time information support Officer Wooley and Officer Clark would likely have fired 2 or more shots under a stressful dynamic life-threatening encounter. FSI studies have shown officers can begin shooting in as little as .35 seconds and can continue to pull the trigger on a semi-automatic handgun as rapidly as .18 seconds per trigger pull. The FSI studies have shown officers time to stop shooting is .31 seconds. Studies on the human ability to recognize a change in conditions and implement a new action range from .25-.75 seconds.

The FSI has studied why a suspect is shot in the back. Based on the motion of the 180-degree rotation, and with a subject (weapon in hand) who only inadvertently pointed it at the officer, the time was .54 seconds.

The FSI studies described above are relevant to this incident because they provide data related to the ability of an officer to perceive and react in a dynamic event. The time estimates provided by Officer Wooley and Officer Clark and the BWC video support this shooting occurred in approximately two seconds after the first round was fired. Officer Wooley's testimony and his BWC video show Officer Wooley facing Mr. Gonsalez as he advanced towards him armed with an edged weapon. When Mr. Gonsalez was approximately fifteen feet away, Officer Wooley started firing his pistol. About a second later, Mr. Gonsalez stepped back and rotated 180 degrees away from Officer Wooley. Based on the FSI study, Mr. Gonsalez could change his position from facing Officer Wooley to rotating 180 degrees away from him in .54 seconds. Add the delay of a second before rotating for a total time of 1.54 seconds.

Officer Wooley's decision to shoot an advancing Mr. Gonsalez, who was armed with an edged weapon, was initiated when the suspect was approximately fifteen feet away. Mr. Gonsalez did not initiate his step back and rotation to his right until a second after the

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

first shots were fired. This explains how multiple shots hit Mr. Gonsalez ranging from the front, left, and rear of his body.

If .35 seconds are used to initiate Officer Wooley's shooting and the subsequent seven shots can be fired in .18 seconds (.18 x 7 = 1.26) and the time to recognize a change in conditions and implement a new action at .25 seconds and the time to stop shooting at .31 seconds is added together, it brings a total time of 2.17 (.35 + 1.26 + .31 + .25 = 2.17) seconds to recognize and stop shooting. This reaction time explains why some of the rounds hit Mr. Gonsalez in the back as he turned away from Officer Wooley.

If .35 seconds are used to initiate Officer Clark's shooting and the subsequent two shots can be fired in .18 seconds (.18 x 2 = .36) and the time to recognize a change in conditions and implement a new action at .25 seconds and the time to stop shooting at .31 seconds is added together, it brings a total time of 1.27 seconds (.35 + .36 + .25 + .31 = 1.27) to recognize and stop shooting. This explains why some of the rounds hit Mr. Gonsalez in the back as he turned away from Officer Wooley.

**HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER**

Based on the totality of this investigation I subsequently offer the following finding for Officer Clark:

**Findings:**
*300.3 USE OF FORCE POLICY*
*Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.*

*The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.*

*Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.*

*It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.*

*While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.........***Exonerated**

*300.4 USE OF FORCE POLICY - DEADLY FORCE APPLICATIONS*
*Use of deadly force is justified in the following circumstances:*
   *(a) An officer may use deadly force to protect him/herself or others from what he/she reasonably believes would be an imminent threat of death or serious bodily injury.*
   *(b) An officer may use deadly force to stop a fleeing subject when the officer has probable cause to believe that the person has committed, or intends to commit, a felony involving the infliction or threatened infliction of serious bodily injury or death, and the officer reasonably believes that there is an imminent risk of serious bodily injury or death to any other person if the suspect is not immediately apprehended. Under such circumstances, a verbal warning should precede the use of deadly force, where feasible.*

   *Imminent does not mean immediate or instantaneous. An imminent danger may exist even if the subject is not at that very moment pointing a weapon at*

---

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

*someone. For example, an imminent danger may exist if an officer reasonably believes any of the following:*

1. *The person has a weapon or is attempting to access one and it is reasonable to believe the person intends to use it against the officer or another.*
2. *The person is capable of causing serious bodily injury or death without a weapon and it is reasonable to believe the person intends to do so*.........**Exonerated**

I certify the content of this investigation to be true and correct:

_____          _____
Sergeant James Javier                                              09-04-19
                                                                                Date

I have read and understand the content of this administrative investigation.

_____          _____
Officer Michael Clark                                              10-30-19
                                                                                Date

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

Based on the totality of this investigation I subsequently offer the following finding for Officer Wooley:

**Findings:**
*300.3 USE OF FORCE POLICY*
*Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.*

*The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.*

*Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.*

*It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.*

*While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.........* **Exonerated**

*300.4 USE OF FORCE POLICY - DEADLY FORCE APPLICATIONS*
*Use of deadly force is justified in the following circumstances:*
  *(c) An officer may use deadly force to protect him/herself or others from what he/she reasonably believes would be an imminent threat of death or serious bodily injury.*
  *(d) An officer may use deadly force to stop a fleeing subject when the officer has probable cause to believe that the person has committed, or intends to commit, a felony involving the infliction or threatened infliction of serious bodily injury or death, and the officer reasonably believes that there is an imminent risk of serious bodily injury or death to any other person if the suspect is not immediately apprehended. Under such circumstances, a verbal warning should precede the use of deadly force, where feasible.*

  *Imminent does not mean immediate or instantaneous. An imminent danger may exist even if the subject is not at that very moment pointing a weapon at*

---

HIGHLY CONFIDENTIAL - PROTECTED BY COURT ORDER

*someone. For example, an imminent danger may exist if an officer reasonably believes any of the following:*

3. *The person has a weapon or is attempting to access one and it is reasonable to believe the person intends to use it against the officer or another.*
4. *The person is capable of causing serious bodily injury or death without a weapon and it is reasonable to believe the person intends to do so………***Exonerated**

I certify the content of this investigation to be true and correct:

_____          09-04-19
Sergeant James Javier                                _____
                                                                         Date

I have read and understand the content of this administrative investigation.

_____          10/30/2019
Officer Phillip Wooley                                 _____
                                                                         Date