United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AGG, et al.,

Plaintiffs,

v.

CITY OF HAYWARD, et al.,

Defendants.

Case No. 19-cv-00697-DMR

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 54

This case arises out of the fatal shooting of Agustin Gonsalez by officers of the Hayward Police Department. Plaintiffs are Gonsalez's minor children, AGG and ARG (through their guardian ad litem Jessica Aquino), and Gonsalez's parents, Agustin Gonsalez, Jr., and Karla Gonsalez. The complaint asserts claims under 42 U.S.C. § 1983 and related state laws against Defendants City of Hayward (the "City"), Phillip Wooley, Michael Clark, and Tasha DeCosta. Defendants move for summary judgment. [Docket Nos. 54 ("Mot."), 82 ("Reply").] Plaintiffs timely opposed. [Docket No. 72 ("Opp.").] The court held a hearing on August 13, 2020.

Having considered the parties' submissions and oral argument, the motion is granted in part and denied in part.

## I. BACKGROUND

### A. Factual Background

The following sets forth the testimony of the key witnesses about the incident at issue. The referenced exhibits are attached to the declarations of Michael Vigilia (Docket No. 55, "Vigilia Decl.") and Benjamin Nisenbaum (Docket Nos. 73, 81, "Nisenbaum Decl."). At the time of the incident, Officer Wooley, Officer Clark, and Sergeant DeCosta were employed by the Hayward Police Department. On November 15, 2018, the individual defendants responded to a dispatch call reporting a "man armed with a knife threatening people." Vigilia Decl., Ex. B, Deposition of

Michael Clark ("Clark Depo.") at 132:15-18; *see also* Nisenbaum Decl., Ex. E.

**1. Wooley's Testimony**

Wooley arrived on scene and encountered Oscar Cisneros, the individual who had called the police. Vigilia Decl., Ex. A, Deposition of Phillip Wooley ("Wooley Depo.") at 65:2-7; *see also* Nisenbaum Decl., Ex. B. Cisneros pointed at Gonsalez and said "he's over there." *Id.* Wooley saw Gonsalez and a woman later identified as Christina Rodrigues, Gonsalez's ex-girlfriend, standing in the street. *Id.* at 112:21-113:3; Vigilia Decl., Ex. D, Deposition of Christina Rodrigues ("Rodrigues Depo.") at 92:10-17; *see also* Nisenbaum Decl., Ex. L. To Wooley, it looked like Gonsalez had his hand raised as if threatening Rodrigues with a knife, although he testified that he did not remember seeing a knife. Wooley Depo. at 65:2-16; 64:6-8; 113:1-3, 13-18. Gonsalez did not appear to be touching Rodrigues, but Wooley said that she looked scared. *Id.* at 68:2-11. Gonsalez was about a foot away from Rodrigues, "close enough to stab her." *Id.* at 68:12-17. Cisneros was standing right in front of Wooley's patrol car and did not appear to be injured. *Id.* at 69:17-25. Cisneros ran forward, grabbed Rodrigues, and pulled her out of the way. *Id.* at 70:7-11. Wooley stated that no other officers were present at this time, but he knew that other officers were on their way. *Id.* at 67:7-8; 75:2-9.

Wooley got out of his car and stood behind the open door of his patrol car. Wooley Depo. at 67:4-6; 73:12-23. At that point, Gonsalez was about seven to ten yards from him. *Id.* at 77:10-13; 125:18-23. Wooley testified that Gonsalez immediately noticed him and the two made eye contact. *Id.* at 77:14-78:3. Gonsalez gave him "probably the [] blackest, blankest stare" that he has ever seen, which frightened him. *Id.* at 78:1-3. Gonsalez looked as if "he had a plan in his mind" and that there was nothing Wooley could do to change it. *Id.* at 78:5-10. Wooley then heard Gonsalez say, "You're going to have to shoot me." *Id.* at 115:21-24. Wooley took out his gun, pointed it at Gonsalez, and told him to drop the knife. *Id.* at 67:4-6, 116:1-2. Gonsalez began walking toward Wooley, his hands at about waist level in front of him. *Id.* at 117:9-15. He was illuminated by the headlights of Wooley's car, and Wooley saw a "quick glint of . . . something that was metallic." *Id.* at 44:11-17. Wooley testified that Gonsalez was walking toward him "fairly quickly." *Id.* at 85:7-9. Gonsalez took about seven steps, and then Wooley began shooting him. *Id.*

at 124:6-20. Forensics revealed that Wooley shot at Gonsalez nine times. Nisenbaum Decl., Ex. F, Opening Report of Plaintiffs' Videoforensic Expert Gregg Stutchman ("Stutchman Opening Report") at 11.

In the internal police investigation, Wooley stated that he had decided to shoot Gonsalez once Gonsalez came within a set distance of where Wooley was standing:

> In the last few years . . . we've been going through a lot of this training on, you know, putting a line in the sand, and I had already formulated if he comes any closer than that line in the sand, then he was gonna be an . . . extreme threat to me by . . . stabbing me with that knife, or turn[ing] his attention back to these two people.

Nisenbaum Decl., Ex. G, OIS Interview of Phillip Wooley at HAY638.[1]

**2. Clark's Testimony**

Clark heard over dispatch that there was a "man armed with a knife threatening people." Clark Depo. at 132:15-18. Dispatch gave a description of the man's clothes and reported that he was Hispanic. *Id.* at 136:2-6; 146:2-7. Clark drove to the indicated street and saw two patrol cars. *Id.* at 139:12-23. He saw Wooley to his left and knew DeCosta was in the area, although he did not see her. *Id.* at 139:21-140:11. Clark saw Wooley pointing a gun at Gonsalez and heard Wooley tell Gonsalez to stop and put the knife down. *Id.* at 147:7-15; 160:12-16. He saw Gonsalez holding his hands together in front of him, one over the other, as if he were holding something. *Id.* at 149:21-150:8. Gonsalez's hands were about at waist height. *Id.* at 150:14-17. According to Clark, Gonsalez was "not walking fast" but instead was "walking deliberately." *Id.* at 181:21-24. Seeing Gonsalez walk toward Wooley, Clark perceived Wooley to be in "immediate, bodily harm," and "fear[ing] for [Wooley's] death and his safety," realized that it was a "lethal force situation." *Id.* at 146:15-21; 147:7-20. Clark estimated that Gonsalez was about fifteen feet from Wooley at that time. *Id.* at 163:24-25. Clark drew his gun and shot at Gonsalez three times. *Id.* at 147:16-24; Stutchman Opening Report at 11. Clark estimated that about seven seconds elapsed between the time he got out of his car to the time he shot Gonsalez. *Id.* at 161:8-13.

[1] Citations to documents with Bates numbers omit leading zeros.

**3. DeCosta's Testimony**

DeCosta was about a mile away from the scene when the call came over dispatch. Vigilia Decl., Ex. C, Deposition of Tasha Decosta ("DeCosta Depo.") at 16:12-17:3; *see also* Nisenbaum Decl., Ex. H. It took her "less than a couple minutes" to arrive. *Id.* at 20:4-12. She saw both Wooley and Clark drive past her. *Id.* at 45:17-24. DeCosta came across someone (later identified as Cisneros) who waved her down. *Id.* at 20:13-17. She got out of her car, and the man told her something like "you gotta stop him," and pointed down the street. *Id.* at 21:20-23:3. The man began walking in the direction he was pointing. *Id.* at 22:2-12. DeCosta testified that she could not tell if Cisneros was injured, but he appeared to be panicked. *Id.* at 21:20-22:24. Ahead, she could see two people in the street, a man and a woman, and she heard the man say something like "you called the fucking police on me. They are going to have to kill me." *Id.* at 24:1-20. It looked as if they were "grabbing on each other" but it was not clear "who was grabbing who." *Id.* at 26:3-13. She could not see if the man had any weapons in his hands. *Id.* at 25:9-11. She then saw the man walk toward Wooley and heard Wooley say "drop the knife." *Id.* at 45:2-13. She heard Gonsalez say "you're going to have to shoot me." *Id.* at 47:10-16. Clark called to Wooley and Clark, "he's threatening," which she meant as "[h]e's threatening . . . suicide by cop." *Id.* at 47:16-20; 63:11-18. However, she stopped talking because "it didn't seem like [Wooley and Clark] could hear [her], and they were involved in something more critical." *Id.* at 48:1-5. She stated that if she were to continue talking, "it would [have] diverted their attention from what was going on in front of them." *Id.* at 81:1-6. Wooley and Clark then began shooting. DeCosta was a few feet behind Wooley at the time, "just . . . behind" his patrol vehicle. *Id.* at 35:11-17. Approximately six to eight seconds passed between the time DeCosta exited her vehicle to the time Wooley and Clark shot Gonsalez. *Id.* at 33:5-8.

**4. Gillett's Testimony**

Jason Gillett, another Hayward Police Department officer and not a defendant in this case, also responded to the incident. Vigilia Decl., Ex. E, Deposition of Jason Gillett ("Gillett Depo."). He saw two patrol cars, and observed Wooley standing on the side of his car with his gun drawn. *Id.* at 12:14-21. At the time Wooley and Clark began firing at Gonsalez, Gillett was approximately 300 or 400 yards away. *Id.* at 12:4-8. Gillet approached and saw Gonsalez on the ground, and Clark

United States District Court
Northern District of California

attempting to detain him. *Id.* at 13:9-14. Gillett grabbed Gonsalez's left arm to help detain him and saw a razor blade on the ground near Gonsalez. *Id.* at 13:15-19, 15:2-4. The paramedics showed up approximately five minutes later and transported Gonsalez to the hospital. *Id.* at 18:22-23, 22:4-12.

**5. Rodrigues's Testimony**

Rodrigues and Gonsalez were standing in the street when the officers arrived. Rodrigues Depo. at 92:10-17. Gonsalez was holding a razor blade to his arm as if threatening to cut himself. *Id.* at 89:1-90:7, 21-23. She knew Cisneros had called the police and reported that Gonsalez had a knife. *Id.* at 92:2-5. Rodrigues saw Wooley and Clark pull up, get out of their cars, and draw their guns. *Id.* at 94:4-7. She heard them yell "stop" or "put your weapon down." *Id.* at 94:17-22. Rodrigues yelled, "Don't shoot." *Id.* at 94:8-13; 98:12-18. She testified that she said it several times and "nobody responded to [her] at all." *Id.* at 94:10-16. Gonsalez was screaming and began walking toward the officers. *Id.* at 95:13-22, 97:2-12. According to Rodrigues, he was walking with "a tiny bit of speed" but was not walking in "an aggressive manner" or running. *Id.* at 97:5-12. She testified that he said something like "I don't care" or "You're going to have to shoot me." *Id.* at 97:13-17. Cisneros grabbed Rodrigues from behind and pulled her out of the way. *Id.* at 97:20-98:2. When Gonsalez was about ten feet from the officers, they started shooting. *Id.* at 98:19-21; 99:10-14. Rodrigues stated that "they never said 'we're going to shoot'" and "there was no warning to anybody on the street." *Id.* at 98:19-99:4. She also testified that Gonsalez had stopped walking before the police started shooting. *Id.* at 99:5-9.

**B. Procedural History**

Plaintiffs filed this case on February 7, 2019 and filed an amended complaint on April 12, 2019. The court granted in part Defendants' motion to dismiss the first amended complaint, and Plaintiffs filed the operative complaint on August 22, 2019. The remaining claims are (1) wrongful death against the individual defendants (section 1983); (2) violation of Plaintiffs' civil rights to familial relationship against Wooley and Clark (section 1983); (3) municipal liability under *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978) against the City; (4) survival action for violation of Gonsalez's civil rights against the individual defendants (section 1983); (5)

wrongful death–negligence under Cal. Civ. Pro. §§ 377.60 and 377.61 against the individual defendants; (6) violation of the Bane Act, Cal. Civ. Code § 52.1, against Wooley, Clark, and the City; and (7) wrongful death-battery against Wooley, Clark, and the City.

## II.   LEGAL STANDARD FOR SUMMARY JUDGMENT

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. *Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 248. The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *See id.* at 249.

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists. *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citations omitted). In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on the motion. *Scott*, 550 U.S. at 380.

## III.   DISCUSSION

Defendants move for summary judgment on the section 1983 claims against the individual defendants. They argue that there is no genuine dispute of fact as to the reasonableness of Wooley and Clark's use of force and that DeCosta is not liable for the actions of the other officers. In the

United States District Court
Northern District of California

alternative, they argue that the individual defendants are entitled to qualified immunity. They also move for summary judgment on Plaintiffs' *Monell* and state law claims.

**A. Excessive Force**

A claim of excessive force in the context of an arrest or investigatory stop implicates the Fourth Amendment right to be free from "unreasonable . . . seizures." U.S. Const. amend. IV; *see Graham v. Connor*, 490 U.S. 386, 394 (1989). Courts analyze claims of excessive force under an "objective reasonableness" standard. *Bryan v. MacPherson*, 630 F.3d 805, 817 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 395). The controlling question is whether the officers' actions are objectively reasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation" and without the "20/20 vision of hindsight." *Graham*, 490 U.S. at 396-97. "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396 (citations and internal quotation marks omitted).

Because the reasonableness standard is not capable of precise definition or mechanical application, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. The "most important single element" is whether there is an immediate threat to safety. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). These factors "are not exclusive. Rather, [the court] examine[s] the totality of the circumstances and consider[s] 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan*, 630 F.3d at 826 (citing *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)). Courts also consider the "'quantum of force' used to arrest the plaintiff, the availability of alternative methods of capturing or detaining the suspect, and the plaintiff's mental and emotional state." *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010) (internal citations omitted). When the challenged force is deadly force, it "satisfies Fourth Amendment standards '[w]here the officer has probable cause to believe that the

United States District Court
Northern District of California

suspect poses a threat of serious physical harm, either to the officer or to others.'" *Blanford v. Sacramento Cty.*, 406 F.3d 1110, 1115 (9th Cir. 2005) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

"[T]he reasonableness of force used is ordinarily a question of fact for the jury." *Liston v. Cty. of Riverside*, 120 F.3d 965, 976 n. 10 (9th Cir. 1997). "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (internal quotations and citations omitted). However, "defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Scott*, 39 F.3d at 915.

**1. Reasonableness of Force**

Defendants argue that the use of deadly force was reasonable as a matter of law under the totality of the circumstances. According to Defendants, the undisputed facts establish that the officers responded to a dispatch call about a man with a knife; Gonsalez began walking toward Wooley; he had his hands clasped in front of him as if holding something; Wooley saw a "glint of something metallic" in his hands; Wooley ordered Gonsalez to stop and drop his weapon and Gonsalez did not comply; and Gonsalez approached to within ten to fifteen feet from Wooley before the officers began shooting. Mot. at 9-10. Defendants contend that these facts support the officers' reasonable belief that Gonsalez posed an immediate threat to Wooley. Plaintiffs respond that Gonsalez was not threatening anyone when the officers arrived; there were no reports of injuries and no one appeared to be injured; neither Wooley nor Clark saw a knife and there was in fact no knife; Rodrigues and Cisneros had moved away from Gonsalez and were not in any immediate danger; Gonsalez was only walking and not running toward Wooley; Gonsalez had slowed or stopped when the officers began shooting;[2] Wooley could have retreated but did not; and Wooley

[2] Rodrigues testified that Gonsalez was no longer walking when the shooting started. Rodrigues Depo. at 99:5-9. Both Plaintiffs' videoforensic expert Gregg Stutchman and Defendants' expert

could have used less lethal force but did not attempt to do so.  Opp. at 17-18.  Plaintiffs also emphasize that the officers fired a total of twelve shots (nine by Wooley and three by Clark), and that two of these shots were fired after Gonsalez was lying on the ground.  Plaintiffs argue that under these circumstances, it was unreasonable for the officers to believe that Gonsalez posed an immediate threat that justified the use of deadly force.

The court concludes that the reasonableness of the officers' actions presents a triable issue of fact.  Defendants' cases are readily distinguishable.  In *City & Cty. of San Francisco, Calif. v. Sheehan*, the U.S. Supreme Court found that police officers reasonably used potentially lethal force when confronting a mentally ill woman (Sheehan) with a knife.  575 U.S. 600 (2015).  Sheehan had threatened to kill three people, including the officers.  *Id.* at 1771, 1775.  One of the officers attempted to subdue her with pepper spray but she continued to approach.  *Id.* at 1775.  She was only a few feet away from an officer (who could not retreat because the door behind him was closed) when the police shot at her twice, and then shot several more times after she did not collapse.  *Id.* at 1770-71.  By contrast, in this case, it is undisputed that Gonsalez did not verbally threaten the officers.  Even if Gonsalez was holding a razor blade, as Plaintiffs concede was likely, a reasonable juror could determine that he was not wielding it or threatening to use it on others.  Wooley testified that although he saw a "glint of something metallic" in Gonsalez's hands he made no further attempt to determine whether it was a knife.  *See* Wooley Depo. at 84:6-18.  Also dissimilar to *Sheehan*, Wooley did not attempt to use less lethal means such as his Taser or pepper spray.  In fact, he testified that he discounted the idea of using his Taser before he was even on scene.  Wooley Depo. at 105:13-20 ("Q: The first and last time you recall giving consideration to using your Taser was while driving to the scene before you had seen Mr. Gonsalez, correct? . . . THE WITNESS: Yes.").  Finally, Sheehan was closer to the officers when they finally shot her, and the officers had no way

---

Scott Seaman determined, based on an analysis of the video, that Gonsalez was slowing or had stopped moving forward before the first gunshot was fired.  *See* Stutchman Opening Report at 11 (reporting that "Mr. Gonsalez stopped and started leaning down . . . before the first gunshot was fired"); Nisenbaum Decl., Ex. K, Deposition of Scott Seaman ("Seaman Depo.") at 88:16-21 ("I do think the first shot was at a point as Mr. Gonsalez . . . was stopping his movement forward.").  Stutchman testified that the time between Gonsalez stopping and the first shot was approximately 300 milliseconds.  Stutchman Opening Report at 11.

United States District Court
Northern District of California

to retreat. Here, by contrast, it appears to be undisputed that Wooley had the option of moving away from Gonsalez and creating more time to assess the situation.

*Lal v. California* is also inapposite. *See* 746 F.3d 1112 (9th Cir. 2014). There, the suspect led police on a high-speed car chase that put other motorists at risk, then threw rocks at the officers and ultimately approached them holding a large rock above his head. *Id.* at 1114-15. The Ninth Circuit held that the officers reasonably believed that the suspect would throw the rock at them and therefore the use of deadly force was justified. *Id.* at 1117. By contrast, in this case a reasonable juror could determine that it was unreasonable for Wooley or Clark to believe that Gonsalez was wielding a weapon that posed an immediate threat to their safety. A juror could reasonably conclude that Gonsalez had his hands clasped in front of him at waist level and that Wooley began shooting before verifying whether Gonsalez had a weapon, despite having the opportunity to move away and further evaluate the situation.

Defendants also rely on *Watkins v. City of San Jose*, another case where officers shot a suspect who had a knife. *See* Case No. 15-cv-5786-LHK, 2017 WL 1739159 (N.D. Cal. May 4, 2017). As with *Sheehan* and *Lal*, *Watkins* is also distinguishable because the facts established a threat to the officers that was more immediate and apparent than those presented here. In *Watkins*, the officers clearly saw a knife in the suspect's hand with the tip "pointed up." *Id.* at *1. The suspect ignored the officers' multiple commands to stop and drop the knife and instead began sprinting toward the officers. *Id.* at *2. He covered a total distance of approximately 130 feet and was about 17 feet away from the officers they began shooting. *Id.* at *3. Here, by contrast, it is undisputed that Wooley and Clark began shooting without verifying that Gonsalez had a knife. A reasonable juror could determine that Gonsalez did not raise a weapon or appear to be imminently ready to attack. It is also undisputed that Gonsalez was not running toward Wooley. While Defendants argue that Gonsalez "could have" broken into a run at any time, there is no record evidence to suggest that he was about to do so before the officers shot him. Indeed, a reasonable juror could conclude that Gonsalez had in fact stopped advancing before Wooley shot him. *See supra* fn. 2.

The other cases cited by Defendants contain similar material distinguishing factors. *See J.A.L. v. Santos*, Case No. 15-cv-00355-LHK, 2016 WL 913743 (N.D. Cal. Mar. 10, 2016), *aff'd*,

724 F. App'x 531 (9th Cir. 2018) (finding a reasonable use of deadly force where the suspect had a knife over twelve inches long, ran at the officers while wielding it, and an officer attempted to use a Taser before shooting him); *Robbins v. City of Hanford*, 2006 WL 1716220, at *9 (E.D. Cal. June 19, 2006) (finding that officers did not act unreasonably in shooting a suspect who clearly had a large knife, made threatening movements with it, and the threatened officer attempted to retreat before shooting).

The cases cited by Plaintiffs are closer to the incident at issue here. In *Hayes v. Cty. of San Diego*, police officers responded to a domestic disturbance call. 736 F.3d 1223, 1227 (9th Cir. 2013). They arrived at the residence in question and were met at the door by the owner of the home. *Id.* She reported that her boyfriend (Hayes) had attempted to commit suicide that night by inhaling exhaust fumes from his car. *Id.* The woman informed officers that she was concerned that Hayes would harm himself. *Id.* Two officers with holstered guns entered the house to check on Hayes's welfare. *Id.* They saw Hayes in a kitchen area about eight feet away and observed that he had his right hand behind his back. *Id.* One of the officers ordered Hayes to show his hands. *Id.* While he was taking a step or two toward the officers, Hayes raised both his hands to about shoulder level, revealing a large knife with the point tipped down. *Id.* at 1228. Both officers immediately pulled their guns and shot at Hayes. *Id.* The district court held that the use of deadly force was reasonable as a matter of law due to the threat to the officers' safety. The Ninth Circuit disagreed. While the court recognized that "threatening an officer with a weapon does justify the use of deadly force," there was "no clear evidence . . . that Hayes was threatening the officers with a knife . . . ." *Id.* at 1234. The court also discounted the officer's professed fear that Hayes had moved toward him, noting that the officers had not told Hayes to stop and he was still six to eight feet away from them when they began shooting. *Id.* The Ninth Circuit therefore reversed the district court's decision that the officers' use of force was objectively reasonable as a matter of law.

Plaintiffs' position also finds support in other Ninth Circuit authorities. *See, e.g.*, *Curnow By & Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 323 (9th Cir. 1991) (holding that officers acted unreasonably in shooting a suspect whom they had observed hitting a woman and was holding a gun, but was facing away from the officers and did not point the gun at them); *see also Deorle v.*

*Rutherford*, 272 F.3d 1272, 1280-83 (9th Cir. 2001) (finding that the threat to an officer was minimal where the suspect approached the officer with a bottle or can in his hand but the officer knew backup was on the way, had a "clear line of escape," and did not consider other, less dangerous methods of stopping the suspect). These cases illustrate that the threat of harm must be "immediate" and supported by "objective factors" justifying an officer's professed fear for his safety. *Bryan*, 630 F.3d at 826.

Plaintiffs also argue that other factors weigh in favor of finding that the officers' use of deadly force was unreasonable. First, they assert that the officers were required to consider less intrusive means of restraining Gonsalez before shooting him, citing *Smith*. *See* Opp. at 20. The law does not require police officers to employ the "least intrusive" degree of force possible. *Bryan*, 630 F.3d at 831-32. Nevertheless, courts may consider the "presence of feasible alternatives [as] a *factor*" in the analysis. *Id.* at 831 n. 15 (emphasis in original). In this case, Wooley was carrying a Taser that had two cartridges in it, so that it could be immediately fired a second time without changing cartridges. Wooley Depo. at 58:18-59:1. Although Wooley testified that Tasers do not always work, *id.* at 51:23-54:7, he also admitted that he personally experienced a Taser failure only twice in the 20-25 times he used one. *Id.* at 52:23-53:3. Moreover, Wooley explicitly acknowledged that he decided to not use a Taser before he even arrived on the scene. *Id.* at 80:4-5; 105:13-20. In examining the totality of the circumstances, a reasonable juror could conclude that Wooley unreasonably failed to consider less intrusive methods of effecting the arrest.

Plaintiffs also argue that the officers should have identified that Gonsalez had a disturbed mental state and adjusted their actions accordingly. "The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense." *Deorle*, 272 F.3d at 1282–83. Although there is no "per se rule" establishing a different legal framework for mentally ill persons, "where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed." *Id.* at 1283. In this case, both Wooley and DeCosta testified

United States District Court
Northern District of California

that they heard Gonsalez say "you're going to have to shoot me."[3]  Wooley Depo. at 71:15-20; DeCosta Depo. at 47:10-16.  Rodrigues stated that Gonsalez was holding a razor blade to his arm as if threatening to cut himself.  Rodrigues Depo. at 89:1-90:7, 21-23.  Clark testified that he had been trained in how to identify and respond to subjects who exhibited emotional disturbance, including those threatening to commit "suicide by cop."  Clark Depo. at 77:7-13.  Under the legal framework explained in *Deorle*, Gonsalez's apparent mental state is at least a factor that a jury could consider in determining whether Wooley and Clark's use of deadly force was reasonable.

Finally, Plaintiffs contend that even if the use of deadly force was permissible, it was unreasonable to shoot at Gonsalez twelve times "without reassessing [the threat] between shots." *See* Opp. at 28.  Plaintiffs' expert Stutchman opined that "[a]ny threat perceived by the officers was no longer present after gunshot #3 or certainly by #4, and [Gonsalez] was down laying on the ground in a fetal position at the time of the last two shots."  Stutchman Opening Report at 11.  The Supreme Court has determined that "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (holding that it was not unreasonable for officers to fire a total of fifteen shots at a single suspect who was driving away).  However, in *Plumhoff*, the suspect "never abandoned his attempt to flee." *Id.*  He drove away after all shots were fired and continued to drive until he crashed. *Id.*  The Court noted that "[t]his would be a different case if [the police] had initiated a second round of shots after an initial round had clearly incapacitated [the decedent] and ended any threat of continued flight." *Id.*  Whether or not Wooley actually saw that Gonsalez was incapacitated before he stopped shooting, a jury could find that it was unreasonable under the circumstances to not at least slow his rate of fire to check.

---

[3] Stutchman opines, based on his analysis of the video, that Gonsalez in fact said "you cannot shoot me."  Nisenbaum Decl., Ex. D, Stutchman Rebuttal Report at 2.  This fact does not appear to be central to the reasonableness analysis.  Defendants seem to acknowledge that it would not be justified to shoot Gonsalez just because he said "you're going to have to shoot me."  Their argument is instead that the shooting was justified based on the Wooley's perceived threat to his safety.  In any case, whatever Gonsalez said does not appear to have been clear to anyone on scene, since Plaintiffs' own witness Rodrigues also testified that she heard something to the effect of "you're going to have to shoot me."  Rodrigues Depo. at 13-17.  Further, during Wooley's deposition, Plaintiff's counsel played the video of Wooley's body cam and observed that Rodrigues seemed to be saying "you're going to have to shoot me."  Wooley Depo. at 116:3-9.

In sum, viewing the facts in the light most favorable to Plaintiffs, the court finds that a reasonable jury could conclude that the officers' use of deadly force was not objectively reasonable under the circumstances.[4]

**2. Liability Against DeCosta**

It is undisputed that DeCosta did not shoot Gonsalez. Instead, Plaintiffs argue that DeCosta is liable for the use of excessive force because (1) she was an integral participant in the constitutional violation; (2) she failed to intercede to prevent unlawful conduct; and (3) she failed to adequately supervise Wooley and Clark. These theories are addressed in turn.

**a. Integral Participation**

The integral participant rule "extends liability to those actors who were integral participants in the constitutional violation, even if they did not directly engage in the unconstitutional conduct themselves." *Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009). For example, in *Boyd v. Benton Cty.*, the Ninth Circuit found that each officer involved in a search operation was an integral participant in the decision to use a flash-bang device. 374 F.3d 773, 780 (9th Cir. 2004). Although only one officer actually threw the device, the other officers "knew of the plan to use the flash-bang, did not object to that plan, and actively participated in its operation." *Id.* at 778. In this case, there is no evidence that DeCosta participated in Wooley and Clark's decision to shoot Gonsalez. Wooley testified that he did not even know she was on scene at the time. Wooley Depo. at 67:7-8; 75:2-9. DeCosta's body camera footage shows that she attempted to communicate with Wooley and Clark and that they did not respond. DeCosta Depo. at 47:16-20; 63:11-18. There is no apparent coordination or planning between DeCosta and the two officers. Accordingly, the undisputed evidence does not support that DeCosta integrally participated in Wooley and Clark's use of excessive force.

---

[4] For the same reason, the court rejects Plaintiffs' invitation to find Defendants' conduct unreasonable as a matter of law. *See* Opp. at 25-26. A jury considering this set of facts could decide that, considering all the relevant factors, that Defendants did not act unreasonably in using lethal force. Plaintiffs' motion under Rule 56(f) is therefore denied. Similarly, the court declines to find that certain facts are established in this case, including that Gonsalez said "you cannot shoot me" and that Gonsalez had stopped walking before Wooley fired. Plaintiffs will be able to present evidence on those facts to the jury, which can then weigh the significance of that evidence in deciding whether Defendants' actions were reasonable.

United States District Court
Northern District of California

**b. Failure to Intercede**

Plaintiffs posit that DeCosta should have but did not intervene. "[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *United States v. Koon*, 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994), *rev'd in part on other grounds by* 518 U.S. 81 (1996). Officers are liable under a failure to intercede theory only if they had an opportunity to intercede. *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000). Defendants argue that DeCosta had no reasonable opportunity to intervene because of how quickly the situation unfolded and because Wooley and Clark did not hear her calling out. Reply at 16. This argument is not convincing at the summary judgment stage. Whether "an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Fernandez v. Virgillo*, 2014 WL 2930749, at *7 (D. Ariz. June 30, 2014) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)), *aff'd*, 651 F. App'x 692 (9th Cir. 2016). Here, DeCosta was close behind Wooley and called out to him and Clark before they started shooting. A jury could find that she had a reasonable opportunity to intervene because she had time to—and in fact did—insert herself into the situation and then chose to stop. A factfinder could also determine that DeCosta's professed reason for stopping is not credible. Thus, DeCosta's ability to intervene in the situation is a genuine dispute of material fact suitable for resolution at trial.

**c. Supervisory Liability**

A defendant may be held liable as a supervisor under section 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (citing *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). If a supervisory official is not directly involved in the allegedly unconstitutional conduct, then "[a] supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1208 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)). Liability can

be established if the supervisor "knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known would cause others to inflict a constitutional injury." *Dubner v. City & Cty. of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001).

Plaintiffs argue that DeCosta is liable for the other officers' use of excessive force because she did not adequately supervise her subordinates. They cite the same facts that are laid out above: that DeCosta was on scene, saw that Wooley and Clark had their firearms drawn, and could have shouted orders to them but instead "stopped trying to lead her inferior officers." Opp. at 23. Plaintiffs' police practices expert Roger Clark opines that DeCosta "fail[ed] to take command of the incident" and did not give "useful instruction," such as to "keep a safe distance, not shoot, isolate Mr. Gonsalez and arrange for the use of less lethal weapons (if necessary)." Nisenbaum Decl., Ex. I at 23. As explained above, a jury could find that DeCosta had a reasonable opportunity to intervene. A factfinder could also infer that DeCosta should have known that her failure to take control of the situation would allow her subordinate officers to inflict a constitutional injury.

Therefore, the existence of disputed material facts on DeCosta's ability to intervene precludes summary judgment on the section 1983 claims against her.

#### 3. Qualified Immunity

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The analysis involves two inquiries. First, taken in the light most favorable to plaintiff, the court must ask whether the facts alleged show that the officer's conduct violated a constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). If the answer is "no," then the court need not inquire further before ruling that the officer is entitled to qualified immunity. *Id*. If, however, "a violation could be made out on a favorable view of the parties' submissions," the court must examine "whether the [constitutional] right was clearly established." *Id*. The court may exercise its discretion in deciding "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

**a. Wooley and Clark**

**i. Excessive Force**

"The linchpin of qualified immunity is the reasonableness of the official's conduct." *Rosenbaum v. Washoe Cty*., 663 F.3d 1071, 1075 (9th Cir. 2011) (citation omitted). Above, the court determined that a reasonable jury could find that the use of deadly force by Wooley and Clark was excessive. Thus, viewing the evidence in the light most favorable to Plaintiffs, and for the purpose of analyzing the qualified immunity defense, the officers violated Gonsalez's Fourth Amendment rights.

**ii. Clearly Established Rights**

Defendants argue that Wooley and Clark are entitled to qualified immunity because it was "not clearly established at the time of the incident that using deadly force against a suspect holding a razor blade who threatened officers was unreasonable." Mot. at 13. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The Supreme Court has cautioned that specificity in determining whether "the violative nature of *particular* conduct is clearly established . . . is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*, 136 S. Ct. at 308 (quotation omitted). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix*, 136 S. Ct. at 309). However, the Supreme Court has cautioned that "officials can be on notice that their conduct violates established law even in novel factual situations." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "[I]n the absence of 'a case directly on point,' we compare 'specific factors' relevant to the excessive force inquiry to determine whether a

reasonable officer would have known that the conduct in question was unlawful."[5] *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 947 (9th Cir. 2017) (quoting *Bryan*, 630 F.3d at 826). While qualified immunity "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 1152 (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)). Finally, "[i]t is the plaintiff who bears the burden of showing that the rights allegedly violated were clearly established." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (internal quotation marks and citation omitted).

Above, the court examined the parallels between this case and similar cases that allowed constitutional questions to be decided by a jury. Where the suspect had a weapon, cases have focused on whether the individual was immediately threatening to use it. In *Hayes*, the suspect had a large knife that he raised to shoulder height while taking a few steps toward the officers. *See* 736 F.3d at 1232-35. However, the court found a triable issue of reasonableness because "there [was] no clear evidence . . . that Hayes was threatening the officers with the knife . . . ." *Id.* at 1234. In *Glenn v. Washington Cty.*, the Ninth Circuit held that a reasonable jury could find a constitutional violation where officers shot an individual holding a pocket knife that he "did not brandish at anyone." 673 F.3d 864, 873 (9th Cir. 2011). Several cases have also denied qualified immunity where the suspect had (or appeared to have) a gun but the gun was not pointed at the officers. *See Curnow*, 952 F.2d at 323-25 (determining that the officers were not entitled to qualified immunity where the individual had picked up a rifle but did not point it at the officers and was not facing them when he was shot); *Estate of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998, 1020 (9th Cir. 2017) (stating that *Curnow* gave "fair notice" that the use of deadly force is unreasonable where

[5] Multiple courts have used the "specific factor" analysis applied by *Isayeva*. *See, e.g.*, *N.E.M. v. City of Salinas*, Case No. 14-cv-5598-EJD, 2017 WL 5128008 at *9-10 (N.D. Cal. Nov. 6, 2017) (finding that defendant officers were not entitled to qualified immunity based on specific factors analyzed by various Ninth Circuit cases that were "not directly on point"), *aff'd*, 761 Fed. App'x 689 (9th Cir. 2019); *Anderson v. Virga*, 2018 WL 1556806, at *2 (E.D. Cal. Mar. 30, 2018) ("[A] right may be clearly established by a range of sources, as long as those sources define the established law."); *Smith v. City of Stockton*, 2018 WL 3831001 at *5-6 (E.D. Cal. Aug. 13, 2018), *rev'd in part on other grounds*, 2020 WL 3485140 (9th Cir. 2020); *Davis v. City of Santa Clara*, 2018 WL 1524081, at *12 (N.D. Cal. Mar. 28, 2018); *Porter v. City of Davis Police Dep't*, 2018 WL 558806, at *6 (E.D. Cal. Jan. 25, 2018), *rev'd on other grounds*, 756 F. App'x 729 (9th Cir. 2019).

"the victim does not directly threaten the officer with the gun"); *see also George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013) (holding that a reasonable jury could find a constitutional violation where it was disputed whether the suspect ever raised his gun). In each of these cases, the suspects were holding weapons but, much like Gonsalez, were not immediately threatening to use them.[6] Moreover, the apparent threat in those cases was greater because it was clear that the individuals had weapons[7] whereas neither Wooley nor Clark saw whether Gonsalez was carrying a weapon. In addition, the suspect in *Hayes* had raised his knife to shoulder level whereas Gonsalez kept his hands at waist level.

Other factors present in this case have also been examined by clear authority. With respect to disobeying police orders, the *Glenn* court found that the district court erred in granting summary judgment for the defendants where the suspect had a knife and ignored multiple orders from the officers to drop it. *See* 673 F.3d at 875. Similarly, in *Smith*, the Ninth Circuit held that the reasonableness of using less-than-lethal force was a question for a jury where the suspect ignored police commands to remove his hands from his pockets to show whether he had a weapon and physically resisted arrest. 394 F.3d at 703. Together, these cases put Defendants on fair notice that failure to follow police commands does not justify use of deadly force, particularly where it was not clear that the suspect is armed.

The availability of less lethal force has also been examined by the Ninth Circuit. In cases where "a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force." *Smith*, 394 F.3d at 704. However, where there is no immediate threat, the Ninth Circuit has held that "police are required to consider what other tactics if any were available to effect the arrest." *Bryan*, 630 F.3d at 831 (internal quotation marks and alterations omitted). In *Bryan*, the court considered the fact that an officer did not consider less serious use of force before

[6] While Defendants assert that Gonsalez "could have" started running or "could have" raised a weapon at any time, they did not point to any evidence that makes their assertion anything more than speculative. The cases cited above demonstrate that the *possibility* of using a weapon, even within a short time frame, is not enough to justify deadly force.

[7] Additionally, some of the cases involve guns which can be quickly lethal from a distance, as opposed to the perceived potential threat of a knife held by Gonsalez, who was ten to fifteen feet away from Wooley when Wooley began shooting him.

tasing the plaintiff relevant to the excessive force analysis. *See id.* In *Vos v. City of Newport*, the suspect had what appeared to be scissors in his hand, ignored police commands to drop the weapon, and ran toward the officers holding the scissors. *See* 892 F.3d 1024, 1029 (9th Cir. 2018). The Ninth Circuit found that the officers did not show that less lethal means of stopping the suspect would have been ineffective, and it was a question for the jury whether the suspect posed an immediate threat to the officers' safety. *Id.* at 1033-34. As explained above, a reasonable jury could find that Gonsalez did not pose an immediate threat to either officer, given that he was still at least ten feet away from Wooley, did not clearly have a weapon (much less a ranged weapon), and kept his hands visible and at waist level during the entire encounter. In addition, Wooley appears to have admitted that he dismissed the idea of using less serious force before even arriving on scene. In sum, when the facts are viewed in Plaintiffs' favor, they are comparable to those examined by Ninth Circuit authority and should have put the officers on notice of the potential unconstitutionality of their actions.

The cases cited by Defendants do not compel a different result. In *Kisela*, officers received a report that a woman (Hughes) was "hacking a tree with a kitchen knife" and were informed that she was "acting erratically." 138 S. Ct. at 1151. A person matching the suspect's description emerged from a house carrying a large knife and approached another woman standing nearby. *Id.* The three responding officers were separated from the two women by a chainlink fence. *Id.* They all drew their guns and told Hughes to drop the knife at least twice. *Id.* She did not "acknowledge the officers' presence or drop the knife." *Id.* One officer dropped to the ground and shot Hughes four times through the fence. *Id.* The Supreme Court held that the officer was entitled to qualified immunity because he reasonably believed that Hughes was a danger to the other woman. *Id.* at 1153. *Kisela* is distinguishable. There, it was clear that Hughes had a large kitchen knife and was "within striking distance" of another person. *Id.* at 1154. In this case, reviewing the facts in the light most favorable to Plaintiffs, neither Wooley nor Clark attempted to confirm that Gonsalez in fact had a knife. Gonsalez was not within striking distance of either the bystanders or the officers. Gonsalez had already turned away from Rodrigues and Cisneros and was walking toward Wooley. Unlike a bystander, Wooley was trained and armed. Gonsalez did not get within striking distance

of him and he had the means to retreat and consider his options or wait for backup. *Kisela* is therefore not persuasive in this case.

Defendants also cite this court's decision in *Hill v. Bay Area Rapid Transit District*. *See* Case No. 12-cv-372-DMR, 2013 WL 5272957 (N.D. Cal. Sept. 18, 2013). *Hill* is inapposite. In *Hill*, a suspect (Hill) threw a glass bottle at two officers. *Id.* at *1. One officer slipped in the liquid from the bottle and fell. *Id.* at *1. Hill then started walking toward the other officer, who saw a knife or sharp object in Hill's hand. *Id.* at *2. The officer drew his gun and ordered Hill to drop the knife. *Id.* Hill did not respond and continued walking toward the officer. *Id.* He then raised the knife and made a throwing gesture at the officer. *Id.* The officer, believing that Hill would throw the knife at him, shot Hill three times. *Id.* The situation in the current case is not similar. In *Hill*, the suspect had already thrown an object at the officers and caused one of them to fall. He not only brandished the knife but moved as if to throw it at the officers. Given that he had already thrown one object, it was reasonable for the officer to believe that he was about to throw the knife as well. Here, in the light most favorable to Plaintiffs, Gonsalez had not made any verbal threats or threatening gestures to the officers. He kept his hands clasped in front of him as he walked toward Wooley and did not brandish a knife, much less move to throw one.

In sum, each of the factors present in this case, as construed favorably for Plaintiffs, have been addressed in previously existing and binding caselaw. A finding of qualified immunity is therefore inappropriate.

**b. DeCosta**

The constitutional claims against DeCosta proceed on the theories that she failed to intervene and failed to exercise supervisory control over her subordinates. It is clearly established law that police officers "have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Koon*, 34 F.3d at 1447 n. 25; *see also Cunningham*, 229 F.3d at 1289. It has also been established by clear authority that a supervising officer can be liable for "knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known would cause others to inflict a constitutional injury." *Dubner*, 266 F.3d at 968. The applicability of either theory turns on whether DeCosta had a reasonable opportunity to intercede to prevent the

constitutional injury, which is a triable question of fact. Where, as here, there are genuine issues of fact "preventing a determination of qualified immunity at summary judgment, the case must proceed to trial." *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993).

Accordingly, the issue of qualified immunity as to DeCosta cannot be determined on summary judgment.

**B. *Monell* Liability**

A municipality may face section 1983 liability if it "'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, S. Ct. 1350, 1359 (2011) (quoting *Monell*, 436 U.S. at 692). However, the municipality may be held liable "only for '[its] *own* illegal acts.'" *Id.* (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). It cannot be held vicariously liable for its employees' actions. *Id.* (citations omitted). To establish municipal liability, plaintiffs "must prove that 'action pursuant to official municipal policy' caused their injury." *Id.* (quoting *Monell*, 436 U.S. at 691). "The 'official policy' requirement 'was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality,' and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479-80 (emphasis in original). Official municipal policy includes "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 131 S. Ct. at 1359 (citations omitted). Such policy or practice must be a "moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell*, 436 U.S. at 694). "A single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom." *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999). However, an isolated constitutional violation may be sufficient to establish a municipal policy in the following three situations: (1) "when the person causing the violation has 'final policymaking authority,'" *see id*. at 1235; (2) when "the final policymaker 'ratified' a subordinate's actions," *see id*. at 1238; and (3) when "the final policymaker acted with deliberate indifference to the subordinate's constitutional violations." *See id*. at 1240.

In this case, Plaintiffs' *Monell* claim is premised on Wooley's testimony that he decided to

United States District Court
Northern District of California

shoot Gonsalez when Gonsalez came within a predetermined distance (drawing a "line in the sand") and that he had training to do so.[8] *See* OIS Interview of Phillip Wooley at HAY638. Courts have found constitutional violations in cases where officers predetermined when they would use deadly force. *See, e.g.*, *Glenn*, 673 F.3d at 869 (officers stated that they decided to use deadly force if the suspect moved toward the door of his home); *Curnow*, 952 F.2d at 323 (officer was instructed to shoot a suspect if he picked up his rifle); *Deorle*, 272 F.3d at 1283 (emphasizing that the officer "made a calculated and deliberate decision to shoot [the suspect] when [he] reached a particular point in his peregrinations"). Predetermining the point at which to use deadly force undermines the principle that the threat must be "immediate" and supported by "objective factors" justifying an officer's professed fear for his safety. *See Bryan*, 630 F.3d at 826. Therefore, training officers to draw a "line in the sand" could be a "moving force behind a violation of constitutional rights" sufficient to subject a municipality to *Monell* liability. *See Dougherty*, 654 F.3d at 900.

However, Plaintiffs do not offer evidence of a widespread training failure beyond Wooley's bare and unspecific statement that he "had training" that led to his decision to draw a "line in the sand." Therefore, in order to establish municipal liability, Plaintiffs must show ratification of Wooley's action by a "final policymaker." *Christie*, 176 F.3d at 1235. This showing requires Plaintiffs to prove that the "authorized policymakers approve[d] a subordinate's decision and the basis for it." *Id.* at 1239. So long as Plaintiffs can show a genuine issue of material fact regarding whether ratification occurred, ratification is ordinarily a question for the jury. *Id.* at 1238-39. In this case, Wooley told the internal police investigatory board about his "line in the sand" training and answered multiple follow-up questions about it. *See* OIS Interview of Phillip Wooley at HAY638 ("[W]e've been going through a lot of this training on . . . putting a line in the sand, and I

[8] At the hearing, Plaintiffs also argued that there is *Monell* liability because the City violated its own policies. According to Plaintiffs, the City promulgates a policy that it "examines all uses of force from an objective standard," as required by *Graham*. *See* Nisenbaum Decl., Ex. R. Plaintiffs assert that during the City's investigation into the incident, the City did not apply an objective standard and instead relied on Wooley and Clark's subjective perceptions and beliefs. Opp. at 29 n. 5. This argument turns *Monell* on its head. *Monell* imposes liability when the execution of an official policy inflicts a constitutional injury. *See Monell*, 436 U.S. at 694-95. In other words, *Monell* targets unconstitutional policies. Plaintiffs do not cite any authority for the proposition that *Monell* applies to individual violations of constitutionally permissible policies.

had already formulated if he comes any closer than that line in the sand, then he was gonna be an [] extreme threat to me"); HAY657 ("Q: . . . Can you just describe for us what you mean by a line in the sand? A: It means that was as close as I was gonna allow him to get without using some sort of force in order to get him to stop. . . ."); HAY657-58 ("Q: Was that a specific line that you're referring to or was it like fluid, like as he's advancing on you – you just turn it in your mind that that is the point already? A: That is the point, yes."); HAY658 ("Q: . . . About how far away was that line . . . when this unfolded? A: About the same two to three yards."). The investigatory board explicitly acknowledged Wooley's predetermined use of deadly force in its findings and recommendation to the Chief of Police, Toney Chaplin. *See* Nisenbaum Decl., Ex. Q at HAY926 ("Officer Wooley discussed he has been trained about 'putting a line in the sand.' Officer Wooley formulated in his mind if the suspect got any closer than that line, he was an extreme threat to him."); HAY930 (recording the multiple follow-up questions relating to the "line in the sand" standard). While the board did not make any findings specific to Wooley's use of the "line in the sand," it ultimately recommended that he be exonerated of any wrongdoing. *Id.* at HAY947-48. The parties do not appear to dispute either that Chaplin had the final decision with respect to disciplinary action against Wooley or that Wooley was ultimately exonerated from wrongdoing. In light of the facts above, a reasonable jury could determine that Chaplin knew of Wooley's "line in the sand" decision because of the investigatory board's findings and recommendations and could infer that Chaplin ratified that decision by exonerating Wooley.

Because there is a genuine dispute of material fact regarding whether Wooley's allegedly unconstitutional decision to shoot Gonsalez at a predetermined distance was ratified by a final decisionmaker, the court denies Defendants' motion for summary judgment on Plaintiffs' *Monell* claim.

**C. State Law Claims**

Plaintiffs assert state law claims for negligence, battery, and violation of the Bane Act. Defendants move for summary judgment on all state law claims.

**1. Negligence**

In order to prevail on a negligence claim, Defendants must establish "(1) a legal duty to use

due care; (2) a breach of that duty; and (3) injury that was proximately caused by the breach." *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1164 (N.D. Cal. 2009) (citing *Ladd v. Cty. of San Mateo*, 12 Cal.4th 913, 917 (1996)). "[N]egligence claims under California law encompass a broader spectrum of conduct than excessive force claims under the Fourth Amendment." *Mulligan v. Nichols*, 835 F.3d 983, 991 (9th Cir. 2016). In *Hayes v. County of San Diego*, the California Supreme Court held that an officer's "tactical conduct and decisions preceding the use of deadly force are relevant considerations under California law in determining whether the use of deadly force gives rise to negligence liability." 57 Cal. 4th 622, 639 (2013).

Under California law, "peace officers have a duty to act reasonably when using deadly force, a duty that extends to the totality of the circumstances surrounding the shooting, including the officers' preshooting conduct." *Id.* at 638. The court held above that a reasonable jury could determine that Wooley and Clark's use of deadly force was excessive, which constitutes a breach of the duty articulated in *Hayes*. Accordingly, summary judgment is denied as to the negligence claim against Wooley and Clark.

With respect to DeCosta, the court previously noted the established principle that "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Koon*, 34 F.3d at 1447 n. 25. The court also held that there is a genuine dispute of material fact about whether DeCosta had the opportunity to intervene and prevent Wooley and Clark's use of excessive force. If a jury determines that DeCosta had the opportunity and failed to take it, DeCosta could be liable for breaching her duty to intercede. However, Plaintiffs do not articulate any negligence theory with respect to DeCosta's duties as a supervisor. Further, they did not respond to Defendants' argument that DeCosta is entitled to discretionary immunity under California Government Code section 820.2 for negligent acts she undertook within the scope of her authority as a supervisor. Plaintiffs have therefore waived the issue. Accordingly, while Plaintiffs' negligence claim against DeCosta may proceed based on her duty to intercede as a police officer, Defendants' motion is granted with respect to the negligence claim insofar as it relies on DeCosta's duties as a supervisor.

**2. Battery**

A state law battery claim against a police officer is "analyzed under the reasonableness standard of the Fourth Amendment to the United States Constitution." *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 (2009) (internal citation omitted). Defendants assert that Wooley and Clark's use of force was objectively reasonable under the circumstances. The court has already rejected this argument in connection with Plaintiffs' excessive force claim. Accordingly, summary judgment is denied as to Plaintiffs' battery claim.

**3. Bane Act**

California's Bane Act allows a claim for violation of a plaintiff's state or federal civil rights when the violation is achieved through "threats, intimidation, or coercion." Cal. Civ. Code § 52.1. Plaintiffs cite *Chaudhry v. City of Los Angeles* for the proposition that "a successful claim for excessive force under the Fourth Amendment provides the basis for a successful claim under § 52.1." 751 F.3d 1096 (9th Cir. 2014). However, the Ninth Circuit has since clarified that section 1983 and section 52.1 are not coextensive. *See Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018). A finding of a constitutional violation in an excessive force claim is sufficient to satisfy the "threat, intimidation, or coercion" element of section 52.1. *Id.* (citing *Cornell v. City & Cty. of San Francisco*, 17 Cal. App. 5th 766, 800 (2017), *as modified* (Nov. 17, 2017). But "the Bane Act imposes an additional requirement beyond a finding of a constitutional violation." *Reese*, 888 F.3d at 1043. A plaintiff must also show that an officer had a "specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Id.* (quoting *Cornell*, 17 Cal. App. 5th at 801). Specific intent may be shown through an officer's "reckless disregard of constitutional [or statutory] prohibitions or guarantees." *Cornell*, 17 Cal. App. 5th at 803.

Plaintiffs' Bane Act claim is brought against Wooley, Clark, and the City (under a theory of *respondeat superior*). According to Plaintiffs, Wooley and Clark at least acted in reckless disregard of Gonsalez's constitutional rights when they shot at him twelve times (including twice after he fell), even though he had not injured anyone and was not imminently threatening the officers' safety. Opp. at 29. In addition to those facts, a reasonable jury could infer reckless disregard from Wooley's predetermined decisions to not use less lethal force and to shoot Gonsalez when he was within a

United States District Court
Northern District of California

certain distance. *See Cornell*, 17 Cal. App. at 803, 804 (holding that the state of mind inquiry under the Bane Act is usually a question of fact for the jury).

Since the specific intent inquiry is suitable for determination at trial, the court denies Defendants' motion for summary judgment on Plaintiffs' Bane Act claim.

**IV. CONCLUSION**

For the reasons stated above, the court grants in part and denies in part Defendants' motion for summary judgment. Summary judgment is granted on Plaintiffs' section 1983 claims against DeCosta insofar as they rely on an integral participation theory; on Plaintiffs' negligence claim against DeCosta insofar as it relies on any duty of care that DeCosta had as a supervisor; and on the *Monell* claim insofar as it relies on the investigatory board's alleged failure to follow City policy. The motion is otherwise denied. The court also declines to grant judgment to Plaintiffs under Rule 56(f) or find that certain facts are established under Rule 56(g).

**IT IS SO ORDERED.**

Dated: October 13, 2020

Donna M. Ryu
United States Magistrate Judge